**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

JASON GARCIA, Individually and on Behalf of
All Others Similarly
Situated,

              Plaintiff,

v.

REMY INTERNATIONAL, INC., JOHN J.
PITTAS, DOUGLAS K. AMMERMAN, KARL
G. GLASSMAN, LAWRENCE F.
HAGENBUCH, CHARLES G. MCCLURE,
ARIK W. RUCHIM, GEORGE P. SCANLON,
J. NORMAN STOUT, JOHN H. WEBER,

              Defendants.

Civil No. 1:15-cv-01385-TWP-TAB

MAXINE PHILLIPS, Individually and on Behalf
of All Others Similarly
Situated,

              Plaintiff,

v.

REMY INTERNATIONAL, INC., JOHN J.
PITTAS, DOUGLAS K. AMMERMAN, KARL
G. GLASSMAN, LAWRENCE F.
HAGENBUCH, CHARLES G. MCCLURE,
ARIK W. RUCHIM, GEORGE P. SCANLON,
J. NORMAN STOUT, JOHN H. WEBER,

              Defendants.

Civil No. 1:15-cv-01343-TWP-TAB

ADDITIONAL CAPTION TO FOLLOW

| | |
|---|---|
| STEPHEN BUSHANSKY, Individually and on Behalf of All Others Similarly Situated,<br><br>         Plaintiff,<br><br>v.<br><br>REMY INTERNATIONAL, INC., JOHN J. PITTAS, DOUGLAS K. AMMERMAN, KARL G. GLASSMAN, LAWRENCE F. HAGENBUCH, CHARLES G. MCCLURE, ARIK W. RUCHIM, GEORGE P. SCANLON, J. NORMAN STOUT, JOHN H. WEBER,<br><br>         Defendants. | Civil No. 1:15-cv-1361-TWP-TAB |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT, CLASS CERTIFICATION, AND APPLICATION FOR AWARD OF ATTORNEYS' FEES AND EXPENSES**

# TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................................1

II.     BACKGROUND OF THE LITIGATION.........................................................................3

        B.      Settlement Negotiations and Confirmatory Discovery ...........................................4

        C.      Preliminary Approval and Notice to Remy Stockholders.......................................5

III.    THE SETTLEMENT TERMS......................................................................................6

IV.     THE PROPOSED SETTLEMENT SHOULD BE APPROVED .......................................9

        A.      The Applicable Legal Standard ........................................................................9

        B.      The Settlement Is Fair, Reasonable, and Adequate and Warrants Final
                Approval ...................................................................................................11

                1.      Information Concerning Remy's Projections Relied Upon By UBS.........12

                2.      Information Concerning the Financial Analyses of UBS ........................16

                3.      Information Concerning the Background of the Merger ..........................21

        C.      The Relevant Factors Support Final Approval of the Settlement .........................22

                1.      The Strength of Plaintiffs' Case Compared to the Terms of the
                        Settlement Supports Approval of the Settlement.......................................22

                2.      The Complexity, Length, and Expense of Further Litigation
                        Supports Approval of the Settlement.....................................................23

                3.      The Class Members Overwhelmingly Support the Settlement.................24

                4.      The Settlement Is the Product of Good Faith, Arm's-Length
                        Negotiations ..............................................................................25

                5.      Plaintiffs' Counsel Endorse the Settlement .............................................25

                6.      The Stage of the Proceedings and the Amount of Discovery
                        Completed ...................................................................................26

V.      THE PROPOSED SETTLEMENT CLASS SHOULD BE CERTIFIED ........................27

VI.     THE FEE AWARD SHOULD BE APPROVED..............................................................28

        A.      The Applicable Legal Standard .......................................................................28

B.     The Common Benefit Doctrine Entitles Plaintiffs' Counsel to an Attorneys' Fee Award ................................................................................................... 30

C.     Negotiated Resolutions of Fee Issues Are Preferred and Should Be Upheld ........ 31

D.     The Requested Attorneys' Fee Award Is Reasonable Under a Lodestar Analysis ................................................................................................... 33

E.     Fees Awarded in Similar Cases Support the Fee Request .................................... 34

VII.    CONCLUSION ........................................................................................... 36

# TABLE OF AUTHORITIES

## FEDERAL CASES

In re AT&T Mobility Wireless Data Servs. Tax Litig.,
   789 F. Supp. 2d 935 (N.D. Ill. 2011) .............................................................................. 26-27

Abbott v. Lockheed Martin Corp.,
   No. 06-cv-701, 2015 U.S. Dist. LEXIS 93206 (S.D. Ill. July 17, 2015) ................................33

Alyeska Pipeline Serv. Co. v. Wilderness Soc'y,
   421 U.S. 240 (1975) .........................................................................................................28

Anderson v. Torrington Co.,
   755 F. Supp. 834 (N.D. Ind. 1991) ...................................................................................10

Armstrong v. Bd. of Sch. Dirs.,
   616 F.2d 305 (7th Cir. 1980) ...........................................................................................10

Boeing Co. v. Van Gernert,
   444 U.S. 472 (1980) .........................................................................................................28

Brown v. Brewer, No. CV 06-3731-GHK (SHx),
   2010 U.S. Dist. LEXIS 60863 (C.D. Cal. June 17, 2010) ......................................................14

Burdett v. Miller,
   957 F.2d 1375 (7th Cir. 1992) ..........................................................................................34

In re Cenco, Inc. Sec. Litig.,
   519 F. Supp. 322 (N.D. Ill. 1981) .....................................................................................34

Chrapliwy v. Uniroyal, Inc.,
   670 F.2d 760 (7th Cir. 1982) ............................................................................................33

Collier v. Brightpoint, Inc.,
   No. 1:12-c 2013 U.S. Dist. LEXIS 62125 (S.D. Ind. May 1, 2013) .......................................35

In re Diet Drugs (Phentermine/Fenfluramine/ Dexfenfluramine) Prod. Liab. Litig.,
   582 F.3d 524 (3d Cir. 2009) .............................................................................................30

Dutchak v. Cent. States, Se. & Sw. Areas Pension Fund,
   932 F.2d 591 (7th Cir. 1991) ......................................................................................33, 34

E.E.O.C. v. Hiram Walker & Sons, Inc.,
   768 F.2d 884 (1985) ...........................................................................................................9

Florin v. Nationsbank, N.A.,
34 F.3d 560 (7th Cir. 1994) ....................................................................................30

Florin v. Nationsbank of Ga., N.A.,
60 F.3d 1245 (7th Cir. 1995) ..................................................................................29

GE Capital Corp. v. Lease Resolution Corp.,
128 F.3d 1074 (7th Cir. 1997) ..................................................................................9

Gautreaux v. Pierce,
690 F.2d 616 (7th Cir. 1982) .............................................................................9, 26

Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S.A., Inc.,
549 F.3d 1079 (7th Cir. 2008) ................................................................................23

In re Gould Sec. Litig.,
727 F. Supp. 1201 (N.D. Ill. 1989) .........................................................................34

Great Neck Capital Appreciation Inv. P'ship, L.P. v. PricewaterhouseCoopers, L.L.P.,
212 F.R.D. 400 (E.D. Wis. 2002) ...........................................................................10

Hall v. Cole,
412 U.S. 1 (1973) ...............................................................................................30, 31

Hensley v. Eckerhart,
461 U.S. 424 (1983) ...........................................................................................31, 33

Isby v. Bayh,
75 F.3d 1191 (7th Cir. 1996) .........................................................................9, 10, 26

Johnson v. GDF, Inc.,
668 F.3d 927 (7th Cir. 2012) ..................................................................................33

Johnson v. Ga. Highway Express, Inc.,
488 F.2d 714 (5th Cir. 1974) ..................................................................................32

Kahan v. Rosenstiel,
424 F.2d 161 (3d Cir. 1970) ...................................................................................30

Kirchoff v. Flynn,
786 F.2d 320 (7th Cir. 1986) ..................................................................................29

Koerner v. Copenhaver,
No. 12-1091, 2014 U.S. Dist. LEXIS 155783 (C.D. Ill. Nov. 3, 2014)...................24

Langendorf v. Conseco Senior Health Ins. Co.,
No. 08-CV-3914, 2009 U.S. Dist. LEXIS 131289 (N.D. Ill. Nov. 18, 2009) ..........................6

Lone Star Steakhouse & Saloon, Inc. v. Adams,
148 F. Supp. 2d 1141 (D. Kan. 2001) ...................................................................11

Mars Steel Corp. v. Cont'l Ill. Nat'l Bank & Trust Co.,
834 F.2d 677 (7th Cir. 1987) ..............................................................................10

Mathur v. Bd. of Trs. of S. Ill. Univ.,
317 F.3d 738 (7th Cir. 2003) ........................................................................29, 33

McGill v. Ralph Hake, et al.,
No. 1:15-cv-00217-TWP-DKL, slip op. (S.D. In. Mar. 10, 2016) ..........................35

In re Mexico Money Transfer Litig. (W. Union & Orlandi Valuta),
164 F. Supp. 2d 1002 (N.D. Ill. 2000) ..................................................................26

Mills v. Electric Auto-Lite Co.,
396 U.S. 375 (1970)............................................................................28, 29, 30

Nichting v. DPL Inc.,
No. 3:11-cv-141, 2011 U.S. Dist. LEXIS 76739 (S.D. Ohio July 15, 2011)....................14, 36

Pawlak v. Greenawalt,
713 F.2d 972 (3d Cir. 1983)..................................................................................28

Prandini v. Nat'l Tea Co.,
557 F.2d 1015 (3d Cir. 1977)................................................................................33

In re Prudential Sec. Inc. Ltd. P'ships Litig.,
163 F.R.D. 200 (S.D.N.Y. 1995) ..........................................................................24

Reade-Alvarez v. Eltman, Eltman, & Cooper, P.C.,
237 F.R.D. 26 (E.D.N.Y. 2006) ............................................................................26

Reid v. Unilever U.S., Inc.,
2015 U.S. Dist. LEXIS 75383 (N.D. Ill. June 10, 2015) ........................................34

In re Schering-Plough/Merck Merger Litig.,
No. 09-CV-1099 (DMC), 2010 U.S. Dist. LEXIS 29121,................................. passim

Smith v. Robbins & Myers, Inc.,
969 F. Supp. 2d 850 (S.D. Ohio 2013) ..................................................................14

St. Louis Police Ret. Sys. v. Severson,
    2012 U.S. Dist. LEXIS 152392 (N.D. Cal. Oct. 23, 2012)......................................................9

St. Louis Police Ret. Sys. v. Severson,
    No. 12-CV-5086, 2012 U.S. Dist. LEXIS 152392 (N.D. Cal. Oct. 23, 2012)........................11

TSC Industries, Inc. v. Northway, Inc.,
    426 U.S. 438 (1976).......................................................................................................12

In re Walgreen Co. Stockholder Litig.,
    2016 U.S. App. LEXIS 14684 (7th Cir. Ill. Aug. 10, 2016)..................................................12

## STATE CASES

David P. Simonetti  Rollover IRA v. Margolis,
    No. 3694, 2008 Del. Ch. LEXIS 78 (Del. Ch. June 27, 2008) .........................................19, 22

In re Emerging Commc'ns, Inc. S'holder Litig.,
    No. 16415, 2004 Del. Ch. LEXIS 70 (Del. Ch. May 3, 2004) ...............................................12

In re John Q. Hammons Hotels Inc.  S'holder Litig.,
    No. 758-CC, 2009 Del. Ch. LEXIS 174 (Del Ch. Oct. 2, 2009) ............................................19

Kosseff v. Ciocia,
    No. 188, 2009 Del. Ch. LEXIS 242 (Del. Ch. Feb. 26, 2009)................................................22

In re Netsmart Techs., Inc. S'holders Litig.,
    924 A.2d 171 (Del. Ch. 2007)..................................................................................11, 14, 15

In re PNB Holding Co. S'holders Litig.,
    C.A. No. 28-N, 2006 Del. Ch. LEXIS 158 (Del. Ch. Aug. 18, 2006) .....................................12

In re Plains Res., Inc. S'holders Litig.,
    C.A. No. 071-N, 2005 Del. Ch. LEXIS 12 (Del. Ch. Feb. 4, 2005) .......................................31

In re Pure Res., Inc. S'holders Litig.,
    808 A.2d at 448........................................................................................................18

Ryan ex rel. Maxim Integrated Prods. v. Gifford,
    C.A. No. 2213, 2009 Del. Ch. LEXIS 1 (Del. Ch. Jan. 2, 2009).............................................31

Sealy Mattress Co. of N.J., Inc. v. Sealy, Inc.,
    532 A.2d 1324 (Del. Ch. 1987)................................................................................12

In re Talley Indus., Inc. S'holders Litig.,
    No. 15961, 1998 Del. Ch. LEXIS 53 (Del. Ch. Apr. 13, 1998)..............................................11

In re Topps Co. S'holders Litig.,
   926 A.2d 58 (Del. Ch. 2007)...............................................................................20

In re Wm. Wrigley Jr. Co. S'holders Litig.,
   No. 3750-V 2009 Del. Ch. LEXIS 12 (Del. Ch. Jan. 22, 2009) ..............................9

## DOCKETED CASES

In re Art Tech. Grp., Inc. S'holders Litig.,
   No. 5955-VCL (Del. Ch. Dec. 21, 2010)...............................................................22

Jason Garcia v. Remy International, et al.,
   No. 1:15-cv-01385 (S.D. Ind.) ...............................................................................4

In re LCA-Vision S'holder Litig.,
   No.  A1401239 (Ohio Com. Pl.- Hamilton Cnty. Aug. 10, 2015).........................35

Maxine Phillips v. Remy International, et al.,
   No. 1:15-cv-1343 (S.D. Ind.) .................................................................................4

In re Meadowbrook Ins. Group, Inc. S'holder Litig.,
   No. 5:15-cv-11057-JCO-MJH (E.D. Mich. April 7, 2016) ...................................35

In re QR Energy LP Unitholder Litigation.,
   Lead Case No.:4:14-cv-02195 (S.D. Texas Sept. 10, 2015) ( Smith Decl., Ex. )...................35

Stephen Bushansky v. Remy International, et al.,
   No. 1:15-cv-1361 (S.D. Ind.) .................................................................................4

Turberg v. ArcSight, Inc.,
   No. 5821-VCL (Del. Ch. Sept. 20, 2011) .............................................................18

## FEDERAL STATUTES

FRCP 23(h)     ........................................................................................................29

# I.    INTRODUCTION

Pursuant to Rule 23 of the Federal Rules of Civil Procedure, plaintiffs Jason Garcia, Maxine Phillips and Stephen Bushansky (collectively, "Plaintiffs"), on behalf of themselves and all Settlement Class Members, respectfully move this Court for an Order granting final certification of the Class in this action (the "Action"); final approval of the Parties' settlement (the "Settlement") in accordance with the Stipulation and Agreement of Compromise, Settlement, and Release filed on July 19, 2016 (the "Stipulation"); and approval of an unopposed award of attorneys' fees and expenses.[1]

The efforts of Plaintiffs' Counsel resulted in Defendants[2] agreeing to disclose to Remy stockholders previously undisclosed material information in connection with seeking their approval of the Merger (the "Supplemental Disclosures").  As a result of the Supplemental Disclosures and this Settlement, Remy stockholders were able to cast a fully-informed vote on the Merger because they had access to a full summary of the Company's financial projections for calendar years 2015-2019 as a standalone company, thereby allowing stockholders to better evaluate how the merger consideration compared to Remy's prospects as a standalone company. In addition, the Supplemental Disclosures provided Remy's stockholders with the key inputs and

---

[1] Unless otherwise noted, all capitalized terms shall have the same definitions as set forth in the Stipulation.  A copy of the Stipulation was attached as Exhibit 1 to the Declaration of William N. Riley in Support of Plaintiffs' Unopposed Motion for Preliminary Approval of Settlement, which was filed on July 22, 2016 (Dkt. No. 18-1). The Class stipulated to by the Parties and preliminarily certified by the Court is defined as any and all record and beneficial holders of Remy common stock, their respective successors in interest, successors, predecessors in interest, predecessors, representatives, trustees, executors, administrators, heirs, assigns or transferees, immediate and remote, and any person or entity acting for or on behalf of, or claiming under, any of them, and each of them, together with their predecessors and successors and assigns, who held Remy common stock at any time between and including July 13, 2015 and November 10, 2015, but excluding Defendants, their subsidiaries or other affiliates, their assigns, members of their immediate families, officers of Remy, and the legal representatives, heirs, successors, or assigns of any such excluded person (the "Class").

[2] The term "Defendants" refers to Remy International, Inc. ("Remy"), John J. Pittas, Douglas K. Ammerman, Karl G. Glassman, Lawrence F. Hagenbuch, Charles G. McClure, Arik W. Ruchim, George P. Scanlon, J. Norman Stout and John H. Weber (the "Individual Defendants" or the "Board," and, collectively with Remy, the "Defendants").

assumptions underlying the financial analyses performed by UBS Securities LLC ("UBS"), Remy's financial advisor, in connection with its fairness opinion and certain information relating to the potential conflicts of interest faced by UBS and Company insiders in connection with the sale of the Company. These Supplemental Disclosures resolved the disclosure issues raised by Plaintiffs in the litigation and would not have been available to Remy stockholders without this lawsuit. *See* Declaration of Evan J. Smith in support of Plaintiffs' Motion for Final Approval of Class Action Settlement, Class Certification, and Application for Award of Attorneys' Fees and Expenses ("Smith Decl."), ¶10, filed herewith; Stipulation, Ex. A.

The efforts of Plaintiffs and their counsel to achieve this Settlement included devoting substantial time and resources to investigate and research the public filings made by Remy, including publicly available information about the Merger; investigating and researching stock analyst reports on Remy about the Merger; consulting with financial valuation experts; and reviewing non-public documents produced by Remy and following through with aggressive litigation, including drafting detailed complaints and engaging in preliminary and confirmatory discovery which included, among other things, the deposition of a representative of UBS. Smith Decl., ¶51. As a result of these efforts, holders of over 31 million Remy shares were able to make informed and intelligent decisions about whether to vote in favor of or against the Merger. *Id*., ¶39.

In light of the material benefits caused by Plaintiffs' efforts, the Settlement also provides for an award of attorneys' fees and expenses for Plaintiffs' Counsel of $409,844.50, consisting of $400,000 for attorneys' fees and $9,844.50 in unreimbursed litigation expenses ("Fee and Expense Amount"), which Defendants do not oppose and have agreed to pay upon approval by the Court. Stipulation, ¶15. The Fee and Expense Amount was negotiated at arm's-length after the material terms of the Settlement had been agreed to, and is fair and reasonable in light of the

substantial benefits achieved in the Settlement and in line with fees awarded in similar merger-related litigation. Smith Decl., ¶49; *see also* Stipulation, ¶20. The Fee and Expense Amount also reflects a modest multiplier of approximately 1.12 to the total lodestar of $354,884.50, comprised of over 531.9 hours of work, not including the $9,844.50 in expenses expended by Plaintiffs' Counsel.[3] Smith Decl., ¶53 & Exs. 1-5. To date, there have been no objections to this Settlement, including the Fee and Expense Amount.

For the reasons stated herein, Plaintiffs respectfully move this Court to approve the Settlement, finally certify the Class, and approve Plaintiffs' request for attorneys' fees and expenses. Defendants do not oppose the foregoing relief.[4]

## II.     BACKGROUND OF THE LITIGATION[5]

On July 13, 2015, Remy announced it had signed a definitive agreement to be acquired by BorgWarner Inc. ("Borg Warner") pursuant to which Remy stockholders would receive $29.50 in cash in exchange for each share of Remy common stock (the "Merger"). Smith Decl., ¶6.

### A.  Procedural History of the Litigation

On August 3, 2015, Remy filed with the United States Securities and Exchange Commission ("SEC") a Preliminary Proxy Statement on Schedule 14A (the "Preliminary Proxy") relating to the Merger which was distributed to Remy stockholders. Thereafter, on August 18, 2015, Remy filed with the SEC a Definitive Proxy Statement on Schedule 14A (the

---

[3] These numbers are detailed in the accompanying fee and expense declarations from Plaintiffs' Counsel, attached as Exhibits 1-5 to the Smith Declaration.

[4] Although this Motion is unopposed, this Memorandum of Law is submitted solely by Plaintiffs and does not represent the views of Defendants.

[5] The Court is respectfully referred to the Smith Declaration, filed herewith, for a detailed description of the factual background and procedural history of the Actions, as well as the efforts of Plaintiffs' Counsel on behalf of the Class that resulted in the Settlement. Smith Decl., ¶¶6-20.

"Definitive Proxy") (the Preliminary Proxy and the Definitive Proxy are collectively referred to herein as, the "Proxy"), relating to the Merger which was also distributed to Remy stockholders. Smith Decl., ¶9.

Following the filing and dissemination of the Preliminary Proxy, three putative class actions were filed by certain stockholders of Remy alleging, among other things, that the Defendants had violated Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 and Rule 14a-9 promulgated thereunder by causing a materially incomplete and misleading Proxy Statement to be filed with the SEC relating to the Merger: (1) *Maxine Phillips v. Remy International*, et al., No. 1:15-cv-1343 (S.D. Ind.) (the "*Phillips* Action"); (2) *Jason Garcia v. Remy International, et al.*, No. 1:15-cv-01385 (S.D. Ind.) (the "*Garcia* Action"); and (3) *Stephen Bushansky v. Remy International, et al.*, No. 1:15-cv-1361 (S.D. Ind.) (the "*Bushansky*" Action, and together with the *Phillips* Action and *Garcia* Action, the "Actions"). Smith Decl., ¶8.

On August 31, 2015, following a review and analysis of the Preliminary and Definitive Proxies and other public filings related to the Merger and after consultation with their retained financial expert, counsel for Plaintiffs sent a written settlement demand to Defendants. Smith Decl., ¶10.

**B. Settlement Negotiations and Confirmatory Discovery**

In early September 2015, counsel for the Parties began arms'-length negotiations concerning a possible resolution of the Actions, including the negotiation of various supplemental disclosures that Plaintiffs and their counsel demanded that Defendants file with the SEC sufficiently in advance of the Remy stockholders' meeting to approve the Merger which was set for September 22, 2015 (the "Special Meeting"). Smith Decl., ¶11.

The Parties entered into a Memorandum of Understanding on September 14, 2015 ("MOU"), which set forth an agreement in principle for the settlement of the Actions between

and among Plaintiffs, on behalf of themselves and the Settlement Class, and Defendants on the terms and subject to the conditions set forth in the MOU. Smith Decl., ¶12. Pursuant to the MOU, Defendants agreed to make certain supplemental disclosures ("Supplemental Disclosures"), as reflected in the Form 8-K dated September 14, 2015, filed by Remy with the SEC. *Id.* As discussed below, the Supplemental Disclosures provided Remy's stockholders with material information concerning the fairness of the Merger and the Merger Consideration that had been omitted from the Proxy and was necessary for them to cast a fully informed vote concerning the Merger. *Id.*

Following the execution of the MOU, Plaintiffs' Counsel conducted additional discovery to confirm the reasonableness of the terms of the Settlement (the "Confirmatory Discovery"). In particular, Plaintiffs' Counsel reviewed non-public documents produced by Defendants and conducted the deposition of Vijay Kumra, a representative of UBS. During the course of discovery, Plaintiffs were able to fully ascertain the strengths and weaknesses of their claims. Moreover, through the deposition of the UBS representative, Plaintiffs assured themselves that the process undertaken by the Individual Defendants to sell the Company and how the Individual Defendants valued the Company was satisfactory. Plaintiffs, only after full evaluation of the strengths and weaknesses of their claims, arrived at the belief that the Actions favor Settlement.

### C. Preliminary Approval and Notice to Remy Stockholders

On July 22, 2016, Plaintiffs filed their Motion for Preliminary Approval, requesting that the Court enter the [Proposed] Order for Notice and Scheduling of Hearing on Settlement ("Scheduling Order"): (i) granting preliminary approval of the Settlement of the Actions as embodied in the Stipulation; (ii) preliminarily certifying a non-opt out class for settlement purposes; (iii) approving the form, manner, and content of the notice to be provided to the

Settlement Class and order direct mailing of the Notice to Class members; and (iv) setting a hearing for final approval of the Settlement ("Settlement Hearing").

The Court granted the motion on July 27, 2016, directed Notice be sent to the Settlement Class, and scheduled a Settlement Hearing for November 2, 2016 (Dkt. Entry No. 23); Smith Decl., ¶18, and Notice was disseminated to the Class.[6] Pursuant to the Court's Preliminary Approval Order, Notice was mailed out to the Settlement Class by Garden City Group, LLC, a notice administrator hired by Defendants, during the period July 2, 2015 to August 14, 2015.[7]

Although the October 13, 2016 deadline for objections has not yet passed, as of the date of this filing no objections have been received to any of the terms of the Settlement, or requested fees and expenses. *See* footnote 3, *supra*. Plaintiffs submit that this is evidence of the proposed Settlement's fairness and adequacy, particularly given the comprehensive Notice provided to Remy stockholders.

### III. THE SETTLEMENT TERMS

The Settlement required Remy to disclose certain material information to members of the Class that Plaintiffs believe was critical to Remy's stockholders' ability to make a fully informed decision regarding whether to vote for, or against, the Merger. The Supplemental Disclosures,

---

[6] Class members were sent the detailed Notice attached to the Stipulation as Exhibit C and approved by this Court. Smith Decl., ¶19. The Notice set forth the background and procedural history of this litigation, including the claims asserted against the Defendants; a summary of the Settlement terms; an explanation of the persons and claims being released under the Settlement; a detailed explanation of reasons for the Settlement; a description of the Class; the date, time, and place of the hearing for final approval; a statement of the Class members' right to appear and object with or without counsel and the procedures which must be followed to be heard; a statement that Plaintiffs' Counsel intends to petition the Court for an award of attorneys' fees and expenses, and whom to contact if more information about the Settlement is desired. *Id.* Notice plans like the one utilized here are common in class actions and constitute valid and sufficient notice to proposed class members. *Id.* Accordingly, the Notice comports with the requirements of due process and Rule 23. *Langendorf v. Conseco Senior Health Ins. Co.*, No. 08-CV-3914, 2009 U.S. Dist. LEXIS 131289, at *14-19 (N.D. Ill. Nov. 18, 2009)

[7] Not less than ten (10) days before the Hearing, Remy shall file with the Court an affidavit evidencing mailing of the Notice and service of the CAFA Notice with the Court.

which were set forth in a Form 8-K filed by Remy with the SEC on September 14, 2015, provided material information to Remy stockholders in advance of the Special Meeting concerning the following:

- with respect to the non-public financial forecasts that Remy provided to UBS, Borg Warner and Borg Warner's financial advisor in connection with the negotiation of the Merger, which were prepared by Remy's management for the Board to use in connection with evaluating the Merger, the Supplemental Disclosures provided Remy's projections for the following items for 2015-2019: (i) taxes (or tax rate), (ii) changes in net working capital, (iii) restructuring and impairment charges, (iv) unlevered free cash flow and adjustments thereto, and (v) a reconciliation of GAAP net income and non-GAAP EBITDA;

- with respect to the material financial analyses UBS utilized in connection with providing its fairness opinion, the Supplemental Disclosures provided the individual inputs and assumptions utilized by UBS to derive the discount range of 9.75% to 11.25%, and what forecast period was used in the Illustrative Discounted Cash Flow Analysis of Remy;

- with respect to the material financial analyses UBS utilized in connection with providing its fairness opinion, the Supplemental Disclosures provided the individual multiples for each of the selected public companies analyzed by UBS, including (a) EV/LTM EBITDA, (b) EV/2015E EBITDA, (c) EV/2016 EBITDA, (d) 2015E P/E, and (e) 2016 P/E for the Selected Public Trading Companies Analysis for Remy;

- with respect to the material financial analyses UBS utilized in connection with providing its fairness opinion, the Supplemental Disclosures provided (i) the observed transaction-by-transaction (a) enterprise values, and (b) pricing multiples for each of the selected transactions analyzed by UBS for its Selected Transactions Analysis for Remy;

- with respect to potential conflicts of interest involving certain Remy directors, the Supplemental Disclosures provided that defendant Arik W. Ruchim is a Partner at H Partners Management, LLC, the hedge fund, and that together with H Partners, LP, H Partners Capital, LLC, P H Partners Ltd., H Offshore Fund Ltd. and Rehan Jeffer (collectively, "H Partners Group"), they are the second largest stockholder (after FMR LLC) in Remy with a holding of 3,843,336 shares of Remy as of July 31, 2015;

- with respect to potential conflicts of interest involving UBS, the Supplemental Disclosures provided additional information about UBS's role as the Joint Lead Arranger and Bookrunner in the refinancing of the Company's debt facility in 2013; and

- with respect to potential conflicts of interest involving UBS, the Supplemental Disclosures provided additional information about the value of fees UBS has received since 2007 for the advisory services it has provided to Remy, including having acted as financial advisor to the Company in its 2014 transaction with Fidelity National Financial, Inc.

As discussed below, courts have consistently found information of this nature, concerning a company's financial projections, a financial advisor's analyses, and potential conflicts of

interest in connection with a corporate transaction, to be material and therefore sufficient for purposes of approving a settlement similar to the one reached here. *See, e.g.*, *In re Schering-Plough/Merck Merger Litig.*, No. 09-CV-1099 (DMC), 2010 U.S. Dist. LEXIS 29121, at *48-49 (D.N.J. Mar. 25, 2010) (hereinafter "*Merck*") (granting final approval of settlement where "the supplemental disclosures facilitated communication and informed shareholders of previously undisclosed material information permitting shareholders to exercise their voting rights accordingly"); *In re Wm. Wrigley Jr. Co. S'holders Litig.*, No. 3750-VCL, 2009 Del. Ch. LEXIS 12, at *21 (Del. Ch. Jan. 22, 2009) (granting final approval where "the disclosure claims advanced in the complaint were fully and fairly addressed in the settlement").

## IV.     THE PROPOSED SETTLEMENT SHOULD BE APPROVED

### A.     The Applicable Legal Standard

Rule 23(e) of the Federal Rules of Civil Procedure requires judicial approval for any compromise of claims brought on a class wide basis.  In deciding whether a class action settlement merits final approval under Rule 23(e), courts must determine whether the proposed settlement is fair, reasonable, and adequate. *Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir. 1996) ; *E.E.O.C. v. Hiram Walker & Sons, Inc.,* 768 F.2d 884 (1985) ; *Gautreaux v. Pierce*, 690 F.2d 616, 631 (7th Cir. 1982) .  The Seventh Circuit has identified the following factors that a Court may consider in evaluating the fairness of a class action settlement: (i) the strength of the plaintiffs' case on the merits measured against the terms of the settlement; (ii) the complexity, length, and expense of continued litigation; (iii) the amount of opposition to the settlement among affected parties; (iv) the presence of collusion in gaining a settlement; (v) the stage of the proceedings; and (vi) the amount of discovery completed.  *GE Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1082 (7th Cir. 1997) ; *see also Isby*, 75 F.3d at 1199.

The Seventh Circuit has endorsed an overriding public interest in favor of the settling of litigation, particularly class actions. *See Isby*, 75 F.3d at 1196 ("Federal courts naturally favor the settlement of class action litigation."). "Settlement should be facilitated at as early a stage of the litigation as possible." 6A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure: Civil 2d §1522, at 225-26 (2d ed. 1990) (citing 1983 Advisory Committee Notes). The proceedings to approve a settlement should not be transformed into an abbreviated trial on the merits. *See, e.g.*, *Mars Steel Corp. v. Cont'l Ill. Nat'l Bank & Trust Co.*, 834 F.2d 677, 684 (7th Cir. 1987) . As the Seventh Circuit has explained:

> Because settlement of a class action, like settlement of any litigation, is basically a bargained exchange between the litigants, the judiciary's role is properly limited to the minimum necessary to protect the interests of the class and the public. Judges should not substitute their own judgment as to optimal settlement terms for the judgment of the litigants and their counsel.

*Armstrong v. Bd. of Sch. Dirs.*, 616 F.2d 305, 315 (7th Cir. 1980) , *overruled on other grounds by Felzen v. Andreas*, 134 F. 3d 873 (7th Cir. 1998) . In addition, "[a] strong presumption of fairness attaches to a settlement agreement when it is the result of this type of [arm's length] negotiation." *Great Neck Capital Appreciation Inv. P'ship, L.P. v. PricewaterhouseCoopers, L.L.P.*, 212 F.R.D. 400, 410 (E.D. Wis. 2002) (citing *Anderson v. Torrington Co.*, 755 F. Supp. 834, 838 (N.D. Ind. 1991) ).

Here, this analysis weighs in favor of approval of the Settlement. Plaintiffs and Plaintiffs' Counsel have examined the facts, the applicable law, and the arguments Defendants could have raised in defense to Plaintiffs' claims; have weighed the benefits secured by the proposed Settlement against the risk, delay, and cost of further litigation; and have determined, in their judgment, that the proposed Settlement is fair, reasonable, adequate, and in the best interests of the Class.

## B. The Settlement Is Fair, Reasonable, and Adequate and Warrants Final Approval

In connection with the Settlement, Defendants agreed to make the Supplemental Disclosures to remedy Plaintiffs' disclosure claims. Smith Decl., ¶12. The Supplemental Disclosures were disseminated to Remy's stockholders prior to the stockholders' vote at the Special Meeting, which provided a substantial benefit to the Class. *See, e.g.*, *Merck*, 2010 U.S. Dist. LEXIS 29121, at *48-49.

It is well-settled that curative disclosures, which provide material information to stockholders faced with a significant decision, such as whether or not to approve a merger, confer a substantial benefit on them. This is because "[a] fully informed shareholder vote in compliance with Section 14(a) of the Securities Exchange Act [ ] is in the best interests of shareholders and the shareholding public generally." *St. Louis Police Ret. Sys. v. Severson*, No. 12-CV-5086, 2012 U.S. Dist. LEXIS 152392, at *17 (N.D. Cal. Oct. 23, 2012) . Indeed, numerous courts have recognized that the most meaningful remedy for a violation of disclosure obligations in connection with a merger is the disclosure of the material information that shareholders have been denied access to before the transaction is consummated, not a subsequent claim for money damages. *Lone Star Steakhouse & Saloon, Inc. v. Adams*, 148 F. Supp. 2d 1141, 1149-50 (D. Kan. 2001) ("[T]he free and intelligent voting rights of plaintiff's shareholders will be forfeited if such votes are exercised based upon false or misleading information. Monetary damages cannot restore the right of shareholders to effectively exercise their corporate suffrage rights."); *St. Louis Police Ret. Sys.*, 2012 U.S. Dist. LEXIS 152392, at *16-17 ("disclosure deficiencies cannot be remedied effectively by an 'after-the-fact damages' case."); *In re Talley Indus., Inc. S'holders Litig.*, No. 15961, 1998 Del. Ch. LEXIS 53, at *46 (Del. Ch. Apr. 13, 1998) ("[T]he timely disclosure of the information in the supplement was

presumably of greater value to the class than any potential award of damages based on the failure to disclose the same information, as such information is of the greatest utility when it is available in a timely manner to inform the stockholders' decision making process.").

Additionally, as set forth by the supreme Court in *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449 (1976), "an omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote. … What th[is] standard … contemplate[s] is a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder." *Id.* As further articulated in *In re Walgreen Co. Stockholder Litig.*, 2016 U.S. App. LEXIS 14684, at *11 (7th Cir. Ill. Aug. 10, 2016), under these circumstances, the trial judge should ask whether the [supplemental disclosures] "*would* be *likely* to matter to a reasonable investor." (emphasis in original).

As detailed herein, the information Plaintiffs obtained for the Class via the Supplemental Disclosures was clearly informative and material to Remy's stockholders voting decision with respect to the Merger.

### 1. Information Concerning Remy's Projections Relied Upon By UBS

*First*, the Supplemental Disclosures provided Remy's stockholders with material information related to the Company's projections, created by Remy management and relied upon by UBS in preparing its valuation analyses in support of its fairness opinion. Smith Decl., ¶24. Specifically, with respect to the non-public financial forecasts, the Supplemental Disclosures provided Remy's projections for the following items for 2015-2019: (i) taxes (or tax rate), (ii) changes in net working capital, (iii) restructuring and impairment charges, (iv) a reconciliation of

GAAP net income and non-GAAP EBITDA, and, perhaps most importantly, (v) unlevered free cash flows ("UFCF") and adjustments thereto. *Id.*

Courts, in particular those in the Delaware Court of Chancery, have found the omission of projections, especially projected cash flows, to be a basis for enjoining mergers, and therefore information that is clearly material to stockholders deciding whether to approve a cash merger. *See In re Maric Capital Master Fund, Ltd. vs. Plato Learning, Inc*. 11 A.3d 1175, 1178-1179 (Del. Ch. 2010) ("The proxy statement selectively disclosed projections relating to PLATO's future performance. In particular, the proxy statement, for some inexplicable reason, excised the free cash flow estimates that had been made by PLATO's management and provided to [the financial advisor]…This is odd…in my view, management's best estimate of future cash flow of a corporation that is proposed to be sold in a cash merger is clearly material information…Given the centrality of this issue, I believe that the proxy statement omits material information by, for reasons not adequately explained, selectively removing the free cash flow estimates from the projections provided to PLATO's stockholders. Until this information is disclosed, the merger will be enjoined."); *See also In re Netsmart Techs., Inc. S'holders Litig.,* 924 A2d 171, 203 (Del. Ch. 2007) ("A reasonable stockholder deciding how to make these important choices would find it material to know what the best estimate was of the company's future cash flows …When stockholders must vote on a transaction in which they would receive cash for their shares, information regarding the financial attractiveness of the deal is of particular importance…a calculus heavily dependent on the stockholder's assessment of future cash flows…"). *In re PNB Holding Co. S'holders Litig.*, C.A. No. 28-N, 2006 Del. Ch. LEXIS 158, at *58 (Del. Ch. Aug. 18, 2006) ("reliable management projections of the company's future prospects are of obvious materiality to the electorate"); *In re Emerging Commc'ns, Inc. S'holder Litig.*, No. 16415, 2004

Del. Ch. LEXIS 70, at *13 (Del. Ch. May 3, 2004) (projections are "highly material" because knowledge of the projections "would have enabled the shareholders to understand [the company's] intrinsic worth and the extent of the market's undervaluation of their company"); *Sealy Mattress Co. of N.J., Inc. v. Sealy, Inc.*, 532 A.2d 1324, 1339-40 (Del. Ch. 1987) (nondisclosure of "corporation's . . . projected revenues or income" is "highly material and constituted violations of the defendants' duty of candor").

Additionally, courts throughout the country have placed a similar premium on the disclosure of projections. *See, e.g.*, *Nichting v. DPL Inc.*, No. 3:11-cv-141, 2011 U.S. Dist. LEXIS 76739, at *17 n.16 (S.D. Ohio July 15, 2011) ("it smacks of materiality that a voter be made aware of the Company's cash flow projections in order to make an informed decision."); *Smith v. Robbins & Myers, Inc.*, 969 F. Supp. 2d 850, 874 (S.D. Ohio 2013) (finding omitted line items from financial projections were material because the projections were used by financial advisor in its fairness analyses); *Brown v. Brewer*, No. CV 06-3731-GHK (SHx), 2010 U.S. Dist. LEXIS 60863, at *70 (C.D. Cal. June 17, 2010) ("A reasonable shareholder would have wanted to independently evaluate management's internal financial projections to see if the company was being fairly valued. There is a substantial likelihood that a reasonable shareholder would consider it important' in making his decision.") (citation omitted). Thus, it is axiomatic that projections, and in particular the projections of future cash flows were material to Remy stockholders in evaluating the Merger.

Moreover, UBS's *Illustrative Discounted Cash Flow Analysis* ("DCF"), which, as discussed below, is the cornerstone of financial valuation analyses, expressly relied upon Remy's financial projections and the UFCFs derived from those projections. Since projected UFCFs were left out of the Proxy, Remy stockholders could neither (i) independently prepare a DCF, or

(ii) critically review the DCF performed by UBS in order to assess its accuracy and/or reasonableness, and therefore the amount of weight (if any) to place on UBS's DCF results.

It is important to understand that the DCF analysis has primacy among corporate valuation techniques. This particular analysis, in fact, forms the basis for all other valuation techniques and is the very core of modern corporate finance.[8,9] Both academicians and practitioners alike acknowledge this principle.

Since a DCF analysis cannot be performed without projected cash flows (in this case the previously undisclosed UFCFs), and considering the unique vantage point from which management is able to make its assessment of future operating cash flows with respect to the prospects of the company, knowledge of projected cash flows is all but irreplaceable. For this reason, the disclosure of projected cash flows (or, equivalently, the financial figures for the formula used to calculate cash flows), is a staple in the vast majority of proxy statements filed by publicly traded companies being acquired in corporate mergers, and is why so many Court's deem such information plainly material. The original disclosures in the Proxy contained certain financial projections, but these projections completely excluded the unlevered free cash flows commonly used in DCF analyses (including the DCF analyses prepared by UBS in support of its

---

[8] "Discounted cash flow (DCF) forms the core of finance.... Though professionals may employ other methods of valuation, such as relative valuation and the contingent claims approach, DCF forms the basis for all other valuations. Underscoring the importance of DCF valuation is the fact that it provides a linchpin to link various fields of finance."

"Developing an Automated Discounted Cash Flow Model." *The Valuation Handbook: Valuation Techniques from Today's Top Practitioners*. Ed. Rawley Thomas and Benton E. Gup. Hoboken: John Wiley & Sons, 2010. 110. Print.

[9] "While discounted cash flow valuation is only one of the three ways of approaching valuation and most valuations done in the real world are relative valuations, it is the foundation on which all other valuation approaches are built. Damodaran, Aswath. "Approaches to Valuation." *Investment Valuation*. 2nd ed. 11. Print.

fairness opinion).  The absence of such critical information from the original disclosures in the Proxy in this instance was conspicuous and inappropriate.

The financial projections included in the Proxy set forth one forecast scenario which omitted unlevered free cash flows, but was instead limited to revenue, adjusted EBITDA, depreciation & amortization and capital expenditures.  Consequently, as detailed above, Remy's stockholders were provided with neither UFCF figures nor the information necessary to calculate such figures for themselves. The Supplemental Disclosures remedied this significant problem by:

    a.  Disclosing the UFCFs for the entire projection period; and

    b.  providing the figures corresponding to the UFCF formula, thus enabling Remy's stockholders to calculate for themselves the UFCF figures corresponding to the Company's projections.

For these Supplemental Disclosures alone, the Settlement – and, as addressed below, Plaintiffs' Counsel's Fee and Expense Amount – should be approved.  Indeed, as the Delaware Court of Chancery has previously recognized:

> [W]hen a banker's endorsement of the fairness of a transaction is touted to shareholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses must also be fairly disclosed.  Only providing some of that information is insufficient to fulfill the duty of providing a 'fair summary of the substantive work performed by the investment bankers upon whose advice the recommendations of the [] board as to how to vote ... rely.'

*Netsmart Techs., Inc. S'holders Litig.*, 924 A.2d at 203-204.

## 2. Information Concerning the Financial Analyses of UBS

*Second*, the Supplemental Disclosures provided Remy's stockholders with material information related to UBS's valuation analyses and fairness opinion. Smith Decl., ¶27. Specifically, with respect to the financial analyses UBS prepared in connection with its fairness

opinion, the Supplemental Disclosures provided, among other things: (1) the UFCF figures utilized by UBS in its DCF analysis of Remy (as discussed above); (2) the individual multiples for each of the selected public companies analyzed by UBS, including (a) EV/LTM EBITDA, (b) EV/2015E EBITDA, (c) EV/2016 EBITDA, (d) 2015E P/E, and (e) 2016 P/E for the *Selected Public Trading Companies Analysis* for Remy; and (3) the observed transaction-by-transaction (a) enterprise values, and (b) pricing multiples for each of the selected transactions analyzed by UBS for its *Selected Transactions Analysis* for Remy. *Id.*

The disclosure of the individual multiples observed and analyzed by UBS in its *Selected Public Trading Companies Analysis* was material to Remy stockholders because it provided greater context as to how Remy compared to its public peers, and also provided a more complete picture of the work done by UBS.

A selected public comparables analysis, such as the one performed by UBS here, is one of the three primary valuation analyses typically performed as part of the valuation process for a company, with the other two analyses being a precedent transactions analysis and a discounted cash flow analysis. The selected public comparables analysis is a market approach to valuation, "The market approach to valuation is relevant because it uses observable factual evidence of actual sales of other properties to derive indications of value."[10] Said another way, this type of analysis uses multiples and a benchmarking process for publicly-traded "peers" as a basis of valuation. No two companies are identical, so it is important to undertake this benchmarking process as there are certain companies that will be more similar to the valuation subject than others.

---

[10]     Pratt, Shannon P. *The Market Approach to Valuing Businesses*. 2nd ed. Hoboken: John Wiley & Sons, 2005: xxxii.

The comparable companies selected in UBS' analysis were chosen because UBS felt they all shared similarities to Remy. Invariably, however, some types of companies will share more similarities to Remy than others and, without the individual multiples, stockholders have a limited ability to gauge which companies are most like Remy when drawing conclusions from UBS's analysis. Because UBS did not actually select and apply multiples in this analysis (as is customary), this left unanswered questions about how UBS's opinion was based on this market information. The disclosure of the individual multiples and metrics provided enough detail to help evaluate Remy against its peers in evaluating the sufficiency of the Merger consideration. Thus, without the aforementioned information, stockholders' ability to understand UBS's analysis was significantly limited, rendering them unable to make a fully-informed decision regarding the Merger.

As part of the Supplemental Disclosures, stockholders were also provided with the observed transaction-by-transaction (a) enterprise values, and (b) pricing multiples for each of the selected transactions analyzed by UBS for its *Selected Transactions Analysis* for Remy.

This information was important because it provided a better understanding of the scope of work performed by UBS in arriving at its fairness opinion. As described above, a precedent transactions analysis is one of the three primary valuation analyses typically performed by financial advisors. Like the *Selected Public Trading Companies Analysis*, the *Precedent Transactions Analysis* UBS performed is a market approach to valuation, "The basic principles of the transaction method are the same as for the guideline publicly traded company method.

The differences in implementation are a result of the differences in data available and, in some cases, the structure of the transactions."[11]

In the case of a precedent transactions analysis, the financial advisor typically reviews observable transaction metrics, including valuation multiples and the characteristics of the comparable target companies, in order to determine an appropriate multiple to value the subject company. Much like with a comparable companies analysis, no two target companies in a precedent transactions analysis will be identical. As such, it is important to also review benchmarking metrics for transactions to determine which transactions are the most relevant. The two most recent transaction in the set of transaction comparables, MAHLE GmbH's acquisition of Delphi Automotive and Hahn & Co./ Hanook Tire Co.'s acquisition of Halla Visteon Climate Control Corp. demonstrated the highest EV/LTM EBITDA multiples of any of the transactions reviewed, 9.5x and 10.1x respectively.

This disclosure provided important context to Remy stockholders as to the valuations being paid most recently in comparable transactions and allowed Remy stockholders to benchmark the EV/LTM EBITDA multiples implied by the Merger against the most recent transactions. The original disclosures in the Proxy only provided the mean and median EV/LTM EBITDA multiples for the transaction comp set of 7.6x and 7.5x, leaving stockholders in the dark that the two most recent transactions analyzed by UBS had much higher multiples. Similarly to its *Select Public Trading Companies Analysis*, UBS did not select and apply multiples to estimate values for Remy. As such, the individual multiples and metrics provided as part of this Supplemental Disclosure provided important context and allowed Remy stockholders

---

[11]     Pratt, Shannon P. *The Market Approach to Valuing Businesses*, 2nd ed. Hoboken: John Wiley & Sons, 2005: 35.

to evaluate whether the multiple being received by Remy was appropriate based on Remy's comparability to the specific transactions included as part of this analysis.

The key inputs and assumptions used by a financial advisor are material because they speak directly to the reliability (or lack thereof) of those analyses. *See David P. Simonetti Rollover IRA v. Margolis*, No. 3694, 2008 Del. Ch. LEXIS 78, at *30 (Del. Ch. June 27, 2008) ("The key assumptions made by a banker in formulating his opinion are of paramount importance to the stockholders because any valuation analysis is heavily dependent upon the projections utilized.") (quoting *Netsmart*, 924 A.2d at 203); Transcript of Proceedings at 43:6-15, *Turberg v. ArcSight, Inc.*, No. 5821-VCL (Del. Ch. Sept. 20, 2011) ("[I]f you were to consider what really constitutes a fair summary, then the background multiples should be in there ... [Y]ou would never see a board book that would go to the board without the background multiples.")

It is also well-settled under Delaware law that when a disclosure document "ventures into certain subjects, it must do so in a manner that is materially complete and unbiased by the omission of material facts." *In re Pure Res., Inc. S'holders Litig.*, 808 A2d at 448; *In re Topps Co. S'holders Litig.*, 926 A.2d 58, 76-77 (Del. Ch. 2007) . Information pertaining to an expert's financial analysis is one such subject. *Maric Capital Master Fund, Ltd.* 11 A.3d at 1177-78 ("Because the proxy statement spoke on this subject, there was a duty to do so in a non-misleading fashion.... ).

The above-outlined key assumptions and methodologies made by Defendants were therefore of paramount importance to the Company's stockholders in providing them with a complete and fair summary of UBS's work and to understand the bases of their various analyses. Smith Decl., ¶¶31-32. Without disclosure of this information, their respective analyses were misleading and incomplete.

### 3. Information Concerning the Background of the Merger

*Third*, the Supplemental Disclosures provided Remy's stockholders with material information related to the background of the Merger. Smith Decl., ¶37. Specifically, with respect to potential conflicts of interest involving the Merger, the Supplemental Disclosures disclosed that Defendant Arik W. Ruchim is a partner at H Partners Management, LLC, and that together with H Partners, LP, H Partners Capital, LLC, P H Partners Ltd., H Offshore Fund Ltd. and Rehan Jeffer (collectively, "H Partners Group"), the combined entities are the second largest stockholder in Remy. Moreover, with respect to potential conflicts of interest involving UBS, the Supplemental Disclosures provided additional information about UBS's role as the joint lead arranger and bookrunner in the refinancing of the Company's debt facility in 2013, and additional information regarding the value of fees UBS has received since 2007 for the advisory services it has provided to Remy. Armed with this information, Remy stockholders were able to assess whether UBS was incentivized to push for and support a sale of Remy based on the historical fees it had received for previous work provided for the Company as compared to the fees it stood to receive through a sale of the Company.

Such information is vital for stockholders to determine whether the Company was sold to maximize the value for all of its stockholders or whether the sale process was tainted by certain constituents standing to uniquely benefit from a sale of the Company rather than have the Company continue to operate as a standalone public company.

Courts have routinely found that disclosure concerning a financial advisor's potential conflicts are highly material and must be disclosed. *See In re John Q. Hammons Hotels Inc. S'holder Litig.*, No. 758-CC, 2009 Del. Ch. LEXIS 174, at *55-56 (Del Ch. Oct. 2, 2009) ("This Court . . . has stressed the importance of disclosure of potential conflicts of interest of financial

advisors . . . It is imperative that stockholders be able to decide for themselves what weight to place on a conflict faced by the financial advisor.") (internal citation omitted); *Simonetti Rollover IRA*, 2008 Del. Ch. LEXIS 78, at *25-36 (granting preliminary injunction in part and stating: "A financial advisor's own proprietary financial interest in a proposed transaction must be carefully considered in assessing how much credence to give its analysis. For that reason, the peculiar benefits of the Merger to UBS, beyond its expected fee, must also be disclosed to TriZetto's stockholders."); Transcript of Proceedings, *In re Art Tech. Grp., Inc. S'holders Litig.*, No. 5955-VCL (Del. Ch. Dec. 21, 2010) (enjoining merger pending disclosure of sell-side banker's past engagement fees) (Smith Decl., Ex. 8).

Accordingly, the disclosure of the conflicts of interest present in the sales process was highly material to Remy stockholders, as it allowed Remy stockholders to consider for themselves whether a conflict of interest was present given this activity, and to consider UBS's fairness opinion in light of these facts.

### C. The Relevant Factors Support Final Approval of the Settlement

#### 1. The Strength of Plaintiffs' Case Compared to the Terms of the Settlement Supports Approval of the Settlement

Here, the Supplemental Disclosures conferred substantial benefits on the Class by permitting Remy stockholders to make an informed decision whether to approve the Merger. *See* Section IV.B, *supra*. While Plaintiffs believe that their disclosure claims were strong, they believe that securing the Supplemental Disclosures and not attempting to enjoin the Merger, when weighed against the choice of continuing litigation or abandoning the Class, was in the best interest of the Class.

The decision to enter into the Settlement was made with knowledge of the uncertainty of Plaintiffs' claims and the difficulty of obtaining the extraordinary relief of enjoining the Merger. In

order to have received full recovery, Plaintiffs' first hurdle would have been succeeding on a motion to enjoin the Merger. Plaintiffs recognize that an injunction is an extraordinary remedy, which requires a showing of probable success on the merits, irreparable harm, and a balance of the injuries in favor of Plaintiffs. *See, e.g.*, *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S.A., Inc.*, 549 F. 3d 1079, 1085 (7th Cir. 2008) . In the event the injunction had been granted, Plaintiffs would then have to succeed after a full trial on the merits of the case. If the injunction had been denied, Plaintiffs would have lost the ability to receive additional disclosures prior to the stockholder vote, and Remy stockholders would not have obtained all the information needed to make a fully informed decision prior to the stockholder vote.

Plaintiffs also knew that proving that Defendants breached their fiduciary duties would be a difficult task fraught with uncertainty. In addition, Defendants have continually denied all of the allegations against them. This denial would be a significant hurdle for Plaintiffs to overcome both in obtaining preliminary injunctive relief and in the case on the merits. Once Plaintiffs' financial expert had determined the Merger price to be within the reasonable range, and Plaintiffs' Counsel reviewed relevant SEC filings and other available Company information, it became clear it would be best for the Class to obtain additional material disclosures so that each Class member could make a decision based on a complete and accurate presentation. Smith Decl., ¶41. Plaintiffs' Counsel believe the Supplemental Disclosures were material to the decision of each Remy stockholder as to how to vote on the Merger, which ultimately cashed out their interest in the Company.

> ## 2. The Complexity, Length, and Expense of Further Litigation Supports Approval of the Settlement

After several rounds of negotiations, Plaintiffs were able to obtain Defendants' agreement to promptly disseminate the Supplemental Disclosures in advance of the stockholder vote on the

Merger.  While Plaintiffs could have rejected the settlement proposals and pushed forward with a motion to enjoin the stockholder vote, such course of action would have had uncertain results. The litigation, had it proceeded, likely would have been complex and expensive.  Moreover, from the outset, the sole focus of Plaintiffs' complaints was the disclosure inadequacies in Defendants' proxy materials.  Once Defendants offered to correct the overwhelming majority of these disclosure deficiencies, it would have been a waste of judicial and party resources to continue litigating issues that the parties were able to consensually resolve. Given the complexities and costs, and the continued risks if the parties were to proceed further, the Settlement represents an excellent result.  *See, e.g.*, *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 163 F.R.D. 200, 210 (S.D.N.Y. 1995)  ("Instead of the lengthy, costly, and uncertain course of further litigation, the settlement provides a significant and expeditious route to recovery for the Class."); *Koerner v. Copenhaver*, No. 12-1091, 2014 U.S. Dist. LEXIS 155783, at *12-13 (C.D. Ill. Nov. 3, 2014) .

### 3.     The Class Members Overwhelmingly Support the Settlement

The reaction of the proposed Class – or lack thereof – further supports approval of the Settlement.  *See, e.g.*, *Kosseff v. Ciocia*, No. 188, 2009 Del. Ch. LEXIS 242, at *1 (Del. Ch. Feb. 26, 2009) ; *Doe v. Bradley*, 64 A.3d 379, 396 (Del. Super. Ct. 2012)  (fact that only one objection was raised from class of thousands was significant in showing settlement's fairness). In the Notice, Remy stockholders were apprised of the background of the Actions, the benefits achieved in the Settlement, and that Counsel would be petitioning the Court for a Fee and Expense Award not to exceed $400,000 in attorneys' fees and up to $15,000 in unreimbursed litigation expenses.  To Plaintiffs' knowledge to date, no objections to the Settlement or to

Plaintiffs application for an award of attorneys' fees and expenses have been received. Smith Decl., ¶49.

### 4. The Settlement Is the Product of Good Faith, Arm's-Length Negotiations

The Settlement was reached following extensive, arm's-length negotiations between the Parties and the settlement negotiations were extensive and adversarial. Plaintiffs' counsel and Defendants' counsel exchanged several proposals and counter-proposals concerning the nature and scope of the Supplemental Disclosures. Smith Decl., ¶10. At the conclusion of these negotiations, Plaintiffs and Plaintiffs' counsel unanimously agreed to enter into the MOU. *Id.* The Settlement contemplated by the MOU ensured that Remy's stockholders were given material information previously omitted from the proxy and necessary for them to make a fully informed decision about whether to vote for or against the Merger.

After fully analyzing the merits of all Parties' contentions, including the impact of the proposed Settlement on Plaintiffs and absent Settlement Class Members, Plaintiffs and Plaintiffs' counsel entered into the Stipulation. Importantly, during the negotiations, all Parties had a clear view of the strengths and weaknesses of their respective claims and defenses, and the Settlement is the product of arm's-length negotiations between the Parties, who were all represented by counsel with extensive experience and expertise in stockholder litigation.

As discussed *supra*, there is a presumption that a settlement is fair where, as here, it is the product of arm's-length negotiations between competent and experienced counsel.

### 5. Plaintiffs' Counsel Endorse the Settlement

The opinion of the attorneys who engaged in the settlement negotiations and litigated the Actions are entitled to significant weight. *See, e.g.*, *Isby*, 75 F.3d at 1200 ("the district court was entitled to give consideration to the opinion of competent counsel that the settlement was fair,

reasonable, and adequate."); *In re Mexico Money Transfer Litig.* (*W. Union & Orlandi Valuta*), 164 F. Supp. 2d 1002, 1020 (N.D. Ill. 2000) ("The court places significant weight on the unanimously strong endorsement of these settlements by Plaintiffs' well-respected attorneys.") (citing *Isby*, 75 F.3d at 1200). In fact, courts are even "entitled to rely heavily on the opinion of competent counsel[.]" *Gautreaux v. Pierce*, 690 F.2d 616, 634 (7th Cir. 1982) (internal quotation marks omitted).

Here, Plaintiffs' Counsel has significant experience in securities and other complex class action litigation, and has negotiated hundreds of other substantial class action settlements throughout the country. Smith Decl., ¶22 & Exs. 1-5. Plaintiffs' Counsel is "well informed as to the operative facts" and "considerable risks" of the Actions. *See Reade-Alvarez v. Eltman, Eltman, & Cooper, P.C.*, 237 F.R.D. 26, 34 (E.D.N.Y. 2006). It is Plaintiffs' Counsel's informed opinion that, given the uncertainty and further substantial expense of pursuing the Actions against the Defendants, and the significant benefit obtained by ensuring that the Supplemental Disclosures were disseminated to Remy's stockholders prior to the stockholders' vote, the proposed Settlement is fair, reasonable and adequate, and in the best interests of the Class. Plaintiffs' Counsel's endorsement of the Settlement strongly militates in favor of final approval.

### 6.      The Stage of the Proceedings and the Amount of Discovery Completed

To ensure that a plaintiff has had access to sufficient information to evaluate both its case and the adequacy of a proposed settlement, courts in the Seventh Circuit consider the stage of the proceedings and the discovery taken. *See Isby*, 75 F.3d at 1199; *In re AT&T Mobility Wireless Data Servs. Tax Litig.*, 789 F. Supp. 2d 935, 958 (N.D. Ill. 2011). Here, both the knowledge of Plaintiffs' Counsel and the proceedings themselves have reached a stage where a well-founded evaluation of the claims and propriety of settlement could be made.

Plaintiffs received and reviewed core documents critical to evaluating the fairness of the Merger and the material omissions in the Proxy, including: (i) minutes of the Remy Board and (ii) presentations to the Remy Board by UBS. Smith Decl., ¶14. Plaintiffs' Counsel also conducted a deposition of a representative of UBS. *Id.* Plaintiffs' Counsel also worked with their financial expert, who has extensive experience in valuing companies like Remy, to evaluate the consideration to be received by Remy stockholders and to identify material omissions in the Proxy which Plaintiffs believed needed to be cured before the Remy stockholders' vote. *Id.* This discovery confirmed that the Settlement, from the perspective of Plaintiffs and their counsel, was fair, reasonable and adequate.

## V. THE PROPOSED SETTLEMENT CLASS SHOULD BE CERTIFIED

In presenting the proposed Settlement to the Court for preliminary approval, Plaintiffs requested that the Court preliminarily certify the Class for settlement purposes so that notice of the proposed Settlement, the Settlement Hearing, and the rights of Class members to request exclusion or object could be issued to the Class. In its July 27, 2016 Preliminary Approval Order, this Court preliminarily certified the Class. Plaintiffs submit that nothing has changed to alter the propriety of certification of the Class and, for all the reasons stated in the Plaintiffs' Memorandum of Law in Support of their Motion for Preliminary Approval, incorporated herein by reference, Plaintiffs now request that the Court affirm its determinations in the Preliminary Approval Order and finally certify the Class for purposes of carrying out the Settlement. In addition, Plaintiffs request that the Court affirm its certification of Plaintiffs as Class Representatives for the Class and its appointment of Plaintiffs' Counsel as Class Counsel for the Class.

## VI. THE FEE AWARD SHOULD BE APPROVED

For the benefits conferred through these Actions and the Settlement, Plaintiffs seek (and Defendants do not oppose) approval of the Fee and Expense Amount of $409,844.50. The requested Fee and Expense Amount is consistent with awards granted to plaintiff's counsel for obtaining similar relief in precedent actions prosecuted around the nation. Additionally, the requested Fee and Expense Amount represents a reasonable multiplier of 1.12 times Plaintiffs' Counsel's collective lodestar of approximately $354,884.50[12] and no Class members have objected to the request. Smith Decl., ¶53. Accordingly, Plaintiffs request that this Court award to Plaintiffs' Counsel the unopposed Fee and Expense Amount.

### A. The Applicable Legal Standard

Courts have long permitted counsel who create a benefit for others to recover their expenses, including reasonable attorneys' fees, from those who enjoy the benefit conferred. *See, e.g.*, *Boeing Co. v. Van Gernert*, 444 U.S. 472, 478 (1980) ; *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240 (1975) ; *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 394-95 (1970) . Under the common benefit doctrine, "the vindication of the class' rights … is the common benefit conferred on the class that justifies an award of attorneys' fees." *Merck*, 2010 U.S. Dist. LEXIS 29121, at *5 (quoting *Pawlak v. Greenawalt*, 713 F.2d 972, 983 (3d Cir. 1983) ). The common benefit doctrine is applicable in the context of class and shareholder derivative actions when there is no ascertainable fund from which attorneys' fees can be paid, but the litigation has conferred a substantial non-monetary benefit on an ascertainable group and the court has jurisdiction over both the subject matter of the lawsuit and the defendant. *See Mills*,

---

[12] As detailed in the time and expense declarations submitted herewith, Plaintiffs' Counsel devoted in excess of 531.9 hours and incurred $9,844.50 in unreimbursed expenses. After accounting for the expenses, the proposed Fee and Expense Amount of $409,844.50 reflects less than a 1.12 multiplier to Plaintiffs' Counsel's lodestar of $354,884.50. *See* Smith Decl., Exs. 1-5.

396 U.S. at 396. In light of the substantial benefits conferred on Remy stockholders in the Settlement, the Fee and Expense Amount is appropriate here under the common benefit doctrine.

In assessing the reasonableness of a fee amount, courts in the Seventh Circuit may employ "the lodestar method, the percentage of recovery method, or some combination of the two." *Florin v. Nationsbank of Ga., N.A.*, 60 F.3d 1245, 1247 n.2 (7th Cir. 1995). Where, as here, there is no "common fund" from which attorneys' fees can be awarded and the chief relief sought was injunctive in nature, the lodestar method is an appropriate approach for assessing the reasonableness of the fee request. *See Kirchoff v. Flynn*, 786 F.2d 320, 328 (7th Cir. 1986) ("the lodestar approach is best in cases with substantial injunctive or precedent-creating components"). Once the lodestar figure is calculated, the Seventh Circuit permits district courts to adjust the amount up or down after considering various relevant factors, including:

> the time and labor required; the novelty and difficulty of the questions; the skill requisite to perform the legal services properly; the preclusion of employment by the attorney due to acceptance of the case; the customary fee; whether the fee is fixed or contingent; time limitations imposed by the client or the circumstances; the amount involved and the results obtained; the experience, reputation, and ability of the attorneys; the "undesirability" of the case; the nature and length of the professional relationship with the client; and awards in similar cases. *Mathur v. Bd. of Trs. of S. Ill. Univ.*, 317 F.3d 738, 742 n.1 (7th Cir. 2003).

Determining the amount of a fee and expense award is a matter that rests within the sound discretion of the trial court. *See In re Dairy Farmers of Am., Inc., Cheese Antitrust Litig.*, 80 F. Supp. 3d 838, 844 (N.D. Ill. 2015). Indeed, in class actions such as this, the Federal Rules of Civil Procedure ("FRCP") explicitly provide courts with the discretion to "award reasonable attorney's fees . . . that are authorized by law or by the parties' agreement." FRCP 23(h). The Fee and Expense Amount sought by Plaintiffs' Counsel is reasonable and appropriate.

**B.** **The Common Benefit Doctrine Entitles Plaintiffs' Counsel to an Attorneys' Fee Award**

An award of attorneys' fees is appropriate under the common benefit doctrine if: (1) an attorney confers a substantial benefit, (2) to members of an ascertainable class, and (3) the court ensures that the costs are proportionately spread among that class. *See Hall v. Cole*, 412 U.S. 1, 5 (1973) ; *Mills*, 396 U.S. at 393-394; *In re Diet Drugs (Phentermine/Fenfluramine/ Dexfenfluramine) Prod. Liab. Litig.*, 582 F.3d 524, 546 (3d Cir. 2009) . Under this doctrine, attorneys' fees are awardable even though the benefit conferred is purely non-pecuniary in nature. *Mills*, 396 U.S. at 396. Here, the Fee and Expense Amount is appropriate under the common benefit doctrine because all three elements are satisfied.

First, as discussed *supra*, Plaintiffs and their counsel conferred a substantial benefit upon Remy stockholders by obtaining the Supplemental Disclosures, which enabled Remy stockholders to make a fully-informed decision in connection with the stockholder vote on the Merger. Smith Decl., ¶39. Courts have long recognized that obtaining non-monetary benefits for a class, such as additional material disclosures, can provide substantial value and support a court-approved award of attorneys' fees and reimbursement of expenses.[13] Plaintiffs' Counsel's services to the Class were of material value to the stockholders and entitle Plaintiffs' Counsel to a reasonable fee award.

---

[13] *See, e.g.*, *Mills v. Elec. Auto-Lite Co*., 396 U.S. 375, 396 (1970) ("In many suits under §14(a), particularly where the violation does not relate to the terms of the transaction for which proxies are solicited, it may be impossible to assign monetary value to the benefit. Nevertheless, the stress placed by Congress on the importance of fair and informed corporate suffrage leads to the conclusion that, in vindicating the statutory policy, petitioners have rendered a substantial service to the corporation and its shareholders."); *Florin v. Nationsbank, N.A.*, 34 F.3d 560, 563 (7th Cir. 1994) ("Courts may also make an exception to the American rule based on equitable doctrines, such as the "common fund" or "equitable fund" doctrine."); *Kahan v. Rosenstiel*, 424 F.2d 161, 166 (3d Cir. 1970) ("the award of attorney's fees is not limited to circumstances in which there is a monetary fund from which fees may be paid, but extends to any situation in which the litigation has conferred a substantial benefit on the members of an ascertainable class").

Second, the benefiting class consists of a group of readily identifiable beneficiaries defined as "any and all record and beneficial holders of Remy common stock . . . at any time between and including July 13, 2015 and November 10, 2015. . . ." The substantial benefit arising from the Actions through the Settlement – *i.e.*, the Supplemental Disclosures – was disseminated to all Remy stockholders sufficiently in advance of the stockholder vote on the Merger to enable them to make an informed decision. In light of these facts, the Class is ascertainable and consists of readily identifiable members. *See Merck*, 2010 U.S. Dist. LEXIS 29121, at *49-51.

Finally, the payment of the requested fee and expense award will be spread proportionally given that Remy and/or its insurers have agreed to bear any award of fees and expenses, and no member of the Class is expected to contribute directly to the payment of such an award. *See Hall v. Cole*, 412 U.S. 1, 7 (1973) ("Under these circumstances, reimbursement of the plaintiffs' attorneys' fees out of the corporate treasury simply shifted the costs of litigation to the class that has benefited from them and that would have had to pay them had it brought the suit.") (internal citations omitted); *see also Merck*, 2010 U.S. Dist. LEXIS 29121, at *50-51.

Accordingly, and in light of the substantial benefits conferred on Remy stockholders, Plaintiffs' Counsel are entitled to an award of reasonable fees and expenses.

## C. Negotiated Resolutions of Fee Issues Are Preferred and Should Be Upheld

The United States Supreme Court lauds the consensual resolution of attorneys' fee awards as the ideal toward which litigants should strive. In *Hensley v. Eckerhart*, 461 U.S. 424 (1983), the United States Supreme Court stated that a "request for attorney's fees should not result in a second major litigation. ***Ideally, of course, litigants will settle the amount of a fee.***" *Id.* at 437 (emphasis added). In representative litigation, it is widely recognized that fee agreements between plaintiffs and defendants are preferred. *See, e.g., Johnson v. Ga. Highway Express, Inc.*,

488 F.2d 714, 720 (5th Cir. 1974) ("In cases of this kind, we encourage counsel on both sides to utilize their best efforts to understandingly, sympathetically, and professionally arrive at a settlement as to attorney's fees.").

Consistent with the foregoing precedents, the Parties negotiated the amount of fees and expenses that Remy or its successors will pay to Plaintiffs' Counsel for their work on behalf of Remy stockholders. Smith Decl., ¶49. Specifically, Remy and its successors agreed not to oppose a fee and expense award in an amount up to $415,000. *Id.*; Stipulation, ¶15. That amount reflects a compromise reached through arm's-length bargaining by informed Parties. Importantly, the Parties began addressing the issue of attorneys' fees only after reaching agreement on all other terms and provisions of the Settlement. Smith Decl., ¶50. Thus, the agreement to pay attorneys' fees and expenses did not reduce or otherwise affect the benefits to Remy stockholders in any way.

Moreover, the Parties' negotiations were based upon a knowledgeable analysis of what an appropriate fee would be for the benefits achieved and the fees approved in similar situations. Plaintiffs' Counsel negotiated with defense counsel, who saw the efforts made by Plaintiffs' Counsel firsthand. Defense counsel have an interest in protecting their clients, who have a direct financial stake in the amount of the fees and expenses to be paid. Defendants are represented by highly-skilled lawyers, and do not need (and have not sought) protection from the Court for the results of their own negotiations regarding the amount of the fees and expenses to be paid. All counsel were able to consider and utilize as precedent fee decisions from similar actions. In such circumstances, the end result of those negotiations—which reflects all of the counsel's experience and views as to what is appropriate—is entitled to significant weight in considering Plaintiffs' Counsel's fee request. These factors clearly support an award to Plaintiffs' Counsel of

the full amount negotiated by the Parties. *See, e.g.*, *Prandini v. Nat'l Tea Co.*, 557 F.2d 1015 (3d Cir. 1977) (absent evidence of collusion, a negotiated fee that does not diminish the amount of recovery by a class is entitled to substantial weight and deference.).

### D. The Requested Attorneys' Fee Award Is Reasonable Under a Lodestar Analysis

In setting the lodestar amount, the court "multipl[ies] the number of hours the attorney reasonably expended on the litigation times a reasonable hourly rate. Once this amount is calculated, the district court may adjust the amount up or down to take into account various factors regarding the litigation." *See Mathur*, 317 F.3d at 742 (citations omitted). Applying their reasonable hourly rates,[14] Plaintiffs' Counsel's collective lodestar is $354,884.50. *See* Smith Decl., ¶56. After accounting for the expenses incurred, the proposed fee award of $415,000 reflects less than a 1.12 multiplier to the lodestar of $354,884.50. *See id.*

Given the contingent nature of Plaintiffs' Counsel's compensation, a premium over counsel's normal hourly rate is appropriate.[15] In awarding attorneys' fees to class counsel, it is

---

[14] The rates charged by Plaintiffs' Counsel are reasonable given their legal reputation, experience, and status. Smith Decl., ¶49. Plaintiffs' Counsel are highly regarded firms that practice extensively in the complex and specialized field of shareholder litigation. Smith Decl., Ex. 1-5; *see Chrapliwy v. Uniroyal, Inc.*, 670 F.2d 760, 768 (7th Cir. 1982) (noting that attorneys with specialized skills in a narrow area of law tend to be found in large cities and charge more for performing services in this area of expertise than a general practitioner will charge for performing similar services). Thus, Plaintiffs' Counsel's rates are well within the range charged by attorneys with comparable experience. *See, e.g.*, *Abbott v. Lockheed Martin Corp.*, No. 06-cv-701, 2015 U.S. Dist. LEXIS 93206, at *11-12 (S.D. Ill. July 17, 2015) (finding the reasonable hourly rate for Class Counsel's services are as follows: for attorneys with at least 25 years of experience, $974 per hour; for attorneys with 15-24 years of experience, $826 per hour; for attorneys with 5-14 years of experience, $595 per hour; for attorneys with 2-4 years of experience, $447 per hour; for Paralegals and Law Clerks, $300 per hour; for Legal Assistants, $186 per hour).

[15] *See Hensley*, 461 U.S. at 448 (explaining that "[o]n many occasions awarding counsel fees that reflect the full market value of their time will require paying more than their customary hourly rates" and noting that contingency arrangements cause lawyers to bear the risk of non-recovery usually borne by clients in cases where lawyers are paid an hourly rate, and also cause lawyers to forfeit time value of money); *Dutchak v. Cent. States, Se. & Sw. Areas Pension Fund*, 932 F.2d 591, 595 (7th Cir. 1991) (noting that contingent litigation weighs heavily in favor of increasing the lodestar because "there were inherent uncertainties in pursuing the claim."); *Johnson v. GDF, Inc.*, 668 F.3d 927, 929 (7th Cir. 2012) (noting that "once calculated, the lodestar amount may be adjusted"); *Ryan ex rel. Maxim Integrated Prods. v. Gifford*, C.A. No. 2213, 2009 Del. Ch. LEXIS 1, at *40 (Del. Ch. Jan. 2, 2009) (explaining that where shareholder plaintiffs' attorneys undertook the case on an entirely contingent basis and faced the possibility of receiving no consideration for their efforts if they were not successful in obtaining a recovery, "an attorney may be entitled to a much larger fee … than when [the attorney's compensation] is fixed on an hourly or

appropriate that "[o]nce the total number of hours and the hourly rate are calculated ... it is then necessary to consider if the lodestar rate should be increased." *In re Cenco, Inc. Sec. Litig.*, 519 F. Supp. 322, 326 (N.D. Ill. 1981) . The Court may increase the award by applying a "multiplier" to the lodestar amount if appropriate under the circumstances. *See Reid v. Unilever U.S., Inc.*, 2015 U.S. Dist. LEXIS 75383, at *8-9 (N.D. Ill. June 10, 2015) . Multipliers are appropriate in "class-action cases, in which a multiplier may take the place of the contingent-fee contract that the lawyers for the class cannot negotiate because they are not actually retained by—they do not make a contract with—the members of the class." *Burdett v. Miller*, 957 F.2d 1375, 1384 (7th Cir. 1992) .

The 1.12 multiplier requested here easily falls within the range of implied multipliers that have been found reasonable in other class actions that conferred similar benefits to the class. *See Dutchak v. Cent. States, Se. & Sw. Areas Pension Fund*, 932 F.2d 591, 596 (7th Cir. 1991) (affirming a multiplier of 2 and noting that the "benefits [conferred upon] thousands of [class members] are themselves a conclusive demonstration of the public good served by the litigation"); *In re Gould Sec. Litig.*, 727 F. Supp. 1201, 1207 (N.D. Ill. 1989) (holding that a multiplier of 1.75 "reasonably reflect[ed] the contingent nature of [the] litigation").

In short, the meaningful results and significant efforts expended in the Actions establish that the agreed-upon fee and expense award of $409,844.50 is reasonable.

### E.     Fees Awarded in Similar Cases Support the Fee Request

During negotiations over an appropriate fee amount for Plaintiffs' Counsel, the Parties were aware of the range of fees paid in other similar actions.    Courts have consistently

---

contractual basis"); *In re Plains Res., Inc. S'holders Litig.*, C.A. No. 071-N, 2005 Del. Ch. LEXIS 12, at *22 (Del. Ch. Feb. 4, 2005)  ("[P]laintiffs' counsel were all retained on a contingent fee basis, and stood to gain nothing unless the litigation was successful. It is consistent with the public policy of Delaware to reward this risk-taking in the interests of shareholders.").

recognized the value of disclosures in the context of corporate transactions like the instant case. Indeed, courts within the Seventh Circuit and across the country have awarded plaintiffs' counsel fees and expenses consistent with or higher than the amount requested here in cases where the relief obtained was additional supplemental or curative disclosures. *See, e.g., McGill v. Ralph Hake, et al.,* No. 1:15-cv-00217-TWP-DKL, slip op. (S.D. In. Mar. 10, 2016) (awarding $410,000 in fees and expenses for obtaining supplemental disclosures in the context of a merger transaction) (Smith Decl., Ex. 16); *Collier v. Brightpoint, Inc.,* No. 1:12-cv-01016, 2013 U.S. Dist. LEXIS 62125, at *9 (S.D. Ind. May 1, 2013) (awarding $600,000 in fees and expenses for obtaining supplemental disclosures in the context of a merger transaction); *In re Meadowbrook Ins. Group, Inc. S'holder Litig.,* No. 5:15-cv-11057-JCO-MJH, slip op., ¶12 (E.D. Mich. April 7, 2016) (approving $425,000 fee and expense award for supplemental disclosures relating to management's financial projections, the financial analyses performed by the company's financial advisor, and the financial advisor's potential conflicts of interests) (Smith Decl., Ex. 12); *In re Covidien PLC Securities Litigation.,* Civil Action No.:1:14-cv-12949 (D. Mass. Sept. 22, 2015) (Final Order) (awarding $540,000 in fees and expenses for supplemental disclosures relating to the company's financial projections, and assumptions underlying the analyses performed by the financial advisor) (Smith Decl., Ex. 13); *In re QR Energy LP Unitholder Litigation.,* Lead Case No.:4:14-cv-02195 (S.D. Texas Sept. 10, 2015) (Final Order) (awarding $472,500 in fees and expenses for supplemental disclosures relating to the company's financial projections, the sales process leading up to the merger, conflicts of interest of the financial advisor, and assumptions underlying the analyses performed by the financial advisor, including information pertaining to the comparable companies and precedent transactions analyses) (Smith Decl., Ex. 14); *In re LCA-Vision S'holder Litig.,* No. A1401239, slip op., ¶18 (Ohio Com. Pl.- Hamilton Cnty. Aug.

10, 2015) (approving $562,500 fee and expense award for supplemental disclosures relating to the company's financial projections, the sales process leading up to the merger, conflicts of interest of the financial advisor, and assumptions underlying the analyses performed by the financial advisor, among other things) (Smith Decl., Ex. 15); and *Nichting v. DPL, Inc.*, No. 3:11-cv-00141, slip op. (S.D. Ohio Feb. 24, 2012) (awarding $700,000 in fees and expenses for obtaining supplemental disclosures) (Smith Decl., Ex. 9).

## VII.    CONCLUSION

Plaintiffs respectfully request that the Court enter the Order and Final Judgment, thereby finally approving the Settlement, finally certifying the Class for settlement purposes, and approving the Fee and Expense Award.

DATED:  October 5, 2016

Respectfully submitted,

By: */s/  A. Richard M. Blaiklock*
A. Richard M. Blaiklock
**LEWIS WAGNER, LLP**
501 Indiana Avenue, Suite 200
Indianapolis, Indiana 46202
Telephone:     (317) 237-0500
Facsimile:      (317) 630-2790
Email: rblaiklock@lewiswagner.com

*Attorneys for Plaintiff Bushansky and Liaison Counsel*

**OF COUNSEL**
**WEISSLAW LLP**
Richard A. Acocelli
Michael A. Rogovin
Kelly C. Keenan
1500 Broadway, 16th Floor
New York, NY 10036
Tel:   212-682-3025
Email:  racocelli@weisslawllp.com

*Attorneys for Plaintiff Bushansky and Co-Lead Counsel*
**FARUQI & FARUQI, LLP**
Nadeem Faruqi

369 Lexington Ave., Tenth Floor
New York, NY 10017
Tel:     212-983-9330
Fax:     212-983-9331
Email: nfaruqi@faruqilaw.com

*Attorneys for Plaintiff Phillips and Co-Lead
Counsel*

**BRODSKY & SMITH, LLC**
Evan J. Smith
Marc L. Ackerman
Two Bala Plaza, Suite 510
Bala Cynwyd, PA 19004
Tel:     610-667-6200
Fax:     610-667-9029
Email: esmith@brodsky-smith.com
        mackerman@brodsky-smith.com

*Attorneys for Plaintiff Garcia and Co-Lead
Counsel*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing has been served by CM/ECF or electronic mail this 5th day of October, 2016 to the following, which includes all counsel of record:

Anne N. DePrez
**BARNES & THORNBURG LLP**
11 South Meridian Street
Indianapolis, IN  46204-3535
Email: anne.deprez@btlaw.com

William N. Riley
**RILEY WILLIAMS & PIATT, LLC**
The Hammond Block Building
301 Massachusetts Avenue
Indianapolis, IN  46204

By: */s/  A. Richard M. Blaiklock*
     A.  Richard M. Blaiklock