# Exhibit A

**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| JASON GARCIA, Individually and on Behalf of All Others Similarly Situated, | |
| Plaintiff, | |
| v. | No. 1:15-cv-01385TWP-TAB |
| REMY INTERNATIONAL, INC., JOHN J. PITTAS, DOUGLAS K. AMMERMAN, KARL G. GLASSMAN, LAWRENCE F. HAGENBUCH, CHARLES G. MCCLURE, ARIK W. RUCHIM, GEORGE P. SCANLON, J. NORMAN STOUT, JOHN H. WEBER, | |
| Defendants. | |

--------------------------------------------------------

| | |
|---|---|
| MAXINE PHILLIPS, Individually and on Behalf of All Others Similarly Situated, | |
| Plaintiff, | |
| v. | No. 1:15-cv-01343-TWP-TAB |
| REMY INTERNATIONAL, INC., JOHN J. PITTAS, DOUGLAS K. AMMERMAN, KARL G. GLASSMAN, LAWRENCE F. HAGENBUCH, CHARLES G. MCCLURE, ARIK W. RUCHIM, GEORGE P. SCANLON, J. NORMAN STOUT, JOHN H. WEBER, | |
| Defendants. | |

--------------------------------------------------------

| | |
|---|---|
| STEPHEN BUSHANSKY, Individually and on Behalf of All Others Similarly Situated, | |
| Plaintiff, | |
| v. | No. 1:15-cv-1361-RLY-MJD |
| REMY INTERNATIONAL, INC., JOHN J. PITTAS, DOUGLAS K. AMMERMAN, KARL G. GLASSMAN, LAWRENCE F. HAGENBUCH, CHARLES G. MCCLURE, | |

- 1 -

ARIK W. RUCHIM, GEORGE P. SCANLON,
J. NORMAN STOUT, JOHN H. WEBER,

                    Defendants.

**DECLARATION OF EVAN J. SMITH IN SUPPORT OF
PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT,
CLASS CERTIFICATION, AND APPLICATION FOR AWARD OF ATTORNEYS' FEES
AND EXPENSES**

I, EVAN J. SMITH, hereby declare as follows:

1.      I am a partner with at the law firm of Brodsky & Smith, LLC ("Brodsky & Smith"), which, together with the law firms of Faruqi & Faruqi, LLP and WeissLaw LLP, is Counsel for plaintiffs Jason Garcia, Maxine Phillips and Stephen Bushansky ("Plaintiffs") in the above-captioned actions (the "Actions").[1] I am duly licensed to practice before all courts in the Commonwealth of Pennsylvania and my *pro hac vice* admission was granted by the Court on May 19, 2016. I respectfully submit this Declaration in support of Plaintiffs' Motion for Final Approval of Class Action Settlement, Class Certification, and Application for Award of Attorneys' Fees and Expenses in accordance with the Stipulation. I have personal knowledge of the matters set forth herein based on my active participation in the prosecution and settlement of the Actions, and, if called as a witness, could and would testify competently thereto.

2.      The purpose of this Declaration is to describe the nature and procedural history of the Actions, Plaintiffs' Counsel's investigation and prosecution of the Actions, the negotiations that led to the proposed Settlement, and the results achieved for the proposed Class. In addition,

---

[1] Unless otherwise noted, all capitalized terms shall have the same definitions as set forth in the Stipulation and Agreement of Compromise, Settlement, and Release filed July 19, 2016 ("Stipulation").

this declaration sets forth the basis for Plaintiffs' Counsel's recommendation that the Court approve the Settlement as fair, reasonable, and adequate, and the requested award of attorneys' fees and expenses as fair and reasonable.

## I.    PRELIMINARY STATEMENT

3.    Plaintiffs have obtained a beneficial result on behalf of the former holders of Remy International, Inc. ("Remy" or the "Company") common stock in the form of supplemental disclosures contained in Form 8-K filed with the U.S. Securities and Exchange Commission ("SEC") on September 14, 2015 (the "Supplemental Disclosures"), and related to the acquisition of Remy by BorgWarner Inc. ("BorgWarner") (the "Merger").  The Supplemental Disclosures were obtained in a compromise recognized as both valuable and as the recommended course of action in cases of this type by numerous courts.

4.    Indeed, one of the principal objectives of the Action was to ensure that Remy's public stockholders were given all material information to cast a fully informed vote on the Merger.  Given the short period of time between the announcement of the Merger Agreement and the stockholder vote on the Merger, Plaintiffs' efforts to obtain the Supplemental Disclosures were, by necessity, performed on an expedited basis.

5.    The Settlement is the result of these efforts, and its relief directly addresses Plaintiffs' claims for injunctive relief related to Defendants' failure to disclose material information in connection with the Merger.  Indeed, Plaintiffs' Counsel, who are well-respected and experienced in prosecuting stockholder class actions, have concluded that the Settlement achieves all of the goals of the Action and, therefore, is the best possible result for members of the Class.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

6.      On July 12, 2015, Remy and BorgWarner finalized an Agreement and Plan of Merger (the "Merger Agreement"), pursuant to which Band Merger Sub, Inc. merged with and into Remy, with Remy surviving as a wholly owned subsidiary of BorgWarner (the "Merger"), and Remy shareholders received $29.50 in cash (the "Merger Consideration") in exchange for each share of Remy common stock they owned.

### A.    Procedural History of the Litigation

7.      On August 3, 2015, Remy filed with the SEC a Preliminary Proxy Statement on Schedule 14 (the "Preliminary Proxy"), relating to the Merger which was distributed to Remy stockholders.

8.      Following the filing and dissemination of the Preliminary Proxy, three putative class actions were filed by certain stockholders of Remy alleging, among other things, that the Defendants had violated Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 and Rule 14a-9 promulgated thereunder: (1) Maxine Phillips v. Remy International, et al., No. 1:15-cv-1343 (SD. Ind.) (the "Phillips Action"); (2) Jason Garcia v. Remy International, et al., No. 1:15-cv-01385 (S.D. Ind.) (the "Garcia Action"); and (3) Stephen Bushansky v.Remy International, et al., No. 1:15-cv-1361 (S.D. Ind.) (the "Bushansky Action," together with the Phillips Action and Garcia Action, the "Actions").

9.      On August 18, 2015, Defendants filed with the SEC and disseminated to Remy shareholders the definitive proxy statement on Schedule 14A (the "Definitive Proxy" and together with the Preliminary Proxy, the "Proxy").

### B.    Settlement Negotiations and Confirmatory Discovery

10.     On August 31, 2015, having reviewed the public filings related to the Merger, the Preliminary Proxy, and the Definitive Proxy Statement, and in consultation with their financial

- 4 -

expert, Plaintiffs' Counsel sent a written settlement demand to Defendants.  Plaintiffs' Counsel and Defendants' Counsel exchanged several proposals and counter-proposals concerning the nature and scope of certain Supplemental Disclosures. Ultimately, Defendants agreed to provide Remy's stockholders with material information concerning, *inter alia*: (i) the financial forecasts of the Company; (ii) the material financial analyses UBS performed in connection with providing its fairness opinion; (iii) potential conflicts of interest faced by certain Company directors and Remy's financial advisor UBS Securities LLC ("UBS") in connection with the Merger; and (iv) material information with respect to the sales process conducted by the Board and the background of the transaction.  These Supplemental Disclosures resolved many of the issues raised by Plaintiffs in the litigation.

11.     In early September 2015, counsel for the Parties began engaging in arm's-length negotiations concerning a possible resolution of the Actions, including the negotiation of the Supplemental Disclosures sufficiently in advance of the Remy stockholders meeting to approve the Merger, which was set for September 22, 2015 (the "Special Meeting").

12.     After arm's-length negotiations, on September 14, 2015, the Parties entered into a memorandum of understanding ("MOU"). Pursuant to the MOU, Defendants agreed to make the Supplemental Disclosures, as reflected in the Form 8-K dated September 14, 2015, filed by Remy with the SEC.  The Supplemental Disclosures provided Remy's stockholders with material information concerning the fairness of the Merger and the Merger Consideration that had been omitted from the Proxy and was necessary for them to cast a fully informed vote concerning the Merger.

13.     On September 22, 2015, the Special Meeting was held and Remy stockholders approved the Merger.  On November 10, 2015, the Merger closed and Remy became a wholly owned subsidiary of BorgWarner.

14.     Following the execution of the MOU, Plaintiffs' Counsel conducted additional discovery to confirm the reasonableness of the terms of the Settlement (the "Confirmatory Discovery").  In particular, Plaintiffs' Counsel reviewed thousands of pages of additional non-public documents produced by Defendants and conducted the deposition of Vijay Kumra, a representative of UBS, Remy's financial advisor.  During the course of discovery, Plaintiffs were able to fully ascertain the strengths and weaknesses of their claims.  Moreover, through the deposition of Mr. Kumra, Plaintiffs assured themselves that the process undertaken by the Individual Defendants to sell the Company and how the Individual Defendants valued the Company was satisfactory.  Plaintiffs, only after full evaluation of the strengths and weaknesses of their claims, arrived at the belief that the Action favors Settlement.

15.     From the initiation of the litigation, Plaintiffs vigorously pursued the Actions and sought to cure material omissions in the Proxy.  Plaintiffs' Counsel worked with their financial expert, who has extensive experience in valuing companies like Remy, to evaluate the consideration to be received by Remy stockholders and to identify material omissions in the proxy which Plaintiffs believed needed to be cured before the Remy stockholders' vote.

16.     After fully analyzing the merits of all parties' contentions, including the impact of the proposed Settlement on Plaintiffs and absent Class members, the Parties entered into the Stipulation on July 19, 2016.  During the negotiations, all Parties had a clear view of the strengths and weaknesses of their respective claims and defenses, and the Settlement is the

- 6 -

product of arm's-length negotiations between the Parties, who were all represented by counsel with extensive experience and expertise in stockholder litigation.

**C.      Preliminary Approval and Issuance of Notice to Remy Stockholders**

17.      On July 22, 2016, Plaintiffs moved for the entry of the Scheduling Order and Order Preliminarily Approving Proposed Settlement (the "Preliminary Approval Order") that would: (i) preliminarily approve the Settlement set forth in the Stipulation; (ii) preliminarily certify, for settlement purposes only, a non-opt-out Class; (iii) approve the form, manner, and content of the notice to be provided to the proposed Class and order the direct mailing of the Notice to Class members; and (iv) schedule a hearing (the "Settlement Hearing") at which the Court will consider final approval of the Settlement.  Dkt. Nos. 21-23.

18.      On July 27, 2016, this Court granted the Preliminary Approval Order, therein: (i) preliminarily approving the Settlement; (ii) preliminarily certifying the Class; (iii) approving the Notice and ordering the mailing thereof; and (iv) scheduling the Settlement Hearing for November 2, 2016.  *See* Preliminary Approval Order, ¶¶1-2, 4.

19.      Pursuant to the Preliminary Approval Order, the Notice was mailed to the last known address of each reasonably identifiable member of the proposed Class by U.S. Mail, first class postage pre-paid, in accordance with the Preliminary Approval Order.  The Notice set forth the background and procedural history of this litigation, including the claims asserted against the Defendants; a summary of the Settlement terms; an explanation of the persons and claims being released under the Settlement; a detailed explanation of reasons for the Settlement; a description of the Class; the date, time, and place of the hearing for final approval; a statement of the Class members' right to appear and object with or without counsel and the procedures which must be followed to be heard; a statement that Plaintiffs' Counsel intends to petition for an award of

attorneys' fees and expenses, and whom to contact if more information about the Settlement is desired.

20.     As of the date of this filing, the Parties have not received any objection and none have been filed with the Court.  The lack of objections is convincing evidence of the proposed Settlement's fairness and adequacy, particularly given the comprehensive notice provided to shareholders.

## III.     THE TERMS AND BENEFITS OF THE PROPOSED SETTLEMENT

21.     The Settlement required Remy to disclose certain material information to members of the Class that Plaintiffs believed was critical to Remy's stockholders' ability to make a fully informed decision regarding whether to vote for, or against, the Merger.   The Supplemental Disclosures, which were set forth in a Form 8-K filed by Remy with the SEC on September 14, 2015, provided material information to Remy stockholders in advance of the Special Meeting.

22.     On the basis of all the information available to them, including publicly-available information, non-public information and the additional discovery as described herein, Plaintiffs' Counsel have determined that the Settlement is fair, reasonable, adequate, and in the best interests of Plaintiffs and the Class because it enabled the stockholders of Remy to make a fully informed decision on whether to approve the Merger.  It is undisputed that the pendency and prosecution of the Action and the arm's-length negotiations between Plaintiffs' Counsel and Defendants' counsel therein were the motivating factor in Defendants' agreement to provide Remy stockholders with the Supplemental Disclosures, which were filed with the SEC via Form 8-K on September 14, 2015.  *See* Stipulation, ¶¶8, 20.

23.     The Supplemental Disclosures provided additional information regarding, among other things, the following:

*Information Concerning Remy's Financial Projections*

24.     With respect to the non-public financial forecasts that Remy provided to UBS, Borg Warner and Borg Warner's financial advisor in connection with the negotiation of the Merger, which were prepared by Remy's management for the Board to use in connection with evaluating the Merger, the Supplemental Disclosures provided Remy's projections for the following items for 2015-2019: (i) taxes (or tax rate), (ii) changes in net working capital, (iii) restructuring and impairment charges, (iv) unlevered free cash flow and adjustments thereto, and (v) a reconciliation of GAAP net income and non-GAAP EBITDA.  The original disclosures in the Proxy with respect to the Company's projections failed to provide sufficient information to enable stockholders to either (i) independently prepare a Discounted Cash Flow ("DCF") analysis, or (ii) critically review the DCF performed by UBS in order to assess its accuracy and/or reasonableness, and therefore the amount of weight (if any) to place on UBS's DCF results.  As an initial matter, it is important to understand that the DCF analysis has primacy among corporate valuation techniques. This particular analysis, in fact, forms the basis for all other valuation techniques and is the very core of modern corporate finance.  Both academicians and practitioners alike acknowledge this principle.

25.     A DCF analysis cannot be performed without projected cash flows. Furthermore, the unique vantage point from which it is able to ascertain the future outlook of the business makes management's assessment of future cash flows all but irreplaceable. For this reason, the disclosure of projected cash flows (or, equivalently, the financial figures for the formula used to calculate cash flows), is a staple in the vast majority of proxy statements filed by publicly traded companies being acquired in corporate mergers. The original disclosures in the Proxy contained certain financial projections, but these projections completely excluded the unlevered free cash

flows commonly used in DCF analyses (including the DCF analyses prepared by UBS in support of its fairness opinion).  The absence of such critical information from the original disclosures in the Proxy in this instance was conspicuous and inappropriate.  Nor was the information contained in the original disclosures in the Proxy sufficient to perform calculations to produce the unlevered free cash flows, which are necessary for the type of DCF analyses prepared by UBS for its fairness opinion. The financial projections contained in the original disclosures included one forecast scenario which omitted unlevered free cash flows, but was instead limited to revenue, adjusted EBITDA, depreciation & amortization and capital expenditures. Consequently, as detailed above, Remy's stockholders were provided with neither unlevered free cash flow figures nor the information necessary to calculate such figures for themselves.

26.    The Supplemental Disclosures remedied this significant problem by: (i) disclosing the "unlevered free cash flows" for the entire projection period; and (ii) providing the figures corresponding to the unlevered free cash flow formula, thus enabling Remy's stockholders to calculate for themselves the unlevered free cash flow figures corresponding to the Company's projections.

***Information Concerning UBS's Financial Analyses***

27.    With respect to the material financial analyses UBS utilized in connection with providing its fairness opinion, the Supplemental Disclosures provided, among other things: (i) the unlevered free cash flow figured utilized by UBS in its Illustrative Discounted Cash Flow Analysis of Remy; (ii) the individual multiples for each of the selected public companies analyzed by UBS, including (a) EV/LTM EBITDA, (b) EV/2015E EBITDA, (c) EV/2016 EBITDA, (d) 2015E P/E, and (e) 2016 P/E for the Selected Public Trading Companies Analysis for Remy; and (iii) the observed transaction-by-transaction (a) enterprise values, and (b) pricing

multiples for each of the selected transactions analyzed by UBS for its Selected Transactions Analysis for Remy.

28.     The disclosure of projected cash flows (or, equivalently, the financial figures for the formula used to calculate cash flows), is a staple in the vast majority of proxy statements filed by publicly traded companies being acquired in corporate mergers. The original disclosures in the Proxy contained certain financial projections, but these projections completely excluded the unlevered free cash flows commonly used in DCF analyses (including the DCF analyses prepared by UBS in support of its fairness opinion).  The absence of such critical information from the original disclosures in the Proxy in this instance was conspicuous and inappropriate. The Supplemental Disclosures remedied this omission and allowed Remy stockholders to assess UBS's analysis and also to perform their own DCF analysis using discount rates and terminal multiples they deemed appropriate to apply to the newly disclosed unlevered free cash flow figures for the Company.

29.     Additionally, as part of the Supplemental Disclosures, important information was provided concerning the observed multiples and selected companies reviewed by UBS in its *Selected Public Trading Companies Analysis* for Remy.  Specifically, (a) EV/LTM EBITDA, (b) EV/2015E EBITDA, (c) EV/2016 EBITDA, (d) 2015E P/E, and (e) 2016 P/E were disclosed for each of the selected companies. Not only did this information provide greater context as to how Remy compared to its public peers, but it also provided a more complete picture of the work done by UBS.  A selected public comparables analysis is one of the three primary valuation analyses typically performed as part of the valuation process for a company, with the other two analyses being a precedent transactions analysis and a discounted cash flow analysis.   The selected public comparables analysis is a market approach to valuation, "The market approach to

- 11 -

valuation is relevant because it uses observable factual evidence of actual sales of other properties to derive indications of value."  Said another way, this type of analysis uses multiples and a benchmarking process for publicly-traded "peers" as a basis of valuation.  No two companies are identical, so it is important to undertake this benchmarking process as there are certain companies that will be more similar to the valuation subject than others. The selected comparable companies used in the analysis were chosen because UBS felt they all shared similarities to Remy.  Invariably, however, some types of companies will share more similarities to Remy than others and, without the individual multiples, stockholders have a limited ability to gauge which companies are most like Remy when drawing conclusions from UBS's analysis. Because UBS did not actually select and apply multiples in this analysis as is customary, this left unanswered questions about how UBS's opinion was based on this market information.  The disclosure of the individual multiples and metrics provided enough detail to help evaluate Remy against its peers in evaluating the sufficiency of the Merger consideration.  Thus, without the aforementioned information, stockholders' ability to understand UBS's analysis was significantly limited, rendering them unable to make a fully-informed decision regarding the Merger.

30.     As part of the Supplemental Disclosures, stockholders were also provided with the observed transaction-by-transaction (a) enterprise values, and (b) pricing multiples for each of the selected transactions analyzed by UBS for its *Selected Transactions Analysis* for Remy.

31.     This information was important because it provided a better understanding of the scope of work performed by UBS in arriving at its fairness opinion.  As described above, a precedent transactions analysis is one of the three primary valuation analyses typically performed by financial advisors.  Like the *Selected Public Trading Companies Analysis*, the *Precedent Transactions Analysis* UBS performed is a market approach to valuation, "The basic principles

of the transaction method are the same as for the guideline publicly traded company method. The differences in implementation are a result of the differences in data available and, in some cases, the structure of the transactions."

32. In the case of a precedent transactions analysis, the financial advisor typically reviews observable transaction metrics, including valuation multiples and the characteristics of the comparable target companies, in order to determine an appropriate multiple to value the subject company. Much like with a comparable companies analysis, no two target companies in a precedent transactions analysis will be identical. As such, it is important to also review benchmarking metrics for transactions to determine which transactions are the most relevant. The two most recent transaction in the set of transaction comparables, MAHLE GmbH's acquisition of Delphi Automotive and Hahn & Co./ Hanook Tire Co.'s acquisition of Halla Visteon Climate Control Corp. demonstrated the highest EV/LTM EBITDA multiples of any of the transactions reviewed, 9.5x and 10.1x respectively. This disclosure provided important context to Remy stockholders as to the valuations being paid most recently in comparable transactions and allowed Remy stockholders to benchmark the EV/LTM EBITDA multiples implied by the Merger against the most recent transactions. The original disclosures in the Proxy only provided the mean and median EV/LTM EBITDA multiples for the transaction comp set of 7.6x and 7.5x, leaving stockholders in the dark taht the two most recent transactions analyzed by UBS had much higher multiples. Similarly to its *Select Public Trading Companies Analysis*, UBS did not select and apply multiples to estimate values for Remy. As such, the individual multiples and metrics provided as part of this Supplemental Disclosure provided important context and allowed Remy stockholders to evaluate whether the multiple being received by

Remy was appropriate based on Remy's comparability to the specific transactions included as part of this analysis.

***Information Concerning the Potential Conflicts of Interest faced by Certain Company Directors and UBS***

33.     With respect to potential conflicts of interest involving certain Remy directors, the Supplemental Disclosures provided that defendant Arik W. Ruchim is a Partner at H Partners Management, LLC, the hedge fund, and that together with H Partners, LP, H Partners Capital, LLC, P H Partners Ltd., H Offshore Fund Ltd. and Rehan Jeffer (collectively, "H Partners Group"), they are the second largest stockholder (after FMR LLC) in Remy with a holding of 3,843,336 shares of Remy as of July 31, 2015.

34.     With respect to potential conflicts of interest involving UBS, the Supplemental Disclosures provided additional information about UBS's role as the Joint Lead Arranger and Bookrunner in the refinancing of the Company's debt facility in 2013.

35.     With respect to potential conflicts of interest involving UBS, the Supplemental Disclosures provided additional information about the value of fees UBS has received since 2007 for the advisory services it has provided to Remy, including having acted as financial advisor to the Company in its 2014 transaction with Fidelity National Financial, Inc.

36.     The above information Plaintiffs obtained for the Class via the Supplemental Disclosures was clearly material to Remy's stockholders.

***Information Concerning the Background of the Merger***

37.     The Supplemental Disclosures provided Remy's stockholders with material information related to the background of the Merger. Specifically, with respect to potential conflicts of interest involving the Merger, the Supplemental Disclosures disclosed that Defendant

Arik W. Ruchim is a partner at H Partners Management, LLC, and that together with H Partners, LP, H Partners Capital, LLC, P H Partners Ltd., H Offshore Fund Ltd. and Rehan Jeffer (collectively, "H Partners Group"), the combined entities are the second largest stockholder in Remy. Moreover, with respect to potential conflicts of interest involving UBS, the Supplemental Disclosures provided additional information about UBS's role as the joint lead arranger and bookrunner in the refinancing of the Company's debt facility in 2013, and additional information regarding the value of fees UBS has received since 2007 for the advisory services it has provided to Remy. Armed with this information, Remy stockholders were able to assess whether UBS was incentivized to push for and support a sale of Remy based on the historical fees it had received for previous work provided for the Company as compared to the fees it stood to receive through a sale of the Company.

38.    Such information is vital for stockholders to determine whether the Company was was sold to maximize the value for all of its stockholders or whether the sale process was tainted by certain constituents standing to uniquely benefit from a sale of the Company rather than have the Company continue to operate as a standalone public company.

## IV.    THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE AND SHOULD BE APPROVED

39.    The Settlement provides the Supplemental Disclosures that conferred substantial benefits on the Class by permitting Remy stockholders to make an informed decision whether to approve the Merger. While Plaintiffs believe that their disclosure claims were strong, they believe that securing the Supplemental Disclosures and not attempting to enjoin the Merger, when weighed against the choice of continuing litigation or abandoning the Class, was in the Class's best interest.

40.     The decision to enter into the Settlement was made with knowledge of the uncertainty of Plaintiffs' claims and the difficulty of obtaining the extraordinary relief of enjoining the Merger.  In order to have received full recovery, Plaintiffs' first hurdle would have been succeeding on a motion to enjoin the Merger.  Plaintiffs recognize that an injunction is an extraordinary remedy, which requires a showing of probable success on the merits, irreparable harm, and a balance of the injuries in favor of Plaintiffs.  In the event the injunction had been granted, Plaintiffs would then have to succeed after a full trial on the merits of the case. If the injunction had been denied, Plaintiffs would have lost the ability to receive additional disclosures prior to the stockholder vote, and Remy stockholders would not have obtained all the information needed to make a fully informed decision prior to the stockholder vote.

41.     Once Plaintiffs' financial expert had determined the Merger price to be within the reasonable range, and Plaintiffs' Counsel reviewed relevant SEC filings and other available Company information, it became clear it would be best for the Class to obtain additional material disclosures so that each Class member could make a decision based on a complete and accurate presentation.  Plaintiffs' Counsel believe the Supplemental Disclosures were material to the decision of each Remy stockholder as to how to vote on the Merger.

42.     Further, the Merger closed on November 10, 2015, less than four months after it was publicly announced.  Unless Plaintiffs would have succeeded in enjoining the Merger in that short time frame, Plaintiffs would have faced the undeniable challenge of "unscrambling the eggs" of a completed corporate transaction when proving Defendants' liability and harm to the Class.

43.     Plaintiffs' Counsel vigorously prosecuted the Actions and sought to protect the rights of Remy stockholders.  There has been no fraud or collusion in this action.  Both the

litigation and the negotiations surrounding the Stipulation were hotly contested. The Settlement was produced by arm's-length bargaining by sophisticated parties in a context where there were numerous disputed issues of fact and law. The negotiations were both intensive and hard fought. Once an agreement-in-principle was reached, the Stipulation itself went through several revisions until final agreement was attained.

44.    Continued litigation of the Actions would be extremely complex, costly, and of substantial duration. The Action settled at an early point in the litigation when significant additional resources would be necessary to continue litigating the Actions. Indeed, if the Actions were to proceed, the Parties would further engage in time consuming and expensive discovery, including undertaking depositions of the Defendants, third parties, experts, and Plaintiffs, as well as requesting, producing, and reviewing a multitude of documents related to the Merger. Based on exchanges between the Parties before the Merger closed, further litigation would most likely lead to hotly contested discovery battles. Moreover, if Plaintiffs and Defendants overcame various pre-trial litigation hurdles, a trial could occupy the Court, parties, witnesses, and attorneys on both sides for many weeks and preparation for such a trial would take months.

45.    Plaintiffs' Counsel made a thorough investigation into the facts and circumstances relevant to the allegations in the Actions. Plaintiffs' Counsel retained an expert in corporate finance to assist Plaintiffs' Counsel with their review and analysis of the massive amount of materials relevant to the Merger.

46.    Plaintiffs' Counsel then, with the guidance of a retained expert in corporate finance and valuation, conducted a comprehensive review of public information of Remy and BorgWarner, including review of SEC filings, proxy materials, press releases, news stories, research analysts' reports; analyzed the massive preliminary and definitive proxy statements that

purportedly described all material aspects of the Merger; reviewed thousands of pages of public and non-public documents produced by Defendants; and conducted the interview of a key individual who had direct knowledge of the Merger.

47.     It is a fundamental tenet of corporate law that stockholders are entitled to be fully informed of all material facts concerning transactions requiring their approval.  Without a doubt, full and accurate disclosure was important here, as the shareholders of Remy had to decide whether to accept the $29.50 in cash being offered to them, or reject it in favor of Remy continuing in business as an independent company.

48.     Plaintiffs' Counsel have extensive experience in complex litigation and particularly, stockholder lawsuits involving corporate transactions.  Based on their experience and after a complete evaluation of the information obtained through their own independent investigation and the discovery provided by Defendants, Plaintiffs' Counsel believe that the Settlement is a beneficial result for the Class and should be finally approved.

## V.     THE NEGOTIATED ATTORNEYS' FEES AND EXPENSES ARE FAIR AND REASONABLE AND SHOULD BE APPROVED

49.     In light of the material benefits caused by Plaintiffs' efforts, the Settlement also provides for a Fee and Expense Award of $400,000 and up to $15,000 in expenses (the "Fee Application"), which Defendants have agreed not to oppose and have agreed to pay upon approval by the Court.  Stipulation, ¶15.  The Fee and Expense Amount was negotiated at arm's-length after the material terms of the Settlement had been agreed to, and is fair and reasonable in light of the substantial benefits achieved in the Settlement and in line with fees awarded in similar merger-related litigation.  To date, there have been no objections to this Settlement, including the Fee and Expense Amount.

50.     It was only after the Parties negotiated the other terms and provisions of the Settlement that the parties addressed the issue of attorneys' fees.  The amount that Defendants have agreed to pay for Plaintiffs' attorneys fees and expenses is fair and reasonable, based on, among other things: (i) the results obtained and benefits achieved in advance of the expiration of the Merger; (ii) the character of the work to be done including the difficulty, the time, and skill required, and the prosecution of Plaintiffs' claims on a fully contingent fee basis; and (iii) the quality of the services of Plaintiffs' Counsel, as well as the work performed in pursuing and resolving the complex factual and financial issues, and legal and equitable claims alleged by Plaintiffs, including the investigation and analysis of the underlying facts and successful negotiations with Defendants and their financial and legal advisors.

51.     In order to prosecute the Actions successfully, Plaintiffs' Counsel had to master the complex factual and legal issues involved on an expedited basis.  The services of Plaintiffs' Counsel included: an investigation of the facts of the proposed transaction; analyses of the various types of claims available against Defendants; a review of SEC filings and publicly available news information regarding each of the persons and entities involved in the merger agreement; filing detailed complaints; retention of an expert in mergers and acquisitions; research regarding the applicable law; examining corporate and financial documents produced by Defendants and taking the deposition of one of a UBS representative familiar with the Merger; and negotiating a settlement, including the terms of the definitive Stipulation.

52.     Collectively, Plaintiffs' Counsel's attorneys and paraprofessionals spent 531.9 hours in the prosecution of the Action, for a total lodestar of $354,884.50.  Litigation expenses in the amount of $9,844.50 were also incurred.  These services were of high quality and could only

have been rendered by a team of attorneys and paraprofessionals experienced at prosecuting complex class litigation cases such as this one.

53.    The Fee and Expense Amount reflects a modest multiplier of approximately 1.1 to the total lodestar of $354,884.50, comprised of over 531.9 hours of work, not including the $9,844.50 in expenses expended by Plaintiffs' counsel.

54.    The total number of hours spent on the litigation of the Actions by my firm is 135. The total lodestar amount for attorney, paralegal, and professional staff time based on the firm's current rates is $89,350,00.   The schedule was prepared from contemporaneous, daily time records prepared and maintained by my firm.   The hourly rates shown below are the usual and customary rates charged for each individual in all of our cases.   A breakdown of the lodestar is as follows:

| NAME | STATUS | HOURLY RATE | HOURS | TOTAL LODESTAR |
|---|---|---|---|---|
| Jason L. Brodsky | P | $750 | 12.5 | $9,375.00 |
| Evan J. Smith | P | $750 | 49 | $36,750.00 |
| Marc L. Ackerman | P | $750 | 37.5 | $28,125.00 |
| Jordan A. Schatz | A | $475 | 11 | $5,225.00 |
| Ryan P. Cardona | A | $395 | 25 | $9,875.00 |
| **TOTALS** | | | **135** | **$89,350.00** |

55.    My firm's compensation for services rendered in this case was wholly contingent on the success of the Actions for Plaintiffs.   None of the attorneys' fees and expenses submitted to this Court has been paid from any source or has been the subject of any prior request or prior award in any litigation or other proceeding.

56.    Below is a chart summarizing Plaintiffs' Counsel's time spent on the litigation of the Actions.   As the chart shows, Plaintiffs' Counsel collectively devoted a total of 531.9 hours to this litigation, representing a total lodestar of $354,884.50.   *See* Exs. 2-5.

| *FIRM* | *TOTAL* | *EXPENSES* | *LODESTAR* | *LODESTAR* |
|---|---|---|---|---|

| | *HOURS* | | *WITHOUT EXPENSES* | *WITH EXPENSES* |
|---|---|---|---|---|
| WeissLaw LLP | 176.90 | $6,014.69 | $124,394.50 | $ 130,409.19 |
| Faruqi & Faruqi, LLP | 154.40 | $1,597.59 | $116,632.50 | $118,230.09 |
| Brodsky & Smith, LLC | 135 | $900.00 | $89,350.00 | $ 90,250.00 |
| Riley Williams & Piatt, LLC | 38.30 | $843.58 | $18,900.00 | $19,743.58 |
| Lewis Wagner, LLP | 27.30 | $488.64 | $5,607.50 | $ 6,096.14 |
| **TOTALS** | **531.9** | **$9,844.50** | **$354,884.50** | **$ 364,729.00** |

57.     The hours set forth in the above chart for Plaintiffs' Counsel were reasonable and necessary for counsel to fulfill their obligations in representing Plaintiffs and the Class. Assignments were allocated to partners, associates, and paraprofessionals based upon the required expertise for the purpose of minimizing the fees accrued from work that did not require partner expertise.  The work done in this litigation by Plaintiffs' Counsel was performed on an expedited basis necessitating extensive hours and resulting in a lost opportunity to work on other matters.  All of the work described herein was necessary for Plaintiffs' Counsel to fulfill their obligation to represent their clients and the class zealously and competently.

58.     My firm incurred a total of $900.00 in unreimbursed expenses in connection with the prosecution of this litigation.  They are broken down as follows:

From Inception to October 4, 2016:

| **CATEGORIES** | **AMOUNT** |
|---|---|
| Travel Expenses (including hotels, meals and transportation) | $900.00 |
| TOTAL | **$900.00** |

59.     Below is a chart summarizing the expenses Plaintiffs' Counsel spent on the litigation of the Action.  As the chart shows, Plaintiffs' Counsel incurred a total of $9,844.71 in litigation expenses.  *See* Exs. 2-5.

| *FIRM* | *TOTAL EXPENSES* |
|---|---|

- 21 -

| WeissLaw LLP | $6,014.69 |
| Faruqi & Faruqi, LLP | $1,597.59 |
| Brodsky & Smith, LLC | $900.00 |
| Riley Williams & Piatt, LLC | $843.58 |
| Lewis Wagner, LLP | $488.64 |
| **TOTALS** | **$9,844.71** |

60.     The foregoing expenses are reflected on the books and records of each firm. These books and records are prepared from expense vouchers, check records, and other source materials and represent an accurate recordation of the expenses incurred.

61.     When Plaintiffs' Counsel undertook the representation in the litigation, it was with the expectation that they would have to devote many hours of hard work to the prosecution of a case involving complex factual and legal issues without any assurance of ever getting paid for their efforts.  Plaintiffs' Counsel received no compensation during the course of this litigation and have incurred significant expenses in litigating for the benefit of the Class.  Any fee has always been at risk and completely contingent on the result achieved.

62.     The lawyers and law firms representing Plaintiffs have exceptional experience and reputations for success in the field of complex class actions and stockholder litigation.  The services rendered were performed expeditiously and effectively.  They were of high quality and reflect the practical and accumulated knowledge of counsel.

63.     Further, Defendants are represented by a team of highly respected and skilled corporate litigators.  Given the quality and determination of the opposition, the results achieved through the litigation were substantial and merit the fees and expenses which Remy agreed to pay.

64.     Individuals wronged by violations of corporate law should be afforded reasonable access to counsel with the ability and experience necessary to analyze and litigate complex issues.  Such individuals rarely have the financial resources to pay customary fixed hourly rates

for such services.  In complex stockholder actions, able counsel for a plaintiff can only feasibly be retained on a contingent basis.  A large segment of the public would be denied a remedy for violations of the fiduciary duties by those entrusted with stewardship of public companies if contingency fees awarded by the courts did not fairly compensate counsel for the services provided, the serious risks undertaken, and the delays which normally occur before counsel receive compensation.

65.    Recognizing the importance of providing accurate information to stockholders in the context of proxy contests, courts in the Seventh Circuit and throughout the country have approved fees in excess of that agreed to here where disclosure enhancements comprised the relief obtained.  *See, e.g.*,  *In re Meadowbrook Ins. Group, Inc. S'holder Litig.*, No. 5:15-cv-11057-JCO-MJH, slip op., ¶12 (E.D. Mich. April 7, 2016) (approving $425,000 fee and expense award for supplemental disclosures relating to management's financial projections, the financial analyses performed by the company's financial advisor, and the financial advisor's potential conflicts of interests); *In re Covidien PLC Securities Litigation.*, Civil Action No.:1:14-cv-12949 (D. Mass. Sept. 22, 2015) (Final Order) (awarding $540,000 in fees and expenses for supplemental disclosures relating to the company's financial projections, and assumptions underlying the analyses performed by the financial advisor) ( Decl., Ex. ); *In re QR Energy LP Unitholder Litigation.*, Lead Case No.:4:14-cv-02195 (S.D. Texas Sept. 10, 2015) (Final Order) (awarding $472,500 in fees and expenses for supplemental disclosures relating to the company's financial projections, the sales process leading up to the merger, conflicts of interest of the financial advisor, and assumptions underlying the analyses performed by the financial advisor, including information pertaining to the comparable companies and precedent transactions analyses); *In re LCA-Vision S'holder Litig.*, No. A1401239, slip op., ¶18 (Ohio Com. Pl.-

Hamilton Cnty. Aug. 10, 2015) (approving $562,500 fee and expense award for supplemental disclosures relating to the company's financial projections, the sales process leading up to the merger, conflicts of interest of the financial advisor, and assumptions underlying the analyses performed by the financial advisor, among other things); *Collier v. Brightpoint, Inc.*, No. 1:12-cv-01016, 2013 U.S. Dist. LEXIS 62125, at *9 (S.D. Ind. May 1, 2013) (awarding $600,000 in fees and expenses for obtaining supplemental disclosures in the context of a merger transaction); *Nichting v. DPL, Inc.*, No. 3:11-cv-00141, slip op. (S.D. Ohio Feb. 24, 2012) (awarding $700,000 in fees and expenses for obtaining supplemental disclosures).

## VI.   CONCLUSION

66.     The proposed Settlement is a fair compromise of the issues in dispute.  After weighing the benefits of this Settlement against the uncertainty and risks of continued litigation, the Parties believe that the proposed Settlement is fair, reasonable, and adequate and warrants final approval.  Therefore, I respectfully request that the Court enter the [Proposed] Judgment approving the proposed Settlement and dismissing the Action with prejudice filed concurrently herewith.

67.     Attached hereto are true and correct copies of the following exhibits:

Exhibit 1:     Declaration of Richard A. Acocelli in Support of Plaintiffs' Unopposed Motion for Final Approval of Class Action Settlement and Application for Award of Attorneys' Fees and Expenses

Exhibit 1-A:   WeissLaw LLP Resume;

Exhibit 2:     Declaration of James R. Banko in Support of Plaintiffs' Unopposed Motion for Final Approval of Class Action Settlement and Application for Award of Attorneys' Fees and Expenses;

Exhibit 2-A:   Faruqi & Faruqi, LLP Resume;

Exhibit 3:     Brodsky & Smith, LLC Resume;

Exhibit 4:       Declaration of William N. Riley in Support of Plaintiffs' Unopposed Motion for Final Approval of Class Action Settlement and Application for Award of Attorneys' Fees and Expenses;

        Exhibit 4-A:   Riley Williams & Piatt, LLC Resume;

Exhibit 5:       Declaration of A. Richard M. Blaiklock in Support of Plaintiffs' Unopposed Motion for Final Approval of Class Action Settlement and Application for Award of Attorneys' Fees and Expenses;

        Exhibit 5-A:   Lewis Wagner, LLP Resume;

Exhibit 6:       Transcript of Proceedings, *Turberg v. ArcSight, Inc.*, No. 5821-VCL (Del. Ch. Sept. 20, 2011);

Exhibit 7:       *In re GeoEye, Inc. S'holder Litig.*, No. 1:12-cv-00826, slip op. (E.D. Va. Sept. 6, 2013);

Exhibit 8:       Transcript of Proceedings, *In re Art Tech. Grp., Inc. S'holders Litig.*, No. 5955-VCL (Del. Ch. Dec. 21, 2010);

Exhibit 9:       *Nichting v. DPL, Inc.*, No. 3:11-cv-00141, slip op. (S.D. Ohio Feb. 24, 2012);

Exhibit 10:      *Denney v. Wallace*, No. 2:10-cv-01154, slip op. (W.D. Pa. Sept. 9, 2011);

Exhibit 11:      *Cnty. of York Emps. Ret. Plan v. Merrill Lynch & Co., Inc.*, No. C.A. 4066-VCN, slip op. (Del. Ch. Aug. 31, 2009);

Exhibit 12:      *In re Meadowbrook Ins. Group, Inc. S'holder Litig.*, No. 5:15-cv-11057-JCO-MJH, slip op. (E.D. Mich. April 7, 2016);

Exhibit 13:      *In re Covidien PLC Securities Litigation.*, Civil Action No.:1:14-cv-12949 (D. Mass. Sept. 22, 2015);

Exhibit 14:      *In re QR Energy LP Unitholder Litigation.*, Lead Case No.:4:14-cv-02195 (S.D. Texas Sept. 10, 2015);

Exhibit 15:      *In re LCA-Vision S'holder Litig.*, No. A1401239, slip op. (Ohio Com. Pl.-Hamilton Cnty. Aug. 10, 2015); and

Exhibit 16:      *McGill v. Ralph Hake, et al.,* No. 1:15-cv-00217-TWP-DKL, slip op. (S.D. In. Mar. 10, 2016).

I declare under penalty of perjury under the laws of the State of [ ] that the foregoing is true and correct.  Executed this 5th day of October, 2016, at [Los Angeles, CA

_____

EVAN J. SMITH

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a copy of the foregoing has been served by CM/ECF or electronic mail this 5th day of October, 2016 to the following, which includes all counsel of record:

Anne N. DePrez
**BARNES & THORNBURG LLP**
11 South Meridian Street
Indianapolis, IN 46204-3535
Email: anne.deprez@btlaw.com

A. Richard M. Blaiklock
**LEWIS WAGNER, LLP**
501 Indiana Avenue, Suite 200
Indianapolis, IN 46202-6150

# Exhibit 1

**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| JASON GARCIA, Individually and on Behalf of All Others Similarly Situated,<br><br>        Plaintiff,<br><br>v.<br><br>REMY INTERNATIONAL, INC., JOHN J. PITTAS, DOUGLAS K. AMMERMAN, KARL G. GLASSMAN, LAWRENCE F. HAGENBUCH, CHARLES G. MCCLURE, ARIK W. RUCHIM, GEORGE P. SCANLON, J. NORMAN STOUT, JOHN H. WEBER,<br><br>        Defendants. | Civil No. 1:15-cv-01385-TWP-TAB |
| MAXINE PHILLIPS, Individually and on Behalf of All Others Similarly Situated,<br><br>        Plaintiff,<br><br>v.<br><br>REMY INTERNATIONAL, INC., JOHN J. PITTAS, DOUGLAS K. AMMERMAN, KARL G. GLASSMAN, LAWRENCE F. HAGENBUCH, CHARLES G. MCCLURE, ARIK W. RUCHIM, GEORGE P. SCANLON, J. NORMAN STOUT, JOHN H. WEBER,<br><br>        Defendants. | Civil No. 1:15-cv-01343-TWP-TAB |
| STEPHEN BUSHANSKY, Individually and on Behalf of All Others Similarly Situated,<br><br>        Plaintiff, | Civil No. 1:15-cv-1361-RLY-MJD |

v.

REMY INTERNATIONAL, INC., JOHN J.
PITTAS, DOUGLAS K. AMMERMAN,
KARL G. GLASSMAN, LAWRENCE F.
HAGENBUCH, CHARLES G. MCCLURE,
ARIK W. RUCHIM, GEORGE P.
SCANLON, J. NORMAN STOUT, JOHN
H. WEBER,

                    Defendants.

### DECLARATION OF RICHARD A. ACOCELLI IN SUPPORT OF PLANTIFFS' UNOPPOSED MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND APPLICATION FOR AWARD OF ATTORNEYS' FEES AND EXPENSES

I, Richard A. Acocelli, declare as follows, pursuant to 28 U.S.C. §1746:

1.      I am a member of the Bar of the State of New York and a Principal of the law firm of WeissLaw, LLP ("WeissLaw")[1], counsel for plaintiff Stephen Bushansky (together with plaintiffs Garcia and Phillips, "Plaintiffs") in the above-captioned actions (the "Action").  The testimony provided herein is based on my own personal knowledge, information and belief and, if called upon, I could and would competently testify thereto.

2.      I submit this declaration in support of Plaintiffs' Unopposed Motion for Final Approval of Class Action Settlement and Application for an Award of Attorneys' Fees and Expenses, which is being filed contemporaneously herewith.

3.      My firm resume is attached hereto as Exhibit A.

4.      My firm acted as counsel for Plaintiff Bushansky, worked in conjunction with counsel for Plaintiffs Garcia and Phillips, and was actively engaged in the prosecution of the

---

[1] All capitalized terms not otherwise defined herein shall have the same meaning as terms defined in the Stipulation and Agreement of Compromise, Settlement and Release executed on July 19, 2016 (the "Stipulation").

2

Action by performing the following tasks: correspondence with client; review, analysis and annotation of merger agreement and Preliminary Proxy and consultations with retained financial expert; draft, edit and revise complaint challenging the Merger ("Complaint"); further review and analysis of and Definitive Proxy and consultations with retained financial expert regarding substantive content of Preliminary Proxy and Definitive Proxy; identify disclosure deficiencies in conjunction with financial expert and demand that deficiencies be cured ("Demand Letter"); draft motion for preliminary injunction with respect to allegations in the Complaint and Demand Letter; extensive negotiations with defendants regarding possible resolution of litigation and content of supplemental disclosures; regular communications with client regarding status of litigation and potential resolution; telephonic and email communications with counsel for defendants regarding revisions to draft Memorandum of Understanding ("MOU"); finalize and execute MOU; prepare and serve confirmatory discovery demands, and subsequent meet and confer and negotiations concerning scope of confirmatory discovery; review and analyze confirmatory discovery in conjunction with retained financial expert; revise and comment on Stipulation of Settlement ("Stipulation") and related exhibits; communications with client regarding Stipulation; review and comment on motion and memorandum of law for preliminary approval; and telephonic and email communications regarding case strategy with co-counsel throughout litigation.

5.      The total number of hours spent on the litigation of the Actions by my firm is 176.90. The total lodestar amount for attorney, paralegal, and professional staff time based on the firm's current rates is $124,394.50. The schedule was prepared from contemporaneous, daily time records prepared and maintained by my firm. The hourly rates shown below are the usual and customary rates that I have been awarded this year by courts around the country in similar

actions. My survey of other class action counsel in the area of merger and acquisition litigation has confirmed that my hourly rate, and the hourly rates of the attorneys within my firm are commensurate with the customary rates charged by attorneys with our experience in our area engaged in similar practice. A breakdown of the lodestar is as follows:

| NAME | STATUS | HOURLY RATE | HOURS | TOTAL LODESTAR |
|---|---|---|---|---|
| Richard A. Acocelli | Pr | $850.00 | 87.60 | $74,460.00 |
| Leigh A. Parker | Pr | $810.00 | 0.70 | $567.00 |
| Michael A. Rogovin | A | $695.00 | 43.00 | $29,885.00 |
| Joshua M. Rubin | A | $680.00 | 8.30 | $5,644.00 |
| Kelly C. Keenan | A | $450.00 | 17.20 | $7,740.00 |
| Seth Rosenstein | A | $340.00 | 3.80 | $1,292.00 |
| Jerry Silver | PL | $335.00 | 5.40 | $1,809.00 |
| Alexandra E. Eisig | LC | $275.00 | 10.90 | $2,997.50 |
| **Totals** | | | **176.90** | **$124,394.50** |

Pr=Principal; A=Associate; PL=Paralegal; Law Clerk

6.      My firm's compensation for services rendered in this case was wholly contingent on the success of the action for Plaintiff. (None of the attorneys' fees and expenses submitted to this Court has been paid from any source or has been the subject of any prior request or prior award in any litigation or other proceeding.

7.      My firm incurred a total of $6,014.69 in unreimbursed expenses in connection with the prosecution of this litigation. They are broken down as follows:

*EXPENSES*
From Inception to October 4, 2016

| CATEGORIES | AMOUNT |
|---|---|
| Local Travel | $32.50 |
| Computer Research – LexisNexis / Bloomberg | $354.94 |
| Expert Costs – RGL Forensics | $4,608.00 |
| Meals | $222.45 |
| PR Newswire | $263.30 |
| Photocopy In-House | $523.50 |
| Telephone | $10.00 |
| TOTAL | $6,014.69 |

8.     The expenses incurred pertaining to this case are reflected in the books and records of WeissLaw.   These books and records are prepared from expense reports, check reports, and other sources, and are an accurate record of the expenses incurred.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 5th day of October, 2016 at New York, NY.

RICHARD A. ACOCELLI

5

# Exhibit 1A



16th Floor
1500 Broadway
New York, NY 10036
TEL. (212) 682-3025
FAX (212) 682-3010

Suite 309
1516 South Bundy Drive
Los Angeles, CA 90025
TEL. (310) 208-2800
FAX (310) 209-2348

## FIRM BIOGRAPHY

Over the past 30 years, WeissLaw LLP ("WeissLaw" or the "Firm") has gained the reputation of being amongst the nation's premier law firms representing shareholders in securities class and derivative litigation. The firm has offices in New York and Los Angeles and has litigated hundreds of stockholder class actions brought for violations of federal securities laws and shareholder class and derivative actions brought for violations of corporate and fiduciary duties, in which, it has recovered over a billion dollars for defrauded institutions and individuals and obtained important corporate governance reforms. In addition, the firm has prosecuted numerous consumer fraud and unfair practices actions, in which, it has recovered hundreds of millions of dollars.

With outstanding attorneys based in offices on both coasts, WeissLaw has the experience, talent and resources to tenaciously litigate on behalf of defrauded individuals and institutions.  Its success in doing so has earned it the praise of clients and courts throughout the country.

Numerous courts have commended the firm for its expertise and ability:

• In <u>Spahn v. Edward D. Jones & Co., et al.</u>, No. 04 cv 00086, Eastern District of Missouri, WeissLaw was co-lead counsel and obtained – in conjunction with a parallel state court case – a $127.5 million recovery for the class, representing in excess of 40% of the maximum recoverable damages.  The complaints alleged that the defendants secretly

received revenue sharing payments in exchange for selling preferred mutual funds to clients and misrepresenting the receipt of those payments in violation of the federal securities laws.  WeissLaw prosecuted all aspects of the case including extensive motion practice, the review of nearly 2 million pages of documents, and protracted and contentious settlement negotiations, including two multi-day mediations and numerous multiple day settlement conferences.

In Bachman, et al., v. A.G. Edwards, Inc. et al., No. 22052-01266-03, 22nd Judicial Circuit Court, St. Louis, Mo, WeissLaw served on the Plaintiffs' Executive Committee and obtained a $60 million recovery for the class, representing nearly 25% of the estimated maximum recoverable damages.  The complaint alleged that A.G. Edwards breached its fiduciary duties and was unjustly enriched as a result of receiving and retaining revenue sharing payments from mutual fund companies in exchange for its customers holding shares of mutual funds in their A.G. Edwards accounts.  WeissLaw prosecuted all aspects of the nearly five-year litigation up to the eve of trial, which included defeating three complex and hotly contested SLUSA removal motions, certifying a national class of mutual fund shareholders, defeating numerous motions for summary judgment, reviewing nearly 100,000 pages of documents and conducting and defending 20 depositions.

In Brody v. Hellman, et al., (U.S. West Dividend Litigation), No. CV-4142 (Dist. Ct. for the City & Cty. of Denver, Colo.), Judge Coughlin observed that the case "was litigated by extremely talented lawyers" and "it took a great deal of skill to get to the point of trial."  The case was aggressively litigated and the plaintiffs survived a motion to dismiss, two motions for summary judgment and successfully certified the class over vigorous opposition from defendants.  In certifying the class, the court commented, "Defendants do not contest that

Plaintiffs' attorneys are extremely well qualified to represent the putative class.  This litigation has been ongoing for four years; in that time Plaintiffs' counsel has proven that they are more than adequate in ability, determination, and resources to represent the putative class."  The case settled for $50 million on the day before trial was scheduled to commence.  Judge Coughlin noted "there wasn't any other lawyer[] in the United States that took the gamble that these people did.  Not one other firm anywhere said, 'I am willing to take that on.'  I'll go five years.  I'll pay out the expenses. I'll put my time and effort on the line . . . . [The class is] fortunate that they had some lawyers that had the guts to come forward and do it...I had the opportunity to watch these attorneys throughout this period of time when I had this case and the [lawyers'] ability is terrific."

In <u>In re McLeodUSA Inc. Securities Litigation</u>, No. C02-0001-MWB (N.D. Iowa), Chief Judge Mark Bennett stated at the final approval hearing: "I thought you all did a great job in this litigation" and "I think very highly of the work that all the lawyers did in the case, and [I am] pleased that you were able to get it resolved."

In <u>In re Mutual Funds Investment Litigation, RS Investment Subtrack</u>, MDL 1586, Case No. 04-MD-15863-JFM (<u>Parthasarathy v. RS Investment Management, L.P., et al.</u>, 04-cv-3798-JFM), which was part of the historic market timing multi-district litigation pending in the District of Maryland that resulted in a recovery in excess of $300 million for investors in mutual funds allegedly involved in market timing activities, WeissLaw, in conjunction with co-counsel, served on the Plaintiffs' Steering Committee, and prosecuted all aspects of the case against the advisors to the RS Fund family of mutual funds and other related entities, including extensive motion practice, review, analysis and management of

hundreds of thousands of pages of documents, conducting all key party and non-party witnesses and bringing the litigation to ultimate resolution.

In <u>Ellison v. American Image Motor, et al.</u>, Civil Action No. 97-3608 (S.D.N.Y.), Judge Chin, approving the settlement and fee application, commented that "It has been many years.  The case was hard fought, very capable counsel on both sides, and I saw counsel many times.  It was a hard fought case.  It was a difficult case."... "It's probably not said very often, but in this case I think plaintiffs' counsel are being under paid." ...  "Counsel did a great job..."

In <u>In re United Telecommunications, Inc. Securities Litigation</u>, No. 90-2251-0 (D. Kan.), Judge O'Conner stated "the court finds that plaintiffs' counsel were experienced and qualified attorneys with outstanding professional reputations in securities litigation who ably and zealously prosecuted the instant case on behalf of the class."

In <u>In re VeriFone Inc. Securities Litigation</u>, No. C-93-3640 DCJ (N.D. Cal.), Judge Jensen stated "I think the case was handled extremely well, extremely professionally, so I think you've done very well."

In <u>In re Western Digital Securities Litigation</u>, SACV 91-375(A) GLT (RWRx) (C.D. Cal.), Judge Taylor complimented plaintiffs' attorneys' work in the action, specifically noting "the caliber of the work involved [and] the quality of the attorneys involved."

In <u>Georgallas v. Martin Color-Fi, Inc.</u> Civil Action No. 6:95-06483 (D.S.C.), Judge Anderson expressed "the utmost respect" for the work of the firm.

In <u>Bash v. Diagnostek</u>, CV 94-794 M (D.N.M.), Judge Black said the case provided "a model for how commercial litigation should be conducted and can be resolved."

In re National Medical Enterprises Litigation, CV 93-5223-TJH and CV 93-5313-TJH (C.D. Cal.), Judge Hatter summed up the settlement hearing by saying, "I want to again thank counsel for the work that you put into this and hopefully it's a settlement for which the claimants themselves will be appreciative of the results."

In In re Santa Fe Southern Pacific Corporation, Consold. Civ. No. 9523 (Del. Ch.), Chancellor Allen of the Delaware Chancery Court approved a settlement and cited the creativity and sophistication of plaintiffs' counsel.

Some of the actions which highlight the firm's accomplishments are:

### CASES IN WHICH WEISSLAW LLP WAS LEAD OR CO-LEAD COUNSEL

Jordan v. California Department of Motor Vehicles (Sacramento Cal.): The California Court of Appeal, Third Appellate District, held that the State of California's $300 smog impact fee was unconstitutional, paving the way for the creation of a $665 million fund and full refunds, with interest, to 1.7 million motorists.

In re Geodyne Resources, Inc. Securities Litigation (Harris Cty. Tex.): A recovery (including related litigation) totaling over $200 million was obtained for the class.

Spahn v. Edward D. Jones & Co., et al., No. 04 cv 00086, (E.D. Mo.): A recovery (including related litigation) totaling $127.5 million was obtained for the class.

Freddie Mac Derivative Litigation (S.D.N.Y.): Approximately $100 million was recovered for the Company and significant corporate governance measures were adopted.

Bachman, et al., v. A.G. Edwards, Inc. et al., No. 22052-01266-03, (22nd Jud. Cir. Ct., St. Louis, Mo):  A recovery totaling $60 million was obtained for the class.[*]

Brody v. Hellman, et al., (U.S. West Dividend Litigation), No. CV-4142 (Dist. Ct. for the City & Cty. of Denver, Colo.): A recovery of $50 million was obtained for the class.

In re Tenneco Securities Litigation (D. Tex.): A recovery of $50 million was obtained for the class.

In re Community Psychiatric Center Securities Litigation (C.D. Cal.): A recovery of $42.5 million was obtained for the class.

---

[*]  Member of Plaintiffs' Executive Committee

In re Crazy Eddie Securities Litigation (S.D.N.Y.): A recovery of $42 million was obtained for the class.

In re Apria Healthcare Group Securities Litigation (Orange County Cal.):  A recovery of $42 million was obtained for the class.

Levitan v. McCoy, et al., (First Commerce Corporation), No. 00 C 5096 (N.D. Ill.):  A recovery of $39.9 million was obtained for the class.

In re King Pharmaceuticals, Inc. Securities Litigation, No. 03 cv 77-TWP (E.D. Tenn.):  A recovery of $38.25 million was obtained for the class.

In re Canon Group Securities Litigation (C.D. Cal.): A recovery of $33 million was obtained for the class.

In re Platinum Software Securities Litigation (C.D. Cal.): A recovery of $32 million was obtained for the class.

In re Martha Stewart Living Omnimedia, Inc. Securities Litigation, No. 02 cv 6273-JES (SDNY):  A recovery of $30 million was obtained for the class.

In re McLeodUSA Inc. Securities Litigation, (N.D. Iowa): A recovery of $30 million was obtained for the class.

In re United Telecommunications Securities Litigation (D. Kan.): A recovery of $28 million was obtained for the class.

In re Bergen Brunswig Corp. Sec. Litig., (C.D. Cal.): A recovery of $27.9 million was obtained for the class.

In re Bank of New York Derivative Litigation (Sup. Ct. NY): A recovery of $26.5 million was obtained for the Company and significant corporate governance measures were adopted.

In re FirstEnergy Shareholder Derivative Litigation (N.D. Ohio): A recovery of $25 million was obtained for the Company and significant corporate governance measures were adopted.

In re Vodafone Group, PLC Securities Litigation (S.D.N.Y.): A recovery of $24.5 million was obtained for the class.

In re PurchasePro.com, Inc. Securities Litigation, (D. NV.):  A recovery of $24.2 million was obtained for the class.

In re Arakis Energy Corporation Securities Litigation, No. 95-CV-3431 (ARR) (E.D.N.Y.):  A recovery of $24 million was obtained for the class.

In re Abbey Healthcare Securities Litigation (C.D. Cal.): A recovery of $20.5 million was obtained for the class.

Feinberg v. Hibernia Corp. (D. La.): A recovery of $20 million was obtained for the class.

In re Southern Pacific Funding Corp. Sec. Litig., (D. Or.): A recovery of $19.5 million was obtained for the class.

In re Aura Systems, Inc. Securities Litigation (C.D. Cal.): A recovery of $18 million was obtained for the class.

In re MK Rail Securities Litigation (D. Idaho): A recovery of $14.65 million was obtained for the class.

In re California Microwave Securities Litigation (N.D. Cal.): A recovery of $14 million was obtained for the class.

In re KeySpan Corporation Securities Litigation (E.D.N.Y.): A recovery of $13.75 million was obtained for the class.

In re Elscint Ltd Securities Litigation (D. Mass.): A recovery of $12 million was obtained for the class.

In re Megafoods Securities Litigation (D. Ariz.): A recovery of $12 million was obtained for the class.

Bash v. Diagnostek (D.N.M.): A recovery of $11.7 million was obtained for the class.

In re GTECH Securities Litigation (D.R.I.): A recovery of $10.25 million was obtained for the class.

In re Complete Management, Inc. Securities Litigation (S.D.N.Y.): A recovery of $10.15 million was obtained for the class.

Berlinsky v. Alcatel (S.D.N.Y.): A recovery of $8.8 million was obtained for the class.

Lopez v. Checkers Drive-In Restaurants, Inc. (M.D. Fl.): A recovery of over $8.175 million was obtained for the class.

In re Mesa Airlines Securities Litigation (D.N.M.): A recovery of $8 million was obtained for the class.

In re Resound Securities Litigation (N.D. Cal.): A recovery of $8 million was obtained for the class.

In re Castle Energy Corp. Securities Litigation (C.D. Cal.) A recovery of $7.5 million was obtained for the class.

In re Western Digital, Inc. Securities Litigation (C.D. Cal.): A recovery of $6.75 million was obtained for the class.

In re Circle K Securities Litigation (D. Ariz.): A recovery of $6 million was obtained for the class.

In re Mutual Funds Investment Litigation, RS Investment Subtrack, MDL 1586, Case No. 04-MD-15863-JFM (Parthasarathy v. RS Investment Management, L.P., et al., 04-cv-3798-JFM): A recovery of $5.74 million was obtained for the class.

In re Aura Systems, Inc. Securities Litigation (C.D. Cal.): A recovery of $5.55 million was obtained for the class.

In re Ascend Communications Securities Litigation (C.D. Cal.): A recovery of $5.45 million was obtained for the class.

In re Southmark Securities Litigation (D. Tex.): A recovery of $5 million was obtained for the class.

In re WCT Securities Litigation (C.D. Cal.): A recovery of $5 million was obtained for the class.

In re Sumitomo Bank of California Securities Litigation (San Francisco Sup. Ct.): A recovery of $4.95 million was obtained for the class.

In re NextLevel Systems, Inc. Securities Litigation (N.D. Ill.): A recovery of $4.6 million was obtained for the class.

In re Shopping.com Securities Litigation (C.D. Cal.): A recovery of $4.5 million was obtained for the class.

In re Denver Bonds Securities Litigation (D. Colo.): A recovery of $4.5 million was obtained for the class.

In re Molecular Dynamics, Inc. Securities Litigation (N.D. Cal.): A recovery of $4 million was obtained for the class.

In re Party City Corp. Securities Litigation (D.N.J.): A recovery of $3.8 million was obtained for the class.

In re Iwerks Securities Litigation (C.D. Cal.): A recovery of approximately $3.5 million was obtained for the class.

<u>In re Davstar, Inc. Securities Litigation</u> (C.D. Cal.): A recovery of $3.4 million was obtained for the class.

<u>In re Trident Securities Litigation</u> (N.D. Cal.): A recovery of $3.15 million was obtained for the class.

<u>In re Twinlab Corp. Securities Litigation</u> (E.D.N.Y.): A recovery of $3 million was obtained for the class.

<u>In re Offshore Pipelines Securities Litigation</u> (S.D.N.Y.): A recovery of $3 million was obtained for the class.

<u>Gorga v. Uniroyal Chemical Corp.</u> (Sup. Ct. Conn.): A recovery of $3 million was obtained for the class.

<u>In re Amylin Pharms. Securities Litigation</u> (S.D. Cal.):  A recovery of $2.1 million was obtained for class.

**CLASS AND DERIVATIVE ACTIONS HANDLED BY WeissLaw LLP WHERE A SIGNIFICANT BENEFIT WAS OBTAINED FOR THE COMPANY AND/OR THE SHAREHOLDERS**

<u>In re Santa Fe Southern Pacific Corporation</u> (Del. Ch.).

<u>In re Genentech Shareholder Litigation</u> (N.D. Cal.).

<u>In re Beverly Enterprises Shareholder Litigation</u> (Del. Ch.).

<u>In re Tandon Computer Shareholder Litigation</u> (C.D. Cal.).

<u>In re Sears Shareholder Litigation</u> (D. Ill.).

<u>In re Xoma Shareholder Litigation</u> (N.D. Cal.).

<u>In re Castle Energy Corp. Shareholder Litigation</u> (C.D. Cal.).

<u>In re Times-Mirror, Inc. Shareholder Litigation</u> (C.D. Cal.).

<u>In re Lockheed Corp. Shareholder Litigation</u> (C.D. Cal.).

<u>In re Nexgen Securities Litigation</u> (N.D. Cal.).

<u>In re GT Greater Europe Securities Litigation</u> (N.D. Cal.).

<u>In re Pairgain Securities Litigation</u> (S.D. Cal.).

<u>In re AMI Securities Litigation</u> (L.A. Superior).

<u>Wallace v. Fox, et al. (Northeast Utilities)</u> (D. Conn.).

## BRIEF BIOGRAPHIES OF WeissLaw LLP ATTORNEYS

**JOSEPH H. WEISS** is the Founding Partner of WeissLaw LLP and oversees virtually all of the firm's litigation, taking an active role in case analysis, the drafting of pleadings and briefs, oral arguments, mediations and settlement negotiations.  He has been recognized by courts throughout the nation as one of the leading practitioners representing investors in securities, class and derivative litigation.  Moreover, he has earned the respect of his peers and adversaries as possessing the highest professional standards and outstanding legal acumen.  In fact, he has been recognized in the Class Action category of New York Super Lawyers.  The firm has consistently ranked as amongst the leading plaintiffs law firms in the United States.

Mr. Weiss is a 1972 graduate of Columbia University Law School, where he was an editor of the Law Review.  He is also a 1972 graduate of Columbia University Graduate School of Business from which he obtained a Masters in Business Administration.  Mr. Weiss is a member of the Bar of the State of New York and is admitted to practice in the Southern District of New York, the Eastern District of New York, the Courts of Appeal for the First, Second, Third, Fifth, Ninth and Federal Circuits, and has been admitted to practice in numerous other federal and state courts.

Among the more prominent of Mr. Weiss' cases is *Jordan v. California Department of Motor Vehicles*, No. 95 AS 03903 (Sacramento, Cal.), where the firm recovered $665 million – payment in full plus interest – on behalf of motorists who paid a "smog impact fee."  Mr. Weiss also recovered $42 million in cash for Apria investors after more than four years of vigorous litigation regarding a sophisticated accounting fraud (*In re Apria Healthcare Group Securities Litigation*, No. 797060) in California Superior Court.

Mr. Weiss has been involved in the litigation of numerous other cases of national stature such as *In re Martha Stewart Living Omnimedia, Inc. Securities Litigation*, No. 02 cv 6273 (JES) and *In re Global Crossing, Ltd. Securities and "ERISA" Litigation*, No. 02 cv 910 (GEL), both in the Southern District of New York.  He has also spearheaded derivative litigations on behalf of his clients aimed at reforming corporate malfeasance, breaches of fiduciary duties and other wrongdoing by the boards of some of the largest corporations in the world. including Hewlett Packard Company (*In re Hewlett-Packard Company Derivative Litigation*, C.A. No. 2428 (VCN), Court of Chancery of the State of Delaware), BP p.l.c. (*In re BP p.l.c. Derivative Litigation*, No. 06 cv 6168 (HB), Southern District of New York), Royal Dutch Shell (*Soojian et al. v. Jacobs et al. f/b/o Royal Dutch Petroleum Company*, No. 04 cv 03603, District of New Jersey), The Bank of New York (*Zucker v. Bacon et al. f/b/o The Bank of New York Company Inc.*, No. 00/106275, New York County Supreme Court) and Freddie Mac (*Sadowsky Testamentary Trust v. Brendsel et al. f/b/o Federal Home Loan Mortgage Corporation*, No. 05 cv 2596, Southern District of New York).

The firm led by Joseph Weiss has also taken a lead in prosecuting market timing and secret revenue sharing cases.  A prime example is the class action against Edward Jones and certain other defendants, alleging violations of federal securities laws and state laws by secret receipt of revenue sharing payments in exchange for selling Preferred Funds to their clients, while misleading them about the payments.  (*Spahn v. Edward D. Jones & Co.*, et al., No. 04 cv 00086, District of Missouri).  As a result of the litigation, a recovery valued at $127.5 million was obtained for the class, more than 40% of the maximum recoverable damages.

Mr. Weiss is active in community, educational and philanthropic causes and is a member of the International Board of Governors of the Mesorah Heritage Foundation.

**DAVID C. KATZ** is a principal and in the New York office and has been an advocate of investors' rights for over twenty years.   Currently, Mr. Katz serves as the chair of WeissLaw's Corporate Governance Litigation Practice Group.   He is a 1988 Graduate of Benjamin N. Cardozo School of Law.   He is admitted to the New York State Bar, the United States District Courts for the Southern and Eastern Districts of New York, and the United States Courts of Appeal for the First, Second, Third, and Fourth Circuits.

Mr. Katz has successfully served as the firm's chief litigator in numerous derivative actions involving corporations and issues of national prominence.   When Freddie Mac, the government-sponsored public corporation entrusted with maintaining liquidity in the United States' mortgage markets, announced one of the largest financial restatements in corporate history, he successfully spearheaded the effort to recover the company's damages, recouping more than $100 million (*Sadowsky Testamentary Trust v. Brendsel et al. f/b/o Federal Home Loan Mortgage Corporation*, 05 cv 2596).   When Marsh & McLennan Companies, Inc. was implicated in a bid rigging and business steering scheme, Mr. Katz served as the firm's chief litigator pressing claims on behalf of the company, which efforts were a material factor in securing payment of $205 million, and were instrumental in obtaining payment of $35 million to the company from its insurers (*In re:   Marsh & McLennan Companies, Inc. Derivative Litigation*, 753-VCS).   Mr. Katz also represented shareholders seeking a recovery for First Energy Corp. in the wake of the nation's largest power-outage in history and the closure of the company's nuclear facility resulting from mismanagement and failures in oversight, recouping $25 million for the Company (*In re*

*FirstEnergy Shareholder Derivative Litigation*, 03 cv 1826).   Substantial corporate governance reforms were implemented for the benefit of the subject corporations and their shareholders in each of these cases.

In the securities class action field, Mr. Katz has successfully served as the firm's chief litigator in numerous actions as well.  Mr. Katz was the firm's chief counsel in *Levitan v. McCoy et al. and Bank One Corp.*, 00 C 5096 (concerning Bank One's acquisition of First Commerce), securing approximately $40 million. Mr. Katz also served as the firm's chief counsel in *Daugherty v. Hastings Entertainment, Inc.* (2:00-CV-160-J), recovering over $6.3 million for the class.  He won the remand of *In re Lernout & Hauspie Securities Litigation*, 99-10237 (NG), from the United States Court of Appeals for the First Circuit, subsequently recovering nearly $4 million for the class.  Mr. Katz served on the team that won the Ninth Circuit's reversal of the directed verdict entered at trial in the United States District Court for the Northern District of California in an action concerning Everex Systems, Inc. (*Howard v. Everex Systems, Inc.*, et al., 92 cv 03742).

Mr. Katz is a father of two daughters and his wife is an elected member of the Town of Mamaroneck Town Council.   He is active in his community and a member of the Larchmont Gardens Civic Association.

**RICHARD A. ACOCELLI** is a principal in the New York office.  He received his law degree in 1990 from St. John's University School of Law.  He is admitted to the State Bar of New York and the United States District Courts for the Southern and Eastern Districts of New York and the Eastern District of Michigan.

Mr. Acocelli heads WeissLaw's class action Mergers & Acquisitions Litigation Group and has appeared in courts throughout the country, including the Delaware Court of

Chancery, on numerous occasions on behalf of stockholders in merger & acquisition lawsuits.

Recently, Mr. Acocelli prosecuted a federal class action that alleged receipt of, and failure to adequately disclose, the receipt of transfer agent fees by a national mutual fund firm (*In re Smith Barney Transfer Agent Litigation*, No. 95-cv-7583 (WHP) (S.D.N.Y.)), (preliminarily approval entered October 7, 2013). He was also the firm's chief litigator in the prosecution of a federal class action that alleged receipt of, and failure to adequately disclose, secret revenue sharing payments by a national brokerage firm (*Spahn v. Edward D. Jones & Co., et al.*, 04 cv 00086 (HEA)), which resulted in the recovery of $127.5 million on behalf of Edward Jones' clients. Mr. Acocelli has also successfully represented shareholders as the firm's chief litigator in *In re Ikon Office Solutions, Inc. Securities Litigation*, No. 99 cv 5759, MDL No. 1318 ($111 million recovery) in the Eastern District of Pennsylvania.

In addition, Mr. Acocelli served as the firm's chief litigator in several significant class actions brought on behalf of investors under the federal securities laws, including *In re RS Funds*, 04 cv 3798 (JFM), which was part of the historic market timing Multi District Litigation pending in District of Maryland (*In re Mutual Funds Investment Litig.*, MDL 1586, 04-MD-15863 (JFM)); *In re FleetBoston Financial Corp. Securities Litigation*, 02 cv 4561 (GEB), which involved FleetBoston's failure to adequately reserve for its Argentine loan portfolio; and *Beleson v. Schwartz (Loral)*, 03 cv 06051 (JES), which concerned the adequacy of Loral Space and Communication Ltd.'s disclosure of its pre-packaged bankruptcy.

Mr. Acocelli also serves as the firm's chief litigator in complex actions brought under Section 36(b) of the Investment Company Act of 1940, arising from the alleged payment of excessive fees to investment advisers and distributors of large mutual fund families, including *In re American Mutual Funds Fee Litigation*, 04 cv 5593 (GAF); *Forsythe v. Massachusetts Financial Services Co.*, No. 04 cv 10584 (GAO); and *In re Lord Abbett Excessive Fee Litigation*, 04 cv 559.  Mr. Acocelli also represented current and former clients of A.G. Edwards, Inc. and A.G. Edwards & Sons, Inc. in a class action for breach of fiduciary duties and unjust enrichment (*Bachman v. A.G. Edwards & Sons, Inc.*, Cause No. 22052-01266-02a) in the Circuit Court of St. Louis City, State of Missouri.

**LEIGH A. PARKER** is a principal in the Los Angeles office.  She graduated from Indiana University (B.A. 1981), received her M.B.A. from the American Graduate School of International Management in 1982 and graduated from Loyola Law School in 1993, where she was a member of the Scott Moot Court Honors Board.

Ms. Parker represents institutional and individual investors in complex securities class actions and derivative shareholder litigation in federal and state courts.  She has played an important role in the firm's successful prosecution of cases that have returned over $150 million to investors in publicly traded companies.  Her notable cases include *In re Apria Healthcare Group Securities Litigation* ($42 million recovery); *In re Platinum Software Securities Litigation* ($32 million recovery); *In re Abbey Healthcare Securities Litigation* ($20.5 million recovery); *In re Southern Pacific Funding Corp. Securities Litigation* ($19.5 million recovery); *In re Quintus Securities Litigation* ($10.1 million recovery); *In re Mesa Airlines Securities Litigation* ($8 million recovery); *Garbini v. Protection One, Inc., et al.* ($7.8 million recovery); *In re QuadraMed Corporation Securities Litigation* ($5.25 million

recovery); *In re Exodus Communications, Inc. Securities Litigation* ($5.0 million recovery); *In re Denver Bonds Securities Litigation* ($4.5 million recovery); and *DeMarco v. Robertson Stephens, Inc.* ($3.1 million recovery).   In addition, she was the primary attorney for plaintiffs in *Crafton v. Powerwave Technologies, Inc., et al.* ($3.1 million recovery) and *Seoane v. Mills, et al.* ($1.1 million recovery).   Ms. Parker also participated in landmark litigation leading to the certification of a class of investors asserting securities fraud claims against research analysts, reported at *DeMarco v. Robertson Stephenson, Inc.,* 228 F.R.D. 468 (S.D.N.Y. 2005).

In conjunction with the firm's corporate litigation practice, Ms. Parker represents investors against corporate directors for breaches of fiduciary duties in connection with acquisitions and mergers.   Some of her most recent cases include settlements reached on behalf of shareholders of SRS Labs, Inc. and Epocrates, Inc.

As a part of the firm's consumer protection practice, she helped to create new law with regard to the ability of consumers to prosecute cases brought under California's unfair competition laws, reported at *Foundation for Taxpayer and Consumer Rights v. Nextel Communications, Inc.*, 143 Cal. App. 4th 131 (2006).   Ms. Parker was the principal attorney for plaintiffs in winning affirmance on appeal of the trial court's denial of defendant's special motion to strike in *The League of California Homeowners v. The Better Business Bureau of the Southland, et al.*, 2012 Cal. App. Unpub. LEXIS 8387 (Cal. App. 2012).   She also recently participated in the successful certification of plaintiff classes in a product defect case, reported at *Tait v. BSH Home Appliances Corporation*, 289 F.R.D. 466 (S.D. Cal. 2012).

Ms. Parker is admitted to the Bar of the State of California and the United States District Courts for the Central, Northern, Southern and Eastern Districts of California, as well as the Ninth Circuit Court of Appeals.

**MARK D. SMILOW** is a principal in the New York office.  He graduated Benjamin N. Cardozo School of Law in 1993, *magna cum laude*, where he was an Alexander Fellow and a member of the Cardozo Law Review.  He is admitted to the New York and New Jersey State Bars, and the United States District Courts for the Southern and Eastern Districts of New York.  He has also been admitted in other courts throughout the nation for particular cases. He has litigated all aspects of numerous class, shareholder, derivative and consumer class actions in both trial and appellate courts.

Mr. Smilow concentrates on shareholder, derivative and consumer class actions in both trial and appellate courts.  He has obtained significant recoveries for stockholders in numerous cases brought under the federal securities statutes.  Among the more prominent, he represented shareholders of Jones Pharma Incorporated who exchanged their shares for those of King Pharmaceuticals, Inc., which culminated in a total settlement of $38.25 million (*In re King Pharmaceuticals, Inc. Securities Litigation*, 03 cv 77) in the Eastern District of Tennessee; shareholders of Martha Stewart Living Omnimedia, Inc. in the Southern District of New York, which culminated in a $30 million settlement (*In re Martha Stewart Living Omnimedia, Inc. Sec. Litig.*, 02 cv 6273 (JES)); and the shareholders of KeySpan Corporation in a securities fraud case culminating in a $13.75 million settlement (*In re KeySpan Corp. Sec. Lit.*, 2001 cv 5852) in the Eastern District of New York.  Moreover, many of Mr. Smilow's cases produced reported opinions of great interest to practitioners, including *Baum v. Keystone Mercy Health Plan*, 826 F. Supp. 2d 718 (E.D. Pa. 2011); *Minzer*

*v. Keegan*, 218 F.3d 144 (2d Cir.2000), *cert. denied*, 531 U.S. 1192, 121 S.Ct. 1190, 149 L.Ed.2d 106 (2001); *Sedighim v. Donaldson, Lufkin & Jenrette, Inc.*, 167 F. Supp. 2d 639 (S.D.N.Y. 2001); and *Rosenfeld v. Port Auth.*, 108 F. Supp. 2d 156 (E.D.N.Y. 2000).

In representing investors against corporate officers and directors for breaches of fiduciary duty, Mr. Smilow has successfully prosecuted many cases involving corporate takeovers, buyouts and reorganizations in which claims of self-dealing, corporate waste and improper disclosure were asserted.  Some of the more recent are *Shaev v. Sidhu*, No. 0983 (C.C.P. Philadelphia Co. PA); *Brody v. Catell*, Index No. 008835/06 (Sup. Ct. Kings Co. NY); and *Rosenfeld Fam. Found. Trust v. Ace Cash Express Inc.*, 06 cv 1100-G (N.D. Tex. Dallas Div.).

Finally, as the chair of the Consumer Litigation Practice Group at the firm, Mr. Smilow represented millions of veterans and active members of the United States Armed Services for privacy law violations (*In re Department of Veterans Affairs Data Theft Litigation*, Misc. Action No. 06-0506 (JR), MDL Docket No. 1796) in the District of Columbia District Court, which culminated in a then record recovery of $20 million.  In another privacy litigation reported in *The Legal Intelligencer* on December 11, 2014, entitled *Court Reopens Door to Class Action in Flash Drive Case*, Mr. Smilow successfully argued for reversal of the denial of class certification under Pennsylvania's Unfair Trade Practices and Consumer Protection Law catch-all. Superior Court Judge Sally Mundy wrote in her decision that the trial court erred when concluding that class certification failed due to issues of reliance as to the deceptive conduct alleged. Judge Mundy vacated the decision and directed the trial court to address the other Pennsylvania Rule 1702 class certification factors.  The case is *Baum v. Keystone Mercy Health Plan*, 2677 EDA 2013 (Super. Ct. Dec. 9,

2014).  In an unusual litigation, Mr. Smilow also secured full refunds for one hundred sixty two small businesses in upstate New York in an administrative proceeding before the New York State Public Service Commission deriving from their utility's improper billing for electric demand (*KLCR Land Corp. and Har-Nof, Inc. vs. NYSEG*, Case No. 00-E-1678 (PSC June 20, 2003)).

**MICHAEL A. ROGOVIN** is an associate in the New York office.  He received a B.A. in History from the University of Wisconsin-Madison in 1999 and his J.D. from Brooklyn Law School in 2003. Mr. Rogovin is admitted to the Bar of the State of New York and the United States District Courts for the Southern and Eastern Districts of New York.

Mr. Rogovin has litigated shareholder actions in connection with mergers and acquisitions and represents a broad spectrum of clients in complex class actions including securities class actions and shareholder derivative actions in federal and state courts.

Most recently, he prosecuted a federal class action that alleged receipt of, and failure to adequately disclose, the receipt of transfer agent fees by a national mutual fund firm (*In re Smith Barney Transfer Agent Litigation*, No. 95-cv-7583 (WHP) (S.D.N.Y.)), (preliminarily approval entered October 7, 2013).

Mr. Rogovin was a member of the firm's litigation team in the prosecution of a federal class action that alleged receipt of, and failure to adequately disclose, secret revenue sharing payments by a national brokerage firm (*Spahn v. Edward D. Jones & Co., et al.*, 04 cv 00086 (HEA)), which resulted in the recovery of $127.5 million on behalf of Edward Jones' clients.

Mr. Rogovin also served on the firm's litigation team in numerous derivative actions involving corporations and issues of national prominence.   When Freddie Mac, the

government-sponsored public corporation entrusted with maintaining liquidity in the United States' mortgage markets, announced one of the largest financial restatements in corporate history, he successfully assisted in the effort to recover the company's damages, recouping more than $100 million (*Sadowsky Testamentary Trust v. Brendsel et al. f/b/o Federal Home Loan Mortgage Corporation*, 05 cv 2596).

Mr. Rogovin also devotes significant time to volunteer work, completing over 150 projects for New York Cares, with a focus on elementary education.

**JOSHUA M. RUBIN** is an associate in the New York office. He received a Bachelor of Talmudic Law from Ner Israel Rabbinical College in 2002 and his J.D. from Benjamin N. Cardozo School of Law in 2005. Mr. Rubin is admitted to the Bar of the State of New York and the United States District Courts for the Southern and Eastern Districts of New York.

Mr. Rubin represents a broad spectrum of domestic and foreign clients in complex class actions including securities class actions and shareholder derivative actions in federal and state courts.

Mr. Rubin has played an important role in the recovery of millions of dollars for damaged investors, and derivatively on behalf of publicly traded companies. These actions include the successful class prosecution on behalf of investors of Converium Holding AG (*Sclater-Booth v. SCOR, S.A.*, 07 cv 3476 (GEL)) in the Southern District of New York and Keyspan Corp. (*In re Keyspan Corporation Securities Litigation*, 01 cv 5852 (ARR)) in the Eastern District of New York. He also participated in landmark litigation leading to the certification of a class of investors asserting securities fraud claims against research analysts, reported at *DeMarco v. Robertson Stephenson, Inc.*, 228 F.R.D. 468 (S.D.N.Y. 2005) ($3.1 million recovery).

Additionally, Mr. Rubin has had a significant role in successfully prosecuting derivative actions on behalf of Fortune 500 companies, including on behalf of Hewlett-Packard Company (*In re Hewlett-Packard Company Derivative Litigation*, C.A. No. 2428-VCN, Court of Chancery of the State of Delaware), Southwest Airlines Co. (*Carbon County Employees Retirement System et al., v. Kelly, et al. f/b/o Southwest Airelines Co.*, No. 08-086292, District Court of Dallas County, Texas) and BP p.l.c. (*In re BP p.l.c. Derivative Litigation*, No. 06 cv 6168 (HB) (S.D.N.Y.)).

Mr. Rubin has also litigated shareholder actions in connection with mergers and acquisitions and successfully represented shareholders in a recent action seeking to enforce the application of U.S. tender offer rules to a foreign corporation.

Mr. Rubin oversees the Firm's various systems used to monitor the stock portfolios of its institutional clients, as well as the maintenance of the firm's document retrieval database and Electronic Discovery platforms.

Mr. Rubin also devotes time to pro bono work. While in law school, he represented indigents in New York County Criminal Court and also assisted faculty on major litigation projects, including homicide, federal criminal and DNA finger-printing cases. He also volunteered as an arbitrator for the New York State Lemon Law Arbitration Program and spends time as a Big Brother mentor.

**KELLY C. KEENAN** is an associate in the New York office focusing on mergers and acquisitions litigation.

Ms. Keenan has achieved significant results for shareholders in connection with securities class actions involving corporate mergers and acquisitions. Recently, she assisted in the successful class prosecution on behalf of investors in *In re Epocrates Inc.*

*Shareholder Litigation*, No. 519078 (Cal. Super. Ct.-San Mateo County, Oct. 4, 2013) in the Superior Court of California, County of San Mateo.

Ms. Keenan received a B.B.A. in Finance from the University of Notre Dame in 2006 and her J.D. from Fordham University School of Law in 2012. While at Fordham, Ms. Keenan participated in the Family Advocacy Clinic and interned with the Honorable Robert K. Holdman of the Supreme Court of New York. Prior to joining WeissLaw, she worked as a Legal Fellow at the Neighborhood Legal Services Program in Washington, D.C. Ms. Keenan is admitted to the Bar of the State of New York.

**Seth M. Rosenstein** is an associate in the New York office focusing on mergers and acquisitions litigation.

Mr. Rosenstein has achieved significant results for shareholders in connection with mergers and acquisitions in federal and state courts. Recently, he assisted in the successful class prosecution on behalf of investors in *Murphy v. Synergetics USA Inc., et al.*, No. 1511-CC00778 (Circuit Court, St. Charles County, Missouri, July 29, 2016).

Mr. Rosenstein received a B.A. in Political Science *cum laude* from American University in 2011 and his J.D. from the Benjamin N. Cardozo School of Law in 2015. While at Cardozo, Mr. Rosenstein served as a member of the Cardozo Alternative Dispute Resolution Competition Team. Additionally, he served as an intern with the Kings County District Attorney's Office, the New York State Department of Financial Services, and a national securities and corporate governance litigation firm. Mr. Rosenstein is admitted to practice in New York and New Jersey, and is admitted to practice before the United States District Court for the District of New Jersey.

**Alexandra E. Eisig** is a Law Clerk in the New York office focusing on mergers and acquisitions litigation.

Ms. Eisig received a B.S. in Mathematics with a double major in Spanish from Muhlenberg College in 2012 and her J.D. from the Benjamin N. Cardozo School of Law in 2016. While at Cardozo, Ms. Eisig participated in the Divorce Mediation Clinic and was a Notes Editor on the Cardozo Journal of Conflict Resolution.

**Andrew M. Janof** is a Law Clerk in the New York office focusing on derivative litigation.

Mr. Janof received a B.A. in History from Yeshiva University in 2013 and his J.D. from the Benjamin N. Cardozo School of Law in 2016. While at Cardozo, he served as a Staff Editor for the Cardozo Journal of International and Comparative Law, and interned with the Honorable Judge David B. Cohen of the Civil Court of New York County.

# Exhibit 2

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| JASON GARCIA, Individually and on Behalf of All Others Similarly Situated,<br><br>          Plaintiff,<br><br>v.<br><br>REMY INTERNATIONAL, INC., et al.,<br><br>          Defendants. | Civil No. 1:15-cv-01385-TWP-TAB |
| MAXINE PHILLIPS, Individually and on Behalf of All Others Similarly Situated,<br><br>          Plaintiff,<br><br>v.<br><br>REMY INTERNATIONAL, INC., et al.,<br><br>          Defendants. | Civil No. 1:15-cv-01343-TWP-TAB |
| STEPHEN BUSHANSKY, Individually and on Behalf of All Others Similarly Situated,<br><br>          Plaintiff,<br><br>v.<br><br>REMY INTERNATIONAL, INC., et al.,<br><br>          Defendants. | Civil No. 1:15-cv-1361-RLY-MJD |

**DECLARATION OF JAMES R. BANKO IN SUPPORT OF PLANTIFFS' UNOPPOSED MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND APPLICATION FOR AWARD OF ATTORNEYS' FEES AND EXPENSES**

I, James R. Banko, declare as follows, pursuant to 28 U.S.C. §1746:

1.      I am a member of the Bar, *inter alia*, of the State of Delaware and a Partner of the law firm of Faruqi & Faruqi, LLP, one of Plaintiffs' counsel in the above-captioned action (the "Action"). The testimony provided herein is based on my own personal knowledge, information and belief and, if called upon, I could and would competently testify thereto.

2.      I submit this declaration in support of Plaintiffs' Unopposed Motion for Final Approval of Class Action Settlement and Application for an Award of Attorneys' Fees and Expenses, which is being filed contemporaneously herewith.

3.      My firm resume is attached hereto as Exhibit A.

4.      My firm acted as counsel for Plaintiffs and actively engaged in the prosecution of the Actions by researching and reviewing extensive public filings related to Remy and its merger; drafting comprehensive pleadings; drafting a motion for preliminary injunction; negotiating disclosures with defendants' counsel and overall settlement framework; taking the deposition of Vijay Kumar of UBS; and drafting and editing settlement papers.

5.      The total number of hours spent on the litigation of the Actions by my firm is 154.40. The total lodestar amount for attorney, paralegal, and professional staff time based on the firm's current rates is $116,632.50. The schedule was prepared from contemporaneous, daily time records prepared and maintained by my firm. The hourly rates shown below are the usual and customary rates. My survey of other class action counsel in the area of merger and acquisition litigation has confirmed that my hourly rate, and the hourly rates of the attorneys within my firm are commensurate with the customary rates charged by attorneys with our experience in our area engaged in similar practice. A breakdown of the lodestar is as follows:

| PROFESSIONAL* | HOURS | RATE | LODESTAR |
|---|---|---|---|
| JAMES BANKO (P) | 30.00 | $795 | $23,850.00 |
| JAMES "JOSH" WILSON (SC) | 18.25 | $775 | $14,143.75 |
| JUAN MONTEVERDE (P) | 98.25 | $775 | $76,143.75 |
| RAUL MONDRAGON FIERRO (PL) | 5.00 | $325 | $1,625.00 |
| SIMONE BRAXTON (PL) | 2.90 | $300 | $870.00 |
|  |  |  |  |
| **TOTALS** | 154.40 |  | $116,632.50 |

*(P) - Partner;
(SC) - Senior Counsel
(PL) - Paralegal

6.      My firm's compensation for services rendered in this case was wholly contingent on the success of the action for Plaintiffs.  None of the attorneys' fees and expenses submitted to this Court has been paid from any source or has been the subject of any prior request or prior award in any litigation or other proceeding.

7.      My firm incurred a total of $1,597.59 in unreimbursed expenses in connection with the prosecution of this litigation.  They are broken down as follows:

| CATEGORY | AMOUNT |
|---|---|
| Computer & Other Research Fee(s) (Lexis/Bloomberg) | $317.32 |
| Courier & Overnight Delivery Services | $36.00 |
| Court Reporting Services | $1,048.26 |
| Postage | $32.80 |
| Reproduction (Internal) | $122.00 |
| Telephone/Fax | $38.21 |
|  |  |
| **TOTAL:** | $1,594.59 |

8.     The expenses incurred pertaining to this case are reflected in the books and records of this firm.  These books and records are prepared from expense reports, check reports, and other sources, and are an accurate record of the expenses incurred.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 4th day of October, 2016 at Wilmington, Delaware.

James R. Banko

# Exhibit 2A



Faruqi & Faruqi, LLP focuses on complex civil litigation, including securities, antitrust, wage and hour, and consumer class actions as well as shareholder derivative and merger and transactional litigation.  The firm is headquartered in New York, and maintains offices in California, Delaware and Pennsylvania.

Since its founding in 1995, Faruqi & Faruqi, LLP has served as lead or co-lead counsel in numerous high-profile cases which ultimately provided significant recoveries to investors, consumers and employees.

# <u>PRACTICE AREAS</u>

## SECURITIES FRAUD LITIGATION

Since its inception over eighteen years ago, Faruqi & Faruqi, LLP has devoted a substantial portion of its practice to class action securities fraud litigation. In *In re PurchasePro.com, Inc. Securities Litigation*, No. CV-S-01-0483 (JLQ) (D. Nev.), as co-lead counsel for the class, Faruqi & Faruqi, LLP secured a $24.2 million settlement in a securities fraud litigation even though the corporate defendant was in bankruptcy.  As noted by Senior Judge Justin L. Quackenbush in approving the settlement, ***"I feel that counsel for plaintiffs evidenced that they were and are skilled in the field of securities litigation."***

Other past achievements include: *In re Olsten Corp. Sec. Litig.*, No. 97-CV-5056 (RDH) (E.D.N.Y.) (recovered $24.1 million dollars for class members) (Judge Hurley stated: "The quality of representation here I think has been excellent."), *In re Tellium, Inc. Sec. Litig.*, No. 02-CV-5878 (FLW) (D.N.J.) (recovered $5.5 million dollars for class members); *In re Mitcham Indus., Inc. Sec. Litig.*, No. H-98-1244 (S.D. Tex.) (recovered $3 million dollars for class members despite the fact that corporate defendant was on the verge of declaring bankruptcy), and *Ruskin v. TIG Holdings, Inc.*, No. 98 Civ. 1068 LLS (S.D.N.Y.) (recovered $3 million dollars for class members).

Recently, in *Shapiro v. Matrixx Initiatives, Inc.*, No. CV-09-1479 (PHX) (ROS) (D. Ariz.), Faruqi & Faruqi, LLP, as co-lead counsel for the class, defeated defendants' motion to dismiss, succeeded in having the action certified as a class action, and secured final approval of a $4.5 million dollar settlement for the class.  In *In re Ebix, Inc. Securities Litigation*, No. 11-cv-2400 (RWS) (N.D. Ga.), the court denied defendants' motion to dismiss and Faruqi & Faruqi, LLP, as sole lead counsel, obtained  final approval on June 13, 2014 of a $6.5 million settlement for the class.  In *In re L&L Energy, Inc. Sec. Litig.*, No. 13-cv-6704 (RA) (S.D.N.Y.), Faruqi & Faruqi, LLP, as co-lead counsel, obtained final approval on July 31, 2015 of a $3.5 million settlement for the class.  *See also Simmons v. Spencer, et al.*, No. 13 Civ. 8216 (RWS) (S.D.N.Y.) (obtained final approval of settlement awarding $1.5 million to the class).



In *In re Longwei Petroleum Inv. Holding Ltd. Sec. Litig.*, No. 13 Civ. 214 (HB) (S.D.N.Y.), Faruqi & Faruqi, LLP, as sole lead counsel, defeated defendants' motions to dismiss, including those filed by the company's auditors, on January 27, 2014, and is currently conducting discovery on behalf of class members.

Additionally, Faruqi & Faruqi, LLP is serving as court-appointed lead counsel in the following cases:

- *In re Dynavax Techs. Corp. Sec. Litig.*, No. 13-CV-2796 (CRB) (N.D. Cal) (defeated defendants' motion to dismiss and currently in the discovery phase);
- *McIntyre v. Chelsea Therapeutics Int'l, LTD*, No. 12-CV-213 (MOC) (DCK) (W.D.N.C.) (final approval of $5.5 million settlement pending);
- *In re Geron Corp., Sec. Litig.*, No. 14-CV-1424 (CRB) (N.D. Cal.) (defeated defendants' motion to dismiss and currently in the discovery phase);
- *In re Avalanche Biotechnologies Sec. Litig.*, No. 3:15-cv-03185-JD (N.D. Cal.) (appointed sole lead counsel for the class);
- *Rihn v. Acadia Pharmaceuticals, Inc.*, No. 3:15-cv-00575-BTM-DHB (S.D. Cal.) (appointed sole lead counsel for the class);
- *Markette v. XOMA Corporation*, No. 3:15-cv-03425-HSG (N.D. Cal.) (appointed sole lead counsel for the class); and
- *Loftus v. Primero Mining Corp.*, No. 16-01034-BRO (RAOx) (C.D. Cal) (appointed sole lead counsel for the class).

## SHAREHOLDER MERGER AND TRANSACTIONAL LITIGATION

Faruqi & Faruqi, LLP is nationally recognized for its excellence in prosecuting shareholder class actions brought nationwide against officers, directors and other parties responsible for corporate wrongdoing. Most of these cases are based upon state statutory or common law principles involving fiduciary duties owed to investors by corporate insiders as well as Exchange Act violations.

Faruqi & Faruqi, LLP has obtained significant monetary and therapeutic recoveries, including millions of dollars in increased merger consideration for public shareholders; additional disclosure of significant material information so that shareholders can intelligently gauge the fairness of the terms of proposed transactions and other types of therapeutic relief designed to increase competitive bids and protect shareholder value.  As noted by Judge Timothy S. Black of the United States District Court for the Southern District of Ohio in appointing lead counsel *Nichting v. DPL Inc.*, Case No. 3:11-cv-14 (S.D. Ohio), "[a]lthough all of the firms seeking appointment as Lead Counsel have impressive resumes, the Court is most impressed with Faruqi & Faruqi."

For example, in *In re Playboy Enterprises, Inc. Shareholders Litigation*, Consol. C.A. No. 5632-VCN (Del. Ch.), Faruqi & Faruqi, LLP recently achieved a substantial post close settlement of $5.25 million.  In *In re Cogent, Inc. Shareholders Litigation*, Consol. C.A. No. 5780-VC (Del. Ch.) Faruqi & Faruqi, LLP, as co-lead counsel, obtained a post-close cash settlement of $1.9 million after two years of



hotly contested litigation; In *Rice v. Lafarge* North *America, Inc., et al.*, No. 268974-V (Montgomery Cty., Md. Circuit Ct.), Faruqi & Faruqi, LLP, as co-lead counsel represented the public shareholders of Lafarge North America ("LNA") in challenging the buyout of LNA by its French parent, Lafarge S.A., at $75.00 per share.  After discovery and intensive injunction motions practice, the price per share was increased from $75.00 to $85.50 per share, or a total benefit to the public shareholders of $388 million.  The Lafarge court gave Class counsel, including Faruqi & Faruqi, LLP, shared credit with a special committee appointed by the company's board of directors for a significant portion of the price increase.

Similarly, in *In re: Hearst-Argyle Shareholder Litig.,* Lead Case No. 09-Civ-600926 (N.Y. Sup. Ct.) as co-lead counsel for plaintiffs, Faruqi & Faruqi, LLP litigated, in coordination with Hearst-Argyle's special committee, an increase of over 12.5%, or $8,740,648, from the initial transaction value offered for Hearst-Argyle Television Inc.'s stock by its parent company, Hearst Corporation.  Faruqi & Faruqi, LLP, in *In re Alfa Corp. Shareholder Litig.*, Case No. 03-CV-2007-900485.00 (Montgomery Cty, Ala. Cir. Ct.) was instrumental, along with the Company's special committee, in securing an increased share price for Alfa Corporation shareholders of $22.00 from the originally-proposed $17.60 per share offer, which represented over a $160 million benefit to class members, and obtained additional proxy disclosures to ensure that Alfa shareholders were fully-informed before making their decision to vote in favor of the merger, or seek appraisal.

Moreover, in *In re Fox Entertainment Group, Inc. S'holders Litig.*, Consolidated C.A. No. 1033-N (Del. Ch. 2005), Faruqi & Faruqi, LLP, a member of the three (3) firm executive committee, and in coordination with Fox Entertainment Group's special committee, created an increased offer price from the original proposal to shareholders, which represented an increased benefit to Fox Entertainment Group, Inc. shareholders of $450 million.  Also, in *In re Howmet Int'l S'holder Litig.*, Consolidated C.A. No. 17575 (Del. Ch. 1999) Faruqi & Faruqi, LLP, in coordination with Howmet's special committee, successfully obtained an increased benefit to class members of $61.5 million dollars).

Recently, in *In re Orchard Enterprises, Inc. Stockholder Litigation*, C.A. No. 7840-VCL (Del. Ch.), Faruqi & Faruqi, LLP acted as co-lead counsel with two other firms.  That action involved the approval of a merger by Orchard's Board of Directors pursuant to which Dimensional Associates LLC would cash-out the stock of Orchard's minority common stockholders at a price of $2.05 per share and then take Orchard private.  On April 11, 2014, the parties reached an agreement to settle their claims for a payment of $10.725 million to be distributed among the Class, which considerably exceeded the $2.62 per share difference between the $2.05 buyout price and the $4.67 appraisal price determined in *In re Appraisal of The Orchard Enterprises, Inc.*, C.A. No. 5713-CS, 2012 WL 2923305 (Del. Ch. July 18, 2012).

Faruqi also has noteworthy successes in achieving injunctive or declaratory relief pre and post close in cases where corporate wrongdoing deprives shareholders of material information or an

3



opportunity to share in potential profits.  In *In re Harleysville Group, Inc. S'holders Litigation*, C.A. Bo. 6907-VCP (Del. Ch. 2014), Faruqi as sole lead counsel obtained significant disclosures for stockholders pre-close and secured valuable relief post close in the form of an Anti-Flip Provision providing former stockholders with 25% of any profits in Qualifying Sale.  In April 2012, Faruqi as sole lead obtained an unprecedented injunction in *Knee v. Brocade Communications Systems, Inc.*, No. 1-12-CV-220249, slip op. at 2 (Cal. Super. Ct. Apr. 10, 2012) (Kleinberg, J.).  In *Brocade*, Faruqi, as sole lead counsel for plaintiffs, successfully obtained an injunction enjoining Brocade's 2012 shareholder vote because certain information relating to projected executive compensation was not properly disclosed in the proxy statement.  (Order After Hearing [Plaintiff's Motion for Preliminary Injunction; Motions to Seal]). In *Kajaria v. Cohen*, No. 1:10-CV-03141 (N.D. Ga., Atlanta Div.), Faruqi & Faruqi, LLP, succeeded in having the district court order Bluelinx Holdings Inc., the target company in a tender offer, to issue additional material disclosures to its recommendation statement to shareholders before the expiration of the tender offer.

## SHAREHOLDER DERIVATIVE LITIGATION

Faruqi & Faruqi, LLP has extensive experience litigating shareholder derivative actions on behalf of corporate entities.  This litigation is often necessary when the corporation has been injured by the wrongdoing of its officers and directors.  This wrongdoing can be either active, such as the wrongdoing by certain corporate officers in connection with purposeful backdating of stock-options, or passive, such as the failure to put in place proper internal controls, which leads to the violation of laws and accounting procedures.  A shareholder has the right to commence a derivative action when the company's directors are unwilling or unable, to pursue claims against the wrongdoers, which is often the case when the directors themselves are the wrongdoers.

The purpose of the derivative action is threefold: (1) to make the company whole by holding those responsible for the wrongdoing accountable; (2) the establishment of procedures at the company to ensure the damaging acts can never again occur at the company; and (3) make the company more responsive to its shareholders.  Improved corporate governance and shareholder responsiveness are particularly valuable because they make the company a stronger one going forward, which benefits its shareholders.  For example, studies have shown the companies with poor corporate governance scores have 5-year returns that are 3 .95% below the industry average, while companies with good corporate governance scores have 5-year returns that are 7.91 % above the industry-adjusted average.   The difference in performance between these two groups is 11 .86%.  *Corporate Governance Study: The Correlation between Corporate Governance and Company Performance*, Lawrence D. Brown, Ph.D., Distinguished Professor of Accountancy, Georgia State University and Marcus L. Caylor, Ph.D. Student, Georgia State University.  Faruqi & Faruqi, LLP has achieved all three of the above stated goals of a

4



derivative action.  The firm regularly obtains significant corporate governance changes in connection with the successful resolution of derivative actions, in addition to monetary recoveries that inure directly to the benefit of the company.  In each case, the company's shareholders indirectly benefit through an improved market price and market perception.

In *In re UnitedHealth Group Incorporated Derivative Litig.*, Case No. 27 CV 06-8065 (Minn. 4th Judicial Dist. 2009) Faruqi & Faruqi, LLP, as co-lead counsel for plaintiffs, obtained a recovery of more than $930 million for the benefit of the Company and corporate governance reforms designed to make UnitedHealth a model of corporate responsibility and transparency.  ***At the time, the settlement reached was believed to be the largest settlement ever in a derivative case***.  See "UnitedHealth's Former Chief to Repay $600 Million," Bloomberg.com, December 6, 2007 ("the settlement . . . would be the largest ever in a 'derivative' suit . . . according to data compiled by Bloomberg.").

As co-lead counsel in *Weissman v. John, et al.*, Cause No. 2007-31254 (Tex. Harris County 2008) Faruqi & Faruqi, LLP, diligently litigated a shareholder derivative action on behalf of Key Energy Services, Inc. for more than three years and caused the company to adopt a multitude of corporate governance reforms which far exceeded listing and regulatory requirements.  Such reforms included, among other things, the appointment of a new senior management team, the realignment of personnel, the institution of training sessions on internal control processes and activities, and the addition of 14 new accountants at the company with experience in public accounting, financial reporting, tax accounting, and SOX compliance.

More recently, Faruqi & Faruqi, LLP concluded shareholder derivative litigation in *The Booth Family Trust, et al. v. Jeffries, et al.*, Lead Case No. 05-cv-00860 (S.D. Ohio 2005) on behalf of Abercrombie & Fitch Co.  Faruqi & Faruqi, LLP, as co-lead counsel for plaintiffs, litigated the case for six years through an appeal in the U.S. Court of Appeals for the Sixth Circuit where it successfully obtained reversal of the district court's ruling dismissing the shareholder derivative action in April 2011.  Once remanded to the district court, Faruqi & Faruqi, LLP caused the company to adopt important corporate governance reforms narrowly targeted to remedy the alleged insider trading and discriminatory employment practices that gave rise to the shareholder derivative action.

The favorable outcome obtained by Faruqi & Faruqi, LLP in *In re Forest Laboratories, Inc. Derivative Litigation*, Lead Civil Action No. 05-cv-3489 (S.D.N.Y. 2005) is another notable achievement for the firm.  After more than six years of litigation, Faruqi & Faruqi, LLP, as co-lead counsel, caused the company to adopt industry-leading corporate governance measures that included rigorous monitoring mechanisms and Board-level oversight procedures to ensure the timely and complete publication of clinical drug trial results to the investing public and to deter, among other things, the unlawful off-label promotion of drugs.



## ANTITRUST LITIGATION

The attorneys at Faruqi & Faruqi, LLP represent direct purchasers, competitors, third-party payors, and consumers in a variety of individual and class action antitrust cases brought under Sections 1 and 2 of the Sherman Act.  These actions, which typically seek treble damages under Section 4 of the Clayton Act, have been commenced by businesses and consumers injured by anticompetitive agreements to fix prices or allocate markets, conduct that excludes or delays competition, and other monopolistic or conspiratorial conduct that harms competition.

*Actions for excluded competitors*.  Faruqi & Faruqi represents competitors harmed by anticompetitive practices that reduce their sales, profits, and/or market share.  One representative action is *Babyage.com, Inc., et al. v. Toys "R" Us, Inc., et al.* where Faruqi & Faruqi was retained to represent three internet retailers of baby products, who challenged a dominant retailer's anticompetitive scheme, in concert with their upstream suppliers, to impose and enforce resale price maintenance in violation of §§ 1 and 2 of the Sherman Act and state law.  The action sought damages measured as lost sales and profits.  This case was followed extensively by the Wall Street Journal.  After several years of litigation, this action settled for an undisclosed amount.

*Actions for direct purchasers*.  Faruqi & Faruqi represents direct purchasers who have paid overcharges as a result of anticompetitive practices that raise prices.  These actions are typically initiated as class actions.  A representative action on behalf of direct purchasers is *Rochester Drug Co-Operative, Inc. v. Warner Chilcott Public Limited Company, et al.*, No. 12-3824 (E.D. Pa.), in which Faruqi & Faruqi was appointed co-lead counsel for the proposed plaintiff class under Federal Rule of Civil Procedure 23(g).  Faruqi & Faruqi's attorneys are counsel to direct purchasers (typically wholesalers) in multiple such class actions.

*Actions for third-party payors*.  Faruqi & Faruqi represents, both in class actions and in individual actions, insurance companies who have reimbursed their policyholders at too high a rate due to anticompetitive prices that raise prices.  One representative action is *In re Tricor Antitrust Litigation*, No. 05-360 (D. Del.), where Faruqi & Faruqi represented PacifiCare and other large third-party payors challenging the conduct of Abbott Laboratories and Laboratories Fournier in suppressing generic drug competition, in violation of §§ 1 and 2 of the Sherman Act. The *Tricor* litigation settled for undisclosed amount in 2010.

*Results*.  Faruqi & Faruqi's attorneys have consistently obtained favorable results in their antitrust engagements.  Non-confidential results include the following:  *In re Iowa Ready-Mixed Concrete Antitrust Litigation*, No. C 10-4038 (N.D. Iowa) ($18.5 million settlement); *In re Metoprolol Succinate*

6



*Direct Purchaser Antitrust Litigation*, 06-52 (D. Del.) ($20 million settlement); *In re Ready-Mixed Concrete Antitrust Litigation*, No. 05-979 (S.D. Ind.) ($40 million settlement); *Rochester Drug Co-Operative, Inc., et al. v. Braintree Labs, Inc.*, No. 07-142-SLR (D. Del.) ($17.25 million settlement).

A more complete list of Faruqi & Faruqi's active and resolved antitrust cases can be found on its web site at *www.faruqilaw.com*.

## CONSUMER PROTECTION LITIGATION

Attorneys at Faruqi & Faruqi, LLP have advocated for consumers' rights, successfully challenging some of the nation's largest and most powerful corporations for a variety of improper, unfair and deceptive business practices. Through our efforts, we have recovered hundreds of millions of dollars and other significant remedial benefits for our consumer clients.

For example, in *Bates v. Kashi Co., et al.*, Case No. 11-CV-1967-H BGS (S.D. Cal. 2011), as co-lead counsel for the class, Faruqi & Faruqi, LLP secured a $5.0 million settlement fund on behalf of California consumers who purchased Kashi products that were deceptively labeled as "nothing artificial" and "all natural." The settlement provides class members with a full refund of the purchase price in addition to requiring Kashi to modify its labeling and advertising to remove "All Natural" and "Nothing Artificial" from certain products. As noted by Judge Marilyn L. Huff in approving the settlement, *"Plaintiffs' counsel has extensive experience acting as class counsel in consumer class action cases, including cases involving false advertising claims."* Moreover, in *Thomas v. Global Vision Products*, Case No. RG-03091195 (California Superior Ct., Alameda Cty.), Faruqi & Faruqi, LLP served as co-lead counsel in a consumer class action lawsuit against Global Vision Products, Inc., the manufacturer of the Avacor hair restoration product and its officers, directors and spokespersons, in connection with the false and misleading advertising claims regarding the Avacor product. Though the company had declared bankruptcy in 2007, Faruqi & Faruqi, LLP, along with its co-counsel, successfully prosecuted two trials to obtain relief for the class of Avacor purchasers. In January 2008, a jury in the first trial returned a verdict of almost $37 million against two of the creators of the product. In November 2009, another jury awarded plaintiff and the class more than $50 million in a separate trial against two other company directors and officers. This jury award represented the largest consumer class action jury award in California in 2009 (according to VerdictSearch, a legal trade publication).

Additionally, in *Rodriguez v. CitiMortgage, Inc.*, Case No. 11-cv-04718-PGG-DCF (S.D.N.Y. 2011), Faruqi & Faruqi, LLP, as co-lead class counsel, reached a significant settlement with CitiMortgage related to improper foreclosure practices of homes owned by active duty servicemembers. The settlement was recently finalized pursuant to a Final Approval Order dated October 6, 2015, which provides class



members with a monetary recovery of at least $116,785.00 per class member, plus the amount of any lost equity in the foreclosed property.

Below is a non-exhaustive list of settlements where Faruqi & Faruqi, LLP and its partners have served as lead or co-lead counsel:

- *In re Sinus Buster Products Consumer Litig.,* Case No. 1:12-cv-02429-ADS-AKT (E.D.N.Y. 2012). The firm represented a nationwide class of purchasers of assorted cold, flu and sinus products. A settlement was obtained, providing class members with a cash refund up to $10 and requiring defendant to discontinue the marketing and sale of certain products.
- *In re: Alexia Foods, Inc. Litigation.,* Case No. 4:11-cv-06119 (N.D. Cal. 2011). The firm represented a proposed class of all persons who purchased certain frozen potato products that were deceptively advertised as "natural" or "all natural." A settlement was obtained, providing class members with the cash refunds up to $35.00 and requiring defendant to cease using a synthetic chemical compound in future production of the products.
- *In re: Haier Freezer Consumer Litig.,* Case No. 5:11-CV-02911-EJD (N.D. Cal. 2011). The firm represented a nationwide class of consumers who purchased certain model freezers, which were sold in violation of the federal standard for maximum energy consumption. A settlement was obtained, providing class members with cash payments of between $50 and $325.80.
- *Loreto v. Coast Cutlery Co.,* Case No. 11-3977 SDW-MCA (D.N.J. 2011) The firm represented a proposed nationwide class of people who purchased stainless steel knives and multi-tools that were of a lesser quality than advertised. A settlement was obtained, providing class members with a full refund of the purchase price.
- *Rossi v Procter & Gamble Company.,* Case No. 11-7238 (D.N.J. 2011). The firm represented a nationwide class of consumers who purchased deceptively marketed "Crest Sensitivity" toothpaste. A settlement was obtained, providing class members with a full refund of the purchase price.
- *In re: Michaels Stores Pin Pad Litig.,* Case No. 1:11-CV-03350 CPK (N.D. Ill. 2011). The firm represented a nationwide class of persons against Michaels Stores, Inc. for failing to secure and safeguard customers' personal financial data. A settlement was obtained, which provided class members with monetary recovery for unreimbursed out-of-pocket losses incurred in connection with the data breach, as well as up to four years of credit monitoring services.
- *Kelly, v. Phiten,* Case No. 4:11-cv-00067 JEG (S.D. Iowa 2011). The firm represented a proposed nationwide class of consumers who purchased Defendant Phiten USA's jewelry and other products, which were falsely promoted to balance a user's energy flow. A settlement was obtained, providing class members with up to 300% of the cost of the product and substantial injunctive relief requiring Phiten to modify its advertising claims.
- *In re: HP Power-Plug Litigation,* Case No. 06-1221 (N.D. Cal. 2006). The firm represented a proposed nationwide class of consumers who purchased defective laptops manufactured by defendant. A settlement was obtained, which provided full relief to class members, including among other benefits a cash payment up to $650.00 per class member, or in the alternative, a repair free-of-charge and new limited warranties accompanying repaired laptops.
- *Delre v. Hewlett-Packard Co.,* C.A. No. 3232-02 (N.J. Super. Ct. 2002). The firm represented a proposed nationwide class of consumers (approximately 170,000 members) who purchased, HP dvd-100i dvd-writers ("HP 100i") based on misrepresentations regarding the write-once ("DVD+R") capabilities of the HP 100i and the compatibility of DVD+RW disks written by HP 100i with DVD players and other optical storage devices. A settlement was obtained, which provided full relief to class members, including among other benefits, the replacement of defective HP 100i with its more current, second generation DVD writer, the HP 200i, and/or refunds the $99 it had charged some consumers to upgrade from the HP 100i to the HP 200i prior to the settlement.

NEW YORK    CALIFORNIA    DELAWARE    PENNSYLVANIA



In addition, Faruqi & Faruqi, LLP and its partners are currently serving as lead or co-lead counsel in the following class action cases:

- *Dei Rossi et al. v. Whirlpool Corp.,* Case No. 2:12-cv-00125-TLN-JFM (E.D. Cal. 2012) (representing a certified class of people who purchased mislabeled KitchenAid brand refrigerators from Whirlpool Corp.)
- *In re: Scotts EZ Seed Litigation*, Case No. 7:12-cv-04727-VB (S.D.N.Y. 2012) (representing a certified class of purchasers of mulch grass seed products advertised as a superior grass seed product capable of growing grass in the toughest conditions and with half the water.)
- *Forcellati et al., v Hyland's, Inc. et al.,* Case No. 2:12-cv-01983-GHK-MRW (C.D. Cal. 2012) (representing a certified nationwide class of purchasers of children's cold and flu products.)
- *Avram v. Samsung Electronics America, Inc., et al.,* Case No. 2:11-cv-06973 KM-MCA (D.N.J. 2011) (representing a proposed nationwide class of persons who purchased mislabeled refrigerators from Samsung Electronics America, Inc. for misrepresenting the energy efficiency of certain refrigerators.)
- *Dzielak v. Whirlpool Corp., et al.*, Case No. 12-CIV-0089 SRC-MAS (D.N.J. 2011) (representing a proposed nationwide class of purchasers of mislabeled Maytag brand washing machines for misrepresenting the energy efficiency of such washing machines.)
- *In re: Shop-Vac Marketing and Sales Practices Litigation,* Case No. 4:12-md-02380-YK (M.D. Pa. 2012) (representing a proposed nationwide class of persons who purchased vacuums or Shop Vac's with overstated horsepower and tank capacity specifications.)
- *In re: Oreck Corporation Halo Vacuum And Air Purifiers Marketing And Sales Practices Litigation*, MDL No. 2317 (the firm was appointed to the executive committee, representing a proposed nationwide class of consumers who purchased vacuums and air purifiers that were deceptively advertised effective in eliminating common viruses, germs and allergens.)

## EMPLOYMENT PRACTICES LITIGATION

Faruqi & Faruqi, LLP is a recognized leader in protecting the rights of employees. The firm's Employment Practices Group is committed to protecting the rights of current and former employees nationwide. The firm is dedicated to representing employees who may not have been compensated properly by their employer or who have suffered investment losses in their employer-sponsored retirement plan. The firm also represents individuals (often current or former employees) who assert that a company has allegedly defrauded the federal or state government.

Faruqi & Faruqi represents current and former employees nationwide whose employers have failed to comply with state and/or federal laws governing minimum wage, hours worked, overtime, meal and rest breaks, and unreimbursed business expenses. In particular, the firm focuses on claims against companies for (i) failing to properly classify their employees for purposes of paying them proper overtime pay, or (ii) requiring employees to work "off-the-clock," and not paying them for all of their actual hours worked.

In prosecuting claims on behalf of aggrieved employees, Faruqi & Faruqi has successfully defeated summary judgment motions, won numerous collective certification motions, and obtained significant monetary recoveries for current and former employees. In the course of litigating these claims,



the firm has been a pioneer in developing the growing area of wage and hour law. In *Creely, et al. v. HCR ManorCare, Inc.*, C.A. No. 3:09-cv-02879 (N.D. OH), Faruqi & Faruqi, along with its co-counsel, obtained one of the first decisions to reject the application of the Supreme Court's Fed. R. Civ. P. 23 certification analysis in *Wal-Mart Stores, Inc. v. Dukes et. al.,* 131 S. Ct. 2541 (2011) to the certification process of collective actions brought pursuant to the Fair Labor Standards Act of 1938 ("FLSA"). The firm, along with its co-counsel, also recently won a groundbreaking decision for employees seeking to prosecute wage and hour claims on a collective basis in *Symczyk v. Genesis Healthcare Corp. et al.*, No. 10-3178 (3d Cir. 2011). In *Symczyk,* the Third Circuit reversed the district court's ruling that an offer of judgment mooted a named plaintiff's claim in an action asserting wage and hour violations of the FLSA. Notably, the Third Circuit also affirmed the two-step process used for granting certification in FLSA cases. The *Creely* decision, like the Third Circuit's *Genesis* decision, will invariably be relied upon by courts and plaintiffs in future wage and hour actions.

Some of the firm's notable recoveries include *Bazzini v. Club Fit Management, Inc.,* C.A. No. 08-cv-4530 (S.D.N.Y. 2008), wherein the firm settled a FLSA collective action lawsuit on behalf of tennis professionals, fitness instructors and other health club employees on very favorable terms. Similarly, in *Garcia, et al., v. Lowe's Home Center, Inc., et al.*, C.A. No. GIC 841120 (Cal. Sup. Ct. 2008), Faruqi & Faruqi served as co-lead counsel and recovered $1.6 million on behalf of delivery workers who were unlawfully treated as independent contractors and not paid appropriate overtime wages or benefits.

The firm's Employment Practices Group also represents participants and beneficiaries of employee benefit plans covered by the Employee Retirement Income Security Act of 1874 ("ERISA"). In particular the firm protects the interests of employees in retirement savings plans against the wrongful conduct of plan fiduciaries. Often, these retirement savings plans constitute a significant portion of an employee's retirement savings. ERISA, which codifies one of the highest duties known to law, requires an employer to act in the best interests of the plan's participants, including the selection and maintenance of retirement investment vehicles. For example, an employer who administers a retirement savings plan (often a 401(k) plan) has a fiduciary obligation to ensure that the retirement plan's assets (including employee and any company matching contributions to the plan) are directed into appropriate and prudent investment vehicles.

Faruqi & Faruqi has brought actions on behalf of aggrieved plan participants where a company and/or certain of its officers breached their fiduciary duty by allowing its retirement plans to invest in shares of its own stock despite having access to materially negative information concerning the company which materially impacted the value of the stock. The resulting losses can be devastating to employees' retirement accounts. Under certain circumstances, current and former employees can seek to hold their employers accountable for plan losses caused by the employer's breach of their ERISA-mandated duties.

10



The firm's Employment Practices Group also represents whistleblowers in actions under both federal and state False Claims Acts.  Often, current and former employees of business entities that contract with, or are otherwise bound by obligations to, the federal and state governments become aware of wrongdoing that causes the government to overpay for a good or service.  When a corporation perpetrates such fraud, a whistleblower may sue the wrongdoer in the government's name to recover up to three times actual damages and additional civil penalties for each false statement made. Whistleblowers who initiate such suits are entitled to a portion of the recovery attained by the government, generally ranging from 15% to 30% of the total recovery.

False Claims Act cases often arise in context of Medicare and Medicaid fraud, pharmaceutical fraud, defense contractor fraud, federal government contractor fraud, and fraudulent loans and grants. For instance, in *United States of America, ex rel. Ronald J. Streck v. Allergan, Inc. et al.*, No. 2:08-cv-05135-ER (E.D. Pa.), Faruqi & Faruqi represents a whistleblower in an un-sealed case alleging fraud against thirteen pharmaceutical companies who underpaid rebates they were obliged to pay to state Medicaid programs on drugs sold through those programs.

Based on its experience and expertise, the firm has served as the principal attorneys representing current and former employees in numerous cases across the country alleging wage and hour violations, ERISA violations and violations of federal and state False Claims Acts.

# ATTORNEYS

## NADEEM FARUQI

Mr. Faruqi is Co-Founder and Managing Partner of the firm.  Mr. Faruqi oversees all aspects of the firm's practice areas.  Mr. Faruqi has acted as sole lead or co-lead counsel in many notable class or derivative action cases, such as: *In re Olsten Corp. Secs. Litig.*, C.A. No. 97-CV-5056 (E.D.N.Y.) (recovered $25 million dollars for class members); *In re PurchasePro, Inc., Secs. Litig.*, Master File No. CV-S-01-0483 (D. Nev. 2001) ($24.2 million dollars recovery on behalf of the class in securities fraud action); *In re Avatex Corp. S'holders Litig.*, C.A. No. 16334-NC (Del. Ch. 1999) (established certain new standards for preferred shareholders rights); *Dennis v. Pronet, Inc.*, C.A. No. 96-06509 (Tex. Dist. Ct.) (recovered over $15 million dollars on behalf of shareholders); *In re Tellium, Inc. Secs. Litig.*, C.A. No. 02-CV-5878 (D.N.J.) (class action settlement of $5.5 million); *In re Tenet Healthcare Corp. Derivative Litig.*, Lead Case No. 01098905 (Cal. Sup. Ct. 2002) (achieved a $51.5 million benefit to the corporation in derivative litigation).

Upon graduation from law school, Mr. Faruqi was associated with a large corporate legal department in New York.  In 1988, he became associated with Kaufman Malchman Kirby & Squire,



specializing in shareholder litigation, and in 1992, became a member of that firm.  While at Kaufman Malchman Kirby & Squire, Mr. Faruqi served as one of the trial counsel for plaintiff in *Gerber v. Computer Assocs. Int'l, Inc.*, 91-CV-3610 (E.D.N.Y. 1991).  Mr. Faruqi actively participated in cases such as: *Colaprico v. Sun Microsystems*, No. C-90-20710 (N.D. Cal. 1993) (recovery in excess of $5 million on behalf of the shareholder class); *In re Jackpot Secs. Enters., Inc. Secs. Litig.*, CV-S-89-805 (D. Nev. 1993) (recovery in excess of $3 million on behalf of the shareholder class); *In re Int'l Tech. Corp. Secs. Litig.*, CV 88-440 (C.D. Cal. 1993) (recovery in excess of $13 million on behalf of the shareholder class); and *In re Triangle Inds., Inc. S'holders Litig.*, C.A. No. 10466 (Del. Ch. 1990) (recovery in excess of $70 million).

Mr. Faruqi earned his Bachelor of Science Degree from McGill University, Canada (B.Sc. 1981), his Master of Business Administration from the Schulich School of Business, York University, Canada (MBA 1984) and his law degree from New York Law School (J.D., *cum* laude, 1987).  Mr. Faruqi was Executive Editor of New York Law School's Journal of International and Comparative Law.  He is the author of "Letters of Credit: Doubts As To Their Continued Usefulness," Journal of International and Comparative Law, 1988.  He was awarded the Professor Ernst C. Stiefel Award for Excellence in Comparative, Common and Civil Law by New York Law School in 1987.

## LUBNA M. FARUQI

Ms. Faruqi is Co-Founder of Faruqi & Faruqi, LLP.  Ms. Faruqi is involved in all aspects of the firm's practice.  Ms. Faruqi has actively participated in numerous cases in federal and state courts which have resulted in significant recoveries for shareholders.

Ms. Faruqi was involved in litigating the successful recovery of $25 million to class members in *In re Olsten Corp. Secs. Litig.*, C.A. No. 97-CV-5056 (E.D.N.Y.).  She helped to establish certain new standards for preferred shareholders in Delaware in *In re Avatex Corp. S'holders Litig.*, C.A. No. 16334-NC (Del. Ch. 1999).  Ms. Faruqi was also lead attorney in *In re Mitcham Indus., Inc. Secs. Litig.*, Master File No. H-98-1244 (S.D. Tex. 1998), where she successfully recovered $3 million on behalf of class members despite the fact that the corporate defendant was on the verge of declaring bankruptcy.

Upon graduation from law school, Ms. Faruqi worked with the Department of Consumer and Corporate Affairs, Bureau of Anti-Trust, the Federal Government of Canada.  In 1987, Ms. Faruqi became associated with Kaufman Malchman Kirby & Squire, specializing in shareholder litigation, where she actively participated in cases such as: *In re Triangle Inds., Inc. S'holders Litig.*, C.A. No. 10466 (Del. Ch. 1990) (recovery in excess of $70 million); *Kantor v. Zondervan Corp.*, C.A. No. 88 C5425 (W.D. Mich. 1989) (recovery of $3.75 million on behalf of shareholders); and *In re A.L. Williams Corp. S'holders Litig.*, C.A. No. 10881 (Del. Ch. 1990) (recovery in excess of $11 million on behalf of shareholders).



Ms. Faruqi graduated from McGill University Law School at the age of twenty-one with two law degrees: Bachelor of Civil Law (B.C.L.) (1980) and a Bachelor of Common Law (L.L.B.) (1981).

## JAMES R. BANKO

James R. Banko is a partner in Faruqi & Faruqi's Delaware office.

Mr. Banko has substantial practice in complex litigation, including securities and corporate fraud. Prior to joining the Firm, Mr. Banko practiced law at Grant & Eisenhofer, P.A. where he focused on securities and corporate fraud litigation.  Mr. Banko represented sophisticated institutional investors in a high-profile securities fraud class action, *In re Tyco International, Ltd. Securities Litig.*, which resulted in $3 billion class action settlement and in which Mr. Banko took and defended numerous depositions and wrote class certification, discovery, and summary judgment briefs.  Mr. Banko was also involved in the recovery of a successful settlement against a former chief financial officer on behalf of a European fund which included discovery under the Hague Convention.  Mr. Banko also took a leading role in several other securities fraud class actions against pharmaceutical companies including briefing of Daubert motions.  Representative clients included various state attorney generals, pension funds, and securities funds.

Mr. Banko was previously an associate in the litigation department at Curtis, Mallet-Prevost, Colt & Mosle LLP, New York, NY where he practiced in all aspects of general civil litigation, including complex commercial, contract, corporate, product liability, and trade secret cases, including jury trials. Responsibilities included hearings, pleadings, pretrial discovery, motions for summary judgment, motions in limine, argument of substantive and procedural motions in federal and state courts, engaging in settlement negotiations and drafting of agreements.

Mr. Banko received his J.D. from the University of Pennsylvania Law School where he was a Senior Board Member of the Journal of International Business Law. Mr. Banko is admitted, and in good standing, in NY, NJ, PA, DC, DE, FL, and CA as well as numerous United States district courts as well as the 1st, 2d, 3d and 9th Circuits and the U.S. Supreme Court.

## PETER KOHN

Mr. Kohn is a partner in Faruqi & Faruqi, LLP's Pennsylvania office.

Prior to joining the firm, Mr. Kohn was a shareholder at Berger & Montague, P.C., where he prepared for trial several noteworthy lawsuits under the Sherman Act, including *In re Buspirone Patent & Antitrust Litigation*, MDL No. 1410 (S.D.N.Y.) ($220M settlement), *In re Cardizem CD Antitrust Litigation*, No. 99-MD-1278 (E.D. Mich.) ($110M settlement), *Meijer, Inc. v. Warner-Chilcott*, No. 05-2195 (D.D.C.) ($22M settlement), *In re Relafen Antitrust Litigation*, No. 01-12239 (D. Mass.) ($175M settlement), *In re*

13



*Remeron Direct Purchaser Antitrust Litigation*, No. 03-cv-0085 (D.N.J.) ($75M settlement), *In re Terazosin Hydrochloride Antitrust Litigation*, No. 99-MDL-1317 (S.D. Fla.) ($72.5M settlement), and *In re Tricor Direct Purchaser Antitrust Litig.*, No. 05-340 (D. Del.) ($250M settlement).  The court appointed him as co-lead counsel for the plaintiffs in *In re Pennsylvania Title Ins. Antitrust Litig.*, No. 08cv1202 (E.D. Pa.) (pending action on behalf of direct purchasers of title insurance alleging illegal cartel pricing under § 1 of the Sherman Act).

A sampling of Mr. Kohn's reported cases in the antitrust arena includes *Delaware Valley Surgical Supply Inc. v. Johnson & Johnson*, 523 F.3d 1116 (9th Cir. 2008) (issue of direct purchaser standing under *Illinois Brick*); *Babyage.com, Inc. v. Toys "R" Us, Inc.*, 558 F. Supp.2d 575 (E.D. Pa. 2008) (denying defendants' motion to dismiss following the Supreme Court's decisions in *Twombly* and *Leegin*, and for the first time in the Third Circuit adopting the Merger Guidelines method of relevant market definition); *J.B.D.L. Corp. v. Wyeth-Ayerst Laboratories, Inc.*, 485 F.3d 880 (6th Cir. 2007) (affirming summary judgment in exclusionary contracting case); and *Babyage.com, Inc. v. Toys "R" Us, Inc.*, 458 F. Supp.2d 263 (E.D. Pa. 2006) (discoverability of surreptitiously recorded statements prior to deposition of declarant).

Mr. Kohn is a 1989 graduate of the University of Pennsylvania (B.A., English) and a 1992 *cum laude* graduate of Temple University Law School, where he was senior staff for the *Temple Law Review* and received awards for trial advocacy.  Mr. Kohn was recognized as a "recommended" antitrust attorney in the Northeast in 2009 by the Legal 500 guide (www.legal500.com) and was chosen by his peers as a "SuperLawyer" in Pennsylvania in 2009, 2010, and 2011.  In 2011, Mr. Kohn was selected as a Fellow in the Litigation Counsel of America, a trial lawyer honorary society composed of less than one-half of one percent of American lawyers.  He is a member of the bars of the Supreme Court of Pennsylvania (1992-present), the United States District Court for the Eastern District of Pennsylvania (1995-present), the United States District Court for the Eastern District of Michigan (2010-present), the United States Court of Appeals for the Third Circuit (2000-present), the United States Court of Appeals for the Sixth Circuit (2005-present), and the United States Court of Appeals for the Federal Circuit (2011-present).

## RICHARD W. GONNELLO

Richard W. Gonnello is a partner in Faruqi & Faruqi, LLP's New York office.

Prior to joining the firm, Mr. Gonnello was a partner at Entwistle & Cappucci LLP and an associate at Latham & Watkins LLP.  Mr. Gonnello has represented institutional and individual investors in obtaining substantial recoveries in numerous class actions, including *In re Royal Ahold Sec. Litig.*, No. 03-md-01539 (D. Md. 2003) ($1.1 billion) and *In re Tremont Securities Law, State Law and Insurance Litigation*, No. 08-cv-11117 (S.D.N.Y. 2011) ($100 million+).  Mr. Gonnello has also obtained favorable



recoveries for institutional investors pursuing direct securities fraud claims, including cases against *Qwest Communications International, Inc.* ($175 million+) and *Tyco Int'l Ltd* ($21 million).

Mr. Gonnello has co-authored the following articles: "*'Staehr' Hikes Burden of Proof to Place Investor on Inquiry Notice*, "New York Law Journal, December 15, 2008; and "*Potential Securities Fraud: 'Storm Warnings' Clarified*," New York Law Journal, October 23, 2008.

Mr. Gonnello graduated *summa cum laude* from Rutgers University in 1995, where he was named Phi Beta Kappa.  He received his law degree from UCLA School of Law (J.D. 1998), and was a member of the UCLA Journal of Environmental Law & Policy.

## T. TALYANA BROMBERG

Ms. Bromberg is a partner in Faruqi & Faruqi, LLP's Pennsylvania office.

Prior to joining the Firm, Ms. Bromberg practiced law at Grant & Eisenhofer, P.A. where she represented whistleblowers in pharmaceutical, financial, health care, and government contractor cases, with settlements totaling over $4.5 billion.  Among these settlements was a $1.6 billion settlement against Abbott Laboratories related to off-label promotion and payment of kickbacks for anti-seizure drug Depakote, and a $3 billion settlement against GlaxoSmithKline related to unlawful marketing tactics and kickbacks for GSK drugs.  During her tenure at Grant & Eisenhofer, Ms. Bromberg, among others, also represented sophisticated institutional investors in complex international securities class actions, including *In re Parmalat Securities Litigation* and *In re Vivendi Universal S.A. Securities Litigation*.

Ms. Bromberg previously served as partner at a prominent law firm in Riga, Latvia, where she focused on commercial litigation. She also served as in-house counsel for a U.S.-Latvian joint venture in the exporting and manufacturing sector.  Ms. Bromberg received her L.L.M. degree from the University of Pennsylvania Law School and her J.D. equivalent from the University of Latvia School of Law in Riga, Latvia in 1989.  Ms. Bromberg is a member of the New York Bar and is admitted to practice in the United States District Courts for the Eastern and Southern Districts of New York.

## JOSEPH T. LUKENS

Mr. Lukens is a partner in Faruqi & Faruqi, LLP's Pennsylvania office.

Mr. Lukens was a shareholder at the Philadelphia firm of Hangley Aronchick Segal Pudlin & Schiller, where he represented large retail pharmacy chains as opt-out plaintiffs in numerous lawsuits under the Sherman Act.  Among those lawsuits were *In re Brand Name Prescription Drugs Antitrust Litigation* (MDL 897, N.D. Ill.), *In re Terazosin Hydrochloride Antitrust Litigation* (MDL 1317, S.D. Fla.), *In re TriCor Direct Purchaser Antitrust Litigation* (05-605, D. Del.), *In re Nifedipine Antitrust Litigation* (MDL1515, D.D.C.), *In re OxyContin Antitrust Litigation* (04-3719, S.D.N.Y), and *In re Chocolate*

NEW YORK          CALIFORNIA          DELAWARE          PENNSYLVANIA



*Confectionary Antitrust Litigation* (MDL 1935, M.D. Pa.).  While the results in the opt-out cases are confidential, the parallel class actions in those matters which are concluded have resulted in settlements exceeding $1.1 billion.

Earlier in his career, Mr. Lukens concentrated in commercial and civil rights litigation at the Philadelphia firm of Schnader, Harrison, Segal & Lewis.  The types of matters that Mr. Lukens handled included antitrust, First Amendment, contracts, and licensing.  Mr. Lukens also worked extensively on several notable *pro bono* cases including *Commonwealth v. Morales*, which resulted in a rare reversal on a second post-conviction petition in a capital case in the Pennsylvania Supreme Court.

Mr. Lukens graduated from LaSalle University (B.A. Political Science, *cum laude*, 1987) and received his law degree from Temple University School of Law (J.D., *magna cum laude*, 1992) where he was an editor on the *Temple Law Review* and received several academic awards.  After law school, Mr. Lukens clerked for the Honorable Joseph J. Longobardi, Chief Judge for the United States District Court for the District of Delaware (1992-93).  Mr. Lukens is a member of the bars of the Supreme Court of Pennsylvania (1992-present), the United States Supreme Court (1996-present); the United States District Court for the Eastern District of Pennsylvania (1993-present), the United States Court of Appeals for the Third Circuit (1993-present), and the United States Court of Appeals for the District of New Jersey (1994-present).

Mr. Lukens has several publications, including: *Bringing Market Discipline to Pharmaceutical Product Reformulations*, 42 Int'l Rev. Intel. Prop. & Comp. Law 698 (September 2011) (co-author with Steve Shadowen and Keith Leffler); *Anticompetitive Product Changes in the Pharmaceutical Industry*, 41 Rutgers L.J. 1 (2009) (co-author with Steve Shadowen and Keith Leffler); *The Prison Litigation Reform Act: Three Strikes and You're Out of Court — It May Be Effective, But Is It Constitutional?*, 70 Temp. L. Rev. 471 (1997); *Pennsylvania Strips The Inventory Search Exception From Its Rationale – Commonwealth v. Nace*, 64 Temp. L. Rev. 267 (1991).

## STUART J. GUBER

Stuart J. Guber is a Partner in Faruqi & Faruqi, LLP's Pennsylvania office.

Mr. Guber focuses his practice on representing institutional and individual investors in class actions under the federal securities laws, shareholder derivative suits and mergers and acquisitions litigation, as well as other complex litigation representing consumers.  During his 25-year career as a securities and complex litigator, Mr. Guber, as one of the lead attorneys, has successfully litigated numerous shareholder cases to settlement and verdict including *In re Rite Aid Pharmacy Sec. Litig.*, No. MDL 1360 (E.D. Pa) ($320 Million settlement of securities class action); *In re Tycom Ltd. Sec. Litig.*, No. 03-CV-03540 (D. Conn.) ($79 million settlement in securities class action); *In re Providian Financial Corp.*

16



*Sec. Litig.*, No. 01-CV-3952 (N.D. Cal.) ($65 million settlement in securities class action); *In re Bell South Corp. Sec. Litig.*, No. 02-CV-2142 (N.D. Ga.) ($35 million settlement in securities class action); *In re Evergreen Ultra Short Opportunities Fund Sec. Litig.*, No. 1:08-CV-11064 (D. Mass.) ($25 million class action securities settlement in which participating class members will recover over 65% of their losses); *Robbins v. Koger Properties*, No. 90-896-civ-J-10 (M.D. Flo.) (plaintiffs' trial counsel in jury verdict awarding $81.3 million in damages); *Maiocco, et al. v. Greenway Capital Corp.*, et al., NASD No. 94-04396 (Lead trial counsel for plaintiffs in securities arbitration awarding $227,000 in compensatory damages and $100,000 in punitive damages); *Solomon v. T.F.M., Inc.* (achieved defense verdict as lead trial counsel in securities arbitration representing Philadelphia Stock Exchange options trading firm); *Minerva Group LP v. Keane*, Index No. 800621 (Sup. Ct. NY) (mergers and acquisitions case settled for amendments to merger agreement, additional disclosures and a price bump per share to be paid shareholders from $8.40 per share to $9.25 per share in merger consideration). Mr. Guber has successfully litigated consumer class actions (for e.g., *Nepomuceno v. Knights of Columbus*, No. Civ. A. 96 C 4789 (N.D. Ill.), settled for $22 million in life insurance vanishing premium consumer fraud case) and successfully defended at trial a union health and welfare fund being sued by a healthcare provider (*Centre for Neuro Skills, Inc.-Texas v. Specialties & Paper Products Union No. 527 Health and Welfare Fund*, No. CC-07-10150-A (Cty. Ct. Dallas, Tex.), lead trial defense counsel securing a directed verdict in favor of defendant).

Mr. Guber has also been involved as lead or co-lead counsel in litigation producing a number of noteworthy published decisions including: *South Ferry LP v. Killinger*, 542 F.3d 776 (9th Cir. 2008); *Koehler v. Brody*, 483 F.3d 590 (8th Cir. 2007); *Wagner v. First Horizon Pharm. Corp.*, 464 F.3d 1273 (11th Cir. 2006); *Garfield v. NDC Health*, 466 F.3d 1255 (11th Cir. 2006); *In re Cerner Corp. Sec. Litig.*, 425 F.3d 1079 (8th Cir. 2005); *Nevius v. Read-Rite Corp.*, 335 F.3d 843 (9th Cir. 2003); *Robbins v. Koger Properties*, 116 F.3d 1441 (11th Cir. 1997); *Schreiber v. Kellogg*, 50 F.3d 264 (3d Cir. 1995); *In re Evergreen Ultra Short Opportunities Fund Se. Litig.*, 275 F.R.D. 382 (D. Mass. 2011) *Marsden v. Select Med. Corp.*, 246 F.R.D. 480 (E.D. Pa. 2007); *In re Friedman's Inc. Securities Litigation*, 385 F. Supp. 2d 1345 (N.D. Ga. 2005); *In re Bellsouth Corp. Sec. Litig.*, 355 F. Supp. 2d 1350 (N.D. Ga. 2005); *Tri-Star Farms Ltd. v. Marconi*, PLC, et al., 225 F. Supp. 2d 567 (W.D. Pa. 2002); *In re Campbell Soup Company Securities Litigation*, 145 F. Supp. 2d 574 (D.N.J. 2001); *In re Rite Aid Corp. Securities Litigation*, 146 F. Supp. 2d 706 (E.D. Pa. 2001); *In re ValuJet, Inc. Securities Litigation*, 984 F. Supp. 1472 (N.D. Ga.1997); *Schreiber v. Kellogg*, 194 B.R. 559 (E.D. Pa. 1996); *Schreiber v. Kellogg*, 839 F. Supp. 1157 (E.D. Pa. 1993); *Schreiber v. Kellogg*, 838 F. Supp. 998 (E.D. Pa.1993).

Mr. Guber is admitted to practice before the state bars of Pennsylvania and Georgia and is admitted to numerous federal courts including: United States District Courts for the Eastern District of



Pennsylvania, Northern District of Georgia, Eastern District of Michigan and District of Colorado; United Sates Circuit Court of Appeals for the First, Third, Eighth, Ninth, Tenth and Eleventh Circuits. He graduated with a Juris Doctor from Temple University School of Law (1990) and with a B.S. in Business Administration, majoring in accounting from Temple University (1986).

## DERRICK B. FARRELL

Derrick B. Farrell is a Partner in the Delaware office of Faruqi & Faruqi, LLP and focuses his practice on advocating stockholder rights.

Prior to joining Faruqi & Faruqi, Mr. Farrell started his career as an associate at the prestigious law firm of Latham & Watkins, LLP, where he gained substantial insight into the inner workings of corporate boards and the role of investment bankers in a sale process.  Following his departure from Latham & Watkins, Mr. Farrell joined the corporate and business law boutique law firm of Abrams & Bayliss, LLP.  While at Abrams & Bayliss Mr. Farrell focused his practice on high stakes litigation support, transactional advice and appraisal litigation. While at Abrams & Bayliss Mr. Farrell gained substantial trial experience as both a petitioner and a respondent on a number of high profile matters, including:  *In re Appraisal of Ancestry.com, Inc.*, C.A. No. 8173-VCG, *IQ Holdings, Inc. v. Am. Commercial Lines Inc.*, Case No. 6369-VCL, and *In re Cogent, Inc. S'holder Litig.*, C.A. No. 5780-VCP.  Mr. Farrell has also argued before the Delaware Supreme Court, successfully defeating a cross-appeal in *American Commercial Lines Inc. v. IQ Holdings, Inc.*, Case No. 230, 2013.

Mr. Farrell has co-authored numerous articles including articles published by the Harvard Law School Forum on Corporate Governance and Financial Regulation and PLI.

Mr. Farrell graduated from Texas A&M University (B.S., Biomedical Science) and the Georgetown University Law Center (J.D. cum laude).  At Georgetown Mr. Farrell served as an advocate and coach to the Barrister's Council (Moot Court Team) and was Magister of Phi Delta Phi.

After graduating from the Georgetown University Law Center, Mr. Farrell clerked for the honorable Vice Chancellor Donald F. Parsons, Jr. of the Delaware Court of Chancery.

## BARBARA A. ROHR

Barbara Rohr's practice is focused on securities and consumer litigation.  Barbara is a partner in the firm's Los Angeles office.

Prior to joining F&F, Barbara was an attorney at the Children's Law Center and a law clerk for the Employment Litigation Section of the Los Angeles City Attorney's Office.  Barbara also gained valuable experience as an HR professional in the entertainment industry prior to attending law school.



Barbara received an LL.M, 2013(Specialization in Litigation) and a J.D., 2010, from Southwestern Law School.  While at law school, Barbara was honored by the Los Angeles County Bar Association as the Jeffrey S. Turner Outstanding Commercial Law Student, 2010.  As a research assistant to Professor Michael D. Scott, Barbara drafted the Communication Decency Act chapter update for Scott on Information Technology Law, Third Edition.  Southwestern Law School awarded Barbara its Public Service Award and the Wiley W. Manuel Award for Pro Bono legal services.

Barbara, while practicing with F&F, passionately serves the greater Los Angeles community as a volunteer.  Barbara serves as an Honorary Board of Governors Member for the non-profit organization Los Angeles Trial Lawyers' Charities.  The non-profit serves the LA community by volunteering and fund raising for the needs of children, battered women, the disabled and the homeless.  Barbara also serves on the Board of A New Way of Life Reentry Project, a non-profit that supports former incarcerated women reintegrate into society.

Barbara is licensed to practice law in California.  Barbara is admitted before the United States District Courts for the Central, Northern, Southern and Eastern Districts and the United States Court of Appeals for the Ninth Circuit.

## TIMOTHY J. PETER

Timothy J. Peter is a Partner in Faruqi & Faruqi, LLP's Pennsylvania office and focuses his practice on securities law and complex civil litigation.

Prior to joining Faruqi & Faruqi, Mr. Peter was an Associate at Cohen Placittella & Roth, P.C. where he was involved in such high profile litigation as: *In re Vioxx Products Liability Litigation* ($8.25 million recovery for the Commonwealth of Pennsylvania) and *In re Evergreen Ultra Short Opportunities Fund Securities Litigation* ($25 million class action securities settlement in which participating class members will recover over 65% of their losses). In addition, Mr. Peter played an important role in the resolution of *In re Minerva Group LP v. Mod-Pac Corp., et al*., in which defendants increased the price of an insider buyout from $8.20 to $9.25 per share, a significant victory for shareholders. Prior to attending law school, Mr. Peter worked for one of largest financial institutions in the world where he gained significant insight into the inner workings of the financial services industry.

Mr. Peter is a 2009 cum laude graduate of the Michigan State University College of Law, where he served as an associate editor of the Journal of Medicine and Law. He received his undergraduate degree in Economics from the College of Wooster in 2002.

NEW YORK          CALIFORNIA          DELAWARE          PENNSYLVANIA



Mr. Peter is admitted to practice in the Commonwealth of Pennsylvania and the U.S. District Court for the Eastern District of Pennsylvania.

## JAMES M. WILSON, JR.

James M. Wilson, Jr. is Senior Counsel in Faruqi & Faruqi LLP's New York office

Prior to joining Faruqi & Faruqi, Mr. Wilson was a partner at Chitwood Harley Harnes, LLP, and a senior associate with Reed Smith, LLP. Mr. Wilson has represented institutional pension funds, corporations and individual investors in courts around the country and obtained significant recoveries, including the following securities class actions: *In re ArthroCare Sec. Litig.* No. 08-0574 (W.D. Tex.) ($74 million); *In re Maxim Integrated Prod. Sec. Litig.*, No. 08-0832 (N.D.Cal.) ($173 million); *In re TyCom Ltd. Sec. Litig.*, MDL No. 02-1335 (D.N.H.)($79 million); and *In re Providian Fin. Corp. Sec. Litig.*, No. 01-3952 (N.D. Cal.). Mr. Wilson also has obtained significant relief for shareholders in merger suits, including the following: *In re Zoran Corporation Shareholders Litig.*, No. 6212-VCP (Del. Chancery); and *In re The Coca-Cola Company Shareholder Litigation*, No. 10-182035 (Fulton County Superior Ct.).

Mr. Wilson has authored numerous articles addressing current developments including the following Expert Commentaries published by Lexis Nexis: *The Liability Faced By Financial Institutions From Exposure To Subprime Mortgages; Losses Attributable To Sub-Prime Mortgages; The Supreme Court's Decision in Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc. et al.; Derivative Suite by LLC Members in New York: Tzolis v. Wolff*, 10 N.Y.3d 100 (Feb. 14, 2008).

Mr. Wilson obtained his undergraduate degree from Georgia State University (B.A. 1988), his law degree from the University of Georgia (J.D. 1991), and Masters in Tax Law from New York University (LL.M. 1992). He is licensed to practice law in Georgia and New York and is admitted to the United States District Courts for Middle and Northern Districts of Georgia, the Eastern and Southern Districts of New York, and the Courts of Appeals for the Second and Eleventh Circuits.

## ADAM STEINFELD

Adam Steinfeld is Senior Counsel in Faruqi & Faruqi, LLP's New York office. He practices in the area of antitrust litigation with a focus on competition in the pharmaceutical industry.

Mr. Steinfeld has litigated successfully with significant contributions in *In re Buspirone Patent & Antitrust Litigation*, MDL No. 1410 (S.D.N.Y.) ($220M settlement); *In re Cardizem CD Antitrust Litigation*, No. 99-MD-1278 (E.D. Mich.) ($110M settlement); *In re Relafen Antitrust Litigation*, No. 01-12239 (D. Mass.) ($175M settlement); *In re Remeron Direct Purchaser Antitrust Litigation*, No. 03-cv-0085 (D.N.J.) ($75M settlement); *In re Terazosin Hydrochloride Antitrust Litigation*, No. 99-MDL-1317 (S.D. Fla.) ($72.5M settlement); *In re Tricor Direct Purchaser Antitrust Litig.*, No. 05-340 (D. Del.) ($250M

20



settlement); and *Mylan Pharms., Inc. v. Warner Chilcott*, No. 12-cv-3824 (E.D. Pa.) ($12 million settlement).

Prior to joining Faruqi & Faruqi, Mr. Steinfeld was associated with Grant and Eisenhofer, P.A. (2011-2015) and a partner at Garwin, Gerstein and Fisher, LLP, New York (1997-2009).

Mr. Steinfeld is the author of Nuclear Objections: The Persistent Objector and the Legality of the Use of Nuclear Weapons, 62 Brooklyn L. Rev. 1635 (winter, 1996).

Mr. Steinfeld received his law degree from Brooklyn Law School (J.D., 1997) where he was an editor on the Brooklyn Law Review and received several academic awards.  Mr. Steinfeld is a member of the bars of the States of New York, New Jersey and Massachusetts; and is admitted to practice before the United States District Courts for the District New Jersey, Eastern District of New York, Southern District of New York, and Western District of New York.  Mr. Steinfeld graduated from Brandeis University (B.A., Politics, 1994).

## CHRISTINE GOODRICH

Christine Goodrich is a Senior Associate in the New York office of Faruqi & Faruqi, LLP.

Ms. Goodrich's practice is focused in securities arbitration and litigation.  Ms. Goodrich represents financial service professionals in the securities industry in employment-related disputes, regulatory matters, transition planning and succession planning.  Ms. Goodrich also represents investors in disputes against their broker-dealers.

Prior to joining Faruqi & Faruqi, Ms. Goodrich was the resident partner in the New York office of Eccleston Law, LLC.  Ms. Goodrich's practice focused on representing financial service professionals and investors in the area of securities arbitration and litigation.

Ms. Goodrich earned her undergraduate degree at Case Western Reserve University (B.S., Business Management, 2007).  Ms. Goodrich earned her Juris Doctor from Pace Law School (J.D. and International Law Certificate, 2011) and her Master in Business Administration from the Lubin School of Business (M.B.A., 2011).

Ms. Goodrich is licensed to practice law in New York and New Jersey and is admitted to practice before the United States District Courts for the Southern and Eastern Districts of New York.

Ms. Goodrich is a member of the Public Investors Arbitration Bar Association (PIABA), the New York City Bar Association (NYCBA) and the Financial Planning Association (FPA).  Ms. Goodrich also serves on the Board of Directors of Case Western Reserve University's New York Alumni Association, as well as the Allied Professionals Committee of the Financial Planning Association of New York.  Ms. Goodrich has co-authored several articles for the Journal of Practical Management and Risk Compliance for the Securities Industry.



# NEILL CLARK

Mr. Clark is an associate in Faruqi and Faruqi, LLP's Pennsylvania office.

Before joining the firm, Mr. Clark was an associate at Berger & Montague, P.C. where he was significantly involved in prosecuting antitrust class actions on behalf of direct purchasers of brand name drugs and charging pharmaceutical manufacturers with illegally blocking the market entry of less expensive competitors.

Eight of those cases have resulted in substantial settlements totaling over $950 million: *In re Cardizem CD Antitrust Litig.* settled in November 2002 for $110 million; *In re Buspirone Antitrust Litig.* settled in April 2003 for $220 million; *In re Relafen Antitrust Litig.* settled in  February 2004 for $175 million; *In re Platinol Antitrust Litig.* settled in November 2004 for $50 million; *In re Terazosin Antitrust Litig.* settled in April 2005 for $75 million; *In re Remeron Antitrust Litig.* settled in November 2005 for $75 million; *In re Ovcon Antitrust Litig.* settled in 2009 for $22 million; and *In re Tricor Direct Purchaser Antitrust Litig.* settled in April 2009 for $250 million.

Mr. Clark was also principally involved in a case alleging a conspiracy among hospitals and the Arizona Hospital and Healthcare Association to depress the compensation of per diem and traveling nurses, *Johnson et al. v. Arizona Hospital and Healthcare Association et al.*, No. CV07-1292 (D. Ariz.).

Mr. Clark was selected as a "Rising Star" by Pennsylvania Super Lawyers and listed as one of the Top Young Lawyers in Pennsylvania in the December 2005 edition of Philadelphia Magazine.  Two cases in which he has been significantly involved have been featured as "Noteworthy Cases" in the NATIONAL LAW JOURNAL articles, "The Plaintiffs' Hot List" (*In re Tricor Antitrust Litig.* October 5, 2009 and *Johnson v. Arizona Hosp. and Healthcare Ass'n.*, October 3, 2011).

Mr. Clark graduated cum laude from Appalachian State University in 1994 and from Temple University Beasley School of Law in 1998, where he earned seven "distinguished class performance" awards, an oral advocacy award and a "best paper" award.

# RICHARD SCHWARTZ

Richard Schwartz is an associate in Faruqi & Faruqi, LLP's Pennsylvania office.

Mr. Schwartz graduated from the University of Washington (B.A.) and the University of Chicago in 2004 (J.D.).  While in law school, Mr. Schwartz served as a law clerk at the MacArthur Justice Center in Chicago and as a summer associate with the Chicago law firm Robinson Curley & Clayton P.C.  Since law school, Mr. Schwartz has been a commercial litigator in New York and Pennsylvania.

Mr. Schwartz is a member of the bars of the State of New York (2005-present), Commonwealth of Pennsylvania (2010-present), the United States District Court for the Southern District of New York (2006-



present), the United States District Court for the Eastern District of New York (2007-present), the United States District Court for the Northern District of New York (2008-present), the United States Court of Appeals for the Second Circuit (2010-present) and the United States District Court for the Eastern District of Pennsylvania (2011-present).

## NINA VARINDANI

Nina Varindani is an associate in Faruqi & Faruqi, LLP's New York office.

Prior to joining the firm, Ms. Varindani practiced commercial litigation at Milber Makris Plousadis & Seiden, LLP where she represented directors, officers and other professionals and corporations in complex commercial litigation in federal and state courts. Additionally, Ms. Varindani gained further litigation experience in law school through internships at Collen IP and the New York State Judicial Institute.

Ms. Varindani is licensed to practice law in New York and is admitted to practice before the United States District Courts for the Southern District of New York and the Eastern District of New York.

Ms. Varindani graduated from the George Washington University (B.A. in Psychology, 2006) and Pace Law School (J.D., 2010).

## MEGAN SULLIVAN

Megan Sullivan is an associate in Faruqi & Faruqi, LLP's New York office.

Prior to joining the firm, Ms. Sullivan was a litigation associate at Crosby & Higgins LLP where she represented institutional and individual investors in securities arbitrations before FINRA and counseled corporate clients in commercial disputes in federal court. Additionally, Ms. Sullivan gained further litigation experience in law school through internships at the Kings County District Attorney's Office and the Adjudication Division of the New York City Department of Consumer Affairs.

Ms. Sullivan graduated from the University of California, Los Angeles (B.A., History, 2008) and from Brooklyn Law School (J.D., *cum laude*, 2011). While at Brooklyn Law School, Ms. Sullivan served as Associate Managing Editor of the Brooklyn Journal of Corporate, Financial and Commercial Law.

Ms. Sullivan is licensed to practice law in the State of New York.

## INNESSA MELAMED

Innessa Melamed is an associate in Faruqi & Faruqi, LLP's New York office.

Prior to joining the firm, Ms. Melamed practiced complex commercial and securities litigation at Gusrae Kaplan Nusbaum PLLC. Ms. Melamed, along with co-counsel, represented minority shareholders at trial in a derivative lawsuit captioned *Lisa Romita v. Castle Oil Corp., et. al.*, Index No.: 53145/2011.

NEW YORK          CALIFORNIA          DELAWARE          PENNSYLVANIA



Ms. Melamed was also an associate at Traub Lieberman Straus & Shrewsberry LLP, where she represented primary and excess insurance carriers in complex coverage disputes and insurance defense litigation. Additionally, Ms. Melamed gained further litigation experience in law school through internships at Wilson Elser Moskowitz Edelman & Dicker, LLP and Citigroup's Office of the General Counsel.

Ms. Melamed graduated from Syracuse University (B.A. in Political Science and International Relations, *summa cum laude*, 2007), Pace Law School (J.D., *magna cum laude*, 2011) and Pace Lubin School of Business (M.B.A. in Finance, *summa cum laude*, 2011).

Ms. Melamed is licensed to practice law in New York, New Jersey and Connecticut and is admitted to practice before the United States District Courts for the Southern District of New York, the Eastern District of New York and the District of New Jersey.

## ELIZABETH A. SILVA

Elizabeth A. Silva is an associate in Faruqi & Faruqi, LLP's New York office.

Prior to joining the firm, Ms. Silva was a litigation associate at Crosby & Higgins LLP where she represented institutional and individual investors in securities arbitrations before FINRA and counseled corporate clients in a variety of intellectual property and complex commercial disputes in federal court. Additionally, Ms. Silva gained further litigation experience in law school through internships at the Kings County District Attorney's Office and as a law clerk at a criminal defense firm.

Ms. Silva graduated in *cursu honorum* from Fordham University (B.A. in Comparative Literature and Italian Studies, *cum laude*, 2009) and New York Law School (J.D., *magna cum laude*, 2012). While at New York Law School, Ms. Silva served as a Notes and Comments Editor of the New York Law School Law Review and was an associate in the Institute for Information Law and Policy. Ms. Silva is licensed to practice law in the State of New York and is admitted to practice before the United States District Court for the Southern District of New York.

## KATHERINE M. LENAHAN

Katherine M. Lenahan is an associate in Faruqi & Faruqi, LLP's New York office.

Prior to joining Faruqi & Faruqi, Ms. Lenahan practiced securities litigation at Entwistle & Cappucci LLP. Ms. Lenahan gained further experience through internships for the Honorable Sherry Klein Heitler, Administrative Judge for Civil Matters, First Judicial District, and the Kings County District Attorney's Office.

Ms. Lenahan graduated from Fordham University (B.A., Political Science, *magna cum laude*, 2009) and Fordham University School of Law (J.D., 2012). While at Fordham Law School, Ms. Lenahan



served as an associate editor of the Fordham Intellectual Property, Media and Entertainment Law Journal and was a fellow at the Center on Law and Information Policy.

Ms. Lenahan is licensed to practice law in New York.

## ANDREW COYLE

Andrew Coyle's practice is focused on anti-trust litigation.   Andrew is an associate in the firm's New York office.

Prior to joining F&F, Andrew served the Hon. Deborah A. Kaplan, Justice New York Supreme Court, as Assistant Law Clerk.   Upon law school graduation, Andrew was Law Clerk for the Hon. Gabriel W. Gorenstein, Magistrate Judge, Southern District of New York (2012-2013).

Andrew received his J.D., magna cum laude, from Brooklyn Law School (2012).  While at Brooklyn Law School, Andrew was associate managing editor on the Brooklyn Law Review.  His Note, Finding a Better Analogy for the Right of Publicity, 77 Brook L. Rev. 1133 (2012) was published in the Brooklyn Law Review.  Andrew received his Bachelor of Science from Cornell University (2008).

Andrew is licensed to practice law in New York and New Jersey.

## DAVID CALVELLO

David Calvello is an Associate in Faruqi & Faruqi, LLP's New York office where his focus is litigating Antitrust matters.

Mr. Calvello graduated from the University of Richmond (B.S., 2011) with a double major in Finance and Political Science and Pace Law School (J.D., *magna cum laude*, 2014).  He is licensed to practice law in New York and New Jersey and is admitted to practice before the United States District Court for New Jersey.

Prior to joining Faruqi & Faruqi, Mr. Calvello was as an Associate at Kaufman Borgeest & Ryan, LLP where he focused primarily on insurance coverage matters with respect to Directors & Officers (D&O), Errors & Omissions (E&O), and Professional Liability lines of coverage.  In law school, Mr. Calvello served as an editor on the Pace International Law Review and received the New Rochelle Bar Association Award upon graduation.  He was also very active in moot court competitions, and competed in the Willem C. Vis International Commercial Arbitration Moot held in Vienna, Austria.

## SHERIEF MORSY

Sherief Morsy's practice is focused on securities litigation.   Sherief is an associate in the firm's New York office.

Prior to joining F&F, Sherief was a litigation associate at a New York law firm where he



specialized in New York State Appellate practice.  Sherief also gained litigation experience as an intern with the Honorable Shira A. Sheindlin, Southern District of New York (2013).  He interned as well with a New York securities firm, a multinational corporation, and the King's County DA's office.

Sherief received his J.D., cum laude, from Brooklyn Law School, 2014.  While at Brooklyn Law School, Sherief was a Notes and Comments Editor of the Brooklyn Law Review.  He is the author of The JOBS Act and Crowdfunding:  How Narrowing the Secondary Market Handicaps Fraud Plaintiffs, 79 Brook. L. Rev. (2014), Brooklyn Law Review, Vol. 79, Issue 3.  Sherief received his B.A. in Political Science and Philosophy, Rutgers University, 2010.

Sherief is licensed to practice law in New York and New Jersey.

## BENJAMIN HEIKALI

Benjamin Heikali's practice is focused on securities and consumer litigation.  Benjamin is an associate in the firm's Los Angeles office.

Prior to joining F&F, Benjamin interned at the U.S. Securities and Exchange Commission, Division of Enforcement, focusing on municipal bond litigation and financial fraud work.

Benjamin graduated U.C.L.A. School of Law (J.D., 2015).  During law school, Benjamin was awarded the Masin Family Academic Excellence Award for outstanding performance; and the 2015 American College of Bankruptcy Law Meet, "Best Term Sheet."  As well, Benjamin served as Staff Editor of the U.C.L.A. Entertainment Law Review.  Benjamin received his B.A. in Psychology, with honors, from University of Southern California, 2012.

Ben is licensed to practice law in California and is admitted to practice before the United States District Courts for the Central, Northern, Southern, and Eastern Districts of California.

## FARAZ KHAN

Faraz Khan is an Associate in Faruqi & Faruqi, LLP's New York office and focuses his practice on securities litigation.

Prior to joining Faruqi & Faruqi, Faraz worked in the general corporate practice at one of India's leading law firms. His past work experience ranges from private equity and cross-border mergers and acquisitions to joint ventures and intricate financing transactions.

Faraz graduated from Columbia Law School (LL.M., 2016). His first law degree is from ILS Law College, Pune, India (BSL LL.B., 2010).

Faraz is licensed to practice law in India and also sat for the New York Bar examination in July 2016.



## JACOB B. SHER

Jacob B. Sher's practice is focused on employment law, securities litigation, and consumer class actions. Jacob is an associate in the firm's New York office.

In law school, Jacob served as productions editor on the Pace International Law Review. His Comment, Anonymous Armies: Modern "Cyber-Combatants " and Their Prospective Rights Under International Humanitarian Law, was published in the Pace International Law Review (Spring 2016).

Jacob gained securities law experience as a legal intern with Standard Chartered Bank in New York City. Jacob also served as a legal intern for the Hon. Kenneth Karas, District Judge, Southern District of New York; for the New York Office of the State Inspector General; and for the Hon. David Everett, A.J.S.C., Judge for the Court of Westchester County. In addition, Jacob participated in both the Jessup International Law Moot Court Competition and the Thurgood Marshall Memorial Moot Court Competition.

Jacob earned his J.D., magna cum laude, from Pace Law School (2016). Jacob earned his undergraduate degree from Brandeis University (B.A., high honors, Theater Arts, 2005).

Jacob sat for the Uniform Bar Examination for New York State in July, 2016.

# Exhibit 3

LAW OFFICES

# BRODSKY & SMITH, LLC

### TWO BALA PLAZA, SUITE 510
### BALA CYNWYD, PA 19004
—
610.667.6200
FAX 610.667.9029
www.brodsky-smith.com

CALIFORNIA OFFICE
9595 WILSHIRE BLVD., SUITE 900
BEVERLY HILLS, CA 90212
310.300.8425

NEW YORK OFFICE
240 Mineola Blvd.
Mineola, NY 11501
516.741.4977

NEW JERSEY OFFICE
1040 KINGS HIGHWAY NORTH, STE. 601
CHERRY HILL, NJ 08034
856.795.7250

Brodsky & Smith, LLC is a law firm that was organized under the Limited Liability Laws of the Commonwealth of Pennsylvania in 1998.  The firm's attorneys are licensed to practice in both state and federal courts in the Commonwealth of Pennsylvania, the State of New Jersey, the District of Columbia, the State of California, and the State of New York.

The firm represents individuals and businesses in various types of litigation matters including, securities class action; shareholder derivative litigation; merger and acquisition litigation; civil rights litigation; complex commercial litigation; consumer protection litigation; ERISA litigation; and personal injury litigation.

The firm's offices are located in Bala Cynwyd, Pennsylvania; Cherry Hill, New Jersey; Mineola, New York; and Beverly Hills, California.

## *QUALIFICATIONS OF MEMBERS*

### *JASON L. BRODSKY:*

Jason Lawrence Brodsky is a founding member of Brodsky & Smith, LLC and has over fifteen years of experience representing plaintiffs in complex class action litigation.  His current areas of practice include Class Action Civil Rights Litigation, Class Action Securities, Derivative Shareholder, Merger and Acquisition Litigation; Commercial Litigation; Catastrophic Injury Litigation; and Workers' Compensation Litigation.

He is an experienced trial attorney, who has successfully obtained consent decrees, verdicts, and settlements in various state and federal courts around the country on behalf of injured, wronged, or discriminated against individuals and businesses. In January 2011, after a two-week jury trial, he obtained a $3.0 million dollar verdict on behalf of the firm's client in the Pennsylvania Court of Common Pleas - Philadelphia Court in a construction accident negligence claim.  Prior to forming the firm, he was an attorney at a 150 attorney insurance defense firm in Philadelphia where he represented Fortune 500 clients, insurance companies, and municipal entities, including the City of Philadelphia.

He received his Juris Doctor from Widener University School of Law (1996)

where he was a member of the Trial Advocacy Honor Society.  He also received his Bachelor of Arts in Criminology from Pennsylvania State University (1993).

He is licensed to practice in both the Commonwealth of Pennsylvania (1996) and the State of New Jersey (1996).  He is also licensed to practice in the United States Court of Appeals for the Ninth Circuit (2008); United States District Court for the Eastern District of Pennsylvania (1998) and United States District Court of New Jersey (1996).  He has also been admitted *pro hac vice* in state and federal courts across the country in various matters.

### *EVAN J. SMITH*:

Evan Jason Smith is a founding member of Brodsky & Smith, LLC who has over fifteen years of experience representing plaintiffs in class action litigation.  His current areas of practice include Civil Rights Litigation, Class Action Securities, Shareholder Derivative, and Merger and Acquisition Litigation; Commercial Litigation; ERISA Litigation; and Personal Injury Litigation.

In January 2011, after a two-week jury trial, he and Jason Brodsky obtained a $3.0 million dollar verdict in the Pennsylvania Court of Common Pleas - Philadelphia County for their client in a construction site accident.

In 2010, he was one of the lead negotiators and Settlement Counsel for the shareholder class In re Allied Capital Shareholder Litigation, Circuit Court of Maryland, Montgomery County, No. 322639., and represented two of the named class representatives.  The settlement resulted in a dividend in the amount of $0.20 per share, increasing the consideration received in the merger to Allied shareholders by approximately $36 million.  Allied also agreed to include certain supplemental disclosures that related to the sales process and background of the merger, as well as the financial analyses of the Acquisition.

He was also Lead Counsel in In re Ryland Securities Litigation which settled for $1.2 Million Dollars (2008) and In re A Million Little Pieces Litigation which settled for $2.35 Million Dollars (2007).  In May 2002, he convinced the court, in McCain v. Beverly Enterprises, Inc. CV-02-657 (E.D.Pa.), to reverse the long standing and prevailing case law which precluded injured plaintiffs from bringing a claim for damages under a negligence per se theory against medical facilities for violations of state and federal statutes regarding standard of care towards patients.  This reversal lowered the burden of proof in civil cases for injured plaintiffs when a governmental agency has found a defendant in violation of state and/or federal standard of care statutes.  This case has been cited by many jurisdictions across the country in nursing home neglect litigation.

He has also been Lead Counsel in several disability class action lawsuits that have resulted in thousands of public accommodations throughout the country being remediated to ensure accessibility on behalf of the mobility impaired, and millions of dollars obtained on behalf of the same mobility impaired classes.

He was selected as a Pennsylvania Super Lawyers' Rising Star (Attorneys Under 40), an honor bestowed upon less than 2.5% of Pennsylvania attorneys for each of the years 2005-2009. He began his legal career as an attorney at a Philadelphia boutique litigation law firm where he worked on complex commercial litigation matters for both plaintiffs and defendants.  Prior to forming Brodsky & Smith, LLC, he was an attorney at a Philadelphia insurance defense law firm in the Premises and Casualty Liability Litigation Department.

Upon graduating law school, he served as a judicial law clerk for the Honorable Albert W. Sheppard, Jr. of the Philadelphia Court of Common Pleas, First Judicial District.  He also served as a student law clerk for the Honorable William H. Yohn of the United States District Court for the Eastern District of Pennsylvania and the Honorable John T.J. Kelly, Jr. of the Commonwealth of Pennsylvania Superior Court.

He received his Juris Doctor from Temple University School of Law (1996) where he was a member of the Moot Court Honor Society and the Political and Civil Rights Law Review.  He also served as a clinical intern at the Philadelphia District Attorney's Office.  He received his Bachelor of Arts in International Politics and a minor degree in Spanish from Pennsylvania State University (1993).

He is licensed to practice in state courts for the Commonwealth of Pennsylvania (1996), the State of New Jersey (1996), the District of Columbia (1999), the State of New York (2002), and the State of California (2006).  He is also licensed to practice in federal courts for the United States Supreme Court (2003); United States Court of Appeals for the Third Circuit (1998), United States Court of Appeals for the Second Circuit (2007); United States Court of Appeals for the Ninth Circuit (2007); United States District Court for the Eastern District of Pennsylvania (1998), United States District Court of New Jersey (1996), United States District Court for the Southern District of New York (2002), United States Court for the Eastern District of New York (2003), United States District Court for the Northern District of New York (2003), United States District Court for the District of Colorado (2003); United States District Courts for the Northern, Southern, Central and Eastern Districts of California (2006).  He has also been admitted *pro hac vice* in state and federal courts across the country in various matters.

### MARC L. ACKERMAN:

Marc L. Ackerman joined Brodsky & Smith, LLC as a partner in October 2002. He has over twenty-five years experience in representing both plaintiffs and defendants in complex litigation.  His current areas of practice include Class Action Shareholder, Derivative, and Merger and Acquisition Litigation; Commercial Litigation; and Civil Rights Litigation.

He began his legal career as an associate in the litigation department of a 250 attorney Philadelphia law firm.  After working for the Department of Justice as a Special Assistant United States Attorney for the Eastern District of Pennsylvania, he joined a 300 attorney Philadelphia law firm where he concentrated his practice in insurance and

commercial litigation matters.  As a partner he represented Fortune 500 clients in insurance fraud, RICO, wrongful death and other complex insurance matters.  Prior to joining Brodsky & Smith, LLC, he was Pennsylvania resident counsel for a small boutique class action firm based in Connecticut.

He received his Juris Doctor from Temple University School of Law (1989) where he served as the Director of Temple - LEAP, an organization dedicated to introducing secondary school students to the profession and practice of law.  He received his Bachelor of Arts from Villanova University (1986, cum laude).

He is licensed to practice in state courts for the Commonwealth of Pennsylvania (1989) and the State of New Jersey (1990).  He is also licensed to practice in federal courts for the United States Supreme Court (2003); United States Court of Appeals for the Third Circuit (1995); Eastern District of Pennsylvania (1990) and United States District Court of New Jersey (1990).  He has also been admitted *pro hac vice* in state and federal courts across the country in various matters.

### JORDAN A. SCHATZ:

Jordan A. Schatz joined Brodsky & Smith, LLC as an associate in 2010.  His current practice areas include Class Action Shareholder, Derivative, and Merger and Acquisition Litigation; Commercial Litigation; and Civil Rights Litigation.

He received his Juris Doctor from Drexel University Earl Mack School of Law (2009) where he received a full academic scholarship.  He received his Bachelor of Science in Finance and a minor in International Business from Pennsylvania State University (2006).

He is licensed to practice in state courts for the Commonwealth of Pennsylvania (2009).

### RYAN P. CARDONA:

Ryan P. Cardona joined Brodsky & Smith, LLC. in 2015 as an associate. His current areas of practice include Class Action Shareholder Litigation, Class Action Civil Rights Litigation, and Class Action Consumer Protection Litigation.

He received his Juris Doctorate from Villanova University School of Law (2013) where he received the Deidre L. Bailey Leadership Scholarship. He received his Bachelor of Arts in Political Science and a minor in History from Sonoma State University (2010).

He is licensed to practice in state courts for the Commonwealth of Pennsylvania (2013), the State of New Jersey (2013), and the State of California (2014).

4

*LANCE G. GREENE:*

Lance G. Greene joined Brodsky & Smith, LLC as of counsel in March 2008 and has worked with the firm since 2007. His current practice areas include Commercial Litigation; Business Litigation; and Personal Injury Litigation.

Prior to opening his own litigation practice in Los Angeles, Lance was a senior associate in the business litigation department of a mid-sized full service law firm based in Irvine, California. Lance is a member of the California State Bar and the Los Angeles County Bar Association.

Lance is a successful trial counsel as partially reflected by his $1.5 million unanimous jury verdict in federal court in the employment discrimination matter of *Martin v. Arrow Electronics*, which was the second largest federal trial verdict in Orange County in 2006.

Lance received his Juris Doctor from the University of Minnesota School of Law (1992), and his Bachelor of Science from Arizona State University (1985, History). Lance is also a former United States Naval officer, having obtained his commission as Ensign in 1985, served on the USS Dwight D. Eisenhower, CVN 69 from 1985- 1989, where he attained the rank of Lieutenant and completed his inactive reserve service in 1993.

He is licensed to practice in the State of California (1993); United States District Court for the Central District of California (1993); and United States District Court for the Eastern District of Michigan (2002).

# SELECT FIRM ACCOMPLISHMENTS

## CLASS ACTION LITIGATION

Brodsky & Smith, LLC has demonstrated time and again its reputation for vigorously and tenaciously protecting the rights and interests of shareholders in complex litigation involving breach of fiduciary duty claims. The firm was Class Counsel in *In re Bluegreen Shareholder Litigation*, 502011CA018111, 15th Judicial Circuit, Palm Beach County, Florida, where it was able to secure a $36.5M settlement for a class of shareholders (25% more consideration than originally given in the merger) in a post-merger damages case. This settlement received Court approval in September, 2015 and is the largest post-merger damages settlement in Florida history. The firm was also one of the lead negotiators and Settlement Counsel representing two of the named class representatives, in *In re Allied Capital Corporation Shareholder Litigation*, No. 322639-V, MD Cir. Court (2009) (settlement achieved a $35 million additional dividend to the Class as part of the Merger Transaction and additional disclosures).

The firm also has served as lead counsel in: *In re Brooklyn Federal Bancorp Shareholder Litigation*, 500690/2011, Supreme Court of New York, Kings County, where it was able to secure a 9% increase in the merger consideration for the class and a 35%

reduction of the termination fee; *In re Ryland Group, Inc. Securities Litigation* (Northern District of Texas - 3:04-CV-541G) ($1.2 Million settlement for the Class), *SPX ERISA Litigation* (W.D.N.C.- 3:04cv192) ($6.5 Million for the class); *A Million Little Pieces Litigation* (SDNY - 07-mdl-1771) ($2.35 Million for the class); and *In re Herald National Bank Shareholder Litigation*, 651629/2011, Supreme Court of New York, New York County, which secured a 10% reduction in the termination fee and 6 month reduction in the length of time the termination fee would be triggered. The firm was also successful in obtaining the waivers of the "Don't Ask, Don't Waive" standstill provisions with potential acquirers, thereby creating a significant opportunity for shareholders to obtain maximum value for their shares in the sales processes in *In re MPG Shareholder Litigation*, BC507342, Superior Court of California, Los Angeles County, and *In re Furiex Shareholder Litigation*, 14-CV-6156, Superior Court of North Carolina, County of Wake.

The firm is currently Lead Counsel in the certified class of all Pennsylvania local governmental units in *Delaware County v. First Union National Bank* (Del. Cty., PA 01-6326). The case has survived several appeals; the latest appellate victory being argued by the firm before the Supreme Court of Pennsylvania.

### CIVIL RIGHTS LITIGATION

Brodsky & Smith, LLC represents disabled individuals and advocacy groups in various litigation matters across the country. This representation includes enforcement of Title III of the Americans with Disabilities Act, 42 U.S.C. Section 12181, as well as its equivalent state law counterparts. Through this representation, the firm's clients attempt to make public accommodations accessible to all disabled individuals. Brodsky & Smith, LLC has achieved both Consent Decrees and settlements on behalf of our clients against hundreds of public accommodations around the country. The firm is Class Counsel in the following certified matters:

*Velasco v. Mrs. McGooch*, Superior Court of California – Los Angeles County (BC428347) which achieved a settlement for the Class in an amount of $750,000.00 and complete remediation at over 160 Whole Foods locations in the State of California. The matter has been approved by the Court in February 2012 and is in the remediation stage.

*Acevedo v. TSA Stores, Inc.*, (CDCal. 11-2592) which achieved a settlement for the Class in an amount of $625,000.00 and complete remediation at over 70 Sports Authority locations in the State of California. The matter has been approved by the Court in January 2012 and is in the remediation stage.

*Hicks v. Smart & Final*, Superior Court of California – Los Angeles County (BC428347) which achieved a settlement for the Class resulting in complete remediation at over 75 Smart & Final locations in the State of California. The matter has been approved by the Court in October 2011 and is in the remediation stage.

*Pereira v. Ralph's Grocery Company*, (CDCal 07-841-PA) and *Park v. Ralph's Grocery Company*, (CDCal 08-02021-CAS), two related class cases which obtained class

certification over Defendants' opposition for two classes for Defendants' 250 plus California locations.  After successfully obtaining a reversal of summary adjudication from the United States Court of Appeal for the Ninth Circuit, the parties reached a settlement for complete remediation.  This settlement received final Court approval in June 2010 and is in the remediation stage.

*In re Coffee Bean Litigation* (CDCal 06-7448-PG), which achieved a $750,000 settlement for the Class and complete remediation at over 250 Coffee Bean locations in the State of California.

# Exhibit 4

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| JASON GARCIA, Individually and on Behalf of All Others Similarly Situated, | |
| Plaintiff, | Civil No. 1:15-cv-01385-TWP-TAB |
| v. | |
| REMY INTERNATIONAL, INC., JOHN J. PITTAS, DOUGLAS K. AMMERMAN, KARL G. GLASSMAN, LAWRENCE F. HAGENBUCH, CHARLES G. MCCLURE, ARIK W. RUCHIM, GEORGE P. SCANLON, J. NORMAN STOUT, JOHN H. WEBER, | |
| Defendants. | |

| | |
|---|---|
| MAXINE PHILLIPS, Individually and on Behalf of All Others Similarly Situated, | |
| Plaintiff, | Civil No. 1:15-cv-01343-TWP-TAB |
| v. | |
| REMY INTERNATIONAL, INC., JOHN J. PITTAS, DOUGLAS K. AMMERMAN, KARL G. GLASSMAN, LAWRENCE F. HAGENBUCH, CHARLES G. MCCLURE, ARIK W. RUCHIM, GEORGE P. SCANLON, J. NORMAN STOUT, JOHN H. WEBER, | |
| Defendants. | |

| | |
|---|---|
| STEPHEN BUSHANSKY, Individually and on Behalf of All Others Similarly Situated, | |
| Plaintiff, | Civil No. 1:15-cv-1361-RLY-MJD |

v.

REMY INTERNATIONAL, INC., JOHN
J. PITTAS, DOUGLAS K. AMMERMAN,
KARL G. GLASSMAN, LAWRENCE F.
HAGENBUCH, CHARLES G.
MCCLURE, ARIK W. RUCHIM,
GEORGE P. SCANLON, J. NORMAN
STOUT, JOHN H. WEBER,

<div style="text-align:center">Defendants.</div>

### DECLARATION OF WILLIAM N. RILEY IN SUPPORT OF PLANTIFFS' UNOPPOSED MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND APPLICATION FOR AWARD OF ATTORNEYS' FEES AND EXPENSES

I, William N. Riley, declare as follows, pursuant to 28 U.S.C. §1746:

1.     I am a member of the Bar of the State of Indiana and partner of the law firm of Riley Williams & Piatt, LLC, one of Plaintiffs' counsel in the above-captioned actions *Jason Garcia v. Remy International, Inc. et al.* and *Maxine Phillips v. Remy International, Inc., et al.* (the "Action").   The testimony provided herein is based on my own personal knowledge, information and belief and, if called upon, I could and would competently testify thereto.

2.     I submit this declaration in support of Plaintiffs' Unopposed Motion for Final Approval of Class Action Settlement and Application for an Award of Attorneys' Fees and Expenses, which is being filed contemporaneously herewith.

3.     My firm resume is attached hereto as Exhibit A.

4.     My firm acted as counsel for Plaintiff(s) and actively engaged in the prosecution of the Actions by reviewing all filings (including the complaint, pro hac vice motions, jurisdictional statement, motions for preliminary approval of settlement and all declarations) for conformance with Indiana law and the rules in the Southern District of Indiana; filing all pleadings for the *Garcia* and *Phillips* plaintiffs; and providing advice to the co-lead plaintiffs' counsel regarding Indiana

<div style="text-align:center">2</div>

rules and procedure.

5.     The total number of hours spent on the litigation of the Actions by my firm is 38.3. The total lodestar amount for attorney, paralegal, and professional staff time based on the firm's current rates is $18,900.00.  The schedule was prepared from contemporaneous, daily time records prepared and maintained by my firm.  The hourly rates shown below are the usual and customary rates that I have been awarded most recently by the Hon. Tonya Walton Pratt in *William McGill, indiv. and on behalf of all others similarly situated v. Hake, et al.*, Cause No. 1:15-cv-00217-TWP-DKL and also by the Hon. Robert W. Gettleman in *Price, et al v. B.P. Products North America, Inc.*, Cause No. 12:cv-06799 (N.D. IL), and also by the Hon. Charles R. Breyer in *In re: Bextra and Celebrex Marketing, Sales Practices, and Product Liability Litigation*, Cause No. M:05-cv-01699.  My survey of other class action counsel in the Indianapolis area has confirmed that my hourly rate, and the hourly rates of the attorneys within my firm are commensurate with the customary rates charged by attorneys with our experience in our area engaged in similar practice. A breakdown of the lodestar is as follows:

| NAME | STATUS | HOURLY RATE | HOURS | TOTAL LODESTAR |
|---|---|---|---|---|
| William N. Riley | P | 650.00 | 17.5 | $11,375.00 |
| Joseph N. Williams | P | 450.00 | .6 | $270.00 |
| James A. Piatt | P | 450.00 | 10.4 | $4,680.00 |
| Anne Medlin Lowe | A | 325.00 | 3.7 | $1,202.50 |
| Erin M. Amos | PL | 225.00 | 6.1 | $1,372.50 |
| **Totals** | | | **38.3** | **$18,900.00** |

Pr=Principal; A=Associate; PL=Paralegal

6.     My firm's compensation for services rendered in this case was wholly contingent on the success of the action for Plaintiff(s).  None of the attorneys' fees and expenses submitted to

this Court has been paid from any source or has been the subject of any prior request or prior award in any litigation or other proceeding.

7.     My firm incurred a total of $843.58 in unreimbursed expenses in connection with the prosecution of this litigation.  They are broken down as follows:

**EXPENSES**
From Inception to September 27, 2016

| CATEGORIES | AMOUNT |
|---|---|
| Filing fee (Phillips) | $400.00 |
| Filing Fee (Garcia) | $400.00 |
| Postage/Express Packages | $43.58 |
| TOTAL | **$843.58** |

8.     The expenses incurred pertaining to this case are reflected in the books and records of this firm.  These books and records are prepared from expense reports, check reports, and other sources, and are an accurate record of the expenses incurred.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this _30th_ day of September, 2016 at Indianapolis, Indiana.

William N. Riley, Atty. No. 14941-49
RILEY WILLIAMS & PIATT, LLC
301 Massachusetts Avenue
Indianapolis, Indiana 46204
(317) 633-5270
Fax: (317) 426-3348
wriley@rwp-law.com

# Exhibit 4A



RILEY
WILLIAMS
& PIATT LLC

The Hammond Block Building
301 Massachusetts Ave. | Indianapolis, IN 46204
T: 317 | 633 | 5270    F: 317 | 426 | 3348
www.rwp-law.com

Riley Williams & Piatt, LLC ("RWP") is located in Indianapolis, Indiana and devotes 100% of its practice to litigation, with a substantial portion of its practice specifically devoted to class action litigation. RWP routinely litigates class actions in both state and federal courts throughout the country.

## REPRESENTATIVE CLASS ACTION EXPERIENCE

RWP and its attorneys have successfully represented clients in numerous class actions, including-

- Mr. Riley was a member of Castano litigation group that represented Gray Davis, Governor of California in the case of Davis v. R.J. Reynolds Tobacco Company, et al., resulting in the recovery of more than $12 billion for the State of California.

- Mr. Riley was a member of the litigation team that recovered nearly $4 billion on behalf of the State of Indiana from the tobacco companies.

- Mr. Riley represented a certified class of third party payors in litigation regarding unlawful and excessive drug pricing in the Celebrex multi-district litigation, *Sheet Metal Workers Local No. 20 Welfare and Benefit Fund, et al. v. Pfizer, Inc., et al.,* Case No. M:05-CV-01699-CRB. This matter settled for $89 million. Mr. Riley served on the Settlement Allocation Committee in for the litigation.

- Mr. Riley also served as a member of the Purchase Claims Committees for *In Re: VIOXX Prod. Liab. Litig.,* MDL No. 1657. This case resulted in a $65 million settlement.

- Mr. Riley served as lead counsel in the nationwide class action of *Vicki Sullivan, on behalf of herself and others similarly situated v. Sears Mortg. Corp.,* et al., Cause No. 49D02-9607-CP-000982 which resulted in class-wide recovery for the wrongful collection of private mortgage insurance for individuals who had mortgages with PNC Bank.

- Mr. Riley served as lead counsel in *Robertson, et al. v. Farmers Union Mutual Insurance Company, Inc.,* Case No. CV-2008-217 (Pope County, Arkansas Circuit Court) and successfully defended the trial court's class certification decision before the Arkansas Supreme Court. This case was successfully settled after the Arkansas Supreme Court affirmed the trial court's decision.

- Mr. Riley served as co-lead counsel in *In re RC2 Toy Lead Paint Prod. Liab. Litig.,* MDL No. 1893 (N.D. 111.), which resulted in a successful class-wide settlement.

RILEY
WILLIAMS
& PIATT LLC

- Mr. Riley served as class counsel for a certified class of Indiana consumers in *Thacker, et al. v. Cape Canaveral, et al,* Cause No. 49D03-0207-ct-001148 (Superior Court of Marion County, Indiana), which resulted in a successful class-wide settlement.

## REPRESENTATIVE TRIAL EXPERIENCE

Mr. Riley has extensive jury trial experience-

- Mr. Riley represented a roofing contractor in a six week defamation trial against State Farm Fire & Casualty Company, in which a jury awarded the client $14.5 million. The matter was appealed and after the appellate process was concluded, the amount State Farm paid Mr. Riley's client was $17,284,000.00.   This is the largest defamation verdict in Indiana history, and ranks amongst the highest defamation verdicts in the country.

## RWP's ATTORNEYS

WILLIAM N. RILEY. Mr. Riley is the principal managing member at the Indianapolis based plaintiffs' litigation firm, Riley Williams & Piatt, LLC. His practice focuses on plaintiffs' complex litigation including class actions, pharmaceutical drug litigation, personal injury, medical malpractice, and products liability.

Mr. Riley graduated from Indiana University School of Law-Bloomington where he held the office of Executive Editor of the Indiana Law Journal. He was one of the youngest lawyers in Indiana to be awarded the prestigious AV Rating from Martindale-Hubbell. Mr. Riley is a member of a number of professional associations, and has been honored with multiple selections to Indiana *Super Lawyers.* He has also been named to *Best Lawyers,* and the Top 100 Trial Lawyers.   *Best Lawyers* also named Mr. Riley Best Lawyer in 2015.

Mr. Riley's trial experience includes when he acted as lead counsel in a six-week jury trial against State Farm, which resulted in a $14.5 million verdict for his client (the largest defamation verdict in Indiana history).

# Exhibit 5

**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

| | |
|---|---|
| JASON GARCIA, Individually and on Behalf of All Others Similarly Situated,<br><br>    Plaintiff,<br><br>v.<br><br>REMY INTERNATIONAL, INC., JOHN J. PITTAS, DOUGLAS K. AMMERMAN, KARL G. GLASSMAN, LAWRENCE F. HAGENBUCH, CHARLES G. MCCLURE, ARIK W. RUCHIM, GEORGE P. SCANLON, J. NORMAN STOUT, JOHN H. WEBER,<br><br>    Defendants. | Civil No. 1:15-cv-01385-TWP-TAB |
| MAXINE PHILLIPS, Individually and on Behalf of All Others Similarly Situated,<br><br>    Plaintiff,<br><br>v.<br><br>REMY INTERNATIONAL, INC., JOHN J. PITTAS, DOUGLAS K. AMMERMAN, KARL G. GLASSMAN, LAWRENCE F. HAGENBUCH, CHARLES G. MCCLURE, ARIK W. RUCHIM, GEORGE P. SCANLON, J. NORMAN STOUT, JOHN H. WEBER,<br><br>    Defendants. | Civil No. 1:15-cv-01343-TWP-TAB |
| STEPHEN BUSHANSKY, Individually and on Behalf of All Others Similarly Situated,<br><br>    Plaintiff, | Civil No. 1:15-cv-1361-TWP-TAB |

{0019207/0002/00849169 v4}

v.

REMY INTERNATIONAL, INC., JOHN J. PITTAS, DOUGLAS K. AMMERMAN, KARL G. GLASSMAN, LAWRENCE F. HAGENBUCH, CHARLES G. MCCLURE, ARIK W. RUCHIM, GEORGE P. SCANLON, J. NORMAN STOUT, JOHN H. WEBER,

                    Defendants.

**DECLARATION OF A. RICHARD M. BLAIKLOCK IN SUPPORT OF PLAINTIFFS' UNOPPOSED MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND APPLICATION FOR AWARD OF ATTORNEYS' FEES AND EXPENSES**

I, A. Richard M. Blaiklock, declare as follows, pursuant to 28 U.S.C. §1746:

1.      I am a member of the Bar of the State of Indiana and a Partner of the law firm of Lewis Wagner, LLP, one of Plaintiffs' counsel in the above-captioned action (the "Action"). The testimony provided herein is based on my own personal knowledge, information and belief and, if called upon, I could and would competently testify thereto.

2.      I submit this declaration in support of Plaintiffs' Unopposed Motion for Final Approval of Class Action Settlement and Application for an Award of Attorneys' Fees and Expenses, which is being filed contemporaneously herewith.

3.      My firm resume is attached hereto as Exhibit A.

4.      My firm acted as counsel for Plaintiff(s) and actively engaged in the prosecution of the Actions by, without limitation, researching case law, rules, and filing practices in class actions; reviewing, revising, and filing documents with the Court including the Complaint and preliminary approval documents; reviewing and commenting on settlement documents; and providing advice to lead counsel regarding Indiana rules and procedures.

5.      The total number of hours spent on the litigation of the Actions by my firm is

27.30.  The total lodestar amount for attorney, paralegal, and professional staff time based on the firm's current rates is $5,607.50.  The schedule was prepared from contemporaneous, daily time records prepared and maintained by my firm.  My survey of other class action counsel in the Indianapolis area has confirmed that my hourly rate, and the hourly rates of the attorneys within my firm are commensurate with the customary rates charged by attorneys with our experience in our area engaged in similar practice.  A breakdown of the lodestar is as follows:

| NAME | STATUS | HOURLY RATE | HOURS | TOTAL LODESTAR |
|---|---|---|---|---|
| A. Richard M. Blaiklock | Pr | $340.00 | 4.5 | $1,530.00 |
| Charles R. Whybrew | C | $230.00 | 7.3 | $1,679.00 |
| Keenan M. Jones | A | $195.00 | 5.9 | $1,150.50 |
| Darron E. Pennington | PL | $130.00 | 9.6 | $1,248.00 |
| | | | | |
| **Totals** | | $205.40 | **27.30** | **$5,607.50** |

Pr=Principal; C=Counsel; A=Associate; PL=Paralegal

6.     My firm's compensation for services rendered in this case was wholly contingent on the success of the action for Plaintiff(s).  None of the attorneys' fees and expenses submitted to this Court has been paid from any source or has been the subject of any prior request or prior award in any litigation or other proceeding.

7.     My firm incurred a total of $488.64 in unreimbursed expenses in connection with the prosecution of this litigation.  They are broken down as follows:

*EXPENSES*
From Inception to September 30, 2016

| CATEGORIES | AMOUNT |
|---|---|
| Filing Fees | $400.00 |
| Postage for case-related documents | $88.44 |

| Photocopy In-House | $0.20 |
|---|---|
| | |
| TOTAL | **$488.64** |

8.      The expenses incurred pertaining to this case are reflected in the books and records of this firm.  These books and records are prepared from expense reports, check reports, and other sources, and are an accurate record of the expenses incurred.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 5th day of October, 2016 at Indianapolis, Indiana.


/s/ *A. Richard M. Blaiklock*
A.  Richard M. Blaiklock

# Exhibit 5A



Since 1955, the attorneys of Lewis Wagner have provided pro-active counsel for individuals, small businesses, governmental agencies and Fortune 500 companies. Our unique approach inspires imaginative and practical solutions for clients and utilizes traits all too rare today – common sense and accountability.

Our success is based on our ability to help clients meet their legal and business goals in a timely and cost-effective manner. We have never forgotten that the legal industry is a client-service business, and our success is measured by exceeding the expectations of our clients.

### ACCOUNTABLE

A key element to managing client needs effectively is to have the right people in place to provide direction, leadership and answers. To ensure client satisfaction and peace-of-mind, one partner is designated to oversee each client relationship. The role of this partner is to provide overall direction to the team, make recommendations regarding strategy and staffing, and ensure the execution of commitments made to clients.

### RESOURCEFUL

To manage your legal needs more efficiently and respond to your inquiries quickly and effectively, our attorneys utilize several programs that assist in the research, storage, retrieval and management of materials. Online research and a firm-wide network optimizes our productivity and ability to communicate with our clients.

Our firm is equipped with cost-saving innovations, such as practice management software, powerful databases for the organization and indexing of documents and data, and state-of-the-art software to create graphical timelines and chronologies.

These and other technologies allow us to tackle sophisticated electronic discovery issues and meet the challenges of electronic document management. Efficiencies realized result in competitive rates and the practical administration of our client's needs.

### EFFICIENT AND EFFECTIVE COUNSEL FOR CLIENTS

The attorneys at Lewis Wagner work diligently to achieve positive outcomes for our clients, whose issues and challenges we treat as our own.  We are large enough to offer a wide range of services, but not so large that we risk the personal service we offer to our clients. Our core areas of practice include:

- **BUSINESS SERVICES**: Business Formation and Dissolution, Contract Negotiation and Drafting, Loan Documents, Succession Planning, Risk Management, Supply and Distribution Contracts, Mergers and Acquisitions, Protection of Trade Secrets and Intellectual Property, Non-Compete and Employment Agreements
- **LITIGATION**: Appellate, Asbestos and Toxic Tort, Business, Class Action Defense, Contract Disputes, Construction, Drug and Medical Device, Employment Law, Food Liability, General Commercial Liability, Government Liability, Insurance Law (Coverage Litigation, Coverage Opinions (all lines), Life, Health, Disability, and ERISA), Bad Faith Defense, Medical Malpractice,

Nursing Home Liability, Premises Liability, Product Liability, Professional Liability (Attorneys, Accountants, Insurance Agents, Realtors), Supplier/Distribution Litigation, Transportation

- **ALTERNATIVE DISPUTE RESOLUTION**:  Mediation, Arbitration, Mini-Trials and Summary Jury Trials
- **PERSONAL SERVICES**: Collaborative Law, Divorce and Family Law, Estate Planning and Probate Disputes
- **REAL ESTATE**: Site Identification and Acquisition, Risk Analysis and Opinion Letters, Zoning Planning and Land Use, Commercial Leases, Financing Issues, Commercial Closings, Loan Documents, Tax-Deferred, Like-Kind Exchanges, Representation of Homeowners and Condominium Associations

## A CULTURE OF ACCEPTANCE AND SUPPORT

Diversity is integral to Lewis Wagner's firm's culture. One of the first racially integrated law firms in Indianapolis, Indiana, Lewis Wagner has been committed to diversity and inclusion in the workplace and in the profession. The firm has longstanding policies in place to ensure that Lewis Wagner will always be a welcoming place to work. There is firm-wide participation in the commitment to diversity including: hiring, retaining, promoting, and contracting with qualified and capable individuals within the practice of law. We believe the variety of experiences and backgrounds our attorneys and staff bring to the firm strengthens our culture and enriches the quality of our client relationships and work product, and we have been recognized for our successes including:

- 2016, 2015, 2014, 2013, 2012, 2011, 2010: Best Law Firm by U.S. News Media Group and Best Lawyers
- 2014, 2013, 2012, 2011, 2010: Top Workplace in Central Indiana by The Indianapolis Star and Workplace Dynamics
- 2012: Indiana Minority Business Magazine Champions of Diversity Award
- 2011: Mayor of Indianapolis Celebration of Diversity Award for Workforce Development
- 2010: DRI – The Voice of the Defense Bar, Law Firm Diversity Award
- 2010: Diversity in Practice Award Finalist, presented by *The Indiana Lawyer*
- 2006: Rabb Emison Award presented by the Committee for Racial Diversity in the Legal Profession of the Indiana State Bar Association

**EXPERIENCED TEAM OF LEGAL PROFESSIONALS**

The attorneys of Lewis Wagner are recognized as among the very best in their fields. Their competitors and peers have ranked them at the top of the legal profession including several whose names have appeared on the top 50 lawyers, the top 25 lawyers and Indiana Super Lawyers lists. These are the men and women who are committed to providing excellent service. Attorneys you can trust to get the job done right.

| | |
|---|---|
| A. Richard M. Blaiklock | Eric C. McNamar |
| Matthew C. Boldt | Jonathan W. Padish |
| Neal Bowling | Celia M. Pauli |
| Stephanie L. Cassman | Lesley A. Pfleging |
| Dina M. Cox | Barath S. Raman |
| Stefanie R. Crawford | Meghan E. Ruesch |
| Kristen J. Davee | Richard K. Shoultz |
| Lynsey F. David | Katherine S. Strawbridge |
| Brandon W. Ehrie | Edward D. Thomas |
| Robert R. Foos, Jr. | John C. Trimble |
| Michael R. Giordano | Ryan J. Vershay |
| Jarrell B. Hammond | Robert F. Wagner |
| Thomas C. Hays | Laura M. Walker |
| Brett Y. Hoy | Daun A. Weliever |
| Janelle P. Kilies | Charles R. Whybrew |
| Kyle A. Lansberry | Thomas A. Withrow |
| Jason M. Lee | Lewis S. Wooton |
| Neha M. Matta | |

Of Counsel
Lisa M. Dillman

{BROCHURE//00544180 v1}



**A. RICHARD M. BLAIKLOCK | *PARTNER***
rblaiklock@lewiswagner.com

Lewis Wagner, LLP
501 Indiana Avenue, Suite 200
Indianapolis, Indiana 46202
317.453.8635
F: 317.630.2790

Rich focuses his practice on representing individuals  and businesses in variety of commercial areas, including contract disputes, shareholder/owner disputes, trade secret and non-competes, auto supply chain issues, business and real estate transactions, business succession planning, regulatory matters and commercial litigation. He has experience litigating multi-million dollar disputes, with trial and appellate experience in those disputes. He has experience representing manufacturers in stop-ship situations, and he has successfully obtained injunction orders preventing suppliers from termination ongoing product supply. Rich also represents the Indiana Department of Insurance, Patients Compensation Fund, in tort and coverage cases. He has written and published law review articles on corporate law, appellate practice, and constitutional issues.

Since 2009, Rich has been listed as an *Indiana Super Lawyers©*. In 2010 and 2013-2016 he was one of Indiana's top 50 Indiana Super Lawyers. From 2012-2017, Rich was recognized by the *Best Lawyers* in *America®* in the fields of Commercial Litigation and; Corporate Law. He is also *Martindale-Hubbell* Peer Review Rated AV.

Rich was honored as Co-Recipient, Defense Lawyer of the Year Award by the Defense Trial Counsel of Indiana in 2009 and in 2011, Rich was awarded the Indiana State Bar Association, Litigation Section's Civility Award.

**Areas of Practice:**
- Business Transactions, Contracts
- Commercial Litigation
- General Business Counseling
- Medical Malpractice Litigation
- Real Estate Transactions

**Education:**
· Indiana University Robert H. McKinney School of Law, J.D., *summa cum laude*, 1997
   o Executive Notes Editor of the *Indiana Law Review*, 1996 - 1997
   o Fellowships & Scholarships:  the John J. Dillon Memorial Fellowship in 1994 and 1995; the Indiana University Alumni Scholarship in 1995; the Indianapolis Bar Foundation Scholarship in 1995; Law School Scholarship in 1994 and 1995.
   o Honors: Dean's List in 1994, 1995, 1996 and 1997; National Dean's List in 1994 and 1996; American Jurisprudence Award on Civil Procedure; American Jurisprudence Award on Contracts; "Top Papers" awards for Contracts I & ll, Civil Procedure l & ll, Employment Discrimination, Family Law and Juvenile Law.
· Hanover College, Hanover, Indiana, B.A., 1990

**Bar Admission:**
   · State of Indiana, 1997

**Courts of Practice:**
   · U.S. District Court Southern District of Indiana, 1997
   · U.S. District Court Northern District of Indiana, 2002
   · U.S. Court of Appeals for the Seventh Circuit

**Representative Cases:**

- *Marsh Supermarkets, LLC v. Roche Diagnostic Operations, Inc.*, 987 N.E.2d 72 (Ind. Ct. App. 2013), trans den (Lead trial and appellate counsel; Breach of long-term lease case in which judgment of $19,563,933 was entered in favor of Marsh after a 7 day trial.  Judgment included pre-trial interest and attorney fees incurred by Marsh.  Presented oral argument to the Indiana Court of Appeals, which affirmed the trial court award.  Marsh was awarded the present value of its damages for an 18-year lease, prevailing party attorney fees through entry of judgment, and post-judgment interest, for a total recovery of $22,496,918).
- *Sofaer Global Hedge Fund v. Brightpoint, Inc.*, et. al., 2011WL2413831, June 10, 2011 (S.D. Ind.)(Summary judgment in fraud and promissory estoppel case).
- *Freudenberg - NOK General Partnership v. Allison Transmission, Inc.*, 934 N.E.2d 972, 2010 WL3706573 (Ind. Ct. App. 2010) (Lead trial and appellate counsel; Preliminary injunction on behalf of transmission manufacturer against supplier, upheld on appeal).
- *Brown v. Automotive Components Holding, LLC* 2009 WL425005 (S.D. Ind. 2009) (Obtained summary judgment for automobile manufacturer in discrimination suit).
- *Butler v. Indiana Department of Insurance*, 904 N.E.2d 198 (Ind. 2009) (Successfully argued issue of first impression to Indiana Supreme Court).
- *U.S. Specialty Insurance Co. v. Harley Davidson Credit Corp.*, 1:09-cv-475, December 2, 2009 (S.D. Ind.) (Partial summary judgment against insurer on behalf of note-holder for plane crashed by Marcus Schrenker).
- *Randles v. Indiana Patient's Compensation Fund*, 860 N.E.2d 1212 (Ind. Ct. App. 2007) (Appellate Court affirmed trial court ruling regarding status of plaintiff's inability to obtain damages, and the amount of damages awarded in wrongful death case).
- *Northstar Partners v. Marsh Supermarkets*, 2005WL3429251 (Seventh Circuit Court of Appeals 2005). (Oral argument to 7th Circuit, summary judgment on lease dispute).
- *Medical Assurance of Indiana v. Indiana Patient's Compensation Fund*, 808 N.E. 2d 737 (Ind. Ct. App. 2004) (Summary judgment affirmed on statutory interpretation issue).

**Honors & Awards:**

- *Martindale-Hubbell* Peer Review Rated AV
- Listed In *The Best Lawyers in America®* in the fields of Commercial Litigation; Corporate Law, 2013 – 2017
  - *Best Lawyers' 2016 Indianapolis* Business Organizations (including LLCs and Partnerships) - Lawyer of the Year
- Listed In *Indiana Super Lawyers©, 2009 - 2016*
  - Top 50,  *Indiana Super Lawyers©*, 2010, 2013 - 2016
- Indiana State Bar Association, Litigation Section's Civility Award, 2011
- Co-Recipient, Defense Lawyer of the Year Award by the Defense Trial Counsel of Indiana, 2009

**Professional Associations:**

- ALFA International
  - Contact Partner
  - Business Litigation Practice Group
- Defense Research Institute
- Defense Trial Counsel of Indiana
  - Business Litigation Section Executive Committee, 2015
- Defense Trial Lawyer Honorary Society, Litigation Counsel of America
  - Fellow
- Federal Bar Association
- Historical Society of the United States District Court for the Southern District of Indiana
  - Steering Committee

·    Indiana State Bar Association
        o    American Citizenship Committee, 2014
·    Indianapolis Bar Association
        o    Professionalism Committee, 2010 – present
·    Indianapolis Bar Foundation
        o    Fellow, 2005

**Publications:**
·    "Trade Secrets and Agreements Not to Compete: A State by State Compendium – Trade Secrets, Indiana," The DRI Defense Library Series, 2009-present.
·    "Enhancing the Spectrum: Media Power, Democracy, and the Marketplace of Ideas," 3 Ill. Law Rev., 813 (co-author with Ronald J. Krotoszynski, Jr.), 2000.
·    "Indiana Appellate Procedure in 1998," 32 Ind. L. Rev., 873, (co-author with Michael A. Wilkins), 1998.
·    "Fiduciary Duties Owed by Frozen out Minority Shareholders in Close Corporations," 30 Ind. L. Rev., 763, 1997.
·    "Indiana Appellate Procedure in 1997," 31 Ind. L. Rev., 667, (co-author with Michael A. Wilkins), 1997.

**Presentations:**
·    *Buy-Sell Agreements: Anticipating Issues with Scope, Enforcement and Valuation Methodology*, Business Valuation Conference, Indiana CPA Society, September 18, 2015.
·    Center for Business Preparation, Hanover College, 2005, 2006, Guest Lecturer.
·    *Tortious Interference,* Business Litigation Seminar, 2005.
·    *Technology in the Courtroom*, Indiana Continuing Legal Education Foundation (ICLEF), 2004.
·    *Shareholder Disputes, Indiana Hot Topics in Business Litigation*, PESI, 2003.
·    *Tortious Interference, Shareholder Disputes, Indiana Hot Topics in Business Litigation*, PESI, 2002.

**Civic & Community Involvement:**
·    Big Brothers Big Sisters of Central Indiana, Management Board, 2002-2004
·    Big Sisters of Central Indiana, Board of Directors, 1996-2002
·    Camptown, Board of Directors, 2009 – 2012
·    CARA Charities, Honorary Advisory Board, 2008-present
·    Heritage Place, Board of Directors, 2004-2010
·    Stanley K. Lacy Executive Leadership Series, Class XXIX, 2004-2005
·    Storytelling Arts of Indiana, Board of Directors, 2001-2003





**CHARLES R. WHYBREW |** *ATTORNEY*
*cwhybrew@lewiswagner.com*

Lewis Wagner, LLP
501 Indiana Avenue, Suite 200
Indianapolis, Indiana 46202
317. 453-8648
F: 317.630.2790

Charles Whybrew is an associate in the firm, focusing his practice in the areas of corporate and business law, civil litigation, construction law, bankruptcy, creditors' rights, and products liability. He has represented clients in several types of matters, such as representing a public entity in a lawsuit against several non-public entities including an engineering firm, construction management firm, inspection firm and a contractor relating to $102 Million Project and representing various commercial and residential builder clients with regard to claims made by or against them relating to various commercial and residential projects. Mr. Whybrew was named a Rising Star by Super Lawyers Magazine from 2009-2012. Mr. Whybrew is actively involved in numerous not-for-profit entities including Starting Over Airedale Rescue, an all volunteer organization rescuing Airedale Terriers in the states of Indiana, Michigan and Ohio.

**Areas of Practice:**
- Appellate Practice
- Civil and Commercial Litigation
- Construction Law and Litigation
- Debtor/Creditor Rights and Bankruptcy

**Education:**
· Indiana University Robert H. McKinney School of Law, J.D., 1998
· Wabash College, Crawfordsville, Indiana, B.A. cum laude, 1994

**Bar Admission:**
· State of Indiana, 1998

**Courts of Practice:**
· U.S. District Court Northern District of Indiana, 1998
· U.S. District Court Southern District of Indiana, 1998
· U.S. Bankruptcy Court Southern District of Indiana, 2000

**Representative Cases:**
· *Trietsch v. Circle Design Group Inc.,* 868 N.E.2d 812 (Ind. Ct. App. 2007).
· *Battema v. Booth,* 853 N.E.2d 1004 (Ind. Ct. App. 2006).
· *Newson v. Fenoglio,* 2006 U.S. Dist. Lexis 48570 (S.D. Ind. 2006).
· *Thorton-Tomasetti Eng'rs v. Indianapolis-Marion County Pub. Library,* 851 N.E.2d 1269 (Ind. Ct. App. 2006).
· *Mayer v. BMR Props.,* LLC, 830 N.E.2d 971 (Ind. Ct. App. 2005).
· *Crossman Communities Inc. v. Dean,* 767 N.E.2d 1035 (Ind. Ct. App. 2002).
· *Sheppard v. Stanich,* 749 N.E.2d 609 (Ind. Ct. App. 2001).
· *United States v. Bartle,* 2001 U.S. Dist. Lexis 18483 (S.D. Ind. 2001).
· *United States v. Bartle,* 2001 U.S. Dist. Lexis 22934 (S.D. Ind. 2001).
· *Ling v. Stillwell,* 732 N.E.2d 1270 (Ind. Ct. App. 2000).

**Honors & Awards:**
- *Martindale-Hubbell* Peer Review Rated AV
- Listed In Rising Star, *Indiana Super Lawyers©*, 2009 – 2012

**Professional Associations:**
- American Bar Association
- Indiana School of Law – Indianapolis
    - Moot Court Competition Judge
- Indiana State Bar Association
- Indianapolis Bar Association
    - Appellate Section
    - Litigation Section
- Indianapolis Association of Wabash Men
    - Board Member 2013

**Civic & Community Involvement:**
- Paws and Think, Animal Assisted Therapy
- PHINdy
- Starting Over Airedale Rescue
- Wabash College Community Day, 2009- 2010

# Exhibit 6

EFiled: Sep 28 2011 4:45PM EDT
Transaction ID 40078891
Case No. 5821-VCL

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

THOMAS TURBERG, On Behalf of   :
himself and All Others   :
Similarly Situated,   :
  :
      Plaintiff,   :
  :
     vs.   :   Civil Action
  :   No. 5821-VCL
ARCSIGHT, INC., THOMAS J.   :
REILLY, SANDRA BERGERON,   :
WILLIAM P. CROWELL, E. STANTON   :
MCKEE, JR., CRAIG RAMSEY,   :
SCOTT A. RYLES, TED SCHLEIN,   :
ROGER SIBONI, ERNEST VON   :
SIMSON, HEWLETT-PACKARD   :
COMPANY, and PRIAM   :
ACQUISITIION CORPORATION,   :
  :
      Defendants.   :

- - -

Chancery Courtroom No. 12C
New Castle County Courthouse
Wilmington, Delaware
Tuesday, September 20, 2011
9:58 a.m.

BEFORE:  HON. J. TRAVIS LASTER, Vice Chancellor.

- - -

SETTLEMENT HEARING

- - -

---------------------------------------------------------
CHANCERY COURT REPORTERS
500 North King Street - Suite 11400
Wilmington, Delaware 19801-3759
(302) 255-0525


EXHIBIT
4

Case 2:12-cv-02722-CM-KMH   Document 14-4   Filed 03/01/13   Page 2 of 47
Case 1:15-cv-01364-TWP-DML   Document 25-179   Filed 10/05/16   Page 124 of 293 PageID #:
587

```
                                                              2

 1   APPEARANCES:

 2        P. BRADFORD deLEEUW, ESQ.
          Rosenthal, Monhait & Goddess, P.A.
 3             -and-
          JUAN E. MONTEVERDE, ESQ.
 4        of the New York bar
          Faruqi & Faruqi, LLP
 5          For Plaintiff Thomas Turberg

 6        R. JUDSON SCAGGS, JR., ESQ.
          Morris, Nichols, Arsht & Tunnell LLP
 7          For Defendants ArcSight, Inc., Thomas J.
            Reilly, Sandra Bergeron, William P. Crowell, E.
 8          Stanton McKee, Jr., Craig Ramsey, Scott A.
            Ryles, Ted Schlein, Roger Siboni and Ernest Von
 9          Simson

10        KELLY A. COSTELLO, ESQ.
          Morgan Lewis & Bockius, LLP
11             -and-
          JILL M. BAISINGER, ESQ.
12        of the Pennsylvania bar
          Morgan Lewis & Bockius, LLP
13          For Defendants Hewlett-Packard Co. and
            Priam Acquisition Corp.

14

15                        - - -

16

17

18

19

20

21

22

23

24
```

CHANCERY COURT REPORTERS

3

1                    MR. MONTEVERDE:  Good morning, Your

2    Honor.

3                    THE COURT:  Good morning,

4    Mr. Monteverde.

5                    Mr. deLeeuw, how are you?  Are you

6    introducing?

7                    MR. deLEEUW:  Yes, Your Honor.

8                    THE COURT:  Welcome.

9                    MR. deLEEUW:  I rise solely to

10   introduce my co-counsel, Juan Monteverde of

11   Faruqi & Faruqi.

12                    We also have with us today observing

13   the proceedings, Miss Alexandra Marchuk.  She's not

14   yet been admitted.

15                    THE COURT:  Working on those clerkship

16   requirements?

17                    MR. MONTEVERDE:  She is joining our

18   firm.

19                    THE COURT:  You are elsewhere?

20                    MISS MARCHUK:  In New York.

21                    THE COURT:  We won't hold that against

22   you too much.  We like New Yorkers.

23                    MR. MONTEVERDE:  Thank you, Your

24   Honor.

CHANCERY COURT REPORTERS

4

```
 1              THE COURT:  Mr. Monteverde, how have
 2    you been?
 3              MR. MONTEVERDE:  I've been okay.
 4    That's my client, Your Honor.
 5              THE COURT:  So who is Mr. Turberg?
 6              MR. MONTEVERDE:  He's an individual --
 7    he actually has been represented by my firm before and
 8    he's an individual that actually had 2500 shares in
 9    ArcSight worth approximately 100 grand.  And he was
10    one that did not like the transaction as it was
11    structured and the price itself.  And certainly
12    because he has a relationship with my firm, he
13    contacted us and told us that he had these shares and
14    asked us if we could assist him, and we certainly were
15    happy to do so.
16              Your Honor, just for putting things
17    into context, when this transaction was announced
18    September 13th, 2010 -- and quite frankly, what caught
19    my eye -- my attention -- was the top-up that was
20    structured in this transaction.  At the same time,
21    Your Honor, I was co-lead counsel in the Cogent matter
22    that later I took to preliminary injunction before
23    Vice Chancellor Parsons.  The reality is, the world
24    did change after October 5th when that ruling came
```

CHANCERY COURT REPORTERS

5

1   down.  As this transaction was announced, 34.5 million

2   shares outstanding, with 150 million authorized and a

3   top-up option, and you had a lock-up agreement of

4   19 percent to insiders and 15 percent of other related

5   parties.  Quite frankly, Your Honor, I did not like

6   it.  I do understand that maybe my views are not the

7   same as this Court, but I certainly think, before the

8   decision in Cogent, and as well Your Honor's

9   involvement in NCXT in late September, I think we had

10  more than a good-faith basis to really attack this

11  transaction.

12          THE COURT:  That's helpful.  I've got

13  to tell you, one of my questions was going to be what

14  inspired you.  It did seem like an arm's-length deal

15  that had a significant premium.

16          MR. MONTEVERDE:  That was the

17  motivation.  Your Honor, quite frankly, has seen me

18  appear before this Court before.  Maybe I'm too

19  inspired at the time.  I certainly like inspiration.

20  I don't do cases for the sake of doing them.  And I

21  like this case.

22          (At this time R. Judson Scaggs entered

23  the courtroom.)

24          THE COURT:  Good morning, Mr. Scaggs.

CHANCERY COURT REPORTERS

Case 2:12-cv-02722-CM-KMH   Document 14-4   Filed 03/01/13   Page 6 of 47
Case 1:15-cv-01364-TWP-DML   Document 179-5   Filed 10/05/16/15/   Page 128 of 293   PageID #:
591

6

1              MR. SCAGGS:  I'm sorry, Your Honor.

2    Am I late?

3              THE COURT:  No.  I think I actually

4    looked at the clock as we were walking in and I

5    realized we were starting two or three minutes early.

6              MR. SCAGGS:  I'm so sorry, Your Honor.

7              THE COURT:  It's my fault.  As I say,

8    as I walked in, I noticed that the clock was about two

9    or three minutes before.  So don't feel badly.  It's

10   good to see you.  It's not daylight savings time.

11             MR. SCAGGS:  Your Honor, I'm prepared.

12   I like to be two minutes early.  I'll sit down and not

13   hold things up.

14             THE COURT:  No problem at all.  As I

15   said, you were probably here precisely on time and I

16   made the mistake of walking in a couple minutes early.

17             MR. MONTEVERDE:  Like I was saying,

18   the top-up is what inspired us to join in.  And I'm

19   very proud of this settlement, for two things, Your

20   Honor: one, because there was also litigation that

21   ensued in California brought by my colleagues

22   Robbins Geller on the West Coast.  And we were able --

23   and, quite frankly, I think the tender offer and the

24   timing might have helped us be able to reach agreement

CHANCERY COURT REPORTERS

7

1   and coordinate the litigation from inception.  But

2   that was one thing I'm proud of.  I'm proud because

3   multi-jurisdiction was cured here.  We were able to

4   litigate together, without the Court's intervention,

5   without wanting to have defendants move for stay

6   against the other or have one more motion that had to

7   be filed.  But I'm also proud about the actual result.

8   The reason why, Your Honor, after the discovery with

9   defense counsel, we uncovered that actually there were

10  multiples that had not been disclosed.  I'm not

11  talking about they just had a reference range and now

12  we want every single multiple, which we did get for

13  2011.  We discovered actually 2010 multiples -- this

14  is happening in the middle of 2010 -- relevant to

15  shareholders were considered by the board.  Nowhere in

16  the 14D-9 that was even mentioned.  So I'm proud that

17  we fought and that we actually were able to persuade

18  defendant to disclose that.

19            What I found this morning -- if I

20  may --

21            THE COURT:  Can you focus me on that,

22  because what I was focused on in terms of the multiple

23  disclosure was the essentially detailed information

24  you got on the comparables.  What is this that you're

CHANCERY COURT REPORTERS

Case 2:12-cv-02722-CM-KMH   Document 14-4   Filed 03/01/13   Page 8 of 47
Case 1:15-cv-01364-TWP-DML   Document 25-17   Filed 10/05/15   Page 130 of 297   PageID #:
593

8

1    speaking of?

2                    MR. MONTEVERDE:  Well, it's both, Your

3    Honor.  If I may approach, I actually made it separate

4    photocopies.  It may be easier for Your Honor.

5                    THE COURT:  Sure.

6                    MR. MONTEVERDE:  Thank you, Your

7    Honor.

8                    THE COURT:  Did Mr. Scaggs get one?

9                    MR. MONTEVERDE:  I'm doing that as we

10   speak.

11                   THE COURT:  This is just the same as

12   what I got.  What did you do special to it?

13                   MR. MONTEVERDE:  I actually made the

14   photocopies of the portions.  You do have it, Your

15   Honor.  I just wanted you to have it handy.

16                   THE COURT:  I thought you had done

17   something nice, like highlighting it and putting in

18   fancy colors.

19                   MR. MONTEVERDE:  No.  I figured my

20   voice would be the highlight.

21                   THE COURT:  Everything always sounds

22   better when said with an accent.  Everything always

23   sounds better and more persuasive when said with an

24   accent.

Case 2:12-cv-02722-CM-KMH   Document 14-4   Filed 03/01/13   Page 9 of 47
Case 1:15-cv-01364-TWP-DKL   Document 179-5   Filed 10/05/16   Page 184 of 297 PageID #:
594

9

1                    MR. MONTEVERDE:  That may be why my

2       firm keeps sending me to these hearings.  I don't

3       know.  But I'm happy to be before Your Honor.  Let me,

4       if I may, Your Honor, if you turn to page two of the

5       amendment, which has the 14D-9 amendment, No. 2, and

6       page 28, which would be the fourth page of the

7       excerpt.

8                    THE COURT:  Okay.

9                    MR. MONTEVERDE:  Actually, my

10      apologies.  Page 27.  Your Honor will see, after the

11      list of the companies that starts with Blue Coat

12      Systems, it says there that, for purposes of this

13      analysis, Morgan Stanley analyzed the following

14      multiples and below it bullets two numbers.  It says

15      the 2011 earnings per share and the revenue.  And

16      then, if Your Honor turns the page, Your Honor only

17      sees a reference range for those numbers and implied

18      values.

19                    Well, after discovery we uncovered

20      that they also reviewed 2010 numbers.  Your Honor, if

21      I may direct Your Honor's attention to the other

22      document, the 14D-9 amendment, on page two, Your Honor

23      will see a big chart.  It not only not shows every

24      multiple -- so, yes, Your Honor is correct -- there's

CHANCERY COURT REPORTERS

Case 2:12-cv-02722-CM-KMH   Document 14-4   Filed 03/01/13   Page 10 of 47
Case 1:15-cv-01364-WO-JEP   Document 179-5   Filed 05/16/15   Page 132 of 293   PageID #:
595

10

1   additional detail.  Your Honor will also see there is

2   the 2010 revenue multiples as well as the EBITDA

3   multiples for both 2011 and 2010 and the earnings per

4   share for 2010.

5                  What the original 14D-9 had -- what

6   shareholders were told was Morgan Stanley only reviews

7   2011 multiples.  Not fully correct, Your Honor.

8   Morgan Stanley also reviewed 2010 multiples and also

9   provided them to the board of directors in their

10  presentation of September 12th.

11                 THE COURT:  I must not be

12  understanding.  I see the chart.  It starts with

13  Blue Coat Systems on the top and goes across 2010.

14                 MR. MONTEVERDE:  Correct.

15                 THE COURT:  Is your point just that it

16  includes both the 2010 information and the 2011

17  information?

18                 MR. MONTEVERDE:  Yes.  But the

19  original 14D-9 only had 2011 information.  No word in

20  the supplement -- in the original 14D-9.  There was no

21  indication the 2010 was observed and presented to the

22  board.

23                 THE COURT:  Somebody is beeping.  Who

24  is beeping?

CHANCERY COURT REPORTERS

11

1          THE COURT REPORTER:  That was me, Your

2     Honor.  It was my laptop.

3          THE COURT:  Oh, that was you, Diane.

4     It's an hourly rate beep.  Whatever your hourly rate,

5     Mr. Monteverde, that gives you an incentive to

6     mitigate and to somewhat moderate your hourly rate

7     contentions.

8          MR. MONTEVERDE:  That's why I don't

9     bring my BlackBerry or cell phone inside, Your Honor.

10    I hopefully get the entire amount and I don't have to

11    worry about the beeping penalties.

12         THE COURT:  It's less than the

13    Chancellor.  The last time the Chancellor had this

14    happen, he was considering pro hac revocations.  One

15    or the other, either way.

16         Did they ever give the 2010

17    information for ArcSight?  I see page 28 has the 2011

18    information for ArcSight.  Is there some similar --

19         MR. MONTEVERDE:  Your Honor is

20    correct.  The analysis here focused on what are the

21    numbers of the companies that they looked at.  The

22    2010 numbers one could get and there actually was

23    analysts following.  They were street reports.  So

24    certainly we're starting with the premise, obviously,

CHANCERY COURT REPORTERS

12

1   that this is material information.  A shareholder who

2   actually wants to look at things and use the

3   information will know how to utilize this information.

4   One could actually go on Yahoo Finance or Bloomberg,

5   whichever, and pull estimates for ArcSight and they

6   would be available and they could then use these

7   multiples.  I think what's important, Your Honor, and

8   what I want to focus this Court's attention this

9   morning, is the original 14D-9 was silent.

10                  THE COURT:  Was what?

11                  MR. MONTEVERDE:  Silent.  Did not

12   discuss that they also observed EBITDA multiples and

13   did not discuss that they looked at 2010 numbers.  I

14   felt not only this was a victory, I felt, quite

15   frankly, if defendants would not agree to give us this

16   information, I would be comfortable coming before Your

17   Honor on a preliminary injunction and saying, "Your

18   Honor, we start with Pure Resources, that a fair

19   summary must be disclosed to shareholders of material

20   information presented to the board."

21                  THE COURT:  Look, maybe you ought to

22   do that some time because, you know, it's odd that

23   these banker books go to the board.  And I've seen a

24   lot of banker books.  The banker book that goes to the

CHANCERY COURT REPORTERS

Case 2:12-cv-02722-CM-KMH   Document 14-4   Filed 03/01/13   Page 13 of 47
Case 1:15-cv-01364-WOP-DBG   Document 179-5   Filed 05/16/15   Page 135 of 293   PageID #:
598

13

1   board never just has a list of names and then

2   reference ranges.

3                    MR. MONTEVERDE:  Correct.

4                    THE COURT:  The banker book that goes

5   to the board invariably has a chart like this.  And

6   can you imagine what the directors would say if they

7   got a book that just had a list of names and then a

8   bottom line reference range?  I mean, they'd say,

9   "What are you doing, Morgan Stanley?  Where is your

10  backup?"  Right?

11                   MR. MONTEVERDE:  Exactly.

12                   THE COURT:  Can you imagine the due

13  care claim that there would be if that was all the

14  board book contained?

15                   MR. MONTEVERDE:  But if I may, Your

16  Honor --

17                   THE COURT:  You would be excited about

18  that.

19                   MR. MONTEVERDE:  I would be very

20  excited.  In this case I also was excited because, in

21  the first 14D-9, the one issued on September 22nd, it

22  says Morgan Stanley analyzed the following statistics:

23  Earnings per share for 2011 and revenue for 2011.

24                   On the improved 14D-9, now it says

Case 2:12-cv-02722-CM-KMH   Document 14-4   Filed 03/01/13   Page 14 of 47
Case 1:15-cv-01364-WO-JEP   Document 179-5   Filed 05/16/15   Page 136 of 293   PageID #:
599

14

1   Morgan Stanley analyzed the following statistics: 2010

2   and 2011 revenue, EBITDA 2010 and 2011, and earnings

3   per share 2010, 2011, and then they give a summary of

4   those numbers.

5                    Your Honor, the original 14D-9 did not

6   say anything about EBITDA or 2010.  Those were key

7   inputs given to the board.  I agree with Your Honor

8   that the victory is not that we disclosed necessarily

9   the multiples.  The bigger victory is that we

10  uncovered that they also looked at 2010 numbers, they

11  also looked at EBITDA numbers.  Shareholders were not

12  told that.  This is a different document.  I mean --

13                    THE COURT:  I think I view this a

14  little bit differently than you in that respect.  I

15  don't think that there's -- I guess you could say that

16  that's some type of omission.  But really what we're

17  doing is we're debating what fair summary means.  And

18  at least initially the banker's view of the world was

19  fair summary meant we just give you our bottom line

20  conclusion.  Then, when it turned out that they were

21  wrong about that -- and Chancellor Strine gets really

22  credit for all this -- what they started saying was

23  fair summary meant you only get the bottom line

24  conclusion of each of our individual analyses.

15

1                    So then it turned out, as

2    Then-Vice Chancellor Strine explained it, "No,

3    actually, they were wrong about that.  Fair summary

4    actually means summary, not just your conclusions."

5                    So then we started getting these lists

6    of names, without any other information, so that

7    stockholders could, I guess, go on an informational

8    scavenger hunt and try to develop for themselves all

9    of the multiples.  So really what I hear you saying is

10   the value that you provided was that you got actually

11   a fair summary.

12                   MR. MONTEVERDE:  That was not before.

13   And it was omissions, Your Honor.  I mean, I think

14   it's very important -- Your Honor, we can certainly

15   disagree, but I will -- as I stand before Your Honor,

16   not only am I proud of the settlement, I would have

17   liked to have brought this triple injunction.  I would

18   have definitely liked it.  I think I would have had

19   fun.  And I think Your Honor would have sided with me

20   at a preliminary injunction.  I don't know.

21                   THE COURT:  Here's my question for

22   you.  Maybe it's --

23                   MR. MONTEVERDE:  I could probably

24   answer it, Your Honor.

CHANCERY COURT REPORTERS

Case 2:12-cv-02722-CM-KMH   Document 14-4   Filed 03/01/13   Page 16 of 47
Case 1:15-cv-01364-WO-JEP   Document 25-17   Filed 05/16/15   Page 138 of 293   PageID #:
601

16

1                    THE COURT:  That's okay.  A lot of

2      times backup in the board book is in the form of a --

3      I'm going to get landscape and portrait backwards --

4      but it's a horizontal page; right?  It's not a

5      vertical page like this.  It's a horizontal page.  Is

6      this landscape?  There you go.

7                    MR. MONTEVERDE:  They were graphs.

8                    THE COURT:  See, because what is

9      troubling to me and to other members of the Court is

10     to get into the details of drafting these banking

11     summaries and sort of deciding how much of the chart

12     you put in.  So I was assuming that this corresponded

13     to a landscape table in the board book of the kind

14     that I would often see, and that this was basically

15     all the columns on there.  Is that right?  Or did you

16     pick and choose some of the columns and not others?

17                    MR. MONTEVERDE:  I mean, it is right

18     in the sense that the information is the same.  But

19     instead of doing -- I'm happy to lend this to Your

20     Honor with --

21                    THE COURT:  Why don't you hand it up.

22     Is that the presentation?

23                    MR. MONTEVERDE:  It's my only copy.

24                    THE COURT:  Let me take a quick gander

CHANCERY COURT REPORTERS

Case 2:12-cv-02722-CM-KMH   Document 14-4   Filed 03/01/13   Page 17 of 47
Case 1:15-cv-01364-WO-JEP   Document 179   Filed 05/16/15   Page 18 of 47   PageID #:
602

17

1  and maybe I'll give it back to you.

2                MR. MONTEVERDE:  And if I may just,

3  for illustration, Your Honor, I think what they do --

4  so from every graph they put the multiples for every

5  company and then they develop that into a table.  It's

6  all the numbers in that page.

7                THE COURT:  The only difference

8  between this and what I was envisioning in my head was

9  often you get a sheet of paper that looks like this

10  page of transaction matrix --

11                MR. MONTEVERDE:  Correct.

12                THE COURT:  -- where they're looking

13  at the data in a chart form rather than in a table

14  form.

15                MR. MONTEVERDE:  Yes.

16                THE COURT:  Graphics are great.  This

17  just does the same thing as graphics.  The old school

18  way used to be to put them in terms of numbers.

19                Look, I understand where you're coming

20  from on that.  So you got that.

21                Here, Donna, why don't you give that

22  back to Mr. Monteverde.

23                MR. MONTEVERDE:  Not to stress it

24  again, Your Honor.  For me, the victory?  2010 not

CHANCERY COURT REPORTERS

Case 2:12-cv-02722-CM-KMH  Document 14-4  Filed 03/01/13  Page 18 of 47
Case 1:15-cv-01364-WDQ-BCB Document 25-179 Filed 05/15/15 Page 40 of 237 PageID #:
603

18

1   even mentioned.  EBITDA not even mentioned.  We got

2   it.

3              THE COURT:  Again, what it gets back

4   to, it's not -- it's a problem because therefore it

5   wasn't a fair summary.  They were only telling

6   stockholders 2011 when they actually also considered

7   2010.

8              MR. MONTEVERDE:  Correct.  We got it

9   in the first summary.  And that's the comparable

10  company analysis is where we start, but it was across

11  the board.  We saw sort of that theme -- the theme,

12  I'll call it.

13             The next disclosure we got is that the

14  research analyst report again just said originally --

15  if we turn to the next page, Your Honor.  If Your

16  Honor wants to see this in page 28, there's the second

17  analysis that follows.  It's titled, "Equity Research

18  Analysts' Price Targets."

19             THE COURT:  I get this.

20             MR. MONTEVERDE:  The last sentence

21  said $32.  Guess what, Your Honor?  They also had a

22  $40 price target.  What they say is we're not going to

23  disclose that because that might have been affected

24  because there was a leak to the market.  I'm sorry,

19

1   but I think shareholders need to know that.  We got

2   that, Your Honor.

3                The same thing on the next one for the

4   precedent transactions analysis, Your Honor.  What

5   originally was disclosed were just reference ranges.

6   And here now what we said is, we would like the entire

7   data to be provided, and we got it.  And that's on

8   page six of the amendment.

9                THE COURT:  Here's my question for

10  you.  One of the things that troubles me about these

11  types of things is that you create this situation

12  where the bankers have an incentive to not put in this

13  stuff.  The issuer has an incentive not to really push

14  hard back on the bankers, and then you all come along

15  and you can add this stuff in and get a settlement

16  that supports a fee.  How do I solve that problem

17  where people actually put this stuff in the first

18  time?  And maybe it puts a little bit more pressure on

19  you to find some transactions where there's real stuff

20  going on.  But how do I break this circle of

21  supplementation?

22                MR. MONTEVERDE:  I think the way you

23  break that, Your Honor, I don't think it's to chastise

24  or punish the firms who actually are focusing on what

20

1    I think are the more important enhancements and that

2    actually uncover data that was not summarized.  I

3    think that will happen.  That's going to continue to

4    happen because not every banker -- quite frankly, Your

5    Honor, we focus in this case -- I have my theory why

6    they didn't -- why ArcSight did not put in 2010

7    numbers because there were higher multiples.  That's

8    my theory.  I could be wrong.  If you calculate that,

9    I think a shareholder would have seen that and said,

10   "Gee, the multiples for earning per share for 2010 is

11   43 and the earnings per share, I think, is $.77.  That

12   means 35 bucks."  But if you look at the actual 2010,

13   it's 53.  That that's more like 40 or 45.  The offer

14   is 43.50.  Maybe it doesn't look as good.  I don't

15   know.  We don't know that.  This is my own

16   Monteverde's theory.  It could be right or wrong.  I

17   don't think you punish firms that are actually working

18   hard, are willing to take things to preliminary

19   injunction.

20                  And as to the other settlements that

21   Your Honor may be confronted where it's just an

22   enhancement, maybe Your Honor should do what Your

23   Honor has done in other cases and say, "Wait a second.

24   This may be just a settlement that was just done, so

CHANCERY COURT REPORTERS

Case 2:12-cv-02722-CM-KMH   Document 14-4   Filed 03/01/13   Page 21 of 47
Case 1:15-cv-01364-WDQ-BJC-DDoc Document 25-19 Filed 05/15/15 Page 143 of 297 PageID #:
606

21

1    it could support a waiver or a release of a Revlon

2    claim."

3                        THE COURT:  Here's the thing.

4                        MR. MONTEVERDE:  But I don't think

5    that's before Your Honor today.

6                        THE COURT:  You didn't do very much.

7    You really didn't.  You filed three days after it came

8    out.  You got sort of standard-ish documents, 2,300

9    pages.  You didn't take any pre-MOU depositions and

10   you got supplementations.  But for this bankers stuff,

11   I don't need to say whether it's material or not.

12   It's certainly better disclosure.

13                       The other stuff you got, some of these

14   things I wasn't too impressed with.  I almost feel

15   like I've got a difficult choice where one alternative

16   is to criticize you and beat you up for settlements.

17   You don't enjoy that.  I don't really enjoy that.  The

18   other alternative, I guess, would be really to be

19   generous with you and to start saying, "Look, you get

20   this type of information on bankers?  We're talking

21   millions."  And then if the issuer and the acquiror

22   start thinking, "So, my goodness, we're going to have

23   to pay millions for this," maybe they'll get their

24   bankers to put it in in the first instance.

CHANCERY COURT REPORTERS

Case 2:12-cv-02722-CM-KMH   Document 14-4   Filed 03/01/13   Page 22 of 47
Case 1:15-cv-01364-WO-JEP   Document 179-5   Filed 05/16/15   Page 142 of 2937 PageID #:
607

22

```
 1              MR. MONTEVERDE:  Me, personally, I

 2   like the lottery, Your Honor.

 3              THE COURT:  You would probably get

 4   that once because, after that, the bankers would start

 5   putting it in.

 6              MR. MONTEVERDE:  I know there's a lot

 7   of disclosure settlements going on.  I know that, Your

 8   Honor.  But the reality is, I really think this was a

 9   good one.  I know Your Honor thinks, "Look, you guys

10   didn't work that hard."  We worked very hard for a

11   month.  I managed to get multi-jurisdiction under

12   control.  I think that's a plus.  And I uncovered this

13   was not given, Your Honor.

14              THE COURT:  Tell me about your hours.

15   How did you get to your hours?  Whack it up for me.

16              MR. MONTEVERDE:  Whack it up to you.

17   I think we have around 250 grand, roughly, for my firm

18   and I think about 200 grand is pre-MOU, and probably

19   half of that is my time, which equates to maybe

20   170-some hours.  I pretty much worked on this case,

21   Your Honor -- I remember settling this case because

22   our office was closed, it was Columbus Day, and I was

23   working through the weekend and I was there on Monday.

24              THE COURT:  Look, I've done these
```

23

1   cases.  You know, 2300 documents, to review that?

2                    MR. MONTEVERDE:  Right.

3                    THE COURT:  Even if I give you a

4   minute a page, you're not much more than 40 hours.

5                    MR. MONTEVERDE:  No, Your Honor.  What

6   happened is, you have a tender offer.  If this breaks,

7   if we don't have a settlement after that weekend, we

8   would be before Your Honor with an opening brief which

9   was ready, Your Honor.  I cannot wait for defendants

10  to tell me, "We've been talking for three days.  You

11  know what?  See what you do."  Your Honor, I don't.

12                   THE COURT:  You're telling me that you

13  were doing all those other things?

14                   MR. MONTEVERDE:  Maybe people say,

15  "You know what?  That's inefficient."  I do this, Your

16  Honor.  I know how the game works.  So I need to have

17  everything ready, every motion that I can think of,

18  subpoenas, commissions.  I don't know how people are

19  going to react.  I don't know if they're going to

20  solicit the banker.  I don't know.  I have to already

21  know who I'm going to contact at outside counsel for

22  the banker.  That takes investigation.

23                   Your Honor, this case, I don't think

24  the fees -- and I know Your Honor has hesitation and I

CHANCERY COURT REPORTERS

24

1    guess we're jumping ahead of it, but I don't think the

2    500,000 fee request here is generous, because, one,

3    it's multi-jurisdiction litigation.  And Your Honor

4    says the reality of them means this is not something

5    that we keep for ourselves entirely.  This needs to be

6    sure with other law firms.  That's a reality.  They

7    also worked on the case.

8                    Two, I go back to maybe I'm prouder

9    than I should be.  I think uncovering the 2010 numbers

10   and that the banker put it under fairness opinion, or

11   an analysis in support of their fairness opinion and

12   the board of directors got to consider that, the

13   multiples in 2010 were higher than 2011 and we got

14   that disclosed, I think that's a home run.  I think

15   the disclosure alone warrants the approval of the

16   settlement and the fee requested.

17                   But we did not stop there.  We got

18   enhancement disclosures for every analysis, which

19   included in the present transaction every multiple.

20   That's financial information.  We then got

21   background -- not voluminous disclosures, Your Honor,

22   but two very important.  One, what kind of buyers were

23   you looking at?  They were all strategic.  Are there

24   any standstills enforceable or in play right now?  No,

CHANCERY COURT REPORTERS

25

1  they were not.  Someone could come in and make a bid

2  on how to review the company.  I think that's also a

3  very important disclosure and has a lot of meaning, at

4  least for those who understand how the process works.

5              Three, we got information about the

6  top-up -- how the top-up worked.  First, I did not

7  like the top-up.  I said that before.  At a minimum, I

8  got them.  At least let the shareholders know how many

9  shares you have, how many reserve, how this would be

10 triggered.

11             Now, a shareholder that really wants

12 to find out?  Yes, they can go through 10-K, the 10-Q

13 and figure it out probably.  Why make the shareholder

14 have to do that homework when you are giving a top-up.

15 You should fully disclose it.

16             Quite frankly, Your Honor, I'm also

17 proud about that section because, after this 14D-9,

18 every -- I don't want to say "every" -- most of them

19 have been disclosing the mechanics and the numbers.

20 I'm not responsible for sending -- I don't know.  But

21 I'm proud of it.

22             THE COURT:  You're a trendsetter.

23 We're bleeding into the fee issue here.  I think

24 there's value to that type of disclosure enhancement.

CHANCERY COURT REPORTERS

Case 2:12-cv-02722-CM-KMH   Document 14-4   Filed 03/01/13   Page 26 of 47
Case 1:15-cv-01364-WDQ-254-BJGBoodDronent25t179Filed EO05/16/1Fageatge326 of 2937PageID #:
611

26

1   That's the thing that firms, like Mr. Scaggs, get

2   called on to do all the time.  You read proxy

3   disclosures.  We give people comments.  You know what?

4   That takes like two hours.  And you give them a

5   markup.  You have a telephone call and that's a

6   one-day gig.  Maybe there's some ongoing thing, but

7   it's not a 500,000 bill.

8              MR. MONTEVERDE:  Well, Your Honor, he

9   gets paid every time.  I don't.  I think that has to

10  be put into play there a little bit.

11             Also, I don't think we focus on the

12  hourly.  We focus on the value.  I think Your Honor

13  said it before.  I think Your Honor said it first in

14  Novell Pharmaceuticals, and I think it might have been

15  one of Your Honor's first final hearings where the fee

16  was contested and Your Honor there said, "Look, we

17  still have 400, 500,000."  Decent disclosures.  Dial

18  up or dial down.  I think they're good disclosures

19  that put us there.  And I think I got -- quite

20  frankly, if I was doing this on a contested fee --

21  Your Honor may laugh here -- I would ask for more than

22  500,000.  I advised Your Honor, Your Honor will laugh.

23  But I would.

24             (Laughter.)

CHANCERY COURT REPORTERS

Case 2:12-cv-02722-CM-KMH   Document 14-4   Filed 03/01/13   Page 27 of 47
Case 1:15-cv-01364-WMS-JJM   Document 179   Filed 05/16/15   Page 27 of 47   PageID #:
612

27

1                    THE COURT:  You're a good man,

2     Mr. Monteverde.

3                    Go to page 33 of your brief.  This is

4     where you're talking about the efforts of counsel.

5     You say you did a pre-suit investigation of the facts

6     and analyses of the proposed tender offer merger.

7     Tell me about your pre-suit investigation.

8                    MR. MONTEVERDE:  The pre-suit

9     investigation essentially involves looking at the last

10    10-K, 10-Q for ArcSight, looking at what HP has bought

11    before.  It turned out that HP, after this

12    transaction, has started to buy other companies.  They

13    needed to start up companies to compete.  One of the

14    reasons why it turned out that this case ended up with

15    the going price, they actually ended up paying 52

16    times EBITDA, which has actually been one of the

17    highest payouts.  That's one of the reasons why we

18    think our price case wasn't much of a price case.  But

19    we don't know that.

20                    THE COURT:  You know something about

21    it.  I appreciate you saying that you got into this on

22    the top-up.  I looked at this and I saw a big premium,

23    third-party arm's-length deal.  And it did seem a

24    little bit strange that you saw a massive fiduciary

28

1   wrong.  But I understand that you got into it for the

2   top-up.

3                    Now, the next thing is consultation

4   with your evaluation.

5                    MR. MONTEVERDE:  That's the next

6   thing.  What we do is, we actually have three or

7   four --

8                    THE COURT:  Who is the guy?

9                    MR. MONTEVERDE:  Matthew Morris from

10  RGL.  Actually, if I recall correctly, Your Honor, we

11  had two experts here.  Because what happened is, when

12  we started the case, I was not working with my

13  colleagues at Robbins Geller.  I think they retained

14  Matthew Morris.  I believe I retained Cynthia Jones

15  from FMA.  And what happens is, as part of her

16  consultation, what we do typically -- I do -- I

17  contact three or four experts that I like.  I talk to

18  them briefly.  Then they run the conflicts.  They come

19  back, yeah, nay, and then we sort of discuss the next

20  steps.

21                   I don't normally -- this is me -- I

22  don't like using the same one over and over.  One,

23  because I think you get into the issue of bad habits

24  or the same things over and over.  I like, also, to be

CHANCERY COURT REPORTERS

Case 2:12-cv-02722-CM-KMH   Document 14-4   Filed 03/01/13   Page 29 of 47
Case 1:15Case 1:15-cv-09254-BGB-Document 25-179Fileff 05/16/15PagePage 152 of 2937 PageID #:
614

29

1    challenged.  I like to sometimes try someone new, try

2    different things.

3                    THE COURT:  It's not going to look

4    good if you got the quasi in-house trained expert.

5                    MR. MONTEVERDE:  That also may be one

6    of the reasons, Your Honor.  So we have several

7    experts that we looked at.  That takes time.

8                    THE COURT:  How much did Mr. Morris

9    make on this?

10                    MR. MONTEVERDE:  Roughly, I want to

11   say 14 grand, 13 grand.

12                    THE COURT:  Now, down at the bottom of

13   the page, what complex financial information did you

14   master?

15                    MR. MONTEVERDE:  Well, Your Honor,

16   actually been able to understand how multiples work

17   and how --

18                    THE COURT:  You knew that before;

19   right?

20                    MR. MONTEVERDE:  I knew that before.

21                    THE COURT:  You didn't have to educate

22   up to this case.

23                    MR. MONTEVERDE:  You don't have to be

24   educated for the case, but certainly you have to

CHANCERY COURT REPORTERS

30

1    revisit certain things.  I certainly do know how

2    multiples work, generally.  To be frank, Your Honor,

3    I'm not a banker.  I don't do it every day.

4                    THE COURT:  Can we agree that's

5    probably a little bit of a nervous statement for this

6    case?

7                    MR. MONTEVERDE:  I think there are

8    persuasive papers.  You try to put everything in the

9    best light and accurate.

10                    THE COURT:  You try to be accurate;

11   right?  Did the prosecution of this action require an

12   extensive effort by plaintiffs' counsel to master

13   complex financial information?  This is what you do;

14   right?

15                    MR. MONTEVERDE:  This is what I do.

16   The one thing I can defend a statement is saying,

17   "Well, it requires that I half master it" --

18                    THE COURT:  That's not what you said.

19                    MR. MONTEVERDE:  Your Honor, I

20   certainly take note of that, and I don't think Your

21   Honor is going to see that sentence again.

22                    THE COURT:  I got to tell you, part of

23   what I think you guys ought to think about -- you

24   guys -- I don't mean that in gender-specific sense --

CHANCERY COURT REPORTERS

Case 2:12-cv-02722-CM-KMH   Document 14-4   Filed 03/01/13   Page 31 of 47
Case 1:15-cv-01364-WO-JEP   Document 179-5   Filed 05/16/15   Page 33 of 49   PageID #:
616

31

1    but when people come in and they oversell things, it's

2    something that I notice.  I think that this is a

3    settlement where you got some stuff, you got some

4    disclosure enhancement.  You are very fortunate that

5    the defendants didn't oppose.  This isn't a home run

6    case and you didn't have to master complex financial

7    information.  If that was the case, you would have

8    asked for a lot more; right?

9                   MR. MONTEVERDE:  I will tell Your

10   Honor, sometimes you use words that may read well.  I

11   hear Your Honor's comment.  I can see --

12                   THE COURT:  I do read these briefs.

13   You realize that.  I do read them.

14                   MR. MONTEVERDE:  And I do appreciate

15   that.  I want Your Honor to read it because you're

16   telling me what you're telling me.  I'm taking notice,

17   and I will certainly take that into consideration and

18   actually react to it going forward.  I don't think we

19   punish someone for a couple misused words, if you want

20   to even say that, when I think -- again, Your Honor

21   does not agree this is a home run, or not with me.  I

22   actually think it's quite a bit of a home run.  But I

23   don't do baseball.  I don't know much.  I think they

24   go around somewhere.

CHANCERY COURT REPORTERS

Case 2:12-cv-02722-CM-KMH   Document 14-4   Filed 03/01/13   Page 32 of 47
Case 1:15-cv-01364-WOB-QCB   Document 25-179   Filed 05/16/15   Page 33 of 47   PageID #:
617

32

1              THE COURT:  What is your sport,

2    Mr. Monteverde?

3              MR. MONTEVERDE:  You know, Your Honor,

4    everyone actually makes fun of me because I'm from

5    Spain but I don't really follow soccer.  My parents

6    were intellectuals, so Plato and the Republic was more

7    my focus than sports.

8              THE COURT:  I'll tell you what, then.

9    I want your briefs to be accurate, like Platonic

10   forms.  I do not want them to be the shadows of the

11   cave.  It struck me when I was reading the prosecution

12   of this action required an extensive effort by

13   plaintiffs' counsel to master complex financial

14   information, that strikes me as the shadow on the wall

15   of the cave made by the shadow puppets that are being

16   carried around.  And, you know, look, as I say, you

17   come in here a lot.  I don't want to beat you up on it

18   and I appreciate you're going to take note of it.

19             MR. MONTEVERDE:  Yes.  And so what

20   we're left with is just essentially a summary.  There

21   were three focus of disclosure.  It was the

22   financials, it was the background and the enforcement

23   of the standstill agreement and the top-up disclosure

24   of how the mechanics worked.  We were happy about it.

Case 2:12-cv-02722-CM-KMH   Document 14-4   Filed 03/01/13   Page 33 of 47
Case 1:15-cv-01364-WO-JEP   Document 179-5   Filed 05/16/15   Page 155 of 293   PageID #:
618

33

1   We then took depositions post-close, confirmatory

2   discovery.  We were satisfied the settlement was fair,

3   reasonable and adequate.

4                   THE COURT:  I was glad to see that

5   Morgan Stanley seemed to have put forward a real

6   banker for you.

7                   MR. MONTEVERDE:  Yeah, Mr. Marth.

8   And, Your Honor, we took a lot of time.  I actually

9   remember with a stipulation of settlement there were

10  some issues, but we were able to finally submit it to

11  this Court on June 1st.  Your Honor entered a

12  scheduling order on June 15th, as of which was the

13  result of 7,776 notices were sent.  Not one objection.

14  So I do think that also merits some consideration.  I

15  think the settlement should be approved.

16                  THE COURT:  I think it suggests that

17  people are rationally apathetic, that they know the

18  fee is coming out of somebody else's pocket and that

19  there's a really great deal here, and that it actually

20  would -- to write the objection letter means that you

21  don't get to spend that hour with your kids.  You

22  know, this is a friction lost.  I know we have cases

23  that say the absence of objections is warranted.  In a

24  context where you actually empower class counsel to

CHANCERY COURT REPORTERS

34

1   act because of the premise the stockholders are

2   rationally apathetic, the absence of objections is

3   consistent with the whole premise of class counsel.

4   It's not inherently supportive of the settlement.

5              Now, maybe if you had some radically

6   out-of-range settlement, people might get fired up

7   enough to write in.  So I don't give much weight to

8   that.

9              MR. MONTEVERDE:  I still think it's a

10  very good settlement.  Fair enough, Your Honor.  I

11  think certification is warranted here.  From

12  announcement September 13th through October 22nd --

13             THE COURT:  I don't have any questions

14  about that.

15             MR. MONTEVERDE:  The fee.  I know Your

16  Honor has hesitation about it.  I do think 500,000 is

17  within the range of reasonableness.  I will be the

18  first to admit it is maybe at the end, but it is

19  within that range of fairness and what's reasonable.

20  I think the lawyers involved here are lawyers that we

21  do this.  I thought we did a good job.  And I think,

22  quite frankly, the multi-jurisdictional avoidance of

23  litigation by having firms with different clients in

24  different jurisdictions work together which, at the

Case 2:12-cv-02722-CM-KMH   Document 14-4   Filed 03/01/13   Page 35 of 47
Case 1:15-cv-01364-WOP-BGB Document 25-19 Filed 05/16/15 Page 35 of 47 PageID #:
620

35

1   end of the day, means we have to share in, I think

2   that also is something to consider.  I'm not saying

3   that's a weight or a factor that should be added on to

4   the Sugarland factors, Your Honor, but I do think it's

5   something that adds to it.

6                    I don't have anything further, unless

7   Your Honor needs me to continue talking so I can

8   persuade Your Honor that the approval of the

9   settlement, class certification and the full fee is

10  warranted here.

11                   THE COURT:  There you go.

12                   MR. MONTEVERDE:  Thank you, Your

13  Honor.

14                   THE COURT:  Mr. Scaggs, what do I do

15  about this banker disclosure problem?  You do a lot of

16  this.  Do you have any thoughts for me?  Instead of

17  trying to intervene in the market and keep fees

18  reasonable, why shouldn't I start letting fees climb

19  for that banker disclosure so that eventually people

20  put the information in?

21                   MR. SCAGGS:  It's a real problem, Your

22  Honor.  And we -- thank you for the chance to give you

23  input.  As someone who is working within the system,

24  as opposed to someone running the system like yours,

Case 2:12-cv-02722-CM-KMH   Document 14-4   Filed 03/01/13   Page 36 of 47
Case 1:15Case 01364-cWO0254BJGBoocDocumente5t179Fleed Filed 05/16/15 Page a16e3361 2037 PageID #:
621

36

1   it is a real quandary because --

2                    THE COURT:   The Supreme Court is

3   frequently ready to remind me that I'm not running the

4   system.   I hear you.

5                    MR. SCAGGS:   More so than me, Your

6   Honor.   I think the best thing that can be done,

7   because if you're looking at the kind of certainty

8   that Delaware law has provided to corporations and

9   given us the lead, and the things that we value

10  because we want to be able to give that, you could go

11  with the federal system that says -- I mean, there's

12  actually regulations.   And I don't think that's all

13  that helpful.   We have those that say, "If you have

14  multiples, they go in."   That's one way to certainty.

15  What this Court provides is the flexibility to look at

16  those in context.   So I think it will require some

17  more pain in development of case law.

18                    What would be helpful to us is if this

19  Court has the opportunity -- like you did -- I was all

20  ears, if you saw.   These transcripts, as Your Honor

21  knows, get circulated.   But the more that we can learn

22  about what the Court expects in multiples, or

23  anything, the better those disclosures will be,

24  because we have to go back and often are not involved

CHANCERY COURT REPORTERS

Case 2:12-cv-02722-CM-KMH Document 14-4 Filed 03/01/13 Page 37 of 47
Case 1:15-cv-01364-WDQ Document 25-179 Filed 05/15/15 Page 37 of 47 PageID #:
622

37

1  first line on these things, or fairly late in the

2  transaction, and say you need to do this or you'll get

3  enjoined, quite frankly.  All that can help with

4  regards to the incentives.

5  THE COURT:  Once you get to the point

6  of the injunction phase, though, like this would have

7  been a high premium deal.  It would have been a tough

8  call to put that deal at risk, even for a 20-day

9  period to get multiple enhancement, even though I

10 think that ought to be in there.  So it creates this

11 problem.  And it strikes me that, you know, I've

12 got -- part of me thinks that I ought to continue to

13 beat up poor folks, like Mr. Monteverde, for settling

14 easily for this stuff, because maybe next time he

15 takes it and then we get to learn it.  But the

16 alternative, as I say, would be to back off and let

17 fees rise.

18 Have you and Mr. Alexander thought

19 about getting together with the other deans of the

20 Delaware bar and coming up with a model banker

21 disclosure that would, you know, talk about how you

22 put in a reasonable summary of what's in the board

23 book?

24 MR. SCAGGS:  Well, I think there's

CHANCERY COURT REPORTERS

38

1    pieces of that.  That's a great idea, Your Honor.

2    Certainly that kind of document that we could work

3    through in the corporate law section could be very

4    helpful.  Yeah, I think that's a great idea.  In that

5    comprehensive manner, no.  There is talk and there

6    is -- there's a firm that has its memo -- the more we

7    can learn about the Court's attitudes the better,

8    because we all have our memos and what we know should

9    go in.  And then there's the gray areas that become

10   contextual.

11              As far as the economic incentives, I

12   really didn't answer Your Honor's question.  But let

13   me suggest one other perspective, which is this

14   information may get out.  I mean, it's there.  I do

15   have hesitance, as a person who works within this

16   system, that we do get in a situation where there's

17   settlements, and it's a supplement, and we have to

18   come to Your Honor on a disclosure-only settlement.

19   Everybody knows these days this Court is taking hard

20   looks at that.  There's no doubt about that.  It's out

21   there.  I can assure Your Honor, we have able counsel

22   scouring these things and come back.  Then you have

23   this tad better disclosure.

24              One could look at it from a

CHANCERY COURT REPORTERS

39

1   perspective and say this is about right where it

2   should be because these things are happening.

3   Unfortunately, it creates another court evolution, and

4   here we are talking about that.  But whether or not

5   you need to run the fees up and down, we're here in

6   Delaware, the disclosure happened, and we have a

7   midrange fee that wouldn't be considered low enough --

8   they request low enough -- to have them not bring the

9   case, but not so high it could cause other unintended

10  repercussions within the community.  Having said that,

11  I'll sit down.

12          THE COURT:  No, I appreciate it.

13  Mr. Scaggs, insights from you and other folks are

14  always helpful.

15          All right.  Let me go through my tasks

16  for today.  This hearing is for me to consider the

17  proposed settlement in Turberg v. ArcSight 5821-VCL.

18  This settlement will also resolve claims in a related

19  action pending in California, In Re ArcSight

20  Shareholder Ligtigation, Case No. 110-CV-182474.  The

21  litigation concerns the purchase of ArcSight by

22  Hewlett-Packard Company.  The parties have stipulated

23  to a nonopt-out class for purposes of settlement,

24  defined as all record and beneficial holders of shares

CHANCERY COURT REPORTERS

40

 1    of ArcSight common stock, at any time from

 2    September 13, 2010 through and including October 22nd,

 3    2010, including successors in interest, predecessors,

 4    et cetera.   That class is reasonable and adequately

 5    cohesive.   The boundaries which start from the date of

 6    the announcement of the tender offer and go through

 7    the date of the closing of the acquisition make good

 8    sense and properly define the class.

 9                    In terms of the Rule 23(a)

10    requirements, numerosity is readily met.   As of

11    September 1st, 2010, there were 34.45 million ArcSight

12    shares outstanding held by thousands of beneficial

13    holders.

14                    In terms of commonalty, the plaintiffs

15    allege common injuries arising from the defendants'

16    actions that affected all stockholders equally.

17                    In terms of typicality, the class

18    members were affected in their capacity as

19    shareholders and face the same injury from the same

20    conduct.   Each one of those is satisfied.

21                    In terms of adequacy of

22    representation, the plaintiff was indeed a holder of

23    ArcSight stock and retained experienced counsel.

24    These fast-fuse settlements, I think, push the limits

CHANCERY COURT REPORTERS

41

1    on what is adequate representation.  Mr. Monteverde

2    gave me a good explanation this morning that he got

3    into this because of the top-up option.  When I

4    originally was looking at this last night, and in the

5    preceding days talking about it with my clerks, this

6    looked like an arm's-length deal at a significant

7    premium where the plaintiff filed three days after the

8    announcement of the transaction, before the

9    preliminary proxy was out.  Really, there wasn't a lot

10   done.  There were 2,300 documents obtained, no pre-MOU

11   depositions taken.  I'm not asking people to churn,

12   but there wasn't much done here and folks ultimately

13   got a package, a combo platter, to use

14   Blake Rohrbacher's phrase, of disclosures, some of

15   which are nice, none of which are earth shattering,

16   some of which are -- I'll just use the

17   word unimpressive.  So I think about whether or not

18   (a)(4) was met.  But Mr. Monteverde has done a good

19   job explaining to me this morning that it was a

20   different world in September 2010.  It made sense to

21   get into this because of the top-up option.  So I will

22   hold that (a)(4) also is met.

23              In terms of the Rule 23(b)(3)

24   requirements, certification under (b)(1) is

CHANCERY COURT REPORTERS

42

1    appropriate because the prosecution of separate

2    actions by individual stockholders would have risked

3    inconsistent and varying results.  Certification under

4    (b)(2) is also appropriate because the relief is

5    generally applicable to the class.  It would have

6    taken the form of declaratory or likely

7    injunction-type relief.  Here the disclosures are

8    classwide and generally applicable to the class.

9                Finally, the requirements of

10   Rule 23(aa) and Rule 23(e) have been met.  I have

11   reviewed the affidavits of Mr. Turberg and they

12   satisfy the rules.  Therefore I'm certifying this

13   class as a nonopt-out class pursuant to Rules 23(b)(1)

14   and (b)(2) of the Court of Chancery.

15               In terms of notice, the notice was

16   provided in compliance with Rule 23(e).  It accurately

17   described the lawsuit at page two.  It actually

18   described the consideration of the settlement at page

19   three.  It gave the location and time of this hearing

20   at page one and five, and it informed class members

21   where to go if they wanted further information.  It

22   was adequately delivered.  The affidavit of

23   Carole K. Sylvester of Gilardi & Co. LLC affirms that,

24   as of September 6th, 2011, notice was mailed to 7,776

CHANCERY COURT REPORTERS

43

1   potential class members and nominees.

2              In terms of the merits of the

3   settlement, this is another one where I thought hard

4   about it.  In terms of the combo platter of

5   disclosures, particularly the bankers' disclosures,

6   there are things that I think are very helpful.  The

7   additional information is information that, I think,

8   if you were to consider what really constitutes a fair

9   summary, then the background multiples should be in

10  there, just like they're in there when you give them

11  to the board.

12             As I suggested in my conversation with

13  Mr. Monteverde, you would never see a board book that

14  would go to the board without the background

15  multiples.  You would never expect the board to simply

16  hear from the banker, "Oh, well, we selected the

17  range."  And one would not want to defend the due care

18  injunction case where that was the situation.  So I

19  think that that information was certainly helpful and

20  important and supports the settlement.  Some of the

21  other things on the combo platter I am less enthused

22  by.

23             Although the settlement here was

24  relatively small consideration, it was small

CHANCERY COURT REPORTERS

44

1    consideration for quite weak claims.  The principal

2    claim here was a Revlon claim challenging the price

3    and defensive measures.  But the price was really a

4    substantial premium.  And although I am not one who

5    thinks that premium standing alone is evidence of good

6    conduct (one could just as easily get a premium in a

7    hot market where one, had one acted as a responsible

8    fiduciary, could get a bigger premium), this is a

9    situation where, when you read the background of the

10   merger, Morgan Stanley and the board here appear to

11   have done a fine job.  It's hard to quibble with what

12   happened.  They didn't go exclusive.  They contacted

13   six other companies.  They negotiated hard on price.

14   They didn't take the initial deal.  This was a process

15   that really looked good.  So that's another reason why

16   it was strange to me that this was a case that

17   inspired allegations about fiduciary breach, because

18   not only was it a good premium but it was a case

19   where, when you read the background of the merger, at

20   least my impression was that these were properly

21   motivated, well-advised fiduciaries who were doing a

22   great job.  Part of me wondered why this wasn't a

23   situation where the plaintiffs might have just said,

24   "Hey, you know what?  We filed this but there's not

CHANCERY COURT REPORTERS

Case 2:12-cv-02722-CM-KMH   Document 14-4   Filed 03/01/13   Page 45 of 47
Case 1:15-cv-01364-WO-JEG   Document 25-1   Filed 05/16/15   Page 167 of 293   PageID #: 630

45

1    much here.  We're going to go away."  Ultimately, the

2    claims were quite weak and the disclosures do provide

3    sufficient consideration for a settlement.

4              Now, in terms of attorneys' fees,

5    Delaware's goal in awarding attorneys' fees is to

6    provide real rewards for plaintiffs who file real

7    claims and do real work.  Our goal is not to confer

8    socially unwholesome windfalls on people who simply

9    file upon the announcement of a transaction and then

10   don't do very much.  What I have said and what I stand

11   by is that I am going to give some deference to the

12   negotiations of counsel when I think the disclosures

13   fall within the type of range that is not irrational,

14   even if the Court would likely have come to a

15   different view had I considered the matter myself.

16             Here there were disclosures that

17   provide helpful information about the banker's

18   background.  There were some other helpful

19   disclosures.  Had this been a really litigated and

20   contested fee petition, I would have gone through

21   those and given you greater detail about my thoughts

22   and what they were worth.  But because counsel has

23   negotiated the not-outlandish fee of $500,000 for

24   these, I will go ahead and approve the settlement as

46

1    submitted.

2                    MR. MONTEVERDE:  Would Your Honor like

3    a copy of --

4                    THE COURT:  Miss Keener was kind

5    enough to send me a copy.

6                    MR. MONTEVERDE:  Yes, Your Honor.

7    Thank you.

8                    THE COURT:  So I have it.  I'm writing

9    this down.

10                    MR. MONTEVERDE:  I think it's page

11   eight.

12                    THE COURT:  I got it.

13                    MR. MONTEVERDE:  Thank you, Your

14   Honor.  Sorry.

15                    THE COURT:  And I should note that I

16   do not plan to rely on this fee award as an indication

17   of the value of any aspect of this settlement, to the

18   extent there's a future contested proceeding.  I was

19   heavily influenced by the fact that experienced

20   counsel negotiated the amount.  As I say, it was not

21   an outlandish number to come to for a disclosure

22   settlement.  I have said myself that you start from a

23   $4-500,000 range.

24                    I'm also influenced by the fact that,

CHANCERY COURT REPORTERS

47

1   although I think that the payment conceivably could be

2   rich, one could view this as a helpful incentive in

3   terms of trying to get people to put banker disclosure

4   that is more of a fair summary in the initial document

5   as opposed to leaving it out.

6              So I'm handing this to the clerk.   I

7   appreciate everyone coming in today.   Mr. Monteverde,

8   it's always good to see you.   I appreciate your

9   thorough presentation.   Mr. Scaggs, it was good to

10  have your comments.   It's good to see everyone else.

11  Thank you all for your time, and we stand in recess.

12              (Court adjourned at 10:54 a.m.)

13

14

15

16

17

18

19

20

21

22

23

24

CHANCERY COURT REPORTERS

# Exhibit 7



IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                              :
IN RE: GEOEYE, INC.,                          :    CONSOLIDATED
SHAREHOLDER LITIGATION                        :    Case No. 1:12-cv-00826-CMH-TCB
                                              :
                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## ORDER AND FINAL JUDGMENT

A hearing having been held before this Court (the "Court") on __Sept. 6__, 2013, pursuant to this Court's Order dated __June 5__, 2013 (the "Scheduling Order"), upon a Stipulation of Settlement dated April 24, 2013 (the "Stipulation") filed in the above-captioned action (the "Action"), which (along with the Scheduling Order) is incorporated herein by reference; it appearing that due notice of said hearing has been given in accordance with the aforesaid Scheduling Order; the respective parties having appeared by their attorneys of record; the Court having heard and considered evidence in support of the proposed settlement (the "Settlement") set forth in the Stipulation; the attorneys for the respective parties having been heard; an opportunity to be heard having been given to all other persons requesting to be heard in accordance with the Scheduling Order; the Court having determined that notice to the Class (as defined in the Stipulation) was adequate and sufficient; and the entire matter of the proposed Settlement having been heard and considered by the Court,

**IT IS HEREBY ORDERED, ADJUDGED, and DECREED, THIS __6th__ DAY OF SEPTEMBER__, 2013, AS FOLLOWS:**

1.      Unless otherwise defined herein, all defined terms shall have the meanings as set forth in the Stipulation.

2.     The Notice of Pendency of Consolidated Class Action, Proposed Settlement of Consolidated Class Action, Settlement Hearing and Right to Appear (the "Notice") has been given to the Class (as defined below) pursuant to and in the manner directed by the Scheduling Order, proof of the mailing of the Notice has been filed with the Court and full opportunity to be heard has been offered to all parties to the Action, the Class and persons in interest. The form and manner of the Notice is hereby determined to have been the best notice practicable under the circumstances and to have been given in full compliance with each of the requirements of Federal Rule of Civil Procedure 23, due process and applicable law, and it is further determined that all members of the Class are bound by the Order and Final Judgment herein.

3.     Based on the record in the Action, the Court confirms that each of the pertinent provisions of Federal Rule of Civil Procedure 23 has been satisfied, and that the Action should be properly maintained according to the provisions of Federal Rules of Civil Procedure 23(a), 23(b)(1) and 23(b)(2). Specifically, the Court finds that (a) the Class is so numerous that joinder of all members is impracticable; (b) there are common questions of law and fact, including whether the disclosures made by GeoEye in connection with the Merger were adequate, whether the individual defendants breached their fiduciary duties to Class members, and whether Plaintiffs and any members of the Class were injured as a consequence of the Defendants' actions; (c) the claims of Plaintiffs are typical of the claims of the Class in that they all arise from the same allegedly wrongful course of conduct and are based on the same legal theories; and (d) Plaintiffs and their counsel have fairly and adequately protected and represented the interests of the Class. Moreover, the prosecution of separate actions by individual members of the Class would create a risk of inconsistent adjudications which would establish incompatible standards of conduct for the Defendants, and, as a practical matter, the disposition of this Action will

2

influence the disposition of any pending or future identical cases brought by other members of the Class, satisfying Rule 23(b)(1); and there were allegations that the Defendants acted or refused to act on grounds generally applicable to the Class, satisfying Rule 23(b)(2).

4.      The Action is finally certified as a class action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(1) and (b)(2) on behalf of a class consisting of any and all record holders and beneficial owners of GeoEye common stock, along with their respective successors-in-interest, successors, predecessors in interest, predecessors, representatives, trustees, executors, administrators, heirs, assigns or transferees, immediate and remote, and any person or entity acting for or on behalf of, or claiming under, any of them, and each of them, together with their predecessors and successors and assigns, who held shares of GeoEye common stock at any time between and including July 22, 2012 and January 31, 2013, excluding Defendants and their immediate family members, any entity controlled by any of the Defendants, and any successors-in-interest thereto (the "Class"). Robbins Geller Rudman & Dowd LLP, Levi & Korsinsky LLP, and Finkelstein Thompson LLP are finally certified as Class Counsel.

5.      The Stipulation and the terms of the Settlement as described in the Stipulation and the Notice are found to be fair, reasonable, adequate, and in the best interests of the Class, and are hereby approved pursuant to Federal Rule of Civil Procedure 23(e). The Parties are hereby authorized and directed to comply with and to consummate the Settlement in accordance with the terms and provisions set forth in the Stipulation, and the Clerk of the Court is directed to enter and docket this Order and Final Judgment in the Action.

6.      This Order and Final Judgment shall not constitute any evidence or admission by any party herein that any acts of wrongdoing have been committed by any of the parties to the Action and should not be deemed to create any inference that there is any liability therefor.

3

7.     The Action is hereby dismissed with prejudice on the merits and, except as provided herein, without costs.

8.     The Plaintiffs and each and every member of the Class (collectively, the "Releasing Persons") shall be deemed to have, and by operation of the Order and Final Judgment approving this Settlement, shall have, completely, fully, finally, and forever, compromised, settled, released, discharged, extinguished, relinquished, and dismissed with prejudice any claims, demands, rights, actions, causes of action, liabilities, damages, losses, obligations, judgments, duties, suits, costs, expenses, matters, and issues known or unknown, contingent or absolute, suspected or unsuspected, disclosed or undisclosed, liquidated or unliquidated, matured or unmatured, accrued or unaccrued, apparent or unapparent, that have been or could have been, asserted in any court, tribunal, or proceeding (including but not limited to any claims arising under federal, state, foreign, statutory or common law, including the federal securities laws and any state disclosure law, including Sections 20(a) and 14(a) of the Securities Exchange Act of 1934 and Rule 14a-9 promulgated thereunder), whether individual, direct, class, derivative, representative, legal, equitable, or any other type or in any other capacity, against the Defendants, or any of their respective families, parent entities, controlling persons, associates, affiliates, or subsidiaries and each and all of their respective past or present officers, directors, stockholders, principals, representatives, employees, attorneys, financial or investment advisors, consultants, accountants, investment bankers, commercial bankers, entities providing fairness opinions, advisors or agents, insurers, heirs, executors, trustees, general or limited partners or partnerships, limited liability companies, members, joint ventures, personal or legal representatives, estates, administrators, predecessors, successors, or assigns (the "Released Persons"), whether or not each of the Released Persons was named, served with process, or

4

appeared in the Action, which the Releasing Persons ever had, now have, or may have had by reason of, arising out of, relating to, or in connection with the acts, events, facts, matters, transactions, occurrences, statements, or representations, or any other matter whatsoever set forth in or otherwise related, directly or indirectly, to the allegations in the Action, the complaints, the Merger Agreement, the Merger or other transactions contemplated therein, or disclosures made in connection therewith (including any alleged misstatements or omissions or the adequacy and completeness of such disclosures) (the "Settled Claims"); provided, however, that the Settled Claims shall not include any properly perfected claims for appraisal pursuant to Delaware General Corporation Law Section 262, or claims to enforce the Settlement or the right of the parties to enforce the terms of the Settlement.

9.      Defendants and Released Persons shall be deemed to have, and by operation of this Order and Final Judgment approving the Settlement shall have, completely, fully, finally, and forever released Plaintiffs and their counsel from all claims arising out of the instituting, prosecution, settlement, or resolution of the Action; provided however, that the Defendants and Released Persons shall retain the right to enforce in the Court the terms of the Stipulation, and to oppose or defend any appraisal proceeding brought by any Class member.

10.      The releases contemplated by the Stipulation shall extend to claims that the Releasing Persons do not know or suspect to exist at the time of the release, including without limitation those which, if known, might have affected their decision to enter into Settlement. The Settlement hereby extinguishes all Settled Claims, and the Releasing Persons shall be deemed to waive and relinquish, to the fullest extent permitted by law, the provisions, rights, and benefits of any state, federal, or foreign law or principle or common law, which may have the effect of limiting the releases set forth in paragraphs 8-9 above. The Releasing Persons shall be

5

deemed to relinquish, to the extent applicable, and to the full extent permitted by law, the provisions, rights and benefits of Section 1542 of the California Civil Code, which states that:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

The Releasing Persons shall be deemed to waive any and all provisions, rights and benefits conferred by any law of any state or territory of the United States, or principle of common law, which is similar, comparable or equivalent to California Civil Code Section 1542. The Releasing Persons acknowledge that they may discover facts in addition to or different from those that they now know or believe to be true with respect to the subject matter of this Settlement, but that it is their intention to completely, fully, finally, and forever compromise, settle, release, discharge, extinguish and dismiss any and all claims released hereby, whether known or unknown, suspected or unsuspected, contingent or absolute, accrued or unaccrued, apparent or unapparent, which now exist, or heretofore existed, or may hereafter exist, and without regard to the subsequent discovery of additional or different facts.

11.    Plaintiffs' counsel is hereby awarded attorneys' fees and expenses in the amount of $475,000 which amount the Court finds to be fair and reasonable and which shall be paid to Plaintiffs' counsel in accordance with the terms of the Stipulation.

12.    Plaintiffs and the members of the Class, and any of their respective representatives, trustees, successors, heirs and assigns, are hereby individually and severally permanently barred and enjoined from instituting, commencing, prosecuting, participating in or continuing any action or other proceeding in any court or tribunal of this or any other jurisdiction, either directly, representatively, derivatively or in any other capacity, against any of

6

the Released Persons, based upon, arising out of, or in any way related to or for the purpose of enforcing any Settled Claim, all of which Settled Claims are hereby declared to be compromised, settled, released, dismissed with prejudice and extinguished by virtue of the proceedings in this Action and this Order and Final Judgment.

13.     The effectiveness of the provisions of this Order and Final Judgment and the obligations of the Plaintiffs and Defendants under the Settlement shall not be conditioned upon or subject to the resolution of any appeal from this Order and Final Judgment that relates solely to the issue of Plaintiffs' counsel's application for an award of attorneys' fees and expenses.

14.     Without affecting the finality of this Order and Final Judgment, jurisdiction is hereby retained by this Court for the purpose of protecting and implementing the Stipulation and the terms of this Order and Final Judgment, including the resolution of any disputes that may arise with respect to the effectuation of any of the provisions of the Stipulation, and for the entry of such further orders as may be necessary or appropriate in administering and implementing the terms and provisions of the Settlement and this Order and Final Judgment.

Sept. 6, 2013

/s/
Claude M. Hilton
United States District Judge

7

# Exhibit 8

EFiled: Jan 12 2011 9:24AM EST
Transaction ID 35326244
Case No. 5955-VCL

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE


IN RE ART TECHNOLOGY GROUP, INC. :  Consolidated
SHAREHOLDERS LITIGATION          :  Civil Action
                                 :  No. 5955-VCL
                        - - -

                        Chancery Courtroom No. 12C
                        New Castle County Courthouse
                        500 North King Street
                        Wilmington, Delaware
                        Monday, December 20, 2010
                        2:30 p.m.


                        - - -

BEFORE:  HON. J. TRAVIS LASTER, Vice Chancellor.


                 - - -


ORAL ARGUMENT ON PLAINTIFFS' MOTION FOR A PRELIMINARY
           INJUNCTION and RULINGS OF THE COURT

                      - - -

---------------------------------------------------------
                CHANCERY COURT REPORTERS
              New Castle County Courthouse
         500 North King Street - Suite 11400
              Wilmington, Delaware 19801
                   (302) 255-0524

                                                                    2

1    APPEARANCES:

2         CARMELLA P. KEENER, ESQ.
          Rosenthal, Monhait & Goddess, P.A.
3                    -and-
          GINA M. SERRA, ESQ.
4         Rigrodsky & Long, P.A.
                     -and-
5         KIRA GERMAN, ESQ.
          of the New Jersey Bar
6         Gardy & Notis, LLP
                     -and-
7         JOSEPH RUSSELLO, ESQ.
          MARK S. REICH, ESQ.
8         of the New York Bar
          Robbins Geller Rudman & Dowd LLP
9                    -and-
          LOREN R. UNGAR, ESQ.
10        of the Pennsylvania Bar
          The Weiser Law Firm, P.C.
11          for Plaintiffs

12        ROBERT S. SAUNDERS, ESQ.
          STEPHEN D. DARGITZ, ESQ.
13        ELISA M. CANNIZZARO, ESQ.
          Skadden, Arps, Slate, Meagher & Flom LLP
14          for Defendants Art Technology Group, Inc.,
            Daniel C. Regis, Robert D. Burke, Michael A.
15          Brochu, David B. Elsbree, John Robert Held,
            Gregory W. Hughes, Mary Makela, Phyllis S.
16          Swersky, and Ilene H. Lang

17        KENNETH J. NACHBAR, ESQ.
          JOHN P. DiTOMO, ESQ.
18        S. MICHAEL SIRKIN, ESQ.
          Morris, Nichols, Arsht & Tunnell LLP
19          for Defendants Oracle Corporation and Amsterdam
            Acquisition Sub Corporation

20                           - - -

21

22

23

24

                    CHANCERY COURT REPORTERS

3

```
 1                    THE COURT:  Good afternoon, everyone.
 2                    ALL COUNSEL:  Good afternoon, Your
 3    Honor.
 4                    THE COURT:  Mr. Saunders, how are you,
 5    sir?
 6                    MR. SAUNDERS:  Excellent, Your Honor.
 7    Good afternoon.
 8                    If I could just rise for a minute
 9    before the plaintiffs start and introduce my
10    colleagues, Steve Dargitz and Elisa Cannizzaro, from
11    Skadden.
12                    THE COURT:  Okay.  Welcome to both of
13    you.
14                    Mr. Nachbar, hello.
15                    MR. NACHBAR:  Good -- good afternoon,
16    Your Honor.  I just briefly rise to introduce Jim
17    Maroulis, who's in-house counsel at Oracle.
18                    THE COURT:  Okay.  Who is this?
19                    MR. NACHBAR:  Please stand.
20                    THE COURT:  Oh, hi, Mr. Maroulis.  How
21    are you?
22                    MR. NACHBAR:  And Your Honor, of
23    course, knows John DiTomo of my office --
24                    MR. DiTOMO:  Good afternoon, Your
```

4

1    Honor.

2                    MR. NACHBAR:  -- and Michael Sirkin.

3                    THE COURT:  Welcome.  Mr. Sirkin, it's

4    good to see you.  As a former clerk, it's always nice

5    to have you back.

6                    THE COURT:  Good morning -- good

7    afternoon, Ms. Keener.

8                    MS. KEENER:  Good afternoon, Your

9    Honor.  I'd like to introduce plaintiffs' counsel.  At

10   the front table is Kira German of Gardy & Notis; Mark

11   Reich and Joseph Russello, both of Robbins Geller

12   Rudman & Dowd.

13                   MR. RUSSELLO:  Good afternoon, Your

14   Honor.

15                   THE COURT:  Hello.

16                   MS. KEENER:  At the back table, Loren

17   Ungar of The Weiser Law Firm and Gina Serra of

18   Rigrodsky & Long.

19                   MS. SERRA:  Good afternoon, Your

20   Honor.

21                   THE COURT:  Good afternoon.

22                   MS. KEENER:  Your Honor, Mr. Russello

23   has been admitted pro hac vice and will make the

24   presentation on behalf of plaintiffs this afternoon.

CHANCERY COURT REPORTERS

5

1           THE COURT:  Please proceed.

2           MR. RUSSELLO:  Thank you, Your Honor.

3           Your Honor, I want to start off just

4  by pointing out some of the Court's observations at

5  the telephonic hearing that we had in connection with

6  the scheduling of the hearing on this particular

7  motion.  Of course, this motion concerns a request to

8  preliminarily enjoin the December 21st shareholder

9  vote in the proposed acquisition of ATG, Art

10 Technology Group, by Oracle for $6 per share in cash

11 in transaction value, an aggregate of approximately

12 $1 billion.  But what Your Honor so presciently

13 observed during the telephone conference was that, you

14 know, the process resulting in the proposed

15 transaction was a discombobulated and reactive

16 process.  And the facts bear that out, Your Honor.

17          Beginning in 2007, when ATG received

18 two unsolicited expressions of interest, of course,

19 the board immediately hired Morgan Stanley as its

20 financial advisor.  At that point, in connection with

21 the retention of Morgan Stanley, a fee arrangement was

22 negotiated which set $6 per share as the target for

23 any proposed transaction in which Art would be

24 acquired.  As Your Honor is aware, the specific way

6

```
 1  the compensation arrangement worked way back then in
 2  December of 2007 -- I believe the letter -- the
 3  engagement letter was dated December 6th.  It was
 4  signed on December 12th by Mr. Burke, who was the
 5  president, chief executive officer, and the director
 6  of Art Technology.  (Continuing) -- was that for any
 7  transaction which offered shareholders the price of $6
 8  per share or higher, Morgan Stanley would receive a
 9  success fee of 1.3 percent of the aggregate value of
10  the transaction.  With any proposal that offered less
11  than $6, Morgan Stanley would receive 1.1 percent.
12              Now, that is undisputed.  Defendants
13  have now come back and said that that's not an
14  accurate characterization of what had taken place way
15  back in December of 2007.  The proxy, unfortunately,
16  does not make that clear, but I will return to that
17  point in a minute, Your Honor.
18              Moving on from there and with that
19  notion that this $6 target colors the rest of the
20  process, the board moved on with Morgan Stanley and no
21  less than three times attempted to contact Oracle
22  concerning a potential acquisition: once in late 2007,
23  early 2008.  Oracle wasn't interested; again in
24  mid-April 2009.  Oracle conducted due diligence and
```

7

1    advised in late June 2009 it wasn't interested; and

2    the last time in early October 2010 Oracle offered $6

3    per share and, lo and behold, a proposed transaction

4    emerged.

5              But the problem is that this process

6    suffered from a lot of false starts.  At one point in

7    the process, in fact, the board determined to

8    completely abandon the process and remain stand-alone,

9    to pursue its stand-alone business plan.  And the

10   board continued to do that.  However, occasionally the

11   board would receive unsolicited expressions of

12   interest.

13             Now, the issue that keeps popping up

14   and the recurrent theme throughout the whole process

15   is that Oracle is always identified as the acquirer

16   who will be ready to move forward with a transaction.

17   That's the common theme.  The board -- unfortunately,

18   fast-forwarding to 2010, which is really what we're

19   talking about, the process wasn't a three-year-long

20   arduous process.  The company, in fact -- the board, I

21   believe, until October didn't believe the company was

22   even for sale.  Throughout this whole entire time, as

23   far as I understand, the board also had a poison pill

24   in place.  So it's not like the Health Grades

8

1    situation where Vice Chancellor Strine kept opining

2    that a company is not necessarily not for sale unless

3    it has something like a poison pill, something that

4    the public would identify with not wanting to engage

5    in a transaction unless that buyer came directly to

6    the board with a real value-maximizing transaction.

7    That's not what happened here.  The poison pill

8    remains in place the entire time.  And then at some

9    point the board elects to pursue a proposal involving

10   Oracle.

11                 Now, of course, during this time

12   Company H, which we identified as Autonomy, was a

13   company which was interested also in acquiring Art

14   Technology.  Company H's proposal was unsolicited, as

15   were a few other potential buyers.  The process was

16   never actually open.  The defendants say we're

17   actually seeking to have the Court order ATG to

18   conduct a market check of a market check.  Nothing

19   could be farther from the truth.  There was no market

20   check here at all.  But that's besides the point.

21   When Company H expressed the interest, Company H was

22   told "No.  Our valuations, our stand-alone plan

23   supports a far higher valuation than even $6 a share.

24   We need in excess of $6."  Company H offers 5.75.  It

9

1   was an oral proposal.  It wasn't written, but Company

2   H was still interested.  Nevertheless, throughout the

3   entire process, Company H was not told of Oracle's

4   expression of interest.  It is not told that Oracle,

5   in fact, offered $6 per share, which was the exact

6   target set in December 2007.  Company H had no way of

7   knowing this.  And so Company H, of course, was not,

8   we believe, willing to pay against itself.

9             Well, while that's occurring, ATG also

10  considers acquiring another company.  Company G it's

11  known as and referenced in the proxy.  Company G was a

12  smaller company.  A transaction involving an

13  acquisition of Company G would have cost approximately

14  100 to $135 million.  Of course, ATG in February 2010

15  had conducted a very successful secondary offer, which

16  netted the company $95 million.  It was going to use

17  the cash from that offering to finance the acquisition

18  of Company G.  But for some reason the board believed

19  that there was no way to do an acquisition of Company

20  G and move forward with a potential sale of the

21  company.  In fact, there wouldn't have been any reason

22  to sell the company.  It's clear from the record that

23  there was no rush, in fact, to sell this company.  The

24  -- the company had anticipated announcing

10

1  better-than-expected financial results on

2  November 2nd, and yet that became the target date for

3  any potential transaction.  That's, of course, in

4  2010.

5              THE COURT:  Was there any public

6  disclosure that something was going to be set on that

7  date?  I mean, there's a lot of talk in the depos and

8  in the briefing about the idea that that was when

9  management wanted to let the market know about what it

10  was doing or what it was going to be using the cash

11  for.  But had there been any prior conditioning of the

12  market to expect that as the date on which those plans

13  would be announced?

14              MR. RUSSELLO:  As far as I know, Your

15  Honor, there was not any sort of established

16  expectation, from what I understand.  There wasn't a

17  public announcement that, you know, "We're going to

18  use the $95 million from the February 2010 offer, but

19  we're not going to tell you until we announce our

20  third-quarter results on November 2nd, 2010."  I don't

21  believe that -- that urgency ever existed.  In fact,

22  there wasn't, as far as I know, public, you know,

23  instruction to that -- to that extent; yet that's

24  still the recurring point that we constantly hear as

11

1   for why the company was rushing to sell itself.

2                      Now, interestingly, of course, the

3   company had developed these five-year financial, what

4   defense would like to call targets.  They were

5   projections.  They were an estimate of management's

6   best estimate, in any event, of the company's future

7   financial performance going out five years.  It --

8   those projections, I think as Mr. Burke testified,

9   were the subject and the product of a rigorous process

10  that occurred annually and were presented to the board

11  on September 16th, 2010.

12                     Having those projections and doing

13  various financial analyses, the board believed that

14  the stand-alone plan, the company stand-alone plan

15  supported a valuation, again, in excess of $6 per

16  share.  As it turns out, once Oracle made its $6

17  offer, it didn't matter anymore.  That was deemed

18  unfair by the board; yet Company H is still out there

19  with the possibility of perhaps coming in with a

20  superior proposal.  It's never gone back to.

21                     But to go back to the Company G

22  transaction, that was a totally separate transaction

23  that the board had considered.  According to Burke,

24  once again, Oracle wouldn't have wanted to acquire ATG

12

1  had it gone through the Company G acquisition.  It

2  sort of makes no sense to us, however, because if you

3  take the $95 million that the company had on its

4  balance sheet and it puts that toward an acquisition

5  of Company G, which management believed would extend

6  the breadth of ATG services and its footprint, it

7  appears that perhaps the company would have been worth

8  an extra $100 million.  Sure, it had the cash on its

9  balance sheet, but that cash is going to be used to

10 finance the acquisition, presumably.  So it would have

11 been nice to see the company actually think about

12 moving forward with its stand-alone plan; and then at

13 some point, if it wanted to go forward with the sale,

14 which there was no rush to do so, it could have

15 considered those -- those things in kind.  But, still,

16 you have this rushed process.

17            Of course, Morgan Stanley has been

18 doing work since 2007.  And, as Mr. Wyatt had

19 testified, the managing director on this particular

20 engagement for ATG, Morgan Stanley wouldn't have been

21 paid had the board pursued an acquisition of Company G

22 or a like transaction.  It would have never happened.

23 The fact of the matter was, Morgan Stanley was now

24 forced into this window of opportunity, if you will,

13

beginning in -- at some point in 2010, ending

obviously by November 2nd, 2010, where it had to move

forward with a sale of the company or it wouldn't be

paid.  That's just the fact.  Of course, Morgan

Stanley has performed extensive services for Oracle

dating back, as far as we could find, to 2005.  None

of those connections are disclosed in the proxy, but I

would like ultimately to come back to that point.  I

still want to make a few additional points on the

process, Your Honor.

            Of course, when discussions were

taking place with Oracle now in October 2010, the

company had a valuation prepared by Morgan Stanley.

The record is somewhat unclear on what Morgan Stanley

was actually doing.  And the proxy to that extent, as

far as we're concerned, was also somewhat unclear.

But what is clear is that when Morgan Stanley did its

discounted equity analysis in the October 13th

presentation, when it had -- when ATG had received

interest from Oracle and Company H was theoretically

still out there, the higher end of the valuation range

ended at 6.53 per share.  That was based on

management's projections at the time.  Now, Wyatt

testifies he didn't have the five-year projections or

14

1    he would have done a DCF analysis.  Either way, it's

2    unclear what projections Morgan Stanley used; but one

3    thing is certain, that when the November 1st, 2010,

4    fairness presentation was made and an updated

5    discounted equity value analysis was proposed to the

6    board, the higher end of the valuation range all of a

7    sudden dropped by 20 cents to 6.33 per share, leading

8    the board perhaps to believe that the stand-alone

9    value of the company was no longer as high as it could

10   have been.

11                    These are some of the issues that have

12   permeated the entire process.  Where the board is

13   claiming that it did an arduous market check beginning

14   in 2007 and ending in 2010, that's not the case.  It's

15   not the fact.  There was no requirement that a deal be

16   announced by November 2nd; no urgency, despite what

17   internal deadlines the company was setting for itself;

18   and no reason to do that, particularly when the

19   company was serious about acquiring Company G.  It

20   would have made a material impact on the company, as I

21   think Burke testified and we just confirmed as well.

22                    THE COURT:  I mean, I always wonder

23   about when people dial down projections or internal

24   forecasts or targets, whatever you want to call it.

15

1   But here at least, talk to me about the materiality of

2   this change.  The -- the 6 bucks is in the middle of

3   that range, both before and after the shift.  Why is

4   it a big deal?

5                   MR. RUSSELLO:  That's correct, Your

6   Honor.  The $6 always was in the sort of middle of --

7   of the range or the higher end even of the range I

8   would -- I would give you.  The reason why we think

9   it's interesting is that prior to November 1st, of

10  course, and even, I believe, perhaps somewhat prior to

11  that, the board believed that the stand-alone business

12  plan would have supported a valuation in excess of $6

13  per share.

14                  THE COURT:  I tend to view the in

15  excess -- the in excess is messaging to another

16  bidder.  So, you know, that's the type of statement

17  that you could see as a -- as a bargaining posture.

18  So I'm not sure if you can draw an actual firm

19  determination as to the -- the view of the board at

20  that point that, you know, we were clearly north of 6.

21                  MR. RUSSELLO:  Well, the interesting

22  thing about what took place regardless, I suppose, of

23  where the price falls is that it appears that

24  management updated its projections at some point

1  between October 13th and November 1st.  Of course,

2  Mr. Burke testified that he knew as of October 5th the

3  company would be doing exceedingly well, would be

4  beating its estimates most likely.  Somehow there's

5  this manipulation or change -- perhaps it wasn't a

6  manipulation, but a change in updating the projections

7  to reflect a good third quarter and perhaps what they

8  thought was going to be a lackluster fourth quarter.

9  Defendants say that it changed projections by one cent

10 on earnings per share.  However, the October 13th

11 presentation indicates that acquired revenue was

12 included in the revenue figure.  It was $30 million.

13 It was backed out.  Defendants' response, of course,

14 is that revenue had no impact on earnings per share

15 because it was sort of earnings neutral, I suppose.

16 But be that as it may, it still contributed to perhaps

17 the stand-alone value of the company.

18               I'd like to get back into the acquired

19 revenue issue as I touch on some of the disclosures

20 because we still think it's a material issue.  But, in

21 essence, Your Honor correctly points out the number

22 was still within that range.  However, we think that

23 those changes, which do not appear to have been

24 adequately disclosed or explained to the board, that

17

 1    those changes are something that sort of add to the

 2    totality of this rushed process to just get something

 3    done which would justify our need for a lower price.

 4    That's kind of where we think that's a material issue

 5    and why it's important to us.

 6               The proxy, of course, doesn't make it

 7    clear necessarily.  There is a disclosure that there's

 8    an updated analysis, but nobody knows what that means

 9    and nobody knows, for instance, that the company in

10    October -- on October 13th was valued somewhat higher

11    than on November 1st.  We don't have something like a

12    discounted cash flow analysis which would have been a

13    better indicator of the future value of the company,

14    notwithstanding the fact that there were these

15    five-year projections out there.

16               Now, Your Honor, I think that that --

17    that essentially sums up our -- our discussion of the

18    proxy, although there are certain cases that I wanted

19    to address up-front because I know that they must be

20    on Your Honor's mind and I'm sure defendants are going

21    to bring them up at some point.

22               But in particular, the Lyondell case,

23    that was a case, of course, that the Delaware Supreme

24    Court held that the board, even assuming that it

18

1   hadn't done anything, did a good enough job, in

2   essence.  And I might be mischaracterizing that a bit.

3   But the -- the point of that case, I think, was that

4   there was a price that was regarded as not only a home

5   run but a blowout price.  And what ultimately happened

6   there was that the board actually was able to

7   negotiate the price upward from $40 to $48 a share.

8                    Here, instead, what the board did was,

9   Burke instructed a -- its -- his counsel, essentially,

10  ATG's counsel to take Oracle's offer letter, to cross

11  out the number 6, to write in 6.25 and fax it back

12  without any follow-up, no response, no discussion, no

13  nothing.  That's what sets this case apart from ones

14  like Lyondell and the others that will be raised

15  today.  It's because the board actually didn't do

16  anything.  It didn't do anything to get a higher

17  price.  It set the $6 target three years ago, and

18  ultimately it was sort of a self-fulfilling prophesy.

19  It was $6 a share.  It was accepted.  No -- no further

20  negotiation, and that was the end of it.

21                    But what I think is also interesting

22  here -- and this ties into our disclosure issues -- is

23  that, as I had mentioned previously, there's no

24  mention that in December 2007 the $6 per-share price

19

1   was actually set in Morgan Stanley's engagement

2   letter.  Now, there is a disclosure that says the

3   engagement letter provides for X, Y, and Z concerning

4   compensation.  But what -- what the disclosures

5   requiring shareholders to do is to assume that in 2007

6   the $6 per-share price was set and that, indeed, the

7   price never moved from there.  However, the first

8   mention, I believe, of $6 per share in the proxy is in

9   the September-October time frame.  There's absolutely

10  no reason why a reasonable shareholder would make that

11  assumption, that leap of faith three years ago.

12              So that's one material fact we believe

13  needs to be disclosed.

14              THE COURT:  Before you get to the full

15  disclosure barrage, what can you tell me about

16  negotiation of the termination fee?

17              MR. RUSSELLO:  Negotiation of the

18  termination fee, Your Honor, you know, I don't recall

19  whether in fact there were any real material

20  discussions concerning the termination fee.  I do know

21  that we view the totality of the protections to be

22  sort of the issue here.  The termination fee, standing

23  alone, doesn't necessarily pose as much of a problem

24  if you view it in isolation; but in connection with a

20

1    matching rights provision, a nonsolicitation

2    provision, a voting agreement, poison pill, and

3    staggered terms of office for the board, that's what

4    poses an issue for us.

5                        THE COURT:  The thing that seemed to

6    be tied to price was exclusivity.  It didn't seem like

7    the termination fee, at least in terms of discovery

8    you all took, had any link to price or other material

9    terms; is that correct?

10                       MR. RUSSELLO:  As far as I understand,

11   that is correct, Your Honor.

12                       Moving on from there, Your Honor,

13   really, what we view as perhaps the most material

14   deficiency in the proxy is its implication that Morgan

15   Stanley has performed the same magnitude and amount of

16   services for each of ATG and Oracle over the past two

17   years.  It's simply not true.  The facts that we've

18   uncovered in fact indicate that Morgan Stanley has had

19   quite a long-standing and extensive relationship with

20   Oracle, dating back at least to 2005.

21                       THE COURT:  Yeah.  What is Exhibit U?

22   I mean, it's a summary prepared for somebody.

23                       MR. RUSSELLO:  Yes, Your Honor.

24   Exhibit U actually was prepared for our benefit and

21

1   was prepared by counsel for Oracle concerning the

2   engagements that Morgan Stanley has performed and the

3   other work that Morgan Stanley has performed, as well

4   as a statement and itemization of the fees that Morgan

5   Stanley has received for that work only over a

6   four-year period, however.

7                    THE COURT:  Oracle prepared this as

8   part of the discovery process?

9                    MR. RUSSELLO:  Yes, Your Honor, that's

10  correct.  And, in fact, Morgan Stanley prepared a like

11  document which we submitted in connection with our

12  reply.  We hadn't received that document prior to the

13  end of depositions.

14                   THE COURT:  Okay.

15                   MR. RUSSELLO:  And so that's what this

16  document is, Your Honor.  But that doesn't even tell

17  the full story necessarily, because as you can see,

18  Your Honor, in Exhibit U, the -- the emphasis is more

19  on the fact that Morgan Stanley's but one of 17

20  banking houses, as if to say that the business that

21  Morgan Stanley generates from Oracle is not material

22  as a result of the small contribution it might make to

23  Morgan Stanley on the whole.

24                   Of course, the materiality

22

1   determination does not rise or fall on what perhaps

2   Morgan Stanley believed or even what the board

3   believed, the subjective views of the board.  I think

4   that's a statement from Zirn.  But, in fact, it all

5   hinges on what a reasonable shareholder would believe.

6   And given the information that's in the proxy, a

7   reasonable shareholder could never discern, No. 1,

8   that Oracle had all these engagements with Morgan

9   Stanley and continues to to this day, including 2007,

10  as I think the Morgan Stanley statement of services

11  confirms, but that by contrast, Morgan Stanley

12  performed only one item, really, of work for ATG

13  which, incidentally, happened to be the February 2010

14  offering for which Morgan Stanley served as an

15  underwriter and received a fee commensurate with its

16  role there.

17              In total, we estimate the value of the

18  services that Morgan Stanley has performed for Oracle

19  in the past four years to be approximately

20  $24 million, if not higher.  Morgan Stanley actually

21  received $8 million for its work as Oracle's financial

22  advisor on the -- on the Siebel acquisition, Your

23  Honor, and that was paid in 2006 for an engagement

24  that occurred in 2005.

23

1              THE COURT:  What generates the

2   negatives?  --these guys were holding some of it for

3   themselves?

4              MR. RUSSELLO:  Well, your Honor, I

5   believe that -- we -- we don't necessarily have it in

6   the record, Your Honor, but I believe that that

7   reflects a counterparty relationship, perhaps for

8   swaps, something of that nature.  Unfortunately, it's

9   not in the record.  But what we do know is that Morgan

10  Stanley has lent hundreds of millions of dollars to

11  Oracle -- it was a Morgan Stanley bank, a Morgan

12  Stanley affiliate -- pursuant to revolving credit

13  agreements.  In addition, Morgan Stanley actually

14  served as an underwriter on billions of dollars of

15  debt offerings, some of which were used to finance

16  Oracle's acquisition of Sun.  So there is this very,

17  very detailed, long-standing extended relationship

18  here.

19              Of course, to add insult to injury in

20  this particular case, and contrary to what Mr. Wyatt

21  implies, which is that, of course, he didn't work for

22  any -- for Oracle in connection with any engagements,

23  Mr. Kwan and Mr. O'Keefe did in fact work for Oracle.

24  They worked for Oracle in connection with the three

24

1    investment banking engagements we've identified in

2    2005, and Kwan additionally worked on a financing job

3    for Oracle.  So there is some overlap there to the

4    extent that the Court would find that to be a material

5    factor in its decision.

6                    Those facts, we think, need to be

7    disclosed, the extent of the relationship so that

8    shareholders can determine for themselves the level of

9    credibility to assign to the fairness opinion.  Surely

10   it would be important for a shareholder to know -- and

11   it might even change a shareholder's vote -- if it

12   knew that Morgan Stanley at the same time it was

13   representing ATG had Oracle's interests at heart and

14   the prospect of earning even higher fees from Oracle

15   going out in the future.  These are material facts,

16   and we think that the case law establishes that.

17                    THE COURT:  Have you all compared

18   Exhibit U to your reply Exhibit 3?  And do they all

19   match up?

20                    MR. RUSSELLO:  There are some

21   differences.  I think the counterparty arrangements

22   are not necessarily reflected on the information we

23   received from Oracle's counsel, but there -- there

24   could be an explanation for that.  I mean, we had

25

1    sought information concerning debt offerings,

2    investment banking services, other financing

3    activities.  And then you'll see that there's a

4    miscellaneous category on the Oracle statement of

5    services.  So perhaps those fees are reflected there.

6              But I think, for the most part, the

7    benefits that Morgan Stanley has received, at least

8    going back four years, totals to at least 24 to

9    $27 million, not including the investment banking

10   services Morgan Stanley performed in 2005 other than

11   the Siebel acquisition.

12             THE COURT:  Now -- and the four-year

13   thing, is this just semantics?  Because it says "Over

14   the last four years," but then it discloses, at least

15   in U, going back to 2006.  I mean, you count '6, '7,

16   '8, '9, '10, that's actually covering five years.

17             MR. RUSSELLO:  It actually is, Your

18   Honor.  And what's interesting is that if you take the

19   estimate for miscellaneous services I think is

20   $1.5 million a year and you add that on top, that will

21   only makes the fees higher.  So it conceivably could

22   be.  We -- we had said in our complaint alleged claims

23   going back, I suppose, to 2005 with regard to the

24   connections to show how extensive those connections

1    really are, because one factor we have considered is

2    that Oracle does most of its investment banking

3    in-house now in terms of financial advisory services,

4    which is fine; but, of course, that's not the same

5    thing as saying Morgan Stanley would not want this

6    business and it makes no difference in the bottom line

7    whatsoever.  Nothing could be further from the truth.

8    That makes no sense to us.  That's why we think the

9    facts are material regardless of how Morgan Stanley

10   might view them in the grand scheme of its revenue.

11                    So that's a significant point for us.

12                    THE COURT:  What type of disclosure do

13   you want on that?

14                    MR. RUSSELLO:  Well, initially we

15   would want disclosure at the very least going back

16   four or five years, indicating to shareholders what

17   Morgan Stanley specifically has done for Oracle.

18   Oracle makes disclosures like this, by the way, in its

19   offering materials.  It made a disclosure like that --

20   I think we pointed out in the brief -- in connection

21   with one of its debt offerings, that the underwriters

22   have performed these services in the past couple years

23   and they know what services they are.  We'd like a

24   similar disclosure and perhaps also a disclosure

27

 1   concerning the amount of fees that Morgan Stanley has

 2   received, the totality of those fees, because that

 3   would then put in perspective the investment banking

 4   fee that Morgan Stanley is receiving on the deal,

 5   which was largely tied to the consummation of the

 6   deal.

 7                  THE COURT:  I guess to be more

 8   specific, coming in here I was thinking that

 9   essentially what you wanted to disclose was Exhibit U.

10   Now, Exhibit U has differences than Exhibit 3.  So

11   which one do you want and how would you structure

12   this?

13                  MR. RUSSELLO:  I would say let's see

14   which one is higher, Your Honor.  In all seriousness,

15   we would be satisfied with a disclosure of the

16   counterparty relationship, Your Honor, because as you

17   can see I think in the Morgan Stanley statement, money

18   changes hands back and forth, you know, millions and

19   millions of dollars because of those relationships.

20   So we wouldn't necessarily need Morgan Stanley to

21   quantify "Well, in 2007 we received $2 million and

22   paid it right out pursuant to some counterparty

23   relationship"; but certainly some sort of

24   quantification is in order here and some indication of

28

1    magnitude of these services.  And that's really what

2    we're getting at.

3              If you read the disclosure the way it

4    is in the proxy statement, it suggests that Morgan

5    Stanley, as I said before, has performed the same

6    amount of services for each of ATG and Oracle, and

7    it's just misleading.

8              THE COURT:  And how do we determine

9    how far back to go?

10             MR. RUSSELLO:  Well, the investment

11   banker relationship ended, I suppose, in 2005, but

12   fees were still paid out in 2006.  Perhaps we do go

13   back to 2005 just so shareholders can see that.  If

14   Oracle would like to include a statement in the proxy

15   that it now does most of its investment banking

16   services or financial advisory services in-house,

17   that's fine, but certainly some indication of

18   magnitude.

19             But I think even if you go back two

20   years, you still have a material relationship here and

21   it's still probably significant enough to be disclosed

22   to shareholders, just to give some idea of this

23   relationship.

24             So quite honestly, Your Honor, some

29

```
 1    reasonable parameter of disclosure here.  We wouldn't
 2    want to necessarily open up the floodgates, although
 3    there are certainly enough engagements to fill up the
 4    floodgates.  But, you know, we would like some
 5    disclosure of that just so shareholders can see,
 6    because everything rises or falls at the end of the
 7    day on this fairness opinion.  And everything rises
 8    and falls at the end of the day on the $6 target; and
 9    everything rises and falls, of course, at the end of
10    the day on the efforts the board exerted to extract a
11    higher price, in this case nil.
12                  So it's exceedingly important to get
13    disclosure on those relationships out.  And it was
14    simple to do.  This is information within Oracle's
15    possession.  ATG conceivably had access to it through
16    Morgan Stanley or otherwise.  It would have been easy
17    to do.  It would have been keeping in line perhaps
18    with what Oracle has done.  They didn't want to do it
19    for some reason, and it makes no sense to us.  And the
20    only thing -- the only conclusion we can draw from
21    that is that perhaps when those facts are disclosed,
22    they're going to have some influence on what
23    shareholders think about the fairness opinion.  And
24    that would perhaps allow shareholders to think about
```

30

1    what they want to do.

2                    But the disclosure of that

3    information, along with perhaps a modified go-shop,

4    which we could take care of at the same time here,

5    wouldn't result in any harm, as far as we can see, to

6    defendants.  It would just simply delay the

7    shareholder vote with the hopes that perhaps a higher

8    bid would come out somewhere.

9                    THE COURT:  What do you mean by

10   "modified go-shop"?

11                   MR. RUSSELLO:  A modified go-shop in

12   the sense that we -- we essentially want a go-shop.

13   Perhaps it was -- perhaps it was misspeaking with "a

14   modified go-shop."  But essentially a time period

15   within which ATG actually shopped the company, could

16   actually look at other buyers, perhaps even financial

17   buyers, which, for some reason, Morgan Stanley thought

18   would be interested.

19                   THE COURT:  How do I do that?

20                   MR. RUSSELLO:  Well, I think, Your

21   Honor, the best way conceivably to do it would be to

22   hold off the shareholder vote for perhaps

23   approximately a month; allow there to be some -- some

24   period of time for the company to actively go and

31

1    solicit potential buyers or perhaps even to make an

2    announcement that it is fielding offers from potential

3    buyers, because, of course, we still have the poison

4    pill in place, which Oracle's exempted from and nobody

5    else is -- its Not for Sale sign, as I said earlier --

6    and you have these other protections, but allow the

7    market to actually know that this company's for sale,

8    not that it's tied up, not that the deal was tied up

9    with Oracle, when the board never made an effort to go

10   and see who was interested in purchasing the company;

11   and perhaps also require the company to set this

12   process up, with our input, to make sure that the

13   shareholder base would be satisfied with the efforts

14   that are being done and to allow that process to take

15   place.  If nothing emerges, there's no harm, there's

16   no foul.  The shareholder vote goes forward, hopefully

17   with all material information disclosed, and

18   everything proceeds apace.

19              There hasn't been an indication that

20   Oracle's walking away if that happens.  In fact,

21   Oracle, it seems, went through great pains not to say

22   that, it's not going to abandon the deal.  So why not

23   actually open the process up.  That would ameliorate

24   any harm that was occasioned by the board's failure to

CHANCERY COURT REPORTERS

32

1   do so.  And it would actually allow, I think, the

2   market to understand that this company was for sale,

3   which is a difference from some of the other cases,

4   frankly, that are decided out there where an

5   injunction just was not obtained for Revlon reasons

6   because the market knew these companies were for sale

7   and no one approached them.  That's entirely different

8   from here.  There were some unsolicited bids, but it's

9   unclear what would have happened had the process been

10  open to allow that interest to come through.

11            Moving on to some additional issues,

12  Your Honor, I'd like to now touch on the acquired

13  revenue issue, which, for us, is a major point; to

14  them it's not so important.

15            The acquired revenue -- of course, the

16  proxy indicates that acquired revenue was revenue

17  that -- that the company could anticipate sort of

18  incorporating into its own revenue on a going-forward

19  basis should the company remain stand-alone; but the

20  proxy indicates that acquired revenue was not revenue

21  from any specific transaction.  It was not revenue

22  from any identified transaction necessarily, and there

23  could be no guarantee, in fact, of the acquired

24  revenue at some point would be realized.

33

1            But what the proxy doesn't disclose --

2    because that acquired revenue, I should say, as an

3    aside, obviously contributes to the -- to management's

4    view of the stand-alone value of the company.  But the

5    acquired revenue does not include Company G's revenue,

6    which the proxy indicates.

7            But why we thought it would be

8    important to include Company G's revenue is because if

9    this transaction did not materialize, if this

10   transaction were not to close, ATG would seek to move

11   forward with its acquisition of Company G.  It would

12   do that.  But the acquired revenue figures, even

13   without Company G, really reflect management's efforts

14   to back into a revenue figure.  There's no rhyme or

15   reason.

16           And we have a document that we had

17   cited, Your Honor, that confirms that, that, in fact,

18   the acquired revenue figure was simply to match up

19   growth rates for organic and inorganic revenue.  So it

20   really had no basis, completely hypothetical; yet

21   defendants come back and say that Company G's revenue

22   would have been a hypothetical; also, that it was

23   speculative to disclose how that would impact the

24   company's own revenue, when its own acquired revenue

34

1   figures are completely pulled out of the air.

2                  THE COURT:  Have you seen any type of

3   internal projections that had Company G revenue in

4   them?

5                  MR. RUSSELLO:  Yes, Your Honor.  We

6   did actually -- defendants have indicated that the

7   projections for Company G came from Company G, that

8   they were not worked up for management.  But there are

9   figures in the hundreds of millions of dollars.

10                  THE COURT:  Where?  I mean ...

11                  MR. RUSSELLO:  Excuse me, Your Honor?

12                  THE COURT:  Where?

13                  MR. RUSSELLO:  I will find a cite to

14  that, Your Honor.

15                  THE COURT:  What's on page 34 of the

16  proxy, that's what everybody agrees doesn't have

17  Company G in it.

18                  MR. RUSSELLO:  That's right.  Those

19  are the backed-in acquired revenue figures, Your

20  Honor.  Those are the figures that management sort of

21  just --

22                  THE COURT:  And, also, everybody

23  agrees that these were the figures that were from

24  September, basically.  And if we look -- if we look at

35

1    some hypothetical set of numbers that Morgan Stanley

2    used in its updated figures, that line for acquired

3    revenue would have had blanks all the way across.  It

4    wouldn't have changed the bottom line.  It just would

5    have blanks all the way across; is that right?

6                    MR. RUSSELLO:  Well, theoretically,

7    Your Honor.  Of course, we're still not clear on this

8    record whether Morgan Stanley used the five-year

9    projections or just the management case and the street

10   case, which are on the next page, 35.  It's unclear.

11   I mean, why it says that they -- that Morgan Stanley

12   wasn't in possession of these five-year projections or

13   perhaps that they didn't think the projections were

14   reliable enough even though they were the subject and

15   product of rigorous analysis and it was par for the

16   course for the company to develop them; and yet they

17   supposedly weren't used.  But the acquired revenue

18   figure matches up to the October 13 presentation.  So

19   it's unclear which ones they used here.  The proxy, we

20   think, suggests that Morgan Stanley did not use the

21   five-year projections; but, again it's -- it's simply

22   unclear to us.

23                    To go back to Your Honor's request for

24   more detail on Company G projections, it was Exhibit

36

1   A -- X to the Brian Long affidavit.  It was ATG 2117

2   to 2120 at 2119.

3              THE COURT:  Okay.

4              MR. RUSSELLO:  And so there, Your

5   Honor, can see that there were revenue and EBITDA

6   numbers going out through 2012.  They must have been

7   reliable enough for Company G to disclose them.  We

8   think that there's no reason why they at least

9   shouldn't have been incorporated into the acquired

10  revenue that the company itself was disclosing, if

11  that's what, indeed, it was going to do, which it

12  signed a nonbinding letter of intent to do so in the

13  absence, of course, of this transaction.

14             THE COURT:  There's no Morgan Stanley

15  analysis that does that; right?

16             MR. RUSSELLO:  As far as we

17  understand, there's not, Your Honor.

18             And then finally, Your Honor, that

19  brings me back to the Morgan Stanley valuation

20  analysis, which I think we already just touched on

21  with regard to the sort of updated projections that

22  management at some point gave to Morgan Stanley, which

23  were used in the -- in the November 1st presentation

24  but not the October 13th presentation, notwithstanding

37

1    the fact, of course, management expected to have a

2    great year or great quarter as of October 5th.  So

3    that's something else that we think should be

4    disclosed, Your Honor.

5              Finally, it brings me to the net

6    operating loss carryforwards.  That's our last issue,

7    Your Honor.  The net operating loss carryforwards, of

8    course, were used as an advocacy point in a script

9    that Morgan Stanley prepared in connection with the

10   Company H proposal.  That's at Exhibit L to the Long

11   affidavit, ATG 328.  And specifically, Morgan Stanley

12   had essentially said that "Listen, the net operating

13   losses that this company has are not incorporated, do

14   not materialize, are not realized in our stock price.

15   That's extra value to you."  Of course, when Oracle

16   came along, as far as we could find, there was no

17   mention of these net operating losses anywhere to be

18   found.  But if they supported, indeed, a higher price

19   for the company, why wouldn't they have been used in

20   that context?

21             Either way, we think that it adds to

22   the value of the company on a stand-alone basis; and

23   there should have been, at the very least, some

24   disclosure concerning it, notwithstanding the fact, of

38

1    course, that there was a disclosure of net operating

2    losses in the 10-K, in the company's 10-K.  It should

3    be disclosed in connection with the transaction.

4                    That's our position on that issue,

5    Your Honor.

6                    THE COURT:  But why isn't the

7    10-K enough?

8                    MR. RUSSELLO:  Excuse me, Your Honor?

9                    THE COURT:  Why isn't the 10-K

10   disclosure enough?

11                   MR. RUSSELLO:  There's just -- there's

12   just a disclosure in the 10-K concerning net operating

13   losses the company has.  There's no real reference to

14   that as adding value to the company necessarily, but

15   that those net operating losses could be used in the

16   future at some undetermined time.  And, of course,

17   presumably there's some sort of expiration that's

18   associated with those net operating losses.  But if it

19   was important enough to express to Company H, the

20   company that the board never went back to, really, to

21   tell that Oracle's offer existed, the figures were

22   important enough to use in the context of

23   negotiations, to the extent there were any, with

24   Oracle.

CHANCERY COURT REPORTERS

39

1          That concludes my opening

2 presentation, Your Honor, unless Your Honor has any

3 questions.

4               THE COURT:  No, I don't.  Thank you.

5               MR. RUSSELLO:  Thank you, Your Honor.

6               MR. SAUNDERS:  Good afternoon again,

7 Your Honor.

8               THE COURT:  Good afternoon again.

9               MR. SAUNDERS:  I feel like I've fallen

10 down a rabbit hole a little bit.  Let me try to bring

11 us back to reality.

12               Your Honor, it's almost Christmas.  So

13 why don't we focus on the things that really matter,

14 as people like to say this time of year.

15               This is an application for a

16 preliminary injunction.  So naturally the first thing

17 I think we ought to focus on is where's the

18 irreparable harm.  Indeed, I think that question can

19 be refined as where's the threat of irreparable injury

20 that is so grave that it would justify taking away

21 from the stockholders of this company the ability to

22 accept or reject, as they see fit, this 43 percent

23 premium that they're being offered the opportunity to

24 accept tomorrow?

40

1            And, you know, lost in all the legal

2   wrangling here, completely absent from the plaintiffs'

3   presentation is the fact that, on its face, this is a

4   terrific deal.  And I say that because $6 is a

5   43 percent premium over the stock price the day

6   before.  And that's not a 43 percent premium over a

7   stock price that suffered a decline.  It's a

8   43 percent premium over a stock price that had already

9   increased dramatically over the preceding quarter.

10            And it's not as though 2010 by itself

11   was a tough year for the stock price.  The stock had

12   not traded as high as this price, $6, since the

13   dot.com bubble burst.  It had managed to get into the

14   4s in 2007 time frame, and then it dipped down again

15   with the economy in '08 and '09; came back a little

16   bit, bounced around but never was in the 4s until just

17   recently again.

18            The company was able to raise stock in

19   February, as the plaintiffs point out, raise a million

20   dollars at a price of $3.50.  So to be able to turn

21   around less than a year later and sell the company at

22   $6 is, on its face, a great deal.

23            And in recognition of those facts, as

24   of noon today, two-thirds of the outstanding shares

41

1    have been voted in favor of this transaction,

2    representing 99.71 percent of all of the shares voted

3    have been voted in favor.  Only 0.29 percent have

4    either been voted against or withheld.  The

5    stockholders clearly want this deal, Your Honor.

6              THE COURT:  I'll give you credit for

7    the two-thirds stats.  On the majority of the

8    outstanding, I don't understand the relevance of the

9    99 percent voting shares.  I've never gotten it.  I

10   know they cited it in Lyondell.  I don't get it,

11   because, you know, people vote no by not voting.  But

12   I -- two-thirds is a good number.  I give you credit

13   for that.

14             MR. SAUNDERS:  Okay.  Well, thank you.

15             I think there are also some people who

16   don't vote because they didn't hold on the record date

17   and you don't know what exactly is in that nonvoting

18   portion.  It's not all people who don't like the deal.

19             But I would submit there's nothing

20   that's even close to sufficient in this record to

21   warrant preventing the ATG stockholders from deciding

22   for themselves tomorrow whether they want to accept

23   $6.  Certainly, Your Honor, not the process claims,

24   not the Revlon claims.

42

1           Time and again this Court has

2 recognized that the potential harm to stockholders

3 from enjoining a premium transaction when there's no

4 higher, better offer on the table prohibits an

5 injunction.  Vice Chancellor Strine said just a few

6 months ago in the Health Grades transcript that we

7 attached to our briefs and described in the brief that

8 the list of cases -- cases -- he wasn't happy to just

9 say never.  He had to say something a little bit more

10 complicated.  He said it was the null set, right, the

11 list of cases in which this Court has ever enjoined a

12 premium transaction in the end because of a higher and

13 better offer.  And consistent with that fact, the

14 plaintiffs haven't pointed to one because there aren't

15 any.

16           And so the legal reality is that as

17 much as I'd like to and as much as I will talk about

18 the process, Your Honor doesn't need to and no point

19 will be served, no purpose will be served by trying to

20 make a preliminary determination on this necessarily

21 preliminary record about whether the plaintiffs have a

22 reasonable likelihood of success on a Revlon claim or

23 not, because whatever you determine preliminarily,

24 okay, based on what you've read in the papers and what

43

1  you've heard today cannot matter, because you cannot

2  enjoin this transaction on Revlon -- on the basis of

3  Revlon claims when there's no higher or better offer.

4              Now --

5              THE COURT:  Let me ask you something.

6  You know, look, I agree with you, going back to

7  Solash, that's been the view as to the transaction as

8  a whole.  But what about a limited injunction based,

9  for example, solely on the termination fee?

10              MR. SAUNDERS:  Well, first of all,

11  Your Honor -- I guess two things.  First of all, the

12  termination fee is entirely -- is 3.25 percent of the

13  transaction value.  It's entirely within the range of

14  reasonable termination fees.

15              Secondly, you know, sometimes I get

16  settlement demands from plaintiffs when I represent

17  the target and they say "We want you to lower the

18  termination fee.  We want you to increase the price."

19  I say "Great," you know.  And so I would turn to Mr.

20  Nachbar, but his obvious answer is going to be and,

21  therefore, my answer's going to be "They're not bound

22  to go forward with the deal at a lower termination

23  fee.  They don't have any obligation to accept any

24  amendment to the merger agreement at all," right?  And

44

1   so that -- because of that, it affects my clients and

2   the stockholders that they care about, because there's

3   no sensible allegation here that Oracle has aided and

4   abetted in any way, had some reason to know that

5   agreeing to a 3.25 percent termination fee would be a

6   breach of fiduciary duty.  So they're not going to be

7   bound by that at all.  And, therefore, any injunction

8   to try to enjoin consummation of the transaction

9   pending different terms threatens $300 million, real

10  value in -- to be destroyed for these stockholders.

11  It just isn't justified.

12          So the only thing -- again, what

13  matters.  The only thing that could conceivably under

14  our law be a basis for an injunction today would be

15  disclosure issues, okay, because, you know, the law

16  recognizes that material omission or misstatements,

17  you know, can be the cause of irreparable harm.

18          But even then, Your Honor, you have to

19  balance the threat of irreparable harm from a possibly

20  material omission.  And, again, all you could possibly

21  do today will be to make a preliminary determination

22  based on this necessarily preliminary record.

23          You've got to balance that threat

24  against two things, okay.  One, the threat of, I would

45

1    say, similar magnitude, that during any period of

2    delay something bad happens, right, the world changes,

3    Oracle decides to call a MAC, and we've all lost $6 a

4    share because of that delay.  I'd say those threats of

5    irreparable harm tend to balance out.

6                    But there's another thing, Your Honor,

7    on the scale against an injunction; and that is the

8    absolute real, concrete, know-it's-going-to-happen

9    loss of value from delay, time value of money, okay.

10   This is a billion-dollar deal, okay, a billion dollars

11   and change.  Even if the only delay is a week -- and I

12   heard Mr. Russello talk about a month.  Let's say it's

13   only a week to make a supplemental disclosure.  And I

14   don't know how long the plaintiffs think it would --

15   it's necessary to have supplemental disclosure out

16   there, but let's say conservatively it's only a week.

17   That's $2 million in lost value to the stockholders

18   between getting $6 and getting $6 a year later on a

19   billion-dollar transaction.

20                    So as you go through each of these

21   disclosure issues, the question you have to ask

22   yourself is not simply "Gosh, would it be nice, might

23   this be interesting to stockholders, but is it

24   sufficiently important" -- "am I sufficiently

46

```
 1   confident that this will be sufficiently important to
 2   stockholders that they would give up $2 million to
 3   have that information."  Do you think they're likely,
 4   when they get the supplemental disclosure and know
 5   that the meeting has been adjourned, to say "Gosh, I'm
 6   really glad I got that extra information.  And if it
 7   cost me $2 million, that's worth it"?  Or are they
 8   likely to say "What the heck just happened?  How come
 9   I lost $2 million of value just to get this?"  What do
10   you think they're going to say?
11                I would suggest that for each of these
12   claims, as we go through it, that the stockholders are
13   likely to say "I want my money.  I didn't really care
14   about that."
15                Now, I'd suggest to you that there's
16   an easy way to try to put a pin on that -- on that
17   point and get it resolved, okay?  Make people stand
18   behind what their assertions are.  The plaintiffs
19   spent a lot of time complaining in their papers about
20   skewed incentives that Morgan Stanley had, right?
21   What about the incentives that the plaintiffs have
22   here?  And it's not their fault.  It's the way the
23   system sets it up, right?  But if the plaintiffs were
24   to look at this deal and say "Wow, that's a great deal
```

47

1    and the proxy, well, it goes overboard.  They disclose

2    projections that weren't even relied upon by the

3    investment banker.  They've got four years of history

4    there, that's a great proxy," and they wave their hand

5    and say "Oh, great."  They wouldn't earn a fee because

6    they wouldn't have caused anything through litigation,

7    okay?  And yet if they're able to delay the

8    transaction, okay, if they're able to hold it up in

9    some way, then they can earn a fee.  So obviously we

10   can see what their incentives are.

11                   And, Your Honor, I'd suggest, in order

12   to try to even that up a little bit, to ask the

13   plaintiffs to put their money where their mouth is,

14   right?  Are they willing to post an injunction bond,

15   okay?  I'm not even going to get to the $300 million

16   potential loss if the deal goes away; just the loss

17   that we know is going to happen if there is a delay,

18   the time value of money.  Are the plaintiffs going to

19   post a $2 million injunction bond?  If after trial,

20   summary judgment, whatever happens, full record, Your

21   Honor concludes that these were, in fact, material

22   issues, then they suffer no loss and they're, in fact,

23   going to get a fee based on that because they will

24   have caused those disclosures.  If Your Honor

48

```
 1    concludes on a full record that they weren't material,

 2    okay, then the stockholders would be protected because

 3    the bond would protect them for their loss of value.

 4                   THE COURT:  I was thinking about -- I

 5    thought about roughly similar numbers to where you are

 6    in terms of time-value-of-money issues.

 7                   The thing that I wondered about,

 8    though, is, you know, the drop-dead date isn't for

 9    awhile yet.

10                   MR. SAUNDERS:  Correct.

11                   THE COURT:  So how do I know in terms

12    of time value of money how quickly you'll close after

13    the vote?

14                   MR. SAUNDERS:  Well, I think it's -- I

15    think the plan's to close immediately.  But I guess

16    what I would say is that, in any event, whatever date

17    that is, it's going to be an extra week.  I don't

18    think -- there's no regulatory approval or anything.

19                   THE COURT:  That's what I was

20    wondering, but there's nothing -- everything is gotten

21    as far as that goes.

22                   MR. SAUNDERS:  Correct.  It plans to

23    close immediately after the vote.

24                   Your Honor, I want to say one other
```

49

```
 1   thing about these disclosure issues, because it always

 2   struck me as a little bit odd the way we do this here

 3   and particularly in contrast with the federal system.

 4   There is -- there's a complete absence of proof from

 5   the plaintiffs here on the question of materiality,

 6   okay.  Our cases say materiality is a mixed question

 7   of law and fact, okay?  There's not a single piece of

 8   evidence that the plaintiffs have offered to try to

 9   show materiality.  There's no affidavit from any of

10   the plaintiffs saying "This would be really important

11   to me.  Here's the way I decide how to vote.  This is

12   a factor that would matter."  They haven't attached

13   any analyst report for any of the analysts that cover

14   the company to show "Look, this analyst thinks this

15   piece of data would be relevant."  You know, there's

16   ISS and Glass Lewis who are out there, who are the

17   companies that do independent governance proxy

18   analysis, right.  They haven't -- plaintiffs haven't

19   offered one of those reports to show any of those

20   folks are looking at any of those issues and asking

21   any questions, right.  There's certainly no expert

22   testimony, okay.

23                    Now, I know that that's typically the

24   way that it happens in this Court on injunction
```

50

hearings, is that people just make arguments and they
toss it out to the judge to try to decide "Gosh, do I
think a reasonable stockholder would care."  But you
would never dream of going into federal court in a
10b-5 case where the standard is supposed to be the
same, materiality, and going to trial in a securities
fraud case without putting on evidence of materiality,
right?  You have your plaintiff testify about "Hey, I
never would have bought the stock if I had known
this."

          You have -- on the defense side you
have expert witnesses who do event studies and show
that the information didn't move the market, right.
And yet the plaintiffs, you know, seem to come in with
absolutely no evidence and just toss it up to Your
Honor and say -- you know, give you this.  And -- and
that can't be --

          Another thing that's clear under our
law is that the plaintiffs have the burden of proof on
disclosure issues, and in the absence of evidence,
they can't possibly have met that burden.

          THE COURT:  I mean, look, you know me.
I'm always interested in better ways to do things.
What do you think we ought to do?  What's the right

51

1   answer in this?

2              MR. SAUNDERS:  Well, I think -- I

3   don't think it's that complicated.  I think it's

4   simply require the plaintiffs to put on some proof

5   that supports a determination of materiality.  I mean,

6   they're essentially asking Your Honor to be the

7   expert, right?  Not simply weigh the evidence and

8   apply the law to the evidence but to be the expert on

9   what stockholders care about, right?  And I -- I don't

10  know how you can do that.  I think the easy solution

11  is for the plaintiffs to, you know, offer some

12  evidence, the same way people do in securities cases,

13  to try to prove materiality, a statement from somebody

14  that says "I would care."

15             THE COURT:  Yeah.  The -- along those

16  lines, the one that is of most interest to me is the

17  historic fees on the Oracle side for Morgan Stanley.

18  And I think part of the reason I can overcome

19  tentatively the issue that you're raising,

20  Mr. Saunders, is that, you know, I have here an

21  argument that a similarly-sized fee incentivizes

22  Morgan Stanley to get a better deal.  So it seems to

23  me if that argument is being made, it's a reasonable

24  inference to say that compensation on the other side

52

 1  would have some incentive and, therefore, you know,

 2  would be material to a stockholder.

 3              MR. SAUNDERS:  But I think the

 4  critical difference there, Your Honor, is, you know,

 5  future money versus past money, right?  I mean, it's

 6  just like the debate we have in the country with

 7  respect to tax rates.  The way to incentivize

 8  somebody's conduct in the future is by offering to pay

 9  them money in the future if something happens, right?

10              Having paid Morgan Stanley money in

11  the past, right, doesn't make -- give Morgan Stanley

12  an incentive to act in a particular way with this

13  transaction, right; whereas having a retention

14  agreement with Morgan Stanley that promises to pay

15  them a fixed percentage of whatever the transaction is

16  obviously gives them an incentive to have a

17  transaction be as big as possible.

18              THE COURT:  Uh-huh.

19              MR. SAUNDERS:  Your Honor, I guess I'd

20  just like to, with those sort of preambles, the lack

21  of evidence and the request for, at a minimum, a bond

22  on the -- if there's going to be a disclosure

23  injunction, I want to start taking you through the

24  issues.

53

1          There are three that seem to be put in

2     the category of not really omissions but something

3     that's misleading.  The first is this -- the notion

4     that the board targeted a price of $6 three years ago

5     or at least that it's -- it entered into this

6     agreement with Morgan Stanley in 2007 and should

7     disclose that the terms of that agreement was

8     established in 2007.

9          Your Honor, the proxy says -- as we

10    pointed out in our brief, the proxy says that ATG

11    engaged Morgan Stanley in December of 2007; and it

12    says what the terms of the engagement are, including

13    the fact that Morgan Stanley gets one percent if it's

14    up to $6 and then a higher percentage if it's more

15    than $6.  I can't imagine that it would be worth

16    $2 million to stockholders to now have an extra

17    sentence that says "And, oh, by the way, we agreed

18    upon the terms of the engagement at the time of the

19    engagement."

20          The second issue is -- and -- and I'm

21    sorry.  I should make one more point there.  The -- I

22    think this is sort of a back-door-process kind of

23    claim rather than disclosure claim; but the plaintiffs

24    say in their reply brief, "Oh, and the company never

54

1    revisited this compensation arrangement."  But I don't

2    think anybody would have wanted them to, for the

3    reason I described.  The stock price went down.

4                    THE COURT:  Right.  No.  This was a --

5    this was a pre -- it was antediluvian fee agreement,

6    and we've actually come through the trough and we're

7    back where the fee agreement actually makes sense

8    again.

9                    MR. SAUNDERS:  Exactly.

10                   The second point is the -- the price

11   negotiations.  And I thought -- I understand -- I

12   don't think it has any merit, but I understand the

13   process claim.  "You didn't negotiate," okay.  I do

14   not understand the disclosure claim, okay.  The

15   proxy -- and, you know, I skimmed on this, but I want

16   to make a point.  The -- on page 11 of the reply brief

17   the plaintiff -- the plaintiffs say, "The Proxy was

18   deliberately drafted to be vague and to convey an

19   impression of greater vigor in the parties'

20   negotiations."

21                   Your Honor, that is just an

22   irresponsible statement.  There is absolutely nothing

23   in this record -- and I would have thought it was

24   conceded in the rest of the reply brief -- to support

55

 1   the notion -- certainly the plaintiffs don't cite

 2   anything -- to support the notion that anybody here

 3   did anything deliberately wrong.  Instead, their

 4   entire argument is, "Well, even a disinterested and

 5   independent board can make mistakes."  That's just not

 6   an appropriate statement.

 7                  At worst, maybe the plaintiffs are

 8   going to be able to "Well, I gotcha" and persuade the

 9   Court that the proxy should include some other detail

10   here or there.  And that's the risk that you always

11   take when you decide to fight a disclosure case, and

12   we'll accept that risk.  But there's absolutely no

13   basis for the accusation that somebody deliberately

14   drafted the proxy to be vague.

15                  Okay.  On the merits.  The proxy says

16   "We sent Oracle comments on their proposal letter,

17   including a request to increase the price to 6.25."

18   The proxy says Oracle responded the same day and

19   rejected that price increase, right?  And then it says

20   "but agreed to a limitation on the time of

21   exclusivity," and then it says we entered into an

22   exclusivity agreement.  There's no explanation from

23   the plaintiffs at all how that is supposedly

24   misleading and would suggest the existence of greater

56

1    negotiations in that time frame.

2              The proxy is perfectly clear.  What we

3    did was, we sent them a markup.  They said no on the

4    price issue.  That's precisely accurate.  And our

5    cases are very clear that you don't have to slap every

6    paragraph of a proxy with "We didn't have a meeting,

7    we didn't yell at them, we didn't try to persuade,"

8    whatever it is, the 10 things that we didn't do.  You

9    have to say what you did do, not what you didn't do.

10             The third in this category of

11   allegedly misleading disclosures is the Morgan Stanley

12   valuation.  And I -- and I confess I'm not really sure

13   what the claim is as it stands now after the reply

14   brief and the argument.  The original claim in the

15   opening brief had been that Morgan Stanley had

16   manipulated one of its valuation methodologies; that

17   is, the discounted equity value method, by using lower

18   revenue forecasts in the final fairness book than are

19   used in October -- in September and October.  And then

20   we offered the affidavit of Mr. Wyatt because

21   plaintiffs never bothered to ask Mr. Wyatt about this

22   in his deposition.  Never gave him an opportunity to

23   explain.  This was just a theory they came up with for

24   their brief after the fact.  So we asked Mr. Wyatt by

57

1    an affidavit to explain that those revenue forecasts

2    are completely irrelevant to the discounted equity

3    value because it's all driven by EPS and because the

4    company had not projected margins and expenses and

5    costs associated with acquired revenue; it was -- it

6    was earnings neutral.

7              After that what seems to be left is

8    just sort of a generalized statement of "We want more

9    stuff about how we got from the numbers that were used

10   in September and October to the numbers that we used

11   in the fairness book."  And, Your Honor, I guess two

12   things about that.

13             One, it makes me feel damned if you do

14   and damned if you don't in the sense that, you know, I

15   think it would have been completely consistent with

16   the precedent of this Court for us not to disclose the

17   numbers that were in the five-year plan because they

18   were not the numbers that were relied upon by the

19   investment banker in its final fairness opinion.

20             But because the board had them,

21   because it was fairly recent, because let's just get

22   it all out there, we included them in the proxy, okay.

23   And if you look at those charts, I mean, you can see

24   exactly the difference the plaintiffs have identified.

58

1   If you look at the five-year plan numbers and look at

2   the estimated earnings for 2012 -- I'll point Your

3   Honor to the page.  If you take a look at page 34 --

4                    THE COURT:  Yep.

5                    MR. SAUNDERS:  -- this has the chart

6   of the financial metrics from the five-year plan.

7   Right in the middle of that under the 2012 estimated

8   column, "Net income per share (non-GAAP)" is 30 cents,

9   okay?  There it is.

10                    Then if you look to the next page, 35,

11   okay, this is the management case that was relied upon

12   by Morgan Stanley ultimately.  Bottom right-hand

13   corner, 29 cents, okay.  Perfectly obvious, that from

14   between September and November 1st there was a one

15   penny per-share change in management's expectation,

16   target, whatever, for 2012 earnings, okay, one penny a

17   share at 0.29.  And, in fact, the proxy says why.  It

18   says, "In October 2010" -- page 34 -- "based upon the

19   previously described financial targets" -- the ones

20   just above, right -- "and our results for the quarter

21   ended September 30th, 2010, we provided Morgan Stanley

22   with updated targets of our revenue," et cetera, et

23   cetera.

24                    They'd gotten to the end of the third

59

```
 1    quarter.  Management updated its forecast, provided
 2    the update to Morgan Stanley.  And so the number
 3    changed, and it changed -- Your Honor made the point
 4    in response to the plaintiffs' presentation -- in a
 5    way that could hardly be called material.  This is one
 6    metric of a dozen that Morgan Stanley used, right,
 7    that's presented on the football field, and it moves
 8    by 20 cents, as Your Honor pointed out.
 9              And I think the last thing I'd point
10    out as well is, this doesn't -- if you get the
11    chronology right, okay, there's nothing about this
12    that leads to any suggestion of nefariousness or
13    manipulation, okay.  If you -- because if you look at
14    the September 16th workbook, okay, when the only offer
15    that's on the table is the 4.30 to 4.85 one from
16    Company H, okay -- Oracle's not on the scene, yet,
17    okay -- that football field is, across the board,
18    lower, okay, than the fairness book.  Every single
19    metric on that football field is lower or the same.
20              So there's absolutely no reason to
21    conclude that Morgan Stanley thought "Okay, now we're
22    talking about an Oracle deal.  We got to tank the
23    valuation so the board will be fooled into accepting
24    that."  Everything went up, from before it was on the
```

60

1    scene until after.

2                    All right.  Now we have the three

3    omissions that were Mr. Russello's three issues from

4    the scheduling conference.  And the first is the -- is

5    the Morgan Stanley work for Oracle in the past.  Your

6    Honor, we touched on this -- we touched on this before

7    a little bit.

8                    I would submit that there's absolutely

9    nothing remarkable about any of the additional

10   information that the plaintiffs have.  The proxy says

11   -- the proxy discloses that Morgan Stanley has done

12   work for Oracle, okay.  If anybody cares about that --

13   and, again, there's absolutely no evidence that

14   anybody does.  But if anybody is interested enough to

15   wonder about the quantification of that, they can do

16   exactly the same work that the plaintiffs did before

17   they filed their amended complaint of looking at the

18   public records that -- in which Oracle discloses -- or

19   it's obviously identified Morgan Stanley as somebody

20   who represented them in some underwriting or something

21   like that, okay.  And there's no allegation that any

22   of the fees that were earned on any of those

23   publicly-disclosed things were disproportionate so

24   that, you know, there's some inference to be drawn

61

1    that Oracle has paid off Morgan Stanley in the past

2    with above-market rates in order to get favorable

3    treatment, right?

4               Also, just what are the numbers here?

5    Oracle is a $150 billion company, does work with 17

6    different investment banks.  Morgan Stanley is just

7    one of them.  And it's not as though from Morgan

8    Stanley's perspective, which is what would matter,

9    this is a material client.  It's something like

10   two-hundredths of one percent of their revenue

11   throughout this period, right, from -- from Oracle.

12   Not something that would cause this Court, if we were

13   talking about a director or lawyer or some advisor,

14   you know, like an investment bank being conflicted.

15   We would not think under the precedence that 2/100ths

16   of one percent of your revenue would amount to show

17   conflict.  I can't imagine the stockholders would,

18   either.

19               This is not -- this is not Hammons,

20   you know, the case that the plaintiffs rely on in

21   making this argument.  It was a very different case,

22   both factually and procedurally, as we pointed out our

23   brief, right.  It was different factually because

24   there the banker -- I think it was Lehman -- was- at

62

1    the same time it was representing the target, was --

2    other people within Lehman but still Lehman -- having

3    discussions with the buyer about providing postmerger

4    financing.  So, again, that was not just we got

5    somebody in the past but the potential for money in

6    the future.  That is the kind of thing that affects

7    people's incentives, okay?

8                    And -- but beyond even that critical

9    factual distinction, okay, there was the procedural

10   distinction; that is, Chancellor Chandler in Hammons

11   wasn't deciding is there a reasonable likelihood of

12   success on this.  He was simply deciding "I'm not

13   convinced as a matter of law this is immaterial.  So

14   I'm not going to give the defendants summary

15   judgment."  Not a very powerful argument for

16   concluding, Your Honor, that these things are

17   reasonably likely to be -- that the plaintiffs are

18   reasonably likely to succeed on this here.

19                   No other case -- there's no case that

20   I'm aware of that has ever required disclosure -- held

21   that a disclosure like this is material.  Plaintiffs

22   are just making it up.  And I -- I -- again, there's a

23   complete absence of proof on the question of whether

24   anybody would really care about this.

63

1              The next is the acquired revenue

2    question.  You know, I scribbled down the quibbling

3    Mr. Russello said in the context of this point that,

4    you know, "The facts were unclear to us."  Exactly,

5    Your Honor.  And that's on them, okay.  They didn't

6    ask any questions at depositions to try to find out

7    what is the fact here that they would like us to

8    disclose.  In fact, when -- when you -- I also wrote

9    down "completely hypothetical," right.  Plaintiffs'

10   counsel says that the acquired -- the acquired revenue

11   figures that were in the five-year plan were

12   completely hypothetical.  Yeah, that's right, and

13   that's why there's no obligation to disclose them or

14   make a big deal out of them, okay.  What we're

15   supposed to disclose is facts, okay.  And what the

16   plaintiffs are supposed to come forward with if they

17   want to press a disclosure claim is a fact, not just

18   an unanswered question.  Even based on the plaintiffs'

19   counsel own statements, it has to be misleading for us

20   to include that.

21              Now, the -- Your Honor had some

22   back-and-forth with counsel on this point.  I want to

23   be crystal-clear, because the record is crystal-clear.

24   The document that counsel referred you to that has

64

1    Company G revenue numbers in it is exclusively from

2    Company G.  Mr. Burke testified very clearly that

3    those numbers were not vetted by ATG management at

4    all, didn't have any view on whether they were

5    reasonable or reliable or not; just a Company G

6    document.  And there is no other document.

7                   Now, the -- I think the last point I

8    want to make on -- on the acquired revenue question is

9    the Santa Fe case that we -- excuse me -- cited in our

10   brief.  Just really exactly on this.  Santa Fe was a

11   case where Santa Fe entered into an agreement to merge

12   with Burlington Northern.  And the plaintiffs, as one

13   of their disclosure claims, argued that the proxy

14   statement should include projections that had been

15   prepared -- they don't actually exist in this case,

16   but in Santa Fe there actually were projections for a

17   combination between Santa Fe and Kansas City Southern,

18   which was a railroad that Santa Fe was looking in

19   buying.  And the Court of Chancery, affirmed by the

20   Supreme Court explicitly on this issue, said not

21   material because that's not what the deal is, okay.

22   That's not what was presented to stockholders, X or Y.

23   It was X or not X, essentially.  And the same thing is

24   true here.

65

1              The -- the testimony is unrebutted

2     from Chairman Dan Regis that Company G is gone, okay.

3     Maybe if the stockholders vote it down, maybe if we

4     call them up and say "Please, would you talk to us

5     again?"  But it's completely speculative that that

6     opportunity is available.  So if somebody wants to

7     bring a derivative claim and say the board dropped the

8     ball and let Company G go, then, fine.  That's -- you

9     can bring that claim.  But the disclosure question

10    here is not do you want Oracle or do you want Company

11    G.  It's do you want Oracle or do you want nothing,

12    okay?

13              All right.  Last -- last disclosure

14    claim, Your Honor, is NOLs.  Again, I had to write it

15    down.  "As far as we could find" counsel said.  "As

16    far as we could find, there was no discussion."  They

17    didn't ask a single question in any of the depositions

18    about the NOLs.

19              So, again, Your Honor, those are the

20    things I think are potentially important, okay, the

21    things that might potentially warrant injunctive

22    relief, which is the application that's here today.

23              I'm happy also to talk about the

24    Revlon claims, because there's -- if Your Honor wants

66

```
 1   to reach the issue, I'd submit that there's absolutely

 2   no reason for Your Honor to conclude, albeit

 3   preliminarily, that the plaintiffs have any likelihood

 4   of success on these claims.

 5                   THE COURT:  Yeah.  And I'll tell you

 6   where I am on that.  I think in terms of taking away

 7   the whole deal decision, that doesn't make any sense

 8   to me at all for the Solash v Telex reason.  I -- I

 9   completely empathize with you on that.  And, look,

10   even assuming these guys -- I don't think they were,

11   but even assuming they were total dunderheads, you

12   could blunder backwards into a decent price that the

13   shareholders ought to be able to get a chance to

14   accept or reject.

15                   What I'm not really clear on is, this

16   is a case where the -- it was a single-bidder

17   strategy.  And while all of the deal protections are

18   in customary forms and combinations, they're all at

19   the aggressive side of the range.  So you've got a

20   two-day notice plus five-day match -- five-business

21   day match.  You've got 3.25 on the termination fee.

22   You've got a no-shop that's framed in terms of, you

23   know, "constitute a breach" as opposed to softer

24   language.  You know, all those things are things that
```

67

```
1    seem more apropos of something that follows some type
2    of canvass, even a private canvass as opposed to
3    something where you go straight to your one bidder.
4    That's -- that's the part that I'm having trouble
5    with.
6              And in terms of the injunction risk,
7    you know, it's not clear to me that the conditions to
8    close would give Oracle a walk right for, you know, a
9    10- or 15-day or 20-day injunction against the
10   termination fee.  And so the irreparable harm calculus
11   and the balancing is working differently in my mind
12   than were I to issue some type of deal injunction
13   where I am completely on board with what you're
14   saying.
15             MR. SAUNDERS:  Okay.  Your Honor, let
16   me -- let me try to address a few things.  I mean, I
17   think -- sort of starting at the top, I think,
18   respectfully, that this is one of the -- the key
19   strategy of the plaintiffs in presenting their case is
20   to characterize this as a single-bidder strategy.  And
21   critically it's not.  This is a -- this is a market
22   check that worked.  And, okay, it was a targeted
23   market check, but it's, I think, fundamentally
24   different from the situation where we had -- take
```

68

1    Pennaco, for instance, or -- or Dollar Thrifty, any of

2    those cases that are single-bidder situations where

3    the company engages in discussions with one person

4    only from the very beginning, okay, and that's the

5    only person they talk to, and then they rely on the

6    postagreement market check, okay.

7                    This is not what happened here.  What

8    happened here, we were approached by someone else,

9    okay.  We spent months in discussions with them, okay.

10   Got -- from August and September, right; got them from

11   an original proposal of 4.30 to 4.85 all the way up to

12   soft and squooshy indication of interest of 5.75,

13   right, a bigger increase, by the way -- Mr. Dargitz is

14   useful -- a bigger increase than the increase that was

15   negotiated in Lyondell, okay?

16                   So having gotten the unsolicited

17   bidder up from 4.30 to 4.85 up to potentially 5.75 and

18   very attractive, "Gosh, that would be great if we can

19   get it," the company then said "All right.  Let's do a

20   market check.  Let's check that value and let's go

21   first to the company that is most likely" -- I mean,

22   we've always identified as -- not because there's

23   anything nefarious, but because they're the obvious

24   people to go to.  They're the obvious people who are

69

1    going to pay the most for this company, with the

2    biggest -- the most synergies and see if they'll match

3    or exceed 5.75; right?

4                    So this is emphatically not a

5    single-bidder situation.  We negotiated with Company

6    H, got them to dramatically improve, and then went to

7    a market check to the obvious person to go to and they

8    beat it.  You know, this was not, for instance, the

9    situation where we started at so much a lower number

10   and worked them up.  We went to them with a target.

11   We're talking to someone else, right.  "Are you

12   interested in talking 6 or more," right, or "more than

13   6?," right?  So very emphatically not a single-bidder

14   strategy.

15                   Secondly, you know, I appreciate the

16   -- the questions that Your Honor's raising; but I --

17   it's a little bit unfair in the sense that the

18   plaintiffs haven't, okay.  There was not a single

19   question, again, at any of the depositions, any of the

20   three depositions about any of the deal protection

21   measures, not a single question about "Why did you

22   agree to this?  Who asked for it and when?  Did you

23   think it was reasonable?  Why did you think it was

24   reasonable?  What did you talk about in the boardroom

1 | about it?"  Not a single question like that.

2 | So if there's a -- if there's an

3 | absence of record, once again, on the deal protection

4 | measures and how, when they were negotiated and why,

5 | that is all on the plaintiffs.

6 | THE COURT:  Yeah.  Look, I'm -- I

7 | agree with you wholeheartedly on that.  I mean, I

8 | would like to know, for example, if the 3.7 -- I mean

9 | if the 3.25 was, you know, a Toys 'R' Us-style

10 | conversation versus -- at least as the picture is

11 | painted right now, I think it's the -- plaintiffs

12 | didn't develop this more -- it's that the initial

13 | trades were timing and price.  And I don't even know

14 | when the term. fee gets cut.  I don't know if it was

15 | a, you know, 4, 2, 3.25 pro forma back and forth or

16 | whether there's an actual tug over it.

17 | MR. SAUNDERS:  Right.  You don't,

18 | because you haven't been presented with -- with any of

19 | those facts because the plaintiffs didn't ask.

20 | Your Honor, I -- I -- I guess I have a

21 | few more things I wanted -- I want to say.

22 | And I -- I appreciate that you're with

23 | me on -- on Solash versus Telex and -- so I won't give

24 | you the whole story; but I do want to say a couple

71

1  things.

2              I -- I do want to say that the

3  consistent threat on the board's process here

4  throughout this time frame is open-mindedness, okay.

5  And I can understand why sometimes open-mindedness

6  might seem, I don't know, the opposite of

7  single-mindedness but, frankly, that's a good thing.

8  I think we want our boards in the state to be open to

9  all alternatives.

10             And the fact that throughout this

11 process the board executed on its business plan but

12 was very willing to listen to anybody who had an

13 interest in something that might be more valuable than

14 that business plan was also interested in exploring

15 how they might be able to execute on the business plan

16 even better by acquiring some other company that would

17 have a good fit.  All that is very good and exactly

18 what we want people to do.  And the false dichotomy

19 that plaintiffs want to set up, are you for sale or

20 are you not for sale, really doesn't work for what

21 this board did.  They were always willing to consider

22 whatever option is going to create the most value for

23 stockholders.

24             Again, I guess two other things on the

72

1  process, just from the 30,000-foot view.  The entire

2  board's completely disinterested and independent.  The

3  argument that had been made in the opening about the

4  CEO, one thing, you know, lucrative employment, fell

5  away in the reply because it's perfectly clear there

6  were absolutely no employment negotiations before the

7  merger agreement was signed and what discussions they

8  had afterwards.  They had reached an agreement.  Mr.

9  Burke's last day of work is tomorrow.  He is not going

10  to work for Oracle.  So that's done, okay.  Absolutely

11  no conflict on the part of any -- any member of the

12  board.

13          Secondly -- and I think this is, you

14  know, a very important fact to distinguish from Health

15  Grades and many of the other cases where the Court's

16  expressed concern, is, this was a board-directed

17  process, okay.  There's not a single decision, as you

18  go through the chronology, where Mr. Burke or

19  management or Morgan Stanley is off freelancing, okay.

20  If you -- you track through the proxy, the minutes,

21  the record that supports it, right, every single

22  decision, okay, "What are we going to say," "Who are

23  we going to say it to," "Who are we going to talk to?"

24  is a board decision, exactly the way it should be.

1              THE COURT:  Help me on the anchoring

2      on November 2nd.

3              MR. SAUNDERS:  Sure.

4              THE COURT:  Because that does seem to

5      me like where it was something that it was almost a

6      quasilegacy focal point that maybe could have been

7      reconsidered.  But push back on me on that.

8              MR. SAUNDERS:  Sure.  Fair enough.

9      And I do think -- it's not in the record, at least I

10     don't think it is; but certainly my understanding

11     about the way the world works generally is that people

12     announce when they're going to announce.

13             THE COURT:  Sure.

14             MR. SAUNDERS:  And that's why I

15     believe that that would -- that date had been out

16     there.  And we could find it for Your Honor if it

17     matters, but it's not currently in the record.

18             But I -- I think this sort of -- the

19     string of dominoes is the company had raised a hundred

20     million dollars back in February.  Mr. Regis

21     testified, you know, unrebutted that it was the view

22     of the board that if we get to that earnings

23     announcement and we haven't explained in a reasonable

24     and profitable way to the market what we're doing with

74

1   that money, they will have a negative reaction to

2   that, the cash is still just sitting there.  So we

3   feel very strong motivation of the board to announce

4   something by November 2nd, okay.  And clearly, until

5   Company H came along and started the process, the

6   thing that they were hoping to announce then was

7   Company G, okay.  So we're working down the path

8   towards Company G, okay.

9                   But it's also clear once Company H

10  comes in and Oracle comes in that the advice that the

11  board is getting from Morgan Stanley is, those are

12  inconsistent paths.  And that's clearly what Mr. Regis

13  testified about, that from the perspective of Company

14  G, right, you know, we're talking to them; but if we

15  get acquired by somebody else, you know, there's

16  really no reason to believe they're going to hang

17  around, okay.  They don't know if they want to be

18  acquired by Oracle or whether a totally different

19  deal.  And from the perspective of Oracle and Company

20  H, nobody's going to believe that they would be

21  interested in an ATG-Company G combination, okay?

22  Plaintiffs' counsel says liberally, "Well, if it

23  increases value, why wouldn't anybody want it?"  But

24  it's a very different company to acquire.  At a

1   minimum, you'd be back to restarting your due

2   diligence.  And to -- you know, then beyond that,

3   trying to understand Company G, what are these

4   companies going to be like together?  Are they going

5   to generate synergies together?  Are they going to

6   work out together?  All those are reasons why the

7   board felt that -- the board got advised and thought

8   it made sense that these were mutually exclusive

9   trackings.  So they go down those tracks trying to

10  keep both balls in the air as long as possible until

11  they can make a decision on which one is better and

12  have confidence that the one they're choosing is

13  better is going to happen.  And that doesn't happen

14  until October 22nd, right.  But, still, because there

15  was that deadline out there of November 2nd and the

16  earnings release, we need to tell the market something

17  or we're going to suffer.  That's what started that

18  train -- this train of dominoes.

19              THE COURT:  Yeah.  I think the -- the

20  part that makes it a little odd is the -- is the

21  trade-price-for-time issue.  If you think you've got

22  Oracle at 6, then, you know, short term, if the market

23  questions you on November 2nd, I mean, I guess Oracle

24  would recut at that point.  That would be the fear.

76

```
 1              MR. SAUNDERS:  Yeah.  I mean, if you
 2   look at -- I encourage you to take a look at -- I
 3   think it's Exhibit O to Mr. Long's affidavit that was
 4   submitted with the opening brief.  It's the Morgan
 5   Stanley presentation from October 13th, okay.
 6              THE COURT:  Yep.
 7              MR. SAUNDERS:  And that presentation
 8   has -- it has the list of background and then it has
 9   some possible scripts, Alternative A, Alternative B,
10   right, where Alternative A is -- it's called something
11   like accept and run forward and Alternate B is, you
12   know, reject and negotiate, something like that.
13              THE COURT:  Uh-huh.
14              MR. SAUNDERS:  And it identifies pros
15   and cons.  And one of the cons of rejecting, right, is
16   Orion, which is Oracle, you know, may go away.  They
17   don't say "go away."  They say "may lose Orion" or
18   something like that is the language, right?
19              So, I mean, there we are.  The board's
20   given the presentation, right.  And from its expert
21   advisor that identifies this as one of the key cons of
22   proceeding that way, I don't think that within the
23   extremely broad purview of a range of reasonableness
24   that a board gets to act even in Revlon, right, that
```

77

1    the weighing of those pros and cons, you know, is

2    something that you can think that the plaintiffs have

3    a likelihood of success on.

4                    (Reviewing)  Okay.  I think that's --

5    again, I'm happy to go over any more questions Your

6    Honor has about the chronology, but I think that

7    covers what I would like to say for now.

8                    THE COURT:  Thank you, Mr. Saunders.

9    Very helpful, as always.

10                   MR. SAUNDERS:  Thank you, Your Honor.

11                   THE COURT:  Good afternoon, Mr.

12   Nachbar.

13                   MR. NACHBAR:  Yes.  I'll be very

14   brief.  I join in Mr. Saunders' excellent remarks, and

15   I'll try not to repeat them, or at least not too much.

16                   The transaction will close

17   immediately, to answer one of Your Honor's questions.

18   That's the plan, absent an injunction.

19                   I guess I would like to touch briefly

20   on -- on Morgan Stanley and the work it did for

21   Oracle, because I know Your Honor had questions about

22   that.  Obviously the proxy does disclose that Morgan

23   Stanley did work for Oracle and that information is

24   publicly available.  The plaintiffs found it.  It's in

78

1    their amended complaint.  If it were really that

2    important to others, analysts and, you know, people

3    like that, ISS, it was out there.  They could find it.

4                   But -- but let's step back a little

5    bit and look at plaintiffs' theory, because

6    plaintiffs' theory is, well, Morgan Stanley's

7    incentives here are an issue because, you know,

8    they -- they're supposed to be working for ATG.  And

9    they did do an offering for ATG and, you know, they

10   made a lot of money doing that.  But gee, they've done

11   some work for Oracle and so, therefore, it's like

12   they're, you know, bribed or something.  You could

13   question their integrity.  That's the theory.

14                  Well, that theory makes no sense when

15   you're talking about something that is 25/1,000ths of

16   one percent.  You know, if it were 5 percent of Morgan

17   Stanley's revenues or 5 percent of Mr. Wyatt's bonus

18   was tied to Oracle work, you'd have something and --

19   and you would have to disclose that, I think.  But

20   this is the equivalent, to put it into human terms, of

21   $25 to somebody making a hundred thousand dollars a

22   year.

23                  Now, I know for federal employees,

24   gifts of $25 are okay, they don't even need to be

79

1   reported.  Above that, I think they do.  I don't know

2   what it is for state employees.  I've never found out.

3   But, you know, I don't think that if a judge, you

4   know, had a drink bought for him at Tulane, people

5   need to disclose that.  I mean, it's just too small.

6                    And that's what this is, when you put

7   it in human terms.  I know, you know, $4 million a

8   year sounds like a lot of money.  And, you know, to me

9   or to you it is a lot of money.  To Morgan Stanley,

10  with, you know, a hundred billion dollars over the

11  four-year period, it's a lot less money, that's --

12  that's the point.

13                    THE COURT:  Should I worry at all

14  about eventually them not being material to these big

15  banks?

16                    MR. NACHBAR:  No.  I mean, I think it

17  is material, and I think -- you know, I don't know

18  where the line is.  Maybe it's one percent, maybe it's

19  half a percent; but we do have some guidance here

20  because the Paxson versus NBC Universal case, our

21  client was required to hire an independent investment

22  bank and we hired CIBC.  And oh, my God, they were

23  paid millions of dollars by Paxson.  And they were.

24  But in that case it was 1/100th of one percent.  This

80

```
 1   is marginally higher.  It's 25,000ths of one percent.

 2   But it's still -- I don't know exactly where the line

 3   is, but, you know, I think this is clearly on the

 4   nonmaterial side.

 5                  THE COURT:  I mean, the other place

 6   that I wonder is, in -- in the sense of tainting a

 7   process, I'm a hundred percent with you.  And, you

 8   know, the Paxson case, the -- the concern about hiring

 9   the independent banker and the independent's

10   definition seems to be about tainting a process.  You

11   know, here, it's almost what the plaintiffs are

12   arguing for is a, you know, prophylactic disclosure

13   because you're disclosing the one side of the con and

14   you're making the argument that they're incentivized,

15   it's really a partial disclosure situation where you

16   ought to disclose the other side of the con.

17                  Does that distinguish the Paxson case

18   and mean that in this situation, because the numbers

19   are relative order of magnitude, there ought to be

20   some type of balancing disclosure?

21                  MR. NACHBAR:  I think not, because we

22   did disclose.  You know, it's not like the proxy

23   doesn't -- it says Morgan Stanley has done work for

24   Oracle.  And the only theory for further disclosure is
```

81

1   that a stockholder who actually knew the facts would

2   say "Oh, my God, I cannot trust this fairness opinion

3   because of the amount of" -- you know, "these guys" --

4   "these guys are in Oracle's pocket."

5              Now, there are two problems with that.

6   One, most of their financial work and their financial

7   analysis was done when Company H was the bidder, not

8   when Oracle was the bidder.  So even if they somehow

9   were in Oracle's pocket, all their analysis pretty

10  much was done before Oracle was even on the scene.

11  But -- but beyond that, you don't get to be in

12  somebody's pocket for $25 over a hundred thousand.  So

13  anybody who read the disclosure that was made, if you

14  said to them "Guess" -- "Out of a hundred thousand

15  dollars, guess how much Oracle was actually paid?,"

16  they would probably assume it was a hundred dollars, a

17  thousand dollars, $2,000.  People would think you

18  wouldn't put it in if it was $25 out of a hundred

19  thousand.  That's the point.

20             So if they learned the facts, it could

21  only -- they're just not material.  The only thing it

22  could do is -- is say oh, well, this isn't -- this

23  couldn't affect anybody's judgment.  That's the only

24  effect further disclosure would have would have, would

CHANCERY COURT REPORTERS

82

1    be to make the reader say "All right.  This can't be

2    material."  You know, maybe if it was 10 times this

3    amount, it might be material; a hundred times, it

4    probably would be.  This can't be material.

5                        So that's where we are on the Morgan

6    Stanley thing.

7                        The only other couple points I want to

8    make is, there is no basis here for any aiding and

9    abetting claim.  You know, we pointed out in our brief

10   that the complaint doesn't even state a claim for

11   aiding and abetting.  And we said we think the

12   plaintiffs have abandoned it.  They came back, "No, we

13   haven't abandoned it."  They didn't come back and

14   explain why it states a claim, though.  So if they're

15   going to pursue it, it's going to be in an amended

16   complaint because it sure isn't in the complaint

17   they've got now.  And there is, in fact, no wrongdoing

18   at all by Oracle.  And that's important, because

19   Oracle's rights are sought to be affected here.

20                       A preliminary injunction on

21   substantive grounds would convert the merger into an

22   option on the part of Oracle, I believe.  And it's

23   Long affidavit Exhibit E, which is the proxy

24   statement, has the merger agreement attached.  It's

83

1    page A-43 of the merger agreement.

2                    THE COURT:  Uh-huh.

3                    MR. NACHBAR:  And it's Section

4    8.02(c) -- 7.02(c), sorry.  And it says that a

5    condition to the merger -- well, first of all, there's

6    a representation in -- in Section 4.12 that there's no

7    litigation challenging the merger.  So that one is

8    already implicated.  And if it -- if it's -- that

9    could have a material adverse effect, we're already

10   there.  But -- but beyond that, Section 7.02(c) says

11   that there's a closing condition, that there's not a

12   proceeding that has a reasonable likelihood of

13   success.  And Your Honor's going to have to find that

14   to issue an injunction that is "challenging ...

15   seeking to make illegal, delay materially or otherwise

16   directly or indirectly restrain or prohibit the

17   consummation of the Merger or seeking to obtain

18   material damages in connection with therewith ...."

19                    THE COURT:  Uh-huh.

20                    MR. NACHBAR:  So I think if the Court

21   finds a reasonable likelihood of success on

22   plaintiffs' substantive claims, I think the closing

23   condition can't be met.  Now, whether Oracle would

24   close or not, I don't know.  And -- and, frankly, it

84

 1   could depend on what happens in the economy.  If you

 2   take Mr. Russello up on his invitation and delay this

 3   by a month, I don't know what's going to happen in

 4   that month, you know.  The stock market could drop

 5   3,000 points.  That's happened before.  And if that

 6   happens, Oracle would certainly have the right not to

 7   proceed.  I'm not going to stand here and predict one

 8   way or the other what they would do, because it's

 9   purely hypothetical; but they would certainly have the

10   right not to proceed and the stockholders would

11   certainly be a lot worse off in that scenario.

12            THE COURT:  Yeah.  I think -- I mean,

13   I was distinguishing in my mind between consummation

14   of the merger which wouldn't be enjoined and a, you

15   know, injunction that would, for example, enjoin the

16   termination fee for a period of X days.

17            MR. NACHBAR:  Right.  Well, that

18   brings me to my next point.  And that is that, you

19   know, two things about the deal protection measures.

20   First, deal protection measures almost identical to

21   those in this case in almost identical circumstances

22   were upheld in the Cogent case.  And there, it was

23   Company D, not Company H, who was the original bidder.

24   And it was 3M, not Oracle, who acquired the company

85

1   ultimately, but the same, almost identical suite of

2   deal protections, including a match right, including a

3   voting agreement that covered a lot more stock than

4   the voting agreement did.

5                    THE COURT:  The voting agreement here

6   is so small, it's really beside the point, which

7   raises the question, then why'd you get it?  But I

8   hear you.  Keep going.  I don't mean to interrupt you.

9                    MR. NACHBAR:  No; that's fine.

10                   A -- a no-shop that is virtually

11  identical.  The words are -- they're just not

12  materially different.  A match right that was very

13  similar.  And the Court refused to grant an injunction

14  there, finding that the deal protections, taken

15  together, in a very similar context didn't impede

16  anyone from coming forward.  And, in fact, nobody has

17  come forward.  Nobody has even come forward

18  conditionally.  I mean, it's not hard to write a

19  letter that says, you know, "Boy, we would have an

20  interest were it not for these horrific breakup fees

21  or this terrible match right."

22                   THE COURT:  No.  Look, there's

23  definitely an empty chair --

24                   MR. NACHBAR:  Exactly.

CHANCERY COURT REPORTERS

86

1          THE COURT:  -- where Company H is

2    sitting.  I mean, they're the natural folks to come

3    forward and -- and they haven't done it.

4          I mean, part -- part of what nags at

5    me -- and I understand what you're saying about -- and

6    I think of it in terms of Cogent, and I think of it in

7    terms of Pennaco.  But, you know, if a termination

8    fee, in fact, is designed to price things like

9    opportunity costs and is in part designed to give deal

10   certainty as a reward for participating in a process

11   and putting your best price forward, you would expect

12   differential termination fees because those are

13   different risks.

14          I mean, Oracle here is a -- you guys,

15   you know, explained it -- they're a regular acquirer,

16   they're a regular bidder.  This is probably a size

17   deal where they're not really foregoing any other deal

18   to take these guys on.  So that, to my mind, thinks

19   okay, well, this really isn't pricing opportunity

20   cost.

21          And in terms of, you know, bidding up

22   the price or extracting a higher bid, again -- this is

23   partially the plaintiffs to blame -- the record in

24   front of me just shows a tradeoff of price for

87

1   exclusivity.  And so it's weird that, you know,

2   3 percent or 3 to 3.5 percent would be some type of

3   bright-line rule across all different situations.  You

4   would think that -- that -- actually, in this type of

5   situation, people would be pricing these things lower.

6                   And part of my discomfort is that, at

7   least our case law -- and be it Cogent or Pennaco -- I

8   mean, the case (Inaudible), all right, Express

9   Scripts.  Chandler in Express Scripts says really, we

10  ought to be thinking about these things.  And if

11  people want to make a showing that, for example,

12  they're pricing off this, more power to you.  But I

13  think our case law seems to be ignoring these

14  differences.  And I'm not sure it should be.

15                  MR. NACHBAR:  Well, two comments on

16  that.  First of all, there was negotiation over the

17  termination fee here.  I know that the company asked

18  for a lower termination fee.

19                  THE COURT:  Uh-huh.

20                  MR. NACHBAR:  No one at my table

21  recalls whether we asked for a higher one.  We may

22  have.  We just don't remember.  But -- but there

23  are -- they were produced, drafts of the merger

24  agreement.  And if you look in -- in the Morgan

88

1   Stanley presentation, the termination fee is in

2   brackets because it was being negotiated.  And they

3   didn't know where it was going to come out.  So that's

4   Point No. 1.

5                 Point No. 2, there is an opportunity

6   cost to Oracle.  As Your Honor just heard, Oracle does

7   its M and A in-house.  It doesn't have an unlimited

8   number of in-house people.  And a $1 billion deal

9   versus a $10 billion deal takes, you know, roughly the

10  same amount of effort.  There may be another zero on

11  the end.  In terms of financial capacity, Your Honor's

12  probably right.  You know, could -- you know, would it

13  be different for Oracle to do two $1 billion deals

14  versus one $5 billion deal?  In terms of financial

15  capacity, maybe not; but in terms of people capacity,

16  which is probably where the real constraints are,

17  yeah.  There's a huge difference.

18                 THE COURT:  Yeah.  And that makes a

19  lot of sense.  I follow you on that sense.

20                 MR. NACHBAR:  So there was that.  Now,

21  in terms of a modified go-shop, I think Netsmart reads

22  directly on this.  And this is 924 Atlantic 2d at 209.

23  And I'll just quote from the case, because Vice

24  Chancellor Strine said it better than I could.

89

1    "Insight did not promise to pay [16.50] per share in a

2    deal when Netsmart got to actively shop their bid.

3    They promised to pay [16.50] per share based on the

4    opposite: Netsmart could only respond to unsolicited

5    superior bids.  I perceive no basis where I would have

6    the equitable authority to require Insight to remain

7    bound to complete the purchase of Netsmart while

8    simultaneously reforming the Merger Agreement to

9    increase [the] transactional risk in that endeavor.

10   Certainly, on this record, I could not justify such an

11   unusual exercise of authority on the grounds of any

12   misconduct by Insight."

13              I would submit all of that applies

14   here.  You can change "Insight" to "Oracle" and you're

15   in the same at 16.50 to the deal price here and you're

16   in the same position.  The Court went on to say, by

17   the way, that "It would be hubristic for me to take a

18   risk of [the] kind for ... Netsmart stockholders ..."

19   and noted that the plaintiffs had not volunteered to

20   back up their demand with a full bond, all of which is

21   equally true here.

22              THE COURT:  Yeah.  In terms of the

23   economic decision, I think that's exactly right.  And

24   it may -- it may be that the way these things are

CHANCERY COURT REPORTERS

90

drafted, that you're boxed in terms of either a -- an

injunction that gives the walk or not.  But it strikes

me that puts a lot of pressure, particularly as you

continue to get bracket creep, on termination fees.

It's an awkward -- it's an awkward box for a court to

be in.  But I hear what you're saying and -- and I

understand where you're coming from.

MR. NACHBAR:  Right.  And finally, the

last point I'll make relates to Health Grades.  And

what the Court said there is, you know, if -- the

company went back to a particular bidder.  And the

Court said, you know, "If you would analyze that and"

-- "and said which bidder is the one who's likely to

be able to bid and" -- "and had gone through the

correct process, I'd have a lot more confidence in

it."  And I would submit -- this is really

Mr. Saunders' argument, but I would submit that's

exactly what the board did here.  They looked at the

available bidders.  They had been at this in one form

or another for three years.  They had spoken to a lot

of bidders.  You know, you're up to Company H because

there was an A, B, C, D, E, F.  And G was a different

type of transaction.  But there were a bunch of

bidders and they looked at who the likely bidders

1   were.  And they determined that Oracle was the one

2   bidder who, on this time frame, could come out and --

3   and put a bid out there -- it been out there since

4   November 2nd, that anybody could come along and top

5   it; but they were the ones who could bid up $6, a

6   43 percent premium and be out there.  And if somebody

7   wants to top it, great.  And, you know, they proved to

8   be right.  I mean, they -- they went to the right

9   party.  Oracle did make that bid.  If they had gone to

10  Company C or D or E, might -- you know, they might

11  have been stuck with 4.85 and an oral 5.75.  Instead,

12  they went out, they seized the moment.  They got a $6

13  floor.  And I think they did pretty well by the

14  stockholders.

15                  Thank you, Your Honor.

16                  THE COURT:  Thank you.

17                  Before we do reply, I think I'd like

18  to take a 10-minute break for the good of our court

19  reporter.  That will also give counsel a chance to

20  talk among themselves and see if there's any final

21  points that we want -- they want to make when we

22  reconvene.  So when we come back, we'll start with you

23  on reply.

24                  And so it's now quarter after.  We'll

CHANCERY COURT REPORTERS

92

1   come back at 25 after.  We'll stand in recess until

2   then.

3                    (A short recess was taken from

4   4:14 p.m. until 4:29 p.m.)

5                    MR. RUSSELLO:  Thank you, Your Honor.

6                    I'm just going to focus on, really,

7   several points, but they're going to essentially

8   relate to these connections between Morgan Stanley and

9   Oracle, because I think that's where the focus now is.

10                    The -- the first point I wanted to

11  make again was that the materiality standard does not

12  necessarily concern itself with the materiality

13  factor, the importance of a fact to the person that --

14  that it may relate to.  In this case it's Morgan

15  Stanley.  It doesn't matter whether the fees would

16  have really made a difference to Morgan Stanley or not

17  if a reasonable shareholder would have looked at those

18  fees and thought to itself that Morgan Stanley was

19  doing work for Oracle at the same time it was doing

20  work for ATG.  It may have impacted the fairness

21  opinion.

22                    But we don't need to show that it

23  actually did.  And I think Chancellor Chandler said

24  that in the Hammons case, that you don't need to show

93

 1   that the conflict impacted the fairness opinion.

 2   That's not a requirement.  The facts exist.  They're

 3   material to shareholders, and that's where it lies.

 4                   Now, there were some issues that were

 5   raised concerning the factual basis for the Court to

 6   rule on materiality.  But the courts are -- are

 7   generally every day put in a situation where they're

 8   determining whether a fact is material or not under

 9   given circumstances.  So we don't think that that is

10   the death knell for our case.

11                   In addition to that, of course, as is

12   the Court's customary practice and rules require us

13   to, we submitted affidavits in support of each

14   complaint, each iteration, the opening complaints, the

15   initial ones, the consolidated amended complaint, from

16   our clients, indicating that they had read the

17   complaint, that they supported the allegations to the

18   extent that that is something that the Court would

19   find useful, we, of course, would comply with it.

20                   With respect to the issue itself,

21   though, I mean, it's easy to try to belittle the

22   importance of the issue when you look at Morgan

23   Stanley's complete -- or total revenue, rather.  When

24   you look at the total revenue figure, of course, it's

94

1    perhaps not a lot; but you could say that with respect

2    to any investment bank of the size of Morgan Stanley,

3    those issues would then never be material, but yet

4    sometimes they are and sometimes they're not.  We

5    don't need a bright-line rule that connections and

6    relationships between investment banks and buying

7    groups or buyers is always material and it's always

8    inherently material and must be disclosed.  What we

9    need is a rule that, of course, is contextual, that

10   follows along the facts and circumstances.

11                And here, adhering to the facts and

12   circumstances, the engagements that Morgan Stanley has

13   had for Oracle are material and need to be disclosed.

14   I want to, once again, bring the Court to the

15   disclosure that Oracle itself makes in its own

16   filings, which is "Each of the representatives acted

17   as an initial purchaser in connection with our

18   issuance of $5.75 billion aggregate principal amount

19   of senior notes in January 2006.  In addition,

20   affiliates of each of the representatives are lenders

21   under our five-year revolving credit agreement and

22   under our 364-day revolving credit agreement, for

23   which, in each case, they receive or have received

24   customary fees and reimbursement of expenses.

95

1   Furthermore, each of the representatives acted as an

2   underwriter in connection with our issuance of

3   $5.0 billion aggregate principal amount of senior

4   notes in April 2008."  That's in Oracle's July 1,

5   2009, Form 424B2, and that related to Morgan Stanley

6   specifically.

7              So it's easy for the company to make a

8   disclosure like that here.  If it's material there,

9   it's certainly material here.

10             But another point that I wanted to

11  reach was just this notion that we should be posting a

12  multimillion-dollar bond in the event that the Court

13  enjoins the transaction.  Now, the recent Guzzetta

14  case search addresses the issue, but what I believe

15  the Delaware Supreme Court meant in that case was that

16  there needs to be a sufficient evidentiary basis to

17  establish a bond amount.

18             In this case, Your Honor, we

19  respectfully suggest that defendants have not

20  established that basis.  What you had here was a

21  confluence of events.  One was the announcement on

22  November 2nd of the proposed transaction, and the

23  second was the announcement of better-than-expected

24  third-quarter results.  You can't tell which one

96

1    resulted in the stock price doing what it did.  You

2    can't tell which one in isolation resulted in, you

3    know, or influenced the stock price; yet what we do

4    understand is as of this day the stock price is

5    trading around 5.98 or 5.99.

6                    To the extent that shareholders might

7    have an issue with time value of money, Your Honor,

8    they can simply exit their positions.  They wouldn't

9    necessarily lose money if the deal is enjoined.  I

10   don't know that that should be the benchmark if it

11   doesn't reflect the actual harm that would be

12   occasioned or caused to the defendants themselves.

13   They seem to suggest in their papers that the real

14   harm is the difference between the preannouncement

15   price and the postannouncement or offer price, rather.

16   There's no way that can be.  There hasn't been

17   sufficient evidence submitted in support of that.  So

18   --

19                    THE COURT:  Why don't you think -- why

20   isn't it logical that the stock would go back and

21   trade for a preannouncement price?

22                    MR. RUSSELLO:  Well, we thought it

23   would based on the fact that the third-quarter results

24   were favorable.  The third-quarter results could have

97

1    had and certainly presumably would have had a material

2    impact on the stock price.

3                    THE COURT:  They're a penny higher.  I

4    mean, what's this thing's multiple?

5                    MR. RUSSELLO:  Well, I'm not quite

6    sure the multiple sitting here; but I do understand, I

7    believe revenue was 16 percent higher year over year

8    than it had been.  So, I mean --

9                    THE COURT:  No; look, I mean, I don't

10   buy that at all.  I do question whether Guzzetta is

11   supposed to apply to deal litigation.  I -- I don't

12   know what they want us to do after Guzzetta, I really

13   don't.  I mean, it's a very odd case.  It involves,

14   you know, a neighborhood and, you know, quantifiable

15   damages in a neighborhood dispute.  And I completely

16   understand why defense counsel would argue it broadly,

17   you know, when it came down.  I remember thinking

18   geez, what does this mean to deal cases.

19                    MR. RUSSELLO:  And I think the amount

20   in dispute in that case, anyway, Your Honor, was

21   $10,000, $20,000.  It wasn't, you know, potentially

22   millions and millions of dollars here.

23                    THE COURT:  Right.  It's a legal

24   principle.

98

1                 MR. RUSSELLO:  Right.

2                 THE COURT:  And they said it and they

3     held it.  And, you know, I do try to follow what the

4     Supreme Court says.  So it's -- it's an odd situation

5     to be in.

6                 I mean, what would -- to post a bond,

7     what -- what is the cost of posting a bond?  I have

8     some vague recollection from practice it was about

9     10 percent of face, but is that all in the

10    neighborhood?  Am I --

11                MR. RUSSELLO:  With nary a basis

12    really to -- to assist the Court on this --

13                THE COURT:  You've never done it.

14                MR. RUSSELLO:  -- I've never done it,

15    but I believe Your Honor is correct.  I was going to

16    say my understanding was that it was 10 percent of

17    the -- the face amount.  That's based on, you know,

18    not my current practice but my understanding, my

19    general understanding of the way bonds work.

20                THE COURT:  Yeah.  I remember at one

21    point maybe once or twice I had to look into bonds,

22    and that's what I remember being the approximate

23    number.  I mean, you guys -- so that means you'd have

24    to post a hundred grand; right, to have a

99

1   million-dollar bond?

2                    MR. RUSSELLO:  It sounds like it, Your

3   Honor.  It sounds like it.

4                    THE COURT:  Mr. Robbins can write that

5   check out of petty cash; right?

6                    MR. RUSSELLO:  Well, I don't know what

7   Mr. Robbins can do.  I can tell you I can't, Your

8   Honor.  And that would be -- I still say that that

9   would be material to him, Your Honor.  And I think

10  that's the point to make here, that even for somebody

11  like Mr. Robbins -- I don't know what it is is a

12  percentage of his net worth, Your Honor, but ... And

13  that brings me back to Morgan Stanley.

14                   But the Delaware Supreme Court has

15  been clear that materiality does not concern itself

16  necessarily with the subjective views of the

17  directors.  The shareholders are what counts.  They're

18  not -- it's not incumbent upon them to search through

19  Oracle's files.  These are ATG shareholders, not

20  Oracle shareholders.

21                   Those are the remaining points I

22  wanted to make, Your Honor.  I don't want to belabor

23  the issues any longer, unless Your Honor has any

24  further questions.

100

1              THE COURT:  No, unless you have more

2    to talk to me more about the bond, because, again,

3    it's -- it's an odd situation that I'm now in after

4    Guzzetta, and it's something that I think the members

5    of the Court are thinking about and wondering what do

6    they do with this, if anything, or if it's simply so

7    factually distinguishable in terms of the context of

8    the case, that we ought to, you know, continue until

9    we get further guidance as to whether this really

10   applies to deal cases.

11             MR. RUSSELLO:  Well, I think, Your

12   Honor, to the extent Your Honor is inclined to grant

13   some sort of injunctive relief and would consider

14   requiring the plaintiffs to post the bond, certainly

15   we would ask that defendants come forward with some

16   sort of evidence to establish the -- the total amount

17   of the loss in some reasonable way that we would

18   perhaps establish before the Court.

19             The second is that to the extent the

20   Court would simply require the plaintiffs to post a

21   bond, that Your Honor would provide me with a little

22   bit of additional time to call somebody like

23   Mr. Robbins concerning the posting.

24             Thank you, Your Honor.

1                    THE COURT:  Thank you.

2                    Do either the defendants have any

3    final words?  I'm not asking for any.  I just don't

4    want to cut anybody off if they have some last thought

5    they want to share with me.

6                    MR. SAUNDERS:  I'm sure I should sit

7    down, but just one sort of factual issue I want to

8    make Your Honor -- make sure Your Honor is clear

9    about, because it came up just a minute ago.

10                   The -- I think the critical thing

11   about the third-quarter earnings announcement was that

12   the company was not changing guidance for the year,

13   okay.  So the third quarter was good, okay, but

14   essentially it was cannibalistic of the fourth quarter

15   in the overall year results.

16                   THE COURT:  Well, all right.  I

17   thought about this during the recess and where I am on

18   it.  I'm going to give you something in writing, but

19   because of the timing, I'm going to go ahead and tell

20   you.

21                   I just can't get comfortable with the

22   Morgan Stanley issue, I really can't.  I understand

23   the arguments that Mr. Saunders and Mr. Nachbar have

24   raised.  They were very well argued, but I do think

1    that given the nature of the disclosure already in the

2    proxy statement, given the magnitude of the fees on

3    the Oracle side, there needs to be supplemental

4    disclosure of that.  And I have thought about the

5    injunction risk and the balancing of the equities and

6    have taken into account those issues as well.  But

7    because I do think that the Morgan Stanley issue is

8    material, I will be enjoining the vote on the

9    transaction.

10                   Now, what I don't have any problem

11   with people doing is convening and adjourning to the

12   extent that is helpful to people who are holding

13   proxies and record dates.  I, frankly, didn't think

14   through where you guys are in terms of the 60 days

15   or -- or in terms of the proxy.  So to the extent you

16   all want to convene and adjourn in light of that, that

17   is fine with me.

18                   I am going to give you something in

19   writing that gives you my thoughts in a more -- I

20   don't know if "eloquent" is the right answer, but at

21   least more detailed fashion on this issue.  And I will

22   do that -- I'll try to do it as fast as I can.  I

23   can't promise you that it will be tomorrow.  It might

24   be later in the week.  It will certainly be this week.

103

1    And in that I will address the amount of time that I

2    think is necessary for the curative disclosure to be

3    out there.

4                    In terms of a bond, I am really

5    troubled by this.  I think what a lot of Mr. Saunders

6    says makes a lot of sense to me.  And I really think

7    there is a lot of reason to wonder whether

8    entrepreneurial plaintiffs really should have a free

9    option to enjoin deals, you know.  And I don't know if

10   Guzzetta is supposed to get Chancery judges thinking

11   about that.  It does seem to me to be a very

12   distinguishable set of facts and circumstances and

13   really a -- a, you know, radically different order of

14   magnitude in terms of what's going on.

15                   I also think that there are

16   differential considerations in play in the deal

17   context, because although Oracle certainly could close

18   immediately -- and I have no reason to disbelieve Mr.

19   Nachbar that's their intent.  I'm sure it is their

20   intent.  (Continuing) -- you know, that intent could

21   change.  The drop-dead date isn't for some time yet.

22   And, you know, part of what stockholders agree to

23   when, in the proxy that was solicited and necessarily

24   the board has the power to do under Delaware law, is

104

1   adjourn.  So it's not clear to me what expectancy

2   stockholders necessarily have in getting money

3   immediately, such that there should be a large bond on

4   the time-value-of-money basis.

5               So as of today, I'm not prepared to

6   revisit or change this Court's historical practice of

7   not requiring bond in the circumstances, but I'm not

8   intending to announce a rule for all-time.  I

9   definitely think it's something that I am thinking

10  about, particularly in the context of the -- of the

11  free option against enjoining deals; but for those

12  reasons, I am not going to condition the injunction on

13  a bond.

14              Now, for Mr. Saunders and Mr. Nachbar,

15  is that sufficient for your purposes, or do you need a

16  one-page order from me saying that the vote on the

17  merger is enjoined and essentially saying that I'm

18  going to provide you with further detail this week?

19              MR. NACHBAR:  I think in terms of what

20  Your Honor said -- I'll let Mr. Saunders speak, but I

21  think that's sufficient, provided we can get a copy of

22  the transcript.  I'm sure we can at least get the

23  ruling very promptly.

24              The question that I have that's

1    unclear is whether the company, assuming it sends out

2    corrected disclosure and assuming it gives people the

3    full right to revoke, may vote the proxies that it

4    already has, because two-thirds of the stockholders

5    have spoken.  And I -- I honestly don't think this is

6    material, so I don't think it's going to change very

7    many people's minds; but, you know, we might be proved

8    wrong.  But I think it would be better not to have to

9    start over at Square 1.

10                   THE COURT:  No.  And that's my

11   intention, and that was part of my intention in

12   letting you all convene and adjourn.  I think if

13   people have the right to revoke, that's sufficient.

14   Look, it very well could be for a lot of reasons that

15   the vote pretty much stays as it is.  But as I say,

16   I -- the Morgan Stanley number, at bottom, seems to me

17   something that could be material, is material to

18   stockholder voting decisions.  Some stockholders may

19   look at it and say "We don't care."  But it's

20   information that I think, given in this context, they

21   should have.

22                   MR. NACHBAR:  We understand.

23                   THE COURT:  Mr. Saunders?

24                   MR. SAUNDERS:  Yeah.  I guess the

106

1    right to revoke was my first issue.  We've nailed that

2    down.

3                My second issue was, I don't know for

4    sure, but I think we'll need to know tomorrow when we

5    have the meeting and adjourn, you know, until when

6    we're going to adjourn.

7                And I -- so I don't know -- I guess I

8    had hypothesized a week.  I don't know how quickly we

9    could find out from Your Honor how much time you think

10   the supplemental disclosures need to get out there.

11               THE COURT:  Right.  Well, look, I

12   mean, I can tell you the range.  I think because of

13   the drafting of 251, the notice requirement there,

14   under no circumstances would it be more than 20 days,

15   because given that the statute allows a notice of

16   merger ex ante to be given on 20 days' notice, it

17   doesn't make any sense to me that it would be outside

18   of 20 days.

19               I haven't -- I mean, when I researched

20   this issue before, it seemed to me that there was one

21   tight case -- it might have been Gintel v XTRA --

22   where five days was allowed.  That always struck me as

23   a little short.  So my expectation would be that I

24   would probably be in the 10 to 15 days' range, and I'm

107

 1   probably going to fall off closer to 10; and if I had

 2   to bet, I would bet on 10.  And it'll be, you know --

 3   part of what I know you have to wait for is

 4   clarification from me on exactly how much I'm going to

 5   require you all to disclose about the Morgan Stanley

 6   fees.  But I think 10 days in the market is probably

 7   what I'm going to require.

 8              MR. SAUNDERS:  And then I guess that

 9   was my third question, was do we know what we're going

10   to have to disclose, or is that coming in Your Honor's

11   opinion?

12              THE COURT:  I think it's going to come

13   in My Honor's -- my opinion.  My Honor's.  How's that

14   for self-congratulatory?

15              I have to think about that.  And there

16   again, to give you some insight into where I'm going,

17   reserving the right to change my mind, I am influenced

18   by the fact that the proxy chose to go back to 2007 in

19   terms of reciting historical facts and that that's

20   when the original Morgan Stanley agreement was entered

21   into.  And so were I ruling orally, that would be the

22   amount -- the time period that I'm focused on, and

23   that's what I expect to focus on in my written

24   opinion.

108

1          MR. SAUNDERS:  Would it be helpful,

2    Your Honor -- I mean -- and -- would it be helpful for

3    Your Honor for us to try to reach agreement on it?  I

4    mean, obviously the sooner we can get out the

5    supplemental disclosure, the sooner --

6          THE COURT:  Mr. Saunders, that would

7    be wonderful.  And -- but my -- the fact that I plan

8    to write on this, you know, if you all want to moot

9    that, you know, feel free.  What I felt like I needed

10   to do was give you all some explanation for where I'm

11   coming from more eloquently than I thought I could do

12   off-the-cuff here today.  And while I don't find any

13   of the other plaintiffs' claims to be material, I also

14   thought that I should go through them and explain why.

15          But if the parties were to reach

16   agreement on a supplemental disclosure that were to

17   cover that period and to let me know about that, that

18   would be fine with me and it would, you know, save

19   what's going to be, you know, some hard work this week

20   for my clerks and me.

21          MR. NACHBAR:  Your Honor, I'm pretty

22   confident that we'll be able to reach agreement, with

23   the guidance that Your Honor has given and some of the

24   statements that the plaintiffs have made as to the

109

1    type of disclosure they're looking for.

2                    Again, we don't regard any of this as

3    sensitive or earth-moving.  We may be proved wrong,

4    but it's -- it's, at least from our standpoint -- it's

5    obviously the company's disclosure -- but it's --

6    we're not afraid to put facts out there.  So my guess

7    is we'll be able to agree on the best way to do that.

8                    THE COURT:  Well, let's do this, then:

9    We'll -- we've been working.  We'll keep working.  We

10   won't burn the midnight oil tonight.  But, you know,

11   we'll probably have a late dinner, gentlemen.  But

12   then if -- if you all can let us know.  I mean, my

13   team and I will be working on this tomorrow and the

14   next day.  And certainly if you call us up, call

15   chambers up and talk to Kristie and say where you all

16   are, that's fine.

17                   Again, in terms of where my head is,

18   I'm thinking about, you know, 10 days in the market.

19   I'm thinking about the same time period covered by the

20   background of the merger section.  And those are

21   really -- the Morgan Stanley issue is the only one

22   that bothered me, and I felt like the rest of it were

23   things that were adequately explained.

24                   And I should say on the termination

110

1   fee, I do think that ultimately I don't think the

2   record, as developed, provides a basis for me to

3   provide any more targeted relief along the lines that

4   I was asking Mr. Nachbar and Mr. Saunders about

5   whether there might be some room for.

6                    So that's -- that's essentially a

7   preview of what you will get sometime later this week.

8                    Yes, sir.

9                    MR. RUSSELLO:  Your Honor, the first

10  thing I wanted to note is that, of course, we will

11  make every effort to work out adequate disclosure; but

12  to the extent the Court has any additional guidance,

13  it would certainly be worthwhile for us.

14                   The second is that the 10 days that

15  the Court has in mind presumably would be influenced

16  by the manner in which the disclosures are

17  disseminated to shareholders.  In other words, if

18  they're mailed --

19                   THE COURT:  I'm not going to require

20  mailing.  This is going to be a --

21                   MR. RUSSELLO:  Form 8-K, Your Honor?

22                   THE COURT:  -- a Form 8-K or

23  supplement.  The securities jocks can figure out what

24  has to be required there, but I'm not going to require

111

1   another mailing.

2               MR. RUSSELLO:  Understood.  Thank you,

3   Your Honor.

4               MR. SAUNDERS:   Is the -- I apologize,

5   Your Honor.  Can I ask another question?

6               THE COURT:  Yeah.  Look, I -- I

7   actually think it's good to get this stuff hashed out,

8   because I could -- I could give you all a decision,

9   let's say, Wednesday night or the first thing Thursday

10  morning and you all could have all these questions.

11  So, please, Mr. Saunders, you're not disturbing me at

12  all.

13              MR. SAUNDERS:  Can we reach agreement

14  on the amount of time as well or --

15              THE COURT:  I think 10 days is where

16  I'm headed.  And I think it would be difficult to get

17  me less than that.  But I think 10 days is the right

18  amount for something like this.  You know, something

19  that might be bigger, like if there really had been

20  some price-oriented stuff in the proxy statement about

21  the projections or that type of thing, I might have

22  erred on the side of 15; but for something like this,

23  I think 10 days is where I'm leaning.

24              MR. SAUNDERS:  Thank you, Your Honor.

CHANCERY COURT REPORTERS

112

1            THE COURT:  All right.  And the last

2    thing that I wanted to say to everybody is really just

3    to compliment you on what I thought was a

4    well-presented case and particularly for those of you

5    who aren't in front of me often.  You may be wondering

6    well, does he say that to everybody.  And I don't.

7    We -- you know, we have a culture where everybody gets

8    a trophy, but I don't believe in everybody gets a

9    trophy.  I believe that when you do something good,

10   you ought to be told you do something good.  And when

11   you do something less good, you ought to be told you

12   do something less good so that you can do better next

13   time.

14            And there are three things that I

15   really thought were well-done in this case.  First of

16   all, as I said before at the scheduling conference, I

17   very much appreciated the responsible approach

18   Mr. Saunders and Mr. Nachbar took to scheduling.  I

19   had concern that we were going to be jammed.  And so I

20   was very glad to know that they had already undertaken

21   to start the process of making sure this case was

22   presented responsibly.

23            The second thing that I thought was

24   well-done were depositions.  I read the depositions

CHANCERY COURT REPORTERS

1  and I didn't see any type of, you know, obstructionist

2  objections.  The objections were minimal.  I think,

3  you know, the only, frankly, eyebrow-raising moment I

4  had was the pound sand answer; but people seemed to

5  drive on over that.  Maybe if you called me, I would

6  have said "Look, you know, I get to decide and you can

7  caveat it however you want."  But, you know, in terms

8  of fights among counsel, there weren't any.  And I

9  think that's a very important part of Delaware

10  practice, that people handle themselves appropriately

11  at deposition.  And it was clearly done in this case.

12  And so I appreciate that.

13                    And then, finally, I did think that in

14  terms of the briefing, while I empathize with

15  Mr. Saunders and I agree that, you know, you shouldn't

16  be intimating intentional misconduct, I generally

17  thought the briefing was -- was very well-targeted.  I

18  thought that the plaintiffs picked their spots.  So

19  many times you guys come in and have the laundry list

20  of disclosure issues.  And I thought you did a good

21  job here of focusing in on what you really cared about

22  and allowed the defendants to address it.

23                    So, as I say, I thought it was a

24  well-presented case.  And I don't say that every time.

114

1    And so I appreciated your all's professionalism and

2    hearing the arguments today.

3                    So I will get to work on an opinion.

4    If you guys can alleviate our burden in that regard,

5    certainly just give my chambers a call.

6                    Thank you, everyone.

7                    We stand in recess.

8             (Court adjourned at 4:53 p.m.)

9                        -  -  -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

CHANCERY COURT REPORTERS

115

1                        CERTIFICATE

2

3             I, NEITH D. ECKER, Official Court

4     Reporter for the Court of Chancery of the State of

5     Delaware, do hereby certify that the foregoing pages

6     numbered 3 through 114 contain a true and correct

7     transcription of the proceedings as stenographically

8     reported by me at the hearing in the above cause

9     before the Vice Chancellor of the State of Delaware,

10    on the date therein indicated.

11                        IN WITNESS WHEREOF I have hereunto set

12    my hand at Wilmington, this 28th day of December 2010.

13

14

15                              /s/ Neith D. Ecker

16                        - - - - - - - - - - - - - - - - - - - - - - - - - - - -
                                Official Court Reporter
17                              of the Chancery Court
                                State of Delaware
18

19

20    Certificate Number:  113-PS
      Expiration:  Permanent
21

22

23

24

CHANCERY COURT REPORTERS